```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
                     Case No. 16-60340-BLOOM/COHEN
 3

 4   UNITED STATES OF AMERICA,)
                              )
 5           Plaintiff,       )
                              )
 6       -v-                  )
                              )
 7   MARCO LAURETI,           )
                              )
 8           Defendant.       )   Fort Lauderdale, Florida
                              )   November 3, 2017
 9   _____)   8:57 a.m.

10

11

12             EXCERPT TRANSCRIPT OF TRIAL PROCEEDINGS

13              BEFORE THE HONORABLE JAMES I. COHN

14               U.S. DISTRICT JUDGE, AND A JURY

15

16   Appearances:

17

     For the Government:      RANDALL D. KATZ
18                            KAREN STEWART
                              Assistant United States Attorneys
19                            500 East Broward Boulevard
                              Fort Lauderdale, Florida  33394
20
     For the Defendant:       DAVID GARVIN, ESQ.
21                            200 South Biscayne Boulevard
                              Suite 3150
22                            Miami, Florida  33131

23
     Reporter:                Karl Shires, RMR, FCRR
24   (954) 769-5496           Official Court Reporter
                              299 East Broward Boulevard, # 203G
25                            Fort Lauderdale, Florida  33301
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1                         I N D E X

 2    WITNESS                                              PAGE

 3    MARCO ANTONIO LARUETI, DEFENDANT, PREVIOUSLY SWORN .........5
      DIRECT EXAMINATION (RESUMED) BY MR. GARVIN .................5
 4    CROSS-EXAMINATION BY MS. STEWART ..........................22
      REDIRECT EXAMINATION BY MR. GARVIN ........................67
 5    RECROSS-EXAMINATION BY MS. STEWART ........................94

 6

 7

 8    EXHIBITS                                          RECEIVED

 9    DEFENDANT'S EXHIBIT(S) AAAB ................................4
      DEFENDANT'S EXHIBIT(S) LK ..................................6
10    DEFENDANT'S EXHIBIT(S) OR ..................................8

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (Call to Order of the Court.)

 2              THE COURT:  All right.  The record will reflect that

 3    Mr. Laureti present, represented by counsel.

 4              Mr. Garvin, good morning.

 5              MR. GARVIN:  Good morning, Your Honor.  The gentleman

 6    that had the stomach virus, we reassessed his importance to our

 7    case and determined that he was not that important to the case

 8    and Mr. Laureti has already covered the same territory, so

 9    we've decided not to wait for him.

10              THE COURT:  Okay.

11              MR. GARVIN:  We appreciate the Court's patience in

12    allowing us to make that determination.

13              THE COURT:  Thank you.

14              MR. GARVIN:  Now, there was another housekeeping

15    matter.

16              THE COURT:  Yes.

17              MR. GARVIN:  And that was Exhibit AAAB, which the

18    Court overruled the objection yesterday, but I wanted before I

19    sat down to make sure that that document was, in fact, admitted

20    into evidence.  That was AAAB.

21              THE COURT:  Yes, now that -- does the government wish

22    to be heard?  That was the 1003 for Estop?

23              MR. GARVIN:  Yes.  We had moved it into evidence, the

24    government objected, initially the Court sustained the

25    objection, we revisited the objection, the Court then upon
```

1    reconsideration admitted it into evidence, but I just wanted to

2    make sure that record was clear that I had moved it into

3    evidence.

4            THE COURT:  All right.  So the record is clear, AAAB

5    will be received.

6        (Received in evidence Defendant's Exhibit(s) AAAB.)

7            THE COURT:  We are missing one juror who we believe is

8    coming in now.

9            MR. KATZ:  I think there was an accident outside of

10   the courthouse, Judge.

11           THE COURT:  It was a fatality.

12           MR. KATZ:  Fatality?

13           THE COURT:  Yes.

14           If counsel for either party wishes to see either

15   exhibit list, they will be available to you whenever you desire

16   to view those.

17           MR. GARVIN:  Thank you, Your Honor.

18           THE COURT:  You're welcome.

19           All right.  Let's bring in the jury, please.

20       (Jury in at 9:03 a.m.)

21           THE COURT:  All right.  We're missing one.

22           THE COURTROOM DEPUTY:  She is coming, Judge.

23           THE COURT:  All right.  Folks, please be seated.

24           Good morning.  Once again, I commend you all on your

25   punctuality.

Direct (Resumed) - Laureti                          5

1              Have any of you discussed this case or otherwise

2      communicated with anyone regarding the substance of the case?

3              Have any of you received any information pertaining to

4      the case other than which you received here this courtroom?

5              And have any of you formed any fixed opinions on the

6      merits of the case?

7              The record will reflect that there were no affirmative

8      responses.

9              Mr. Laureti, let me remind you that you're still under

10     oath.  You may be seated.

11             And we will continue with direct examination by

12     Mr. Garvin.

13             MR. GARVIN:  Thank you, Your Honor.

14         MARCO ANTONIO LARUETI, DEFENDANT, PREVIOUSLY SWORN

15                    DIRECT EXAMINATION (RESUMED)

16     BY MR. GARVIN:

17     Q.  Good morning, Mr. Laureti.

18     A.  Good morning.

19             MR. GARVIN:  Good morning, ladies and gentlemen of the

20     jury.

21     BY MR. GARVIN:

22     Q.  Mr. Laureti, when we spoke yesterday, you mentioned that

23     Michelle Cabrera had shown you a fax cover sheet stating that

24     the bank had approved the HUD.

25             Do you recall that, sir?

Direct (Resumed) - Laureti                    6

 1   A.  Yes.

 2   Q.  I'm going to show you what has been marked as Defendant's

 3   LK and ask if you recognize that document.

 4   A.  Yes, I do.

 5          MR. GARVIN:  I believe the document is already in

 6   evidence, Your Honor, but I'm going to go through this just in

 7   case.

 8          THE COURT:  I do not show that LK is in evidence.  Are

 9   you offering it now?

10          MR. GARVIN:  Yes.  There's no objection.

11          THE COURT:  No objection.  LK is received.

12       (Received in evidence Defendant's Exhibit(s) LK.)

13   BY MR. GARVIN:

14   Q.  Now, this document refers to the De La Cruz closing; is

15   that correct?

16   A.  Yes, sir.

17   Q.  And did Michelle Cabrera at the De La Cruz closing show you

18   this fax?

19   A.  Yes.

20   Q.  And on the fax can you read what that says?

21   A.  I don't know if that's the letter T, but after it it says

22   "okay."

23   Q.  And do you see that originally it was to Sandra and then

24   somebody struck out the "To:" and made it "From: Sandra"?  Do

25   you see that?

Direct (Resumed) - Laureti                     7

```
 1    A.  Yes, I do.

 2    Q.  Okay.  Who does this purport to be copied to also?

 3    A.  Galen Frizzie.

 4    Q.  And at the top of the document it appears to have two fax

 5    numbers -- excuse me, two fax dates.

 6              First, let's look at the very top.  What fax date does

 7    that have?

 8    A.  June 26, 2007.

 9    Q.  And below it what fax date does it have?

10    A.  12/10/2013.

11    Q.  And in reviewing these documents, did you determine what

12    date did this actually take place?

13    A.  June 26th.

14    Q.  And I am pointing at the handwritten date on the fax cover

15    sheet.  And what does that say?

16    A.  6/26.

17    Q.  Which is what date?

18    A.  June 26th.

19    Q.  Now, I'm also showing you what has been marked as Defense

20    OR and ask you, did Michelle Cabrera show you a similar type of

21    fax cover sheet at your closings?

22    A.  Yes.

23              MR. GARVIN:  Your Honor, there is no objection to

24    Defendant's OR.  We would move it into evidence at this time.

25              THE COURT:  All right.  OR will be received.
```

1          (Received in evidence Defendant's Exhibit(s) OR.)

2     BY MR. GARVIN:

3     Q.   Whose letterhead was this document on, sir?

4     A.   Florida Elite Title & Escrow LLC.

5     Q.   And who was it to?

6     A.   Kathy.

7     Q.   And who was it from?

8     A.   Michelle.

9     Q.   And there's a date on this document?

10    A.   7/17.

11    Q.   Let me -- very good.   And how many pages is the document?

12    A.   Three pages.

13    Q.   Were you shown this document concerning your personal

14    closing?

15    A.   Yes.

16    Q.   And was this HUD attached to that document that you were

17    shown?

18    A.   Yes.

19    Q.   And what, if anything, were you told by Michelle Cabrera

20    when she showed you that?

21    A.   I was told that the bank had approved the HUD.

22    Q.   Now, I want to go to one last point before we conclude,

23    sir.

24          Yesterday we talked about Defendant's PE, this alleged

25    payoff letter found in the records of Florida Elite Title &

Direct (Resumed) - Laureti                    9

1  Escrow.  Do you recall that?

2  A.  Yes, I do.

3  Q.  And we asked you yesterday if that was indeed your

4  signature, and your answer was?

5  A.  No.

6  Q.  And we asked you yesterday if you prepared this document,

7  and your answer was?

8  A.  No.

9  Q.  And we also asked you if this was Northview Equities'

10  stationery?

11  A.  No.

12        MR. GARVIN:  Your Honor, at this time we would move

13  Defendant's Exhibit SJ into evidence if it's not already been

14  admitted.  There is no objection.

15        THE COURT:  Okay.  SJ, let's see.  Just one second.

16  BY MR. GARVIN:

17  Q.  I'm showing you --

18        THE COURT:  SJ has been received on October 27th.

19        MR. GARVIN:  Thank you.

20  BY MR. GARVIN:

21  Q.  Sir, is this the stationery that Northview Equities was

22  using in the summer of 2007?

23  A.  Yes, it was.

24  Q.  And when you compare that to exhibit PE, do you see a

25  difference between the two stationaries on the top?

Direct (Resumed) - Laureti                    10

```
 1   A.  Yes.

 2   Q.  And when you look at SJ on the bottom and compare that to

 3   the bottom of PE, do you see a difference between the two

 4   documents as far as stationery is concerned?

 5   A.  Yes, I do.

 6   Q.  Sir, I want to conclude by asking you, did you knowingly

 7   and intentionally join a scheme to defraud WAMU Bank on these

 8   transactions at 45 Hendricks?

 9   A.  I did not.

10   Q.  Did you knowingly join a scheme to defraud WAMU Bank with

11   regard to Mr. Mostelac's purchase of the condominium at Sunset

12   Harbour?

13   A.  No.

14   Q.  And finally, did you knowingly and intentionally join a

15   scheme to defraud WAMU Bank with regard to the purchase of your

16   home on San Marino Drive?

17   A.  No, I did not.

18        MR. GARVIN:  I have no further questions at this time,

19   Your Honor.

20        THE COURT:  Cross-examination.

21        MS. STEWART:  Yes, Your Honor.  We have a few matters

22   to discuss with Your Honor sidebar before the cross-examination

23   begins.

24        THE COURT:  Folks, please step back in the jury room

25   for just a minute.  Don't discuss the case.
```

```
 1        (Jury out at 9:14 a.m.)

 2            MS. STEWART:  Your Honor, can we ask the witness to

 3   step outside?

 4            THE COURT:  Would you like to be heard?

 5            MR. GARVIN:  I would like to be heard, but I don't

 6   know what this is about.

 7            THE COURT:  Well, the government asked that Mr. --

 8            MR. GARVIN:  Mr. Laureti has a right to be present at

 9   his trial.

10            THE COURT:  I tend to agree with you.

11            Why should the Court exclude the defendant?

12            MS. STEWART:  Maybe go sidebar, Your Honor.  Your

13   Honor, the issue that we want to discuss related to his

14   testimony.

15            MR. GARVIN:  Your Honor, it seems to me that at this

16   point there's nothing that Mr. Laureti can do about his

17   testimony.  So I don't see any reason to exclude him.  He's

18   here.  He's sitting in the chair.  There's nothing he can

19   research.  There is no one he can talk to.  So I don't

20   understand why it would be proper to exclude somebody who has a

21   constitutional right to be at their trial.

22            THE COURT:  A defendant is not like other witnesses.

23            MS. STEWART:  Your Honor, that's correct.  I'm sorry.

24   My co-counsel has explained it to me.  He's correct.

25            THE COURT:  Okay.  All right.
```

Direct (Resumed) - Laureti                    12

```
 1              MS. STEWART:  Yes.

 2              Your Honor, the first issue is that the defendant met

 3   with the government pursuant to a Kastigar letter, and one of

 4   the terms of the agreement was that if the defendant offers

 5   testimony that's different from any statements provided during

 6   the proffer, the United States may use statements made by the

 7   defendant during the proffer.

 8              We believe that there was one area where the defendant

 9   offered testimony that was different from what he stated during

10   the proffer, and we would like to be able to cross-examine him

11   on that using information that he provided during his proffer.

12              THE COURT:  Mr. Garvin.

13              MR. GARVIN:  Well, Your Honor, at this point I don't

14   know what the topic is and whether or not it's inconsistent,

15   and we would -- that's asking me to make an argument in a

16   vacuum.  My gut reaction, until I hear what the alleged

17   inconsistency is, is that I have to object because the Kastigar

18   letter is exactly for this purpose.

19              THE COURT:  I don't know of any way to proceed other

20   than the government proffering what it feels is different from

21   the proffer that defendant gave the government pursuant to the

22   Kastigar letter.

23              MS. STEWART:  I will proffer, Your Honor.

24              THE COURT:  Okay.

25              MS. STEWART:  During his testimony the defendant
```

Direct (Resumed) - Laureti                    13

1    stated that he told Ms. Cabrera and Mr. Frizzie that he was

2    going to be paying the cash to close for the De La Cruz

3    transaction and that they told him that that was okay and that

4    he relied on that information.

5          During the defendant's proffer, on the other hand, he

6    told agents that on the day of the De La Cruz closing

7    Ms. Cabrera simply wired too much money to his account, to the

8    defendant's account, and then instructed the defendant to bring

9    the difference back in the name of a buyer as a cashier's

10   check.

11         That testimony we believe is different from what he

12   said during his proffer, and we would like to be able to

13   cross-examine him on that using what he provided during his

14   proffer.

15         MR. GARVIN:  Your Honor, I think that both statements

16   are true, that Ms. Cabrera did send the money and that

17   Ms. Cabrera did tell him to bring the excess money to the

18   closing.  And I believe that Mr. Laureti has said that on the

19   stand here.

20         But what is missing from what the government is saying

21   is Mr. Laureti has also testified that when he did do that, he

22   questioned her as to whether it was all right and she said it

23   was.  They're not inconsistent statements.  They go to -- hand

24   in hand together.  And I object to that because it implies that

25   there was a conflict in his testimony and there is no conflict.

Direct (Resumed) - Laureti                    14

 1   Both statements are true.

 2          MS. STEWART:  Your Honor, as the government hears it,

 3   it sounds like a conflict.  The defendant during his testimony

 4   testified that it was an accident; in other words, that

 5   Michelle Cabrera wired the money to him in advance of the

 6   closing and that to remedy that accident -- I'm sorry, during

 7   his proffer he said Michelle Cabrera essentially accidently

 8   wired or disbursed the funds to him early and that to remedy

 9   that she told him to bring the difference back in the form of a

10   cashier's check.

11          His testimony at trial indicated that he always

12   intended to bring the cash to close to the transaction.  And,

13   in fact, regarding the other transactions in which he brought

14   the cash to close, his testimony on the stand was that it was

15   an accident.  During the proffer he made a distinction.  During

16   his testimony here we feel it was different.

17          THE COURT:  Could I see the Kastigar letter?

18          MS. STEWART:  Yes, Your Honor.

19          THE COURT:  I'm going to allow it in and the defendant

20   is free to come back on redirect and show that --

21          MR. GARVIN:  If there is an explanation, he can

22   explain on redirect.  I understand the ruling.  Your Honor, we

23   just object to protect the record.

24          THE COURT:  I understand.

25          MS. STEWART:  Your Honor, I wanted to bring the issue

Direct (Resumed) - Laureti                        15

```
 1    up because obviously --
 2              THE COURT:  No, believe me, you did the right thing.
 3    This is something that should be taken up with the Court
 4    outside of the presence of the jury before addressing it with
 5    the defendant in front of the jury.
 6              MS. STEWART:  And then the second issue, Your Honor,
 7    is that during the defendant's direct examination he testified
 8    regarding a finding by a forensic examiner that he had
 9    destroyed evidence.  That destruction, Your Honor, happened
10    during a case in which the defendant's company was the
11    plaintiff, and that case was Emerald Village versus Pacific
12    National Bank, and the presiding judge in that case was the
13    Honorable Stanford Blake from the -- a Circuit Judge in Miami.
14    And the defendant testified at a hearing.  And after listening
15    to the defendant's testimony, the judge made several statements
16    indicating that he found the defendant's testimony to be not
17    credible.
18              The judge also made a finding that the defendant had
19    materially altered evidence.  That evidence that the defendant
20    materially altered included two CDs and also a computer.  And
21    on the CDs and on the computer there were supposed to be
22    emails.  The defendant provided the emails in that case in hard
23    copy.  And a forensic examiner testified that the material on
24    the computer appeared as though it had been altered.  So there
25    was no way to determine whether the emails in hard copy were
```

Direct (Resumed) - Laureti                        16

1    the same emails on the computer.

2            So, for example, during the hearing Judge Blake made

3    findings such as, I don't remember in the 20 years I've been on

4    the bench that I've made that many notes about something that I

5    didn't believe.  I'm being as candid as I can be.  In other

6    words, he found the defendant's testimony not to be credible.

7            He also said, I don't believe him.  It's not credible.

8    Some of the things he said and the notes I made, they should

9    have started with once upon a time.

10           And as a result, the judge issued an order finding

11   that the defendant had not been credible, finding that he had

12   materially altered evidence, and eventually entering a

13   sanctions order against the defendant in his individual

14   capacity.

15           The government would like to be able to cross the

16   defendant regarding the judge's findings of lack of credibility

17   and also the judge's order regarding his conduct in that case.

18           THE COURT:  How would the judge's findings be

19   admissible in this case?

20           MS. STEWART:  Well, Your Honor, we're not attempting

21   to introduce the transcript.  We're attempting to cross-examine

22   him on it.  In other words, isn't it true that a judge found

23   your testimony on a prior occasion was not credible?  Because

24   the defendant's credibility is at issue in this matter.

25           THE COURT:  But what is the authority upon which you

Direct (Resumed) - Laureti                    17

1   can use another judge's findings regarding credibility in

2   cross-examining the defendant?

3           MS. STEWART:  Your Honor, we believe we should be able

4   to cross-examine him on it; in other words, in that matter he

5   testified, he was found not to be truthful, and he can answer

6   whether or not that happened or not.  But I believe that the

7   fact that he previously testified under oath and was found not

8   to be truthful is relevant to his credibility in this matter.

9           THE COURT:  Mr. Garvin.

10          MR. GARVIN:  Your Honor, first, naturally we object.

11  Second, that was at best a collateral matter in which the

12  burden of proof was completely different, a civil case by the

13  preponderance of the evidence.

14          In addition to that, the -- we did not have, that is,

15  the defense in this case have anything to do with this

16  unrelated civil matter.

17          And as far as the introduction of a determination by

18  another Court on a different standard, it's simply not

19  admissible.  And so we object to this document attempting to

20  put this into evidence in this case.

21          MS. STEWART:  Your Honor, it's also true that defense

22  questioned the defendant regarding this issue on his direct

23  examination.  He questioned him regarding --

24          THE COURT:  The issue is the judge's findings.  I'm

25  not saying that you should be precluded from going into the

Direct (Resumed) - Laureti                    18

 1   underlying facts, but the judge's findings -- I mean, if you

 2   can show me some authority.  Because in you stating that Judge

 3   Blake found the defendant to be uncredible, that's pretty

 4   weighty and I want to know where within the Evidence Code

 5   that's admissible.

 6           MS. STEWART:  Your Honor, we thought it would be

 7   admissible to cross-examine him on the fact the defendant's

 8   credibility in this case is obviously at issue because he's

 9   testifying and he's previously been found not to be credible.

10   We thought we should be able to ask him the question and elicit

11   his response.  In other words, isn't it true this has happened?

12           THE COURT:  I understand what you want to do, but what

13   difference does it make that another judge in another case

14   found he wasn't credible?  Why should this jury be informed of

15   that?  I mean, if you show me authority, I will certainly, you

16   know, review it and if I feel it's appropriate, I'll allow you

17   to do it, but I haven't heard anything.

18           MS. STEWART:  Your Honor, then we'll proceed to the

19   next issue.  We would like to be able to at least cross-examine

20   him on the underlying facts; in order words, that he destroyed

21   the computer in that matter and produced evidence that a

22   forensic examiner, as he testified on his direct, found --

23           THE COURT:  Okay.

24           MS. STEWART:  -- it had been altered.

25           THE COURT:  What about that?

Direct (Resumed) - Laureti                    19

```
 1              MR. GARVIN:  Your Honor, I think the government has a
 2    right to ask the question, but I think it's a collateral matter
 3    and I think that they'll be forced to live with the answer the
 4    same way that I was forced to live with the answer when
 5    Michelle Cabrera denied that she used to buy $5 cashier's
 6    checks and then counterfeited them using PhotoShop to turn them
 7    into $500,000 cashier's checks and she denied that she ever did
 8    such a thing.  And when I attempted to call her accomplice in
 9    that Mr. Moran who would have testified that that is indeed
10    what they did and frequently to the point where other people
11    who were doing schemes would come to her and pay her a
12    commission to do that, the Court ruled that Mr. Moran's
13    testimony was not admissible, that it was a collateral matter,
14    and that the defense had to live with her answer.
15              In this case I think without me even asking
16    Mr. Laureti he said as part of one of his answers that his wife
17    in the divorce surprised him by having him physically removed
18    from the home.  When he went to the house, he found that his
19    furniture had been auctioned off and that everything that was
20    in the drawers had been dumped on the floors.  And he then went
21    on to say, without a question, which included two CDs that got
22    scratched up.  And I believe that those two CDs are, in fact,
23    the two CDs that we're talking about.  And so he from his own
24    mouth has already --
25              THE COURT:  Opened the door.
```

1            MR. GARVIN:  -- talked about this issue.

2            Now, when counsel says, well, it was determined that

3    those CDs were in his possession when the ex-foliage occurred,

4    I don't think he will deny that.  I think he will say, yes, the

5    ex-foliage occurred while the disks were in my possession.

6            THE COURT:  All right.  The Court finds that the

7    defendant has opened the door to this area of inquiry.

8    However, he did not open the door to findings by a Miami-Dade

9    Circuit Judge regarding his credibility.  So I'll allow you to

10   go into it but without Judge Blake's findings.

11           MS. STEWART:  So just to be clear, Your Honor, we'll

12   cross-examine him regarding facts of that case; in other

13   words --

14           THE COURT:  Yes.

15           MS. STEWART:  -- the defendant was the plaintiff in

16   that case or his company was a plaintiff, they were required to

17   produce certain evidence, and he, in fact, did not produce the

18   evidence until sometime later.  And the defendant testified

19   during his direct that it was a finding that he had -- that

20   there was a finding he had intentionally destroyed the

21   evidence.  That was his testimony on direct, that the expert

22   found he intentionally destroyed the evidence.

23           MR. GARVIN:  That is not my recollection of his

24   testimony on direct, that there was a finding that he had

25   intentionally destroyed evidence, Your Honor.  I think that up

Direct (Resumed) - Laureti                    21

```
1   until you get to that point that I think honestly the
2   government is now trying to slide in the back door what the
3   Court has already ruled upon, that the finding by Judge Blake
4   is inadmissible.  We're being placed into trying a collateral
5   matter instead of addressing the issues of this case.
6        THE COURT:  Bottom line is, it's not relevant what
7   another judge in another case ruled with respect to
8   Mr. Laureti's credibility.  It is just not relevant in this
9   proceeding.
10        MS. STEWART:  Your Honor, I just want to make sure
11   that I correctly -- my recollection is he said the expert found
12   he had intentionally destroyed the evidence.  I just want to
13   review my notes to make sure I'm not misrepresenting anything
14   to the Court.
15        MR. GARVIN:  Yes, that is what he said.  The expert,
16   meaning his expert.
17        THE COURT:  Not Judge Blake.
18        MS. STEWART:  Right.  So I will be able to
19   cross-examine that the expert found that he --
20        THE COURT:  You can cross-examine him regarding what
21   he said on direct.  He's opened the door to that.  But you
22   can't go so far as to cross-examine what Judge Blake's findings
23   were.
24        Any other matters?
25        MS. STEWART:  No, Your Honor.
```

```
 1              THE COURT:  All right.  Let's bring in the jury,

 2    please.

 3         (Jury in at 9:34 a.m.)

 4              THE COURT:  Folks, please be seated.

 5              Ms. Stewart, cross-examination.

 6                          CROSS-EXAMINATION

 7    BY MS. STEWART:

 8    Q.  Good morning, Mr. Laureti.

 9    A.  Good morning, Ms. Stewart.

10    Q.  Sir, you've been here throughout all of the testimony in

11    this case, correct?

12    A.  Yes, I have.

13    Q.  You've heard what all the other witnesses have had to say?

14    A.  Yes.

15    Q.  And then you've testified after their testimony?

16    A.  Yes.

17    Q.  And, sir, you're charged here with conspiracy to commit

18    wire fraud?

19    A.  Yes, I believe so.

20    Q.  And also wire fraud?

21    A.  I believe so, yes.

22    Q.  And, sir, you understand that those things are crimes,

23    correct?

24    A.  Yes.

25    Q.  And you want to avoid a criminal conviction; isn't that
```

Cross - Larueti                                   23

```
 1    right?

 2    A.   Yes.

 3    Q.   And you would agree with me that wanting to avoid a

 4    criminal conviction is a powerful motivation?

 5    A.   Yes.

 6    Q.   Sir, your property in this case --

 7    A.   I'm sorry?

 8    Q.   Your property in this case --

 9    A.   Yes.

10    Q.   -- 205 East San Marino --

11    A.   Yes.

12    Q.   -- that wasn't the first property, first residential

13    property you ever bought; isn't that right?

14    A.   No.

15    Q.   How many other properties, residential, had you purchased?

16    A.   Uhm, before that property three.

17    Q.   And you also -- you financed properties; isn't that right?

18    A.   Before that property maybe twice.

19    Q.   And you've operated companies that have applied for loans;

20    isn't that right?

21    A.   I'm sorry?

22    Q.   You've operated companies that have applied for loans?

23    A.   I don't understand.

24    Q.   For example, sir, your company applied for an SBA loan;

25    isn't that correct?
```

Cross - Larueti                                    24

1   A.   Yes.

2   Q.   And you also testified that sometimes your company was a

3   creditor; in other words, others had applied for loans from

4   your company; isn't that right?

5   A.   Yes, if you're referring to the -- my doing the hard equity

6   lending.

7   Q.   So persons came to you at times for financing?

8   A.   Yes.

9   Q.   And even more basic than that sir, in your life you filled

10  out loan applications previously for credit cards?

11  A.   Yes.

12  Q.   And you filled out an application for financing for the

13  Porsche that you drove?

14  A.   Yes.

15  Q.   And you filled out an application to go to school,

16  University of Miami; isn't that right?

17  A.   Yes, I did.

18  Q.   And you graduated from the University of Miami, right?

19  A.   Yes.

20  Q.   And you filled out an application form to become a mortgage

21  broker?

22  A.   I think that application was filled out by my brother.

23  Q.   And you signed; in other words, you agreed with what was on

24  there; isn't that right?

25  A.   Yes.

Cross - Larueti                                    25

1   Q.  Because you obtained the mortgage broker license; isn't

2   that right?

3   A.  Yes.

4   Q.  And, sir, it is fair to say then you've signed forms

5   before?

6   A.  Yes.

7   Q.  And you understand that when you sign a form, that in fact

8   means something?

9   A.  Yes.

10  Q.  Now, I would like to show you Exhibit 4R in this case.

11  This was your loan application; isn't that right?

12  A.  Yes, it was.

13  Q.  That's your name there, Marco Laureti?

14  A.  Yes.

15  Q.  And that's your company, Laureti Publishing?

16  A.  Yes.

17  Q.  And on Page 2 it says that you made $105,483.25 per month,

18  right?

19  A.  Yes.

20  Q.  And that was not true?

21  A.  No.

22  Q.  And it also said that you had an account at Citibank ending

23  in 5133 that had approximately $587,000 in it?

24  A.  Yes.

25  Q.  And that wasn't correct, correct?

Cross - Larueti                          26

```
 1    A.   Correct.

 2    Q.   And it also said that you had total assets of over

 3    $8 million; isn't that right?

 4    A.   Yes.

 5    Q.   And that also wasn't true?

 6    A.   I don't recall what my assets were back then.

 7    Q.   Sir, on the front of the application you initialed it?

 8    A.   Yes.

 9    Q.   You initialed the bottom of the second page?

10    A.   Yes.

11    Q.   And you signed the third page; isn't that right?

12    A.   Yes, on the day of closing.

13    Q.   And, sir, you understood that you were signing these

14    documents because you were agreeing to what was stated in them;

15    isn't that right?

16    A.   No.

17    Q.   Sir, you understood that -- you didn't understand that?

18    A.   Repeat the question.

19    Q.   You understood that you were signing these documents

20    because you were agreeing to what was stated in them; isn't

21    that correct?

22    A.   Because I agreed?

23    Q.   To what is stated in the application.  You understood that

24    you were signing the loan application because you agreed to it;

25    isn't that correct?
```

Cross - Larueti                          27

```
 1   A.  No, I didn't read the application.

 2   Q.  Sir, you've been a lender, correct?

 3   A.  Yes.

 4   Q.  And when you're a lender, you want to know what the income

 5   and assets of your borrowers are; isn't that correct?

 6   A.  No, I don't.

 7   Q.  And you rely on information they provide to you?

 8   A.  I lend based on property values.

 9   Q.  So you rely on the information they provide to you?

10   A.  I rely on the value of the property which I do my research

11   and I lend off the value of the property.

12   Q.  So, sir, you're telling me that when folks borrower money

13   from you, you don't rely on the information they provide to

14   you?

15   A.  No, I only rely on the value of the property.

16   Q.  And you understood that when you signed this loan

17   application, Washington Mutual was relying on what you provided

18   to them?

19   A.  I understood that I was --

20   Q.  Sir, that was a "yes" or "no" question.  Did you

21   understand?

22        MR. GARVIN:  Your Honor, if counsel could let the

23   witness finish the sentence.

24        THE COURT:  Yes, but the question does call for a

25   "yes" or "no" answer.  If he needs to explain his answer, I'll
```

Cross - Larueti                                    28

```
 1  give him an opportunity to do so.  But the question does call
 2  for a "yes" or "no" response.
 3            THE WITNESS:  Okay.  Could you repeat the question?
 4  BY MS. STEWART:
 5  Q.  Sir, you understood that Washington Mutual was going to
 6  rely on the loan application that you signed?
 7  A.  I can't respond to what Washington Mutual relied or didn't
 8  rely on.
 9  Q.  You knew this information in here included your income?
10  A.  I'm sorry?
11  Q.  You knew the application included your income?
12  A.  I'm seeing it now, yes.
13  Q.  And you knew that it included your assets; isn't that
14  right?
15  A.  Yes.
16  Q.  And so it is your testimony today that you didn't know that
17  Washington Mutual was going to rely on this information?
18  A.  I can't say what Washington Mutual was going to rely on or
19  not rely on.
20  Q.  So you believed you signed this application for no purpose?
21  A.  I signed the application at the closing.
22  Q.  And, sir, you testified on direct examination that prior to
23  the closing Michelle Cabrera showed you the HUD that said it
24  had been approved by Washington Mutual; isn't that correct?
25  A.  Yes.  Well, she showed me that at the closing.
```

1    Q.  And she showed it to you and you understood that Washington

2    Mutual had approved it?

3    A.  Yes.

4    Q.  In other words, Washington Mutual had taken action based on

5    what was on the HUD; isn't that correct?

6    A.  Yes.

7    Q.  And, sir, your HUD stated that the cash from borrower was

8    to be approximately $1.6 million; isn't that correct?

9    A.  Yes.

10   Q.  And you knew that Washington Mutual was expecting you to

11   bring an additional $1.6 million; isn't that correct?

12   A.  I'm sorry.  An additional?

13   Q.  Yes, sir, an additional $1.6 million.

14   A.  They were requiring me to bring $1.6 million, not an

15   additional $1.6 million.

16   Q.  And, sir, you're aware that there were fake tax returns in

17   your loan file?

18   A.  I am aware now.

19   Q.  And you're aware also that there were fake bank statements

20   in your loan file?

21   A.  I am aware now, yes.

22   Q.  And, sir, isn't it true that you provided those documents

23   to Galen Frizzie?

24   A.  I did not.

25   Q.  Sir, for your loan for your property isn't it true that

Cross - Larueti                                30

1    Galen Frizzie gave you back his commission as a broker credit?

2    A.   He gave me back the commission as a broker --

3    Q.   Sir, could you answer the question?

4    A.   Yes.

5    Q.   In other words, Galen Frizzie gave you the money that he

6    was going to earn on your loan?

7    A.   Yes.

8    Q.   So it's your testimony, sir, that Galen Frizzie made up

9    your tax returns, that he made up your bank statements so that

10   he could refund you the broker credit?

11   A.   Yes.

12   Q.   Now, Jorge De La Cruz did not work for you in 2006; isn't

13   that correct?

14   A.   2006?

15   Q.   You did not pay Jorge De La Cruz in 2006; isn't that

16   correct?

17   A.   That's correct.

18   Q.   And you did not pay Jorge De La Cruz in 2007; isn't that

19   correct?

20   A.   That's correct.

21   Q.   And, sir, you're aware that banks, when they're issuing

22   loans, they want to know what the potential borrower's income

23   and assets are; isn't that correct?

24   A.   Yes.

25   Q.   They don't particularly want to know what the borrower does

```
 1   in his spare time; isn't that right?
 2          They don't ask the borrower his volunteer activities
 3   that don't produce income?
 4          MR. GARVIN:  Object.  Calls for speculation.
 5          THE COURT:  Overruled.
 6   BY MS. STEWART:
 7   Q.  Isn't that correct, sir?
 8          Lenders don't ask borrowers about their volunteer
 9   activities; isn't that correct?
10   A.  Correct.
11   Q.  And so you understand that when the lender asked about
12   employment, they want to know -- they're asking where the
13   borrower gets his source of income; isn't that right?  You
14   understand that, don't you?
15   A.  Yes.
16   Q.  And so in this case, sir, Washington Mutual wanted to know
17   or wanted to verify Jorge De La Cruz's employment; isn't that
18   right?
19   A.  Yes.
20   Q.  And you agree that Washington Mutual was not a
21   coconspirator in this case?
22   A.  Yes.
23   Q.  And Washington Mutual, an employee, Ms. Chentell, called
24   you, sir?  These are your phone numbers?
25   A.  Yes.
```

Cross - Larueti                          32

1   Q.   On June 25, 2007?

2   A.   Yes.

3   Q.   And she called you about Jorge De La Cruz?

4   A.   Yes.

5   Q.   And she was attempting to verify his employment; isn't that

6   correct?

7   A.   Yes.

8   Q.   And you told her that he was currently employed; isn't that

9   correct?

10   A.   Yes.

11   Q.   And that, in fact, was not true?  Ms. Jorge De La Cruz was

12   not employed by you?

13   A.   He was working for me at the time.

14   Q.   And, sir, you did not pay him in 2007, correct?

15   A.   No, I did not.

16   Q.   And you told Washington Mutual the Jorge De La Cruz was

17   employed by you; isn't that correct?

18   A.   Yes.

19   Q.   Now, sir, it was your idea for Jorge De La Cruz to purchase

20   a property at 45 Hendricks; isn't that correct?

21   A.   Yes.

22   Q.   And, sir, you knew that Jorge De La Cruz could not be

23   approved for a loan based on his security guard income; isn't

24   that correct?

25   A.   I didn't -- the loan --

Cross - Larueti                                    33

```
1    Q.  Sir, the properties at 45 --

2    A.  I don't know if he was -- I don't know the answer to that

3    question.

4    Q.  Sir, the 45 Hendricks property that Jorge De La Cruz

5    purchased, the price was $2.1 million; isn't that correct?

6    A.  Yes.

7    Q.  And Jorge De La Cruz was a security guard; isn't that

8    right?

9    A.  Yes.

10   Q.  And you knew that before you approached him to purchase the

11   property; isn't that right?

12   A.  Yes.

13   Q.  And so you knew, sir, that truthful information on Jorge

14   De La Cruz's application could not get him approved for a loan

15   for that much money; isn't that correct?

16   A.  Can you repeat that, please?

17   Q.  Sir, you understood that Washington Mutual would not

18   approve Jorge De La Cruz for a loan based on his security guard

19   income; isn't that right?

20   A.  I can't say "yes" or "no" to that.

21   Q.  Okay.  So you thought it was possible for someone to

22   truthfully state on the application that they made $2,000 a

23   month and be approved for the purchase of a property that cost

24   $2.1 million?

25   A.  My understanding --
```

Cross - Larueti                                34

1   Q.  Sir, you thought that was possible?

2   A.  I can't answer that question.

3   Q.  Okay.  Sir, at some point in 2007 you were seeking to do a

4   joint venture with Avondale Ventures; isn't that right?

5   A.  Yes.

6   Q.  That was Mr. Torbert who came in here and testified

7   yesterday?

8   A.  Yes.

9   Q.  And Mr. Torbert wanted to know who were the employees at

10  Laureti Publishing; isn't that right?

11  A.  He wanted to know who the team was for Laureti Publishing,

12  yes.

13  Q.  He wanted to know who the employees were; isn't that

14  correct?

15  A.  He wanted to know who the team of Laureti Publishing was.

16  Q.  You told us you weren't paying Jorge De La Cruz anything in

17  2007; isn't that right?

18  A.  Well, I did pay him something in 2007.

19  Q.  Sir, you just testified that you paid Jorge De La Cruz

20  nothing in 2007; isn't that correct?

21  A.  Not through Laureti Publishing.

22  Q.  Sir, on the Avondale statement it says Jorge De La Cruz

23  shall remain as circulation manager with a yearly salary of

24  $45,000.  Is that what it says?

25  A.  Yes, it does.

Cross - Larueti                     35

```
 1   Q.  And you provided that information in order to obtain a
 2   financial benefit with Avondale Ventures; isn't that right?
 3   A.  I'm sorry?  I got distracted.
 4   Q.  Sir, you provided that information in order to obtain a
 5   financial benefit with Avondale Ventures; isn't that right?
 6   A.  That LOI was drafted by Avondale Ventures.
 7   Q.  Sir, you provided that information to Avondale Ventures in
 8   order to obtain a financial benefit with Avondale Ventures;
 9   isn't that correct?
10   A.  Yes.
11   Q.  And you told Avondale Ventures that Jorge De La Cruz would
12   remain as circulation manager with a salary of $45,000?
13   A.  Yes.
14   Q.  And, sir, you understand that someone cannot remain being
15   paid $45,000 if they're not being paid $45,000?
16           MR. GARVIN:  Object to the form of the question.  That
17   was not what was stated, Your Honor.
18           THE COURT:  Overruled.
19   BY MS. STEWART:
20   Q.  Sir, you understand that the word "remain" here indicates
21   that he was then being paid $45,000?
22   A.  No.
23   Q.  You don't understand that?
24   A.  No, I don't.
25   Q.  Okay.  Now, sir, when you provided the verification of
```

Cross - Larueti                                    36

1    Jorge De La Cruz's employment when he wasn't in fact employed,

2    you indicated that he was the general manager; isn't that

3    correct?

4    A.   Yes, I did.

5    Q.   And that was information to Washington Mutual?

6    A.   Yes.

7    Q.   And Jorge De La Cruz wasn't being paid at that time in

8    2007?

9    A.   Correct.

10   Q.   But to Avondale Ventures you told them that someone else

11   was the general manager; isn't that correct?

12   A.   Well, that sentence says shall be named general manager.

13   Q.   And Jorge De La Cruz shall remain as circulation manager?

14   A.   Yes.

15   Q.   Now, sir, yesterday you testified that a forensic examiner

16   had found that you had intentionally destroyed evidence; isn't

17   that correct?

18   A.   Yes.

19   Q.   And that finding by the forensic examiner is when you were

20   part or one of your companies was part of a lawsuit; isn't that

21   right?

22   A.   Yes.

23   Q.   And that lawsuit was the lawsuit that Mr. Piccolo

24   referenced during his testimony here; isn't that right?

25   A.   Yes.

```
 1    Q.  That was the lawsuit in which your company, yours and
 2    Mr. Piccolo's company, Emerald Village, sued a bank; isn't that
 3    right?
 4    A.  Yes.
 5    Q.  And your company sued the bank because the bank didn't fund
 6    a loan; isn't that right?
 7    A.  Yes.
 8    Q.  And the reason the bank didn't fund the loan was that your
 9    company did not provide enough sales contracts of persons
10    willing to purchase the property you were attempting to put
11    together; isn't that right?
12    A.  That's the -- that was the defense that the bank used, yes.
13    Q.  The bank didn't fund the loan because you hadn't provided
14    the evidence that you had enough sales of people to purchase
15    the property you were putting together; isn't that right?
16    A.  Uhm, that was not correct.  No.
17    Q.  And, sir, as part of the lawsuit you're required to provide
18    evidence of sales contracts of people that want to purchase the
19    property; isn't that right?
20    A.  Yes.
21    Q.  And you claim that the evidence was backed up onto a disk;
22    isn't that right?
23    A.  Yes.
24    Q.  And the evidence had originally been on a computer; isn't
25    that right?
```

Cross - Larueti                              38

```
 1    A.   Yes.

 2    Q.   And the computer was somehow destroyed?

 3    A.   It was not.

 4    Q.   Sir, isn't it true that you provided an affidavit in this

 5    case in which you stated that the computer had been destroyed?

 6    A.   I don't recall.

 7    Q.   Okay.  The information from the computer you had

 8    transferred to a disk; isn't that right?

 9    A.   The information on the computer was always backed up.

10    Q.   The information from the computer had been transferred to a

11    disk according to you; isn't that right?  The computer no

12    longer existed?

13    A.   The computer no longer existed, correct.

14    Q.   And you were attempting to provide the backup on a disk or

15    two disks; isn't that right?

16    A.   The backup in question was regarding the --

17    Q.   Sir, you were attempting to provide backup from the

18    computer on two disks; isn't that right?

19    A.   Yes.

20    Q.   And the forensic examiner found that you had intentionally

21    destroyed those disks; isn't that right?

22    A.   Yes.

23    Q.   And, sir, as part of the lawsuit you provided those sales

24    contracts in hard copy form to the bank?

25    A.   Yes.
```

Cross - Larueti                    39

1   Q.  And the problem, sir, was that when you provide it in hard

2   copy form and the disks are destroyed, there was no way to tell

3   whether what you provided was actually the sales contracts

4   signed by the borrowers; isn't that right?

5   A.  No, the --

6   Q.  Sir, when you provide information in hard copy form and the

7   disks which had it in electronic form are destroyed, there's no

8   way to tell whether your hard copies are the same as what was

9   in electronic form; isn't that correct?

10  A.  The contracts were provided in several different methods to

11  them.

12  Q.  Sir, you provided as part of the lawsuit the contracts in

13  hard copy form; isn't that right?

14  A.  We provided --

15  Q.  Sir, you provided the contracts as part of the lawsuit in

16  hard copy form; isn't that correct?

17  A.  I don't remember.  We provided a lot of documents.

18  Q.  All right, sir.  And you had claimed that those contracts

19  had previously existed in electronic form; isn't that right?

20  A.  Yes.

21  Q.  And because the electronic form had been destroyed

22  intentionally by you, according to the expert, there was no way

23  to determine whether the hard copies were the same as the

24  electronic copies; isn't that right?  In other words, sir, the

25  problem was there was no way to verify the information you were

Cross - Larueti                                40

```
 1   providing and that information was found to be suspect; isn't
 2   that correct?
 3   A.  I had -- I had -- I had the information backed up in
 4   several methods and they focused only on those CDs.
 5   Q.  Okay.  Now, sir, for the Melian transaction you provided
 6   the cashier's check for the cash to close; isn't that right?
 7   A.  Yes.
 8   Q.  And for the Ramirez transaction you provided the cashier's
 9   check for the cash to close; isn't that right?
10   A.  Yes.
11   Q.  And, sir, your testimony yesterday was that the reason you
12   provided those cash to close cashier's checks was that Michelle
13   Cabrera had accidently sent you too much money and that you're
14   returning the extra; isn't that right?
15   A.  Yes.
16   Q.  So you're testifying that Michelle Cabrera accidently for
17   the Melian and Ramirez transaction sent you too much money?
18   A.  Yes.
19   Q.  And that you were merely returning the overpayment?
20   A.  Yes.
21   Q.  Now, sir, Michelle Cabrera wired you funds in this case,
22   right?
23   A.  Yes.
24   Q.  For the Ramirez transaction she wired you funds?
25   A.  Yes.
```

Cross - Larueti                                41

1    Q.  And it is your testimony that she wired you excess funds?

2    A.  Yes.

3    Q.  And you simply returned it as a cashier's check?

4    A.  Yes.

5    Q.  Now, you didn't return it as a wire?

6    A.  No.

7    Q.  And when you went to buy the cashier's check, you didn't

8    write for your refund, you didn't write refund of excess amount

9    of money paid on the for line?

10   A.  No.

11   Q.  You didn't write return of overpayment?

12   A.  No.

13   Q.  Instead you wrote Eneida Ramirez loan; isn't that right?

14   A.  Yes.

15   Q.  And then you transferred your check into a cashier's check;

16   isn't that right?

17   A.  Yes.

18   Q.  And again, on the for line you didn't write return of

19   excess given to me?  You didn't write --

20   A.  I didn't type up the check.

21   Q.  You didn't write return of overpayment?

22   A.  No, I didn't type up the check.  That's the bank's,

23   Wachovia.

24   Q.  Sir, are you testifying today that you went into a Wachovia

25   to buy the cashier's check and they just knew what to write

1  here?

2  A.  Well, they took the information from my -- the previous

3  check that you just showed me.

4  Q.  And that information came from you; isn't that right?

5  A.  Yes.

6  Q.  And, sir, it's your testimony also that the same thing

7  happened for the Melian transaction?

8  A.  Yes.

9  Q.  Sir, isn't it true that you knew that Melian was a straw

10  buyer?

11  A.  No, I did not.

12  Q.  So your testimony is that Michelle Cabrera wired you for

13  the Melian transaction $790,000?

14  A.  Yes.

15  Q.  And then she told you that she sent you too much money,

16  correct?

17  A.  Yes.

18  Q.  And asked you to return the excess to her?

19  A.  Yes.

20  Q.  As a cashier's check?

21  A.  Yes.

22  Q.  Sir, isn't it true that you knew even before Michelle

23  Cabrera sent you the wire that you had to pay Melian's cash to

24  close?

25  A.  No, I did not.

Cross - Larueti                          43

1   Q.   Sir, Melian's cash to close on his transaction was

2   $157,917.36, correct?

3   A.   Correct.

4   Q.   And Michelle Cabrera wired you $790,000, correct?

5   A.   Correct.

6   Q.   And the settlement date was on August 6, 2007, correct?

7   A.   Correct.

8   Q.   Now, this is Government's Exhibit 27D.  Do you see that?

9   A.   Yes.

10  Q.   And this is your checking account that you had at Wachovia

11  Bank?

12  A.   Correct.

13  Q.   And you also had a savings account at Wachovia Bank?

14  A.   Yes.

15  Q.   And you couldn't write checks from the savings account;

16  isn't that correct?  You would write your checks from the

17  checking account?

18  A.   I would write the checks from the checking account,

19  correct.

20  Q.   So, sir, on August 6th you transferred from your savings

21  account $158,000; isn't that right?

22  A.   Yes.

23  Q.   And then Michelle Cabrera wired to you $790,000; isn't that

24  correct?

25  A.   Yes, that's what that shows.

Cross - Larueti                                      44

```
 1   Q.  So on the very same day that you paid Melian's cash to

 2   close of $157,917.36, you coincidentally wired to yourself

 3   $158,000?

 4   A.  I'm sorry.  I didn't wire -- I don't think that's a --

 5   Q.  Transferred to yourself $158,000?

 6   A.  Yes.

 7   Q.  And that's a coincidence?

 8   A.  No.

 9   Q.  You did not know that you had to pay Melian's cash to

10   close?

11   A.  No, I believe, I believe --

12   Q.  Sir, the answer is "no"?

13   A.  I --

14          MR. GARVIN:  Your Honor, this continues.  He said no.

15   But as the Court earlier stated, a witness is allowed to

16   explain his answer, and I would appreciate it if counsel would

17   let him finish.

18              THE COURT:  Your answer is "no"?

19              THE WITNESS:  My answer is no.  Yes, sir.

20              THE COURT:  You can explain now.

21              THE WITNESS:  Can you put the bank statement back up,

22   please, ma'am?

23          My understanding on this transaction was that the --

24   there were some contributions and some concessions that were to

25   be credited onto this transaction and she did not place them on
```

1    the HUD.

2    BY MS. STEWART:

3    Q.  Sir, on August 6th you transferred $158,000 from your

4    savings to your checking account?

5    A.  Yes, I did.

6    Q.  And then Ms. Cabrera wired to you $790,000?

7    A.  Yes.

8    Q.  And that same day you purchased a cashier's check for the

9    exact amount of Melian's cash to close?

10   A.  Yes, I did.

11   Q.  And, sir, not only did you pay Melian's cash to close, you

12   also then paid the mortgage payments on his unit; isn't that

13   correct?

14   A.  Yes, I did.

15   Q.  So you paid Melian's cash to close of $157,000?

16   A.  Yes.

17   Q.  And you paid the monthly mortgage payments of in excess of

18   $5,000?

19   A.  Yes.

20   Q.  You paid it for November?

21   A.  I can't see the date.

22   Q.  You paid it for November?

23   A.  Uh-huh.

24   Q.  You paid it for December?

25   A.  Yes.

Cross - Larueti                        46

```
 1   Q.  You paid it for January?

 2   A.  Correct.

 3   Q.  Sir, isn't it true you knew that Melian was a straw

 4   purchaser?

 5   A.  I did not.

 6   Q.  Now, yesterday you testified about the spread; isn't that

 7   correct?

 8   A.  Yes.

 9   Q.  And according to your testimony, the spread was the

10   difference between the option price at which you could buy one

11   of the 45 Hendricks properties and the sales contract price;

12   isn't that right?

13   A.  Yes.

14   Q.  So in order for you to make money, sir, you had to sell the

15   condos at a price above your option price; was that right?

16   A.  That's correct.

17   Q.  So, for example, for the Penthouse F your option price was

18   $2 million, $2,050,000?

19   A.  Yes.

20   Q.  And that was Ms. -- the property that Ms. Ramirez

21   purchased, correct?

22   A.  Correct.

23   Q.  And she purchased it for approximately $3.8 million?

24   A.  Yes.

25   Q.  And so the difference is the spread?
```

1   A.  Correct.

2   Q.  Now, when you talked about the Jorge De La Cruz property,

3   you testified that that property was to be a family property;

4   isn't that right?

5   A.  Yes.

6   Q.  And that you were going to use it for the family to go down

7   and visit there?

8   A.  I testified -- well, I haven't --

9   Q.  Sorry.  It was going to be a property for the family?

10  A.  Yes.

11  Q.  And that property that Jorge De La Cruz purchased was Unit

12  3D; isn't that right?

13  A.  That correct.

14  Q.  And, sir, the option price on Unit 3D was $1,095,000; isn't

15  that correct?

16  A.  Correct.

17  Q.  And this property for the family you purchased you had

18  Jorge De La Cruz purchase for $2.1 million; isn't that correct?

19  A.  Yes.

20  Q.  Above the option price?

21  A.  Yes.

22  Q.  And that property was ultimately foreclosed on, right?

23  A.  Around two years later, yes.

24  Q.  It was foreclosed.  And the judgment is in Jorge

25  De La Cruz's name; isn't that right?

Cross - Larueti                                48

1    A.   Yes.

2    Q.   And it's for the amount of the outstanding loan?

3    A.   I haven't seen the paperwork on it.  Yes.  I assume so,

4    yes.

5    Q.   Now, sir, if that property had been purchased at the lower

6    price, Jorge De La Cruz would not have such a large judgment in

7    his name; isn't that correct?

8    A.   Correct.

9    Q.   And, sir, isn't it true that you used Jorge De La Cruz as a

10   straw purchaser?

11   A.   No.

12   Q.   Now, for the Ramirez transaction you paid her cash to

13   close; isn't that correct?

14   A.   I brought back the cash to close.

15   Q.   You brought back the cashier's check?

16   A.   I gave Mostelac the cashier's check is what happened.

17   Q.   For the cash to close?

18   A.   I don't know what they booked it for, but --

19   Q.   And, sir, you also made the mortgage payments on that unit;

20   isn't that correct?

21   A.   Yes.

22   Q.   And you also wired $50,000 to Pedro Melian after that

23   purchase; isn't that correct?

24   A.   Yes.

25   Q.   And, sir, you're aware that Pedro Melian came in here and

1    testified, right?

2    A.   Yes.

3    Q.   And Pedro Melian testified that that $50,000 was a kickback

4    for his mother being used as a straw purchaser; isn't that

5    correct?

6    A.   That's what he testified.

7    Q.   And Pedro Melian pled guilty to that; isn't that correct?

8    A.   That's correct.

9    Q.   He pled guilty to wire fraud in part because of the $50,000

10   that you sent to him as a kickback?

11        MR. GARVIN:  Object to the question, Your Honor, as to

12   what was in Pedro Melian's mind when he pled guilty.

13        THE COURT:  Sustained.

14   BY MS. STEWART:

15   Q.   Well, let me break it down for you, sir.

16        You wired to Pedro Melian $50,000, correct?

17   A.   Yes.

18   Q.   And Pedro Melian came in here and testified that he was a

19   straw buyer, correct?

20   A.   Correct.

21   Q.   And Pedro Melian testified that he received a $50,000 wire

22   from you for being a straw buyer; isn't that correct?

23   A.   That's what he testified.

24   Q.   And he pled guilty to that; isn't that correct?

25   A.   I -- I believe so, yes.

Cross - Larueti                    50

```
1   Q.  Now, the Corzo transaction at 45 Hendricks, that was the
2   first straw buyer purchase, right?
3   A.  That was the first.  I guess Corzo has testified that he
4   was a straw buyer so yes.
5   Q.  And you were to make money as you testified here on the
6   spread again, correct?
7   A.  Correct.
8   Q.  And this would mean the difference between the option price
9   again, correct?
10  A.  Correct.
11  Q.  And the sales contract price?
12  A.  Yes.
13  Q.  And then you were going to split that spread 50/50 with
14  Felix Mostelac?
15  A.  Yes.
16  Q.  But, sir, for the Corzo transaction you would agree with me
17  that it appears that Felix Mostelac received more money than
18  you?  Felix Mostelac received $387,208.92, correct?
19  A.  Correct.
20  Q.  And your company received $243,791.08, correct?
21  A.  Correct.
22  Q.  But, in fact, American Holdings, Mr. Mostelac, in this
23  transaction brought the cashier's check for the cash to close,
24  correct?
25  A.  Yes.
```

Cross - Larueti                          51

1   Q.   And you knew that you weren't going to get 50 percent of

2   the spread because you had to pay or someone had to pay Corzo's

3   cash to close; isn't that correct?

4   A.   No.

5   Q.   Because, sir, $387,208.92 minus the cash to close equals

6   what you received, 243,791.08?

7   A.   Correct.

8   Q.   So you knew, sir, that one of you had to pay Corzo's cash

9   to close; isn't that correct?

10  A.   No.

11  Q.   And, sir, after you paid -- you and Mr. Mostelac paid

12  Corzo's cash to close, isn't it true that you also then paid

13  the mortgage payments on Corzo's property?

14  A.   Can you rephrase your question, please?

15  Q.   Isn't it true, sir, that you made the mortgage payments on

16  Corzo's property?

17  A.   Yes.

18  Q.   And isn't it also true, sir, that Corzo, the straw buyer,

19  did not receive the keys to the property on the day of the

20  closing?

21  A.   I don't know that.  I wasn't at the closing.

22  Q.   Sir, you are Venezuelan; isn't that correct?

23  A.   Born in Venezuela, yes.

24  Q.   I'm showing you what's marked as Government's Exhibit AAAK.

25  Do you see that?

```
 1   A.  Yes.

 2             THE COURT:  You mean the Defense.

 3             MS. STEWART:  I'm sorry.  Defense Exhibit.

 4   BY MS. STEWART:

 5   Q.  And this was the HUD in the Bay Title file for Mr. Corzo,

 6   correct?

 7   A.  Correct.

 8   Q.  And in that file is an email, correct?

 9   A.  Correct.

10   Q.  And in the email Mr. D'Agostino is telling someone to

11   overnight the keys for 2B and 3D to what's the name here?

12   A.  Marco Laureti.

13   Q.  And you would agree with me, sir, that his intention, what

14   he was trying to do was to get you the keys for 2B and 3D?

15   A.  I can't respond to what his intentions were.

16   Q.  Sir, it is an email from D'Agostino.  Do you see that?

17   A.  Yes.

18   Q.  And it says overnight you the keys for 2B?

19   A.  Yes.

20   Q.  And 3D?

21   A.  Yes.

22   Q.  And to Marco Laureti?

23   A.  Correct.

24   Q.  And then there's an address there, right?

25   A.  Yes.
```

Cross - Larueti                          53

```
 1   Q.  And your address -- what was your address at the North Bay
 2   Road property?
 3   A.  2955 North Bay Road.
 4   Q.  Right.  So there's a typo here.
 5   A.  Correct.
 6   Q.  It says 2055 North Bay Road and you were at 2955 North Bay
 7   Road, right?
 8   A.  Yes.
 9   Q.  But the intention, sir, was to send you the keys; isn't
10   that correct?
11   A.  I can't testify as to Mr. D'Agostino's intentions.
12   Q.  Okay.  Now, you heard Mr. Corzo testify that you were at
13   his closing?
14   A.  Correct.
15   Q.  And he testified that Felix Mostelac was at his closing?
16   A.  Correct.
17   Q.  And he testified that Michelle Cabrera was at his closing?
18   A.  Correct.
19   Q.  And he testified that Alain Sanz was at his closing?
20   A.  Correct.
21   Q.  And you know Alain Sanz; isn't that correct?
22   A.  I do not.
23   Q.  Sir, isn't it true that in September of 2007 that you sold
24   a property to Alain Sanz?
25   A.  Yes.
```

Cross - Larueti                                    54

1   Q.  And isn't it also true, sir, that you paid the cash to

2   close for Alain Sanz's property?

3   A.  Yes.

4   Q.  And isn't it also true, sir, that you also paid the deposit

5   for this property?

6   A.  Yes.

7   Q.  And for this transaction where you paid the cash to close,

8   the settlement agent -- who was the settlement agent?

9   A.  Alvarez, Almazan & Rodriguez, PL.

10  Q.  It was not Michelle Cabrera, correct?

11  A.  No.

12  Q.  And Alvarez, Almazan & Rodriguez, those are attorneys,

13  correct?

14  A.  Correct.

15  Q.  They are real estate attorneys?

16  A.  Yes.

17  Q.  And you had been in touch with them from as early as

18  April 2007, correct?

19  A.  Yes.

20  Q.  And it was your testimony, sir, that instead of speaking to

21  the real estate agents about whether you could pay the cash to

22  close that you spoke to Michelle Cabrera?

23  A.  I'm sorry.  The real estate agents?

24  Q.  Instead of speaking with the real estate attorneys -- I'm

25  sorry.  Regarding whether you could pay the cash to close, your

1    testimony was that you relied on Michelle Cabrera?

2    A.   Yes.

3    Q.   Someone who wasn't even involved in this transaction?

4    A.   Yes.

5    Q.   And Michelle Cabrera is not an attorney, correct?

6    A.   She is not.

7    Q.   And these folks, Alvarez, Almazan & Rodriguez, they in fact

8    are real estate attorneys?

9    A.   Well, it's a law firm.  Not all of them are real estate.

10   Q.   And you did not consult with them on the question on

11   whether you could pay the cash to close?

12   A.   I don't recall what I spoke to them about.

13   Q.   Your testimony yesterday, sir, was that you spoke to

14   Michelle Cabrera regarding this transaction?

15   A.   Yes, I did.

16   Q.   And it's fair to say that at the time you knew attorneys?

17   A.   Yes.

18   Q.   Now, you were here for Michelle Cabrera's testimony,

19   correct?

20   A.   I was.

21   Q.   And she testified that she got involved in this conspiracy

22   in part because she was going to be paid, correct?

23   A.   Yes, that's what her testimony was.

24   Q.   And she testified that she was paid $10,000 each time she

25   did the double HUD-1 for you?

Cross - Larueti                              56

1    A.   Yes.

2    Q.   And that she was also paid in part for doing the early

3    disbursement of the cash to close?

4    A.   On my transactions?

5    Q.   On the 45 Hendricks transactions, your transactions, and

6    Mostelac's transactions?

7    A.   My recollection of her testimony was that she claims to

8    have been paid to do the double HUDs.

9    Q.   Okay, sir.  And, in fact, you were one of the persons who

10   paid Michelle Cabrera; isn't that correct?

11   A.   No.

12   Q.   You heard Michelle Cabrera's testimony that her husband had

13   a company called MSJ Couriers, correct?

14   A.   Yes.

15   Q.   And you prepared a 1099 for MSJ Services, correct?

16   A.   No, my accountant did.

17   Q.   She received the information from you; isn't that correct?

18   A.   That's correct.

19   Q.   And you agree that she did it on your behalf?

20   A.   Yes.

21   Q.   She prepared it but it was on your behalf?

22   A.   Yes.

23   Q.   So you were responsible for the information on this form;

24   isn't that correct?

25   A.   Yes.

Cross - Larueti                          57

1  Q.  And the amount here is $30,000 nonemployee compensation,

2  correct?

3  A.  Correct.

4  Q.  And $30,000 divided by three is $10,000 a piece, correct?

5  A.  Yes.

6  Q.  And that's the amount Michelle Cabrera said she was paid

7  for the double HUDs and the early disbursements?

8  A.  Yes.

9  Q.  And you were here and you heard Mark Johnson testify that

10  this was his PO Box?

11  A.  Yes.

12  Q.  And that he did not receive this from you and that he never

13  did any work for you?

14  A.  Yes.

15  Q.  Sir, isn't it true that you claimed as a deduction the

16  kickbacks that you paid Michelle Cabrera?

17  A.  No.

18  Q.  Now, John Olsen was a childhood friend of yours, correct?

19  A.  Correct.

20  Q.  You had known him for over 30 years?

21  A.  Correct.

22  Q.  And he came and testified here, correct?

23  A.  Yes.

24  Q.  And didn't Mr. Olsen seem like a reluctant witness to you?

25  A.  I don't know.  I don't understand.

Cross - Larueti                          58

1   Q.  Did he seem as if he was overly eager to volunteer

2   information to the government?

3   A.  No.  I don't know.

4   Q.  So he seemed like a reluctant witness?

5   A.  I don't know.

6   Q.  In other words, he would have rather not have been here

7   testifying for the government against you?

8   A.  I can't testify to what he was thinking.

9   Q.  Okay.  And the government asked Mr. Olsen about this lease.

10  Do you recall that?

11  A.  Yes.

12  Q.  And Mr. Olsen gave testimony about this lease, correct?

13  A.  Correct.

14  Q.  And he was asked whether he ever lived -- in fact, this

15  address here, 205 East San Marino Drive, that's the address of

16  your property that's involved in this case, correct?

17  A.  Correct.

18  Q.  And this purports to be a lease signed September 5, 2008,

19  between you -- you're Marco Laureti, right?

20  A.  That's correct.

21  Q.  And John Olsen?

22  A.  Yes.

23  Q.  That was the witness who was here, correct?

24  A.  Yes.

25  Q.  And Mr. Olsen testified that he never lived at this

Cross - Larueti                      59

1   property, correct?

2   A.   Correct.

3   Q.   He testified that he never paid you $35,000 per month,

4   correct?

5   A.   Correct.

6   Q.   And he testified that he never paid you $420,000 for the

7   year?

8   A.   Correct.

9   Q.   And that he never paid you a $70,000 deposit?

10   A.   Correct.

11   Q.   And then do you remember he was asked about the initials or

12   the "J" on each page?

13   A.   Yes.

14   Q.   And the government had to ask him this question several

15   times, but ultimately Mr. Olsen testified that he had no memory

16   of signing this document?

17   A.   Yes.

18   Q.   And yet there was what was a signature above his name?

19   A.   Correct.

20   Q.   And he said no memory of signing this?

21   A.   Correct.

22   Q.   And, sir, this document was produced by you to a bank;

23   isn't that correct?

24   A.   Yes.

25   Q.   And it was produced by you to a bank as evidence of income?

Cross - Larueti                              60

1   A.   Correct.

2   Q.   And then there was an addendum to the lease that Mr. Olsen

3   said he never signed.   And this addendum purports to continue

4   the first lease for another year; isn't that correct?

5   A.   Correct.

6   Q.   And you knew at the time of this addendum that the lease

7   had never gone into effect, correct?

8   A.   Yes.

9   Q.   And yet you prepared a document called an addendum to

10  lease, correct?

11  A.   Yes.

12  Q.   And Mr. Olsen again testified reluctantly that he had no

13  memory of signing this document, correct?

14  A.   Correct.

15  Q.   And you, sir, submitted this document to a bank, correct?

16  A.   That's correct.   Yes.

17  Q.   And you submitted it in order to obtain a financial benefit

18  from the bank?

19  A.   Correct.

20  Q.   Now, yesterday you testified that it was a mistake in

21  hindsight?

22  A.   Yes.

23  Q.   Sir, you would agree with me that this was false

24  information knowingly provided to a bank in order to obtain a

25  financial benefit?

1   A.   No.

2   Q.   And that's the same thing you're charged with here,

3   correct?

4   A.   No, this is a lease.  It's different.

5   Q.   Sir, you would agree with me that this was information

6   provided by you to a bank to obtain a financial benefit,

7   correct?

8   A.   Yes.

9   Q.   And here you're charged with the same thing, providing

10  false information to a financial institution to obtain a

11  benefit, the wire; isn't that correct?

12  A.   Okay.  Yes.

13  Q.   Now, sir, I just want to -- in this case the documents that

14  say "MARCO" on the bottom were provided by you?

15  A.   Correct.

16  Q.   And you've told us that an expert has previously found that

17  you intentionally destroyed evidence, correct?

18  A.   The --

19  Q.   Sir, that was a "yes" or "no" question.  You testified that

20  an expert found that you intentionally destroyed evidence --

21  A.   Yes.

22  Q.   -- in a lawsuit?

23  A.   Yes.

24          THE COURT:  Why don't we take our mid-morning recess

25  right now.  We'll take a 15-minute break.

Cross - Larueti                    62

1            Remember, don't discuss the case, continue to keep an

2    open mind.

3            (Jury out at 10:31 a.m.)

4            (Recess at 10:31 a.m.)

5            (Call to Order of the Court.)

6            THE COURT:  All right.  The record will reflect that

7    Mr. Laureti is present, represented by counsel.

8            Ms. Thompkins, would you please bring in the jury.

9            (Jury in at 10:44 a.m.)

10           THE COURT:  All right, folks.  Please be seated.

11           Mr. Laureti, once again I remind you that you're still

12   under oath.

13           We will continue with cross-examination by

14   Ms. Stewart.

15   BY MS. STEWART:

16   Q.  Now, sir, the document that indicated that you sold an

17   option in the spread to Mr. Mostelac was provided by you; isn't

18   that correct?

19   A.  Yes.

20   Q.  Now, for the Ramirez transaction --

21           MR. GARVIN:  Excuse me.  The exhibit number, please?

22           MS. STEWART:  5D.

23   BY MS. STEWART:

24   Q.  The contract sales price was $3.8 million; isn't that

25   right?

```
 1   A.  That's correct.

 2   Q.  And her credit and her name were used to purchase

 3   Penthouse F?

 4   A.  She was the buyer, yes.

 5   Q.  Sir, you knew Eneida was a straw buyer, correct?

 6   A.  I did not.

 7   Q.  Because you paid her cash to close?

 8   A.  I did not.

 9   Q.  You paid the monthly mortgage payments on her property and

10   you paid her son the $50,000 kickback?

11   A.  It wasn't a kickback.

12   Q.  Okay.  So Penthouse F for Eneida Ramirez, the option price

13   was $2,050,000, correct?

14   A.  That's correct.  Yes.

15   Q.  And assuming that my math is correct, 3.8 minus 2,050,000

16   is 1.75 million, correct?

17   A.  Correct.

18   Q.  And for this transaction Michelle Cabrera wired to you

19   $1.6 million, correct?

20   A.  Correct.

21   Q.  And you would agree with me that 1.6 million is less than

22   1.75 million, correct?

23   A.  Correct.

24   Q.  And then you testified that Michelle told you to bring back

25   the excess amount which you brought back as $700,000, correct?
```

Cross - Larueti                              64

1   A.  Correct.

2   Q.  But, sir, you would agree with me that the amount Michelle

3   wired to you, $1.6 million, is in fact less than the spread of

4   $1.75 million?

5   A.  Correct.

6   Q.  And then for the Melian transaction, which was Unit 4D, the

7   sales contract price was $2.1 million, correct?

8   A.  Correct.

9   Q.  And for Unit 4D the option price was $1.21 million,

10  correct?

11  A.  Correct.

12  Q.  And assuming that I did the math correctly, which I believe

13  that I did, the difference between 2.1 million and 1.21 million

14  is $890,000, correct?

15  A.  Correct.

16  Q.  And in this case Michelle Cabrera wired to you $790,000,

17  correct?

18  A.  Correct.

19  Q.  Which you would agree with me is less than $890,000?

20  A.  Correct.

21  Q.  Less than the spread?

22  A.  Yes.

23  Q.  And then Michelle Cabrera told you to bring back the

24  nonexistent excess in the form of a cashier's check for

25  $157,917.36, correct?

Cross - Larueti                          65

```
 1    A.  Correct.

 2    Q.  And you brought it back?

 3    A.  I didn't bring it back.  I wasn't at the closing.

 4    Q.  You purchased the cashier's check?

 5    A.  Yes, I did.

 6    Q.  But you heard Melian's testimony that you were there,

 7    correct?

 8    A.  Yes.

 9    Q.  Because Melian testified that you handed him the cash to

10    close check?

11    A.  That was his testimony.

12    Q.  Now, sir, your testimony was that you always intended to

13    provide the cash to close for the Jorge De La Cruz transaction;

14    isn't that correct?

15    A.  Yes.

16    Q.  And you testified that you had the money to purchase the

17    cash to close cashier's check for the Jorge De La Cruz

18    transaction; isn't that correct?

19    A.  Yes.

20    Q.  But for the Ramirez and Melian transactions you testified

21    that Ms. Cabrera for some reason sent you extra money and you

22    brought it back as the cash to close check; isn't that correct?

23    A.  Correct.

24    Q.  But, sir, isn't it true that you've previously stated that

25    for the Jorge De La Cruz transaction as well it was a mistake,
```

Cross - Larueti                                66

1    that Michelle Cabrera simply accidently wired you an

2    overpayment?

3    A.   Yes, I did.

4    Q.   Sir, in fact, you always intended to use Jorge De La Cruz

5    as a straw purchaser; isn't that right?

6    A.   That's not right.  That's not correct.

7    Q.   Mr. Laureti, the forensic examiner in your lawsuit against

8    the bank found that you intentionally destroyed CDs, right?

9    A.   Correct.

10   Q.   And those were the CDs that you said contained emails,

11   correct?

12   A.   Correct.

13   Q.   And, in fact, those CDs were destroyed with a hot iron,

14   correct?

15   A.   No, that's not correct.

16   Q.   In fact, sir, if one were to look at pictures of the CDs,

17   you would see a hot iron had been placed on them; isn't that

18   correct?

19   A.   That's not correct.

20   Q.   And you destroyed those CDs because you knew that the

21   emails you provided in hard copy weren't the same as the emails

22   that would have been on the disk; isn't that correct?

23   A.   That's not correct.

24   Q.   So in that case, sir, you provided the bank with fake

25   documents, correct?

Redirect - Larueti                      67

```
 1   A.  That's not correct.

 2   Q.  And you provided them with those fake documents in order to

 3   obtain a financial benefit, correct?

 4   A.  No.

 5   Q.  And in this case, sir, there are also fake bank statements?

 6   A.  No.

 7   Q.  Fakes tax returns?

 8   A.  No.

 9   Q.  And you provided those documents to WAMU to obtain a

10   financial benefit; isn't that correct?

11   A.  That's not correct.

12          MS. STEWART:  I have no additional questions.

13          THE COURT:  Redirect.

14                        REDIRECT EXAMINATION

15   BY MR. GARVIN:

16   Q.  Mr. Laureti, let's start where we just ended.

17   A.  Yes, sir.

18   Q.  Now, you were asked by counsel if you were there when other

19   people were testifying, correct?

20   A.  Yes.

21   Q.  And you were also here at the beginning of the case when

22   the Court advised everybody in this room that what an attorney

23   says is not evidence; is that correct?

24   A.  Correct.

25   Q.  Let's talk about this civil case you had with the bank.
```

Redirect - Larueti                    68

1    What bank was it?

2    A.   Pacific National Bank.

3    Q.   So let me start by asking you, does that have anything

4    whatsoever to do with the criminal case that we are here on?

5    A.   No.

6    Q.   Does it have anything to do with 45 Hendricks?

7    A.   No, it does not.

8    Q.   Now, sir, the two CDs that we are talking about that were

9    damaged, are those the same two CDs that you told the ladies

10   and gentlemen of the jury about during your direct examination

11   yesterday?

12   A.   Yes.

13   Q.   And, sir, where did you find those two CDs when you went

14   back to your home to retrieve them?

15   A.   On the floor with all my paperwork dumped on the floor in

16   my home office.

17   Q.   Were you there when they took your furniture and dumped

18   everything on the floor?

19   A.   I was not.  I had a court order not to go in the house.

20   Q.   And was that part of a divorce proceeding that turned very

21   nasty?

22   A.   Yes.

23   Q.   The two CDs, were they, in fact, damaged?

24   A.   Yes.

25   Q.   But are you the one who damaged them?

```
 1   A.   No.

 2   Q.   Now, counsel has referred several times to, quote,

 3   forensic -- I don't even remember the exact word, forensic

 4   expert?

 5   A.   Yes.

 6   Q.   During the course of the civil litigation with the bank,

 7   did the bank go out and hire its own expert?

 8   A.   Yes.

 9   Q.   And was that person going to testify on behalf of the bank

10   as a paid expert witness?

11   A.   Yes.

12   Q.   And was that expert witness going to be paid by the bank?

13   A.   Yes.

14   Q.   And was -- did the bank expect that expert to testify

15   favorably on behalf of the bank?

16   A.   Yes.

17   Q.   Now, when the CDs were provided by you to the expert for

18   his examination, did that expert find that they were damaged?

19   A.   Yes.

20   Q.   And did he formulate his opinion that they were damaged

21   intentionally?

22   A.   Yes.

23   Q.   But were you the one who damaged those documents

24   intentionally?

25   A.   No.   CDs.
```

Redirect - Larueti                                    70

1  Q.  Excuse me.  Those CDs.  Thank you.

2         Does that have anything to do with Mr. Mostelac?

3  A.  No.

4  Q.  Does it have anything to do with Ms. Cabrera?

5  A.  No.

6  Q.  Did you know that Ms. Cabrera was phoneying up payoff

7  letters and forging your name?

8  A.  No.

9  Q.  Did it have anything to do with Galen Frizzie?

10 A.  No.

11 Q.  Did it have anything to do with Gordon Lending?

12 A.  No.

13 Q.  At that time did you know that Gordon Lending was under

14 investigation and ultimately was indicted?

15 A.  No.

16 Q.  Counsel asked you on cross-examination about the plea

17 agreement of Pedro Melian.

18        MR. GARVIN:  Your Honor, this document is in evidence

19 as a government's exhibit, but I don't recall the exhibit

20 number off the top of my head.

21        THE COURT:  I can tell you right quick.

22        MR. KATZ:  56D.

23        MR. GARVIN:  That would be 56D for the record.

24        THE COURT:  Yes, sir.

25

BY MR. GARVIN:

Q.   Sir, counsel just asked you isn't it a fact that Pedro
Melian pled guilty to the $50,000 that you wrote a check for?

A.   Yes.

Q.   Now, this is the plea agreement of Pedro Melian, and I'm
going through the plea agreement with you and I'm going to ask
you, do you see any reference on Page 1 to $50,000 being paid
by Marco Laureti?

A.   No.

Q.   Is there any reference to $50,000 being paid by Marco
Laureti on Page 2?

A.   No.

Q.   I would ask you the same question for Page 3.

A.   No.

Q.   Or Page 4?

A.   No.

Q.   Or Page 5?

A.   No.

Q.   Or Page 6?

A.   No.

Q.   Or Page 7?

A.   No.

Q.   However, what is the amount of the restitution that Pedro
Melian pled guilty to?  Is that $50,000?

A.   No.

Redirect - Larueti                                    72

1   Q.   What is that amount?

2   A.   $3,778,032.16.

3   Q.   Is there any mention of Marco Laureti or $50,000 on Page 8

4   of the nine-page plea agreement?

5   A.   No.

6   Q.   And finally, on the signature page is there any mention of

7   Marco Laureti and $50,000?

8   A.   No.

9   Q.   Now, I want to talk about Exhibit GS.   Do you see that?

10  A.   Yes, I do.

11  Q.   This is the Avondale Ventures document that counsel just

12  showed you a few moments ago.   Do you recall that counsel said

13  to you, well, doesn't this document say that Kent Kirschner is

14  the general manager?   Do you remember that question?

15  A.   I remember that question, yes.

16  Q.   And do you recall reading the document and it says Kent

17  Kirschner shall be named general manager?

18  A.   Yes.

19  Q.   Shall be named.   Was that intended to be a past event or a

20  future event?

21  A.   A future event.

22  Q.   Now, let's look at Jorge De La Cruz.   This document says

23  Jorge De La Cruz shall remain as circulation manager; is that

24  correct?

25  A.   Yes.

Redirect - Larueti                           73

1    Q.  And was that the intent?

2    A.  Yes.

3    Q.  Now, you have testified that prior to that date what amount

4    of money had you paid Jorge De La Cruz for working at

5    El Popular?

6    A.  Zero.

7    Q.  This document says that he shall remain circulation manager

8    with a yearly salary of $45,000.  Was that intended to be a

9    representation of the past or was that to be a representation

10   of the future?

11   A.  The future.

12   Q.  So was this stating that if Avondale Ventures promises, he

13   will stay on in that capacity but they will have to pay him

14   that amount of money?

15           MS. STEWART:  Objection.  Leading.

16           THE COURT:  Sustained.

17   BY MR. GARVIN:

18   Q.  What was your understanding of what, if anything, Avondale

19   Ventures would have to do if they wanted Mr. De La Cruz to stay

20   on?

21   A.  They will have to pay him the $45,000 per year.

22   Q.  Did you ever represent to anyone anywhere in these

23   documents that Mr. De La Cruz was being paid $45,000 prior to

24   that date?

25   A.  No.

Redirect - Larueti                        74

1   Q.  Sir, do you know the term "setup"?

2   A.  Yes.

3   Q.  I am showing you the HUD that was -- that is in evidence as

4   Exhibit PV on behalf of Eneida Ramirez.  You were asked about

5   this document on cross-examination.  Do you recall that?

6   A.  I do.

7   Q.  I am going to focus your attention to the part of the

8   transaction that says that there was a payoff of a second

9   mortgage of $1,683,381.50.  Do you see that?

10  A.  Yes, I do.

11  Q.  Did you ever ask Michelle Cabrera to put that amount there?

12  A.  I did not.

13  Q.  In fact, did you ever have a mortgage?

14  A.  No, I did not.

15  Q.  And, nonetheless, the HUD-1 prepared by Michelle Cabrera,

16  does it reflect the name of your company Northview Equities?

17  A.  Yes.

18  Q.  Were you at this Ramirez closing?

19  A.  I was not.

20  Q.  Did you know that she had put your name on this document as

21  a holder of a second mortgage?

22  A.  No.

23  Q.  And at the time, to be clear to the ladies and gentlemen,

24  you -- did you hold any mortgage against Eneida Ramirez?

25  A.  No, I did not.

Redirect - Larueti                          75

1   Q.  And did you know what is in evidence as Defendant's Exhibit

2   PE, that Michelle Cabrera's file had this document purporting

3   to be from you?

4   A.  No, I did not.

5   Q.  When you saw this document, did you recognize it as being

6   legitimate or as a counterfeit?

7   A.  Counterfeit.

8   Q.  When you saw that your name had been placed on the Eneida

9   Ramirez closing and the amount that was listed as a second

10  mortgage is in this letter that is PE, what was your thought?

11  A.  I thought that this was completely insane.

12  Q.  Did you think at any time that this was a setup?

13  A.  Yes.

14  Q.  And let me ask you, what happened to Mr. Mostelac?  Is he

15  on -- is his name on this HUD-1?

16  A.  No.

17  Q.  When Michelle Cabrera wired you the money and you became a

18  aware that your account had that money, had you seen either of

19  these documents PE or PV?

20  A.  I had not, no.

21  Q.  At that time did you have any reason to distrust Michelle

22  Cabrera?

23  A.  No.

24  Q.  When you went and got the cashier's check to return the

25  money to Michelle Cabrera, did anybody give you instructions as

Redirect - Larueti                              76

1    to what to do?

2    A.  Michelle Cabrera.

3    Q.  And did you follow those instructions?

4    A.  Yes.

5    Q.  And did you follow those instructions in good faith?

6    A.  Yes.

7    Q.  From that money did you also give a check to Mr. Mostelac?

8    A.  Yes.

9    Q.  And did Mr. Mostelac hold 50 percent of the option spread

10   for that unit?

11   A.  Yes.

12   Q.  Why if he held 50 percent of the option spread for that

13   unit is his name not on Defendant's Exhibit PV, the HUD-1 for

14   Eneida Ramirez?

15   A.  I have no idea.

16   Q.  I am showing you what is in evidence as Defendant's Exhibit

17   HJ which is the HUD-1 for the Hector Corzo closing.

18          This document was prepared by Michelle Cabrera; is

19   that correct?

20   A.  Yes.

21   Q.  This document lists American Holdings, does it not?

22   A.  Yes.

23   Q.  This document also lists Northview Equities, does it not?

24   A.  Yes.

25   Q.  Neither of those are listed as a second mortgage; is that

Redirect - Larueti                         77

1    correct?

2    A.   Correct.

3    Q.   Did Michelle Cabrera ever tell you why on the Corzo HUD she

4    listed both entities on two separate lines but in the Ramirez

5    HUD everything went to you?

6    A.   She never explained it.

7    Q.   Were you at the Corzo closing?

8    A.   No.

9    Q.   Did you see the Corzo HUD?

10   A.   I didn't see any of the HUDs prior to preparation, prior to

11   being approved.

12   Q.   Now, I want to go back, sir, on the questions about did you

13   pay from any funds the monthly payment for any of these units.

14   A.   Yes.

15   Q.   And is it a fact that -- did you -- did you make the

16   payments?

17   A.   Yes.

18   Q.   Now, let's go back to the condition of these units at the

19   time of closing.

20           Did the units have floors in place?

21   A.   No.

22   Q.   Did the units have the closets in place?

23   A.   No.

24   Q.   Did the units need other finishing work before they were

25   inhabitable?

Redirect - Larueti                    78

1   A.   Yes.

2   Q.   Was there any agreement with Mr. Mostelac and his buyers as

3   to who was going to pay to complete those things that needed to

4   be completed for these units?

5   A.   Yes.

6   Q.   And who was that?

7   A.   I was to complete them.

8   Q.   And while those construction tasks were being performed,

9   who was obligated to pay the mortgage payments?

10  A.   I was.

11  Q.   And when was your obligation to pay the mortgage payments

12  supposed to stop?

13  A.   As soon as the units were fully delivered.

14  Q.   And when you say "fully delivered," what does that mean?

15  A.   Built out.

16  Q.   Does that mean with floors?

17  A.   Yes.

18  Q.   Does that mean with completed closets?

19  A.   Yes.

20  Q.   Does that mean with light fixtures?

21  A.   Yes.

22  Q.   Would you categorize those things as necessities before

23  somebody can comfortably habitate an apartment?

24  A.   Yes.

25  Q.   Was that part of the deal?

Redirect - Larueti                              79

1   A.   Yes, it was.

2   Q.   Now, in the case of Mr. Pedro Melian, did he allow you to

3   complete the marble floors or what happened?

4   A.   In the case of Pedro Melian, he wanted, he wanted to

5   complete the marble floors with -- for the penthouse.

6   Q.   And what allowance, if any, was given?

7   A.   50,000.

8   Q.   When you made that payment to Pedro Melian, what was your

9   reason for making that payment?

10  A.   The reason for making the payment was because Mostelac had

11  conveyed to me that they were going to do the build-outs on

12  that particular penthouse.

13  Q.   And when you made the payments to MSJ Services, the three

14  $10,000 payments, what was your intention?

15  A.   My intention was that Mostelac had represented to me that

16  he had a cabinetry company that was going to build out the

17  closets for all three units and I gave him the checks for that.

18  Q.   Did you ever intend for those three checks to be any kind

19  of a bribe?

20  A.   No.

21  Q.   Any kind of a kickback?

22  A.   No.

23  Q.   Did you ever intend the $50,000 that you sent to Melian to

24  be any kind of a bribe?

25  A.   No.

Redirect - Larueti                    80

1   Q.  Any kind of a kickback?

2   A.  No.

3   Q.  Now, you were asked about the fact that John Olsen was

4   testifying here yesterday and whether or not he looked

5   uncomfortable; is that correct?

6   A.  Yes.

7   Q.  And this is with regard to the lease?

8   A.  Yes.

9   Q.  You explained circumstances that led to that lease

10  yesterday; is that correct?

11  A.  Yes.

12  Q.  Ultimately did you ever lease that property?

13  A.  No, I didn't.  No, I did not.  No.

14  Q.  Which bank received the original lease?

15  A.  Temecula Valley Bank.

16  Q.  And did you advise them that you had not succeeded in

17  convincing your wife to move out of that property?

18  A.  Well, actually, that bank went out of business before that

19  loan ever --

20  Q.  Was there ever any loan based upon the original lease?

21  A.  Yes.

22  Q.  Now I'm asking the original lease.

23  A.  No.

24  Q.  You said the file -- well, what happened to the file after

25  that bank went out of business?

Redirect - Larueti                                81

1   A.  The bank went out of business.  The people that were

2   employed at Temecula Valley Bank took the whole file to

3   Quadrant Financial and they called me up and asked me if I

4   wanted to pursue this loan again, and I said yes.

5   Q.  And is that when the process of the addendum was made?

6   A.  That's correct.  Yes.

7   Q.  The application for that bank, did you list that lease?

8   A.  No.

9   Q.  Did you list that lease as an asset in that application?

10  A.  No, I did not.

11  Q.  Did the banker who was dealing with you know that you had

12  not successfully leased that home?

13  A.  Yes.  Prior to closing, yes.

14  Q.  And did he also know that you were still residing in that

15  home?

16  A.  Yes.

17  Q.  At least until your divorce took place?

18  A.  That's correct.  Yes.

19  Q.  You were asked about the keys that the developer Federal

20  Expressed to you.  Do you recall that?

21  A.  Yes.

22  Q.  Sir, if you are putting in the floors and finishing the

23  construction so that these properties can be delivered, how are

24  you getting into the property if you don't have keys?

25  A.  Well, that was one of the initial problems.  I didn't have

Redirect - Larueti                                82

1    the keys so I needed the keys to have the workers go in the

2    apartment to build them out.

3    Q.  And was the -- was that understood between you and

4    Mr. Mostelac?

5    A.  Yes.

6    Q.  Was that understood with his three investors?

7    A.  I don't know what he conveyed to them, but I am going to

8    assume yes.

9    Q.  Well, let's not assume.  So let's back up.

10          Would it be fair and accurate to say you never met

11   Eneida Ramirez?

12   A.  Yes, correct.  I've never met her.

13   Q.  And prior to the closing you had not met Mr. Corzo?

14   A.  Correct.

15   Q.  And Mr. Melian, same thing.  Prior to his closing had you

16   ever met him?

17   A.  No.

18   Q.  After the closing had you ever met Mr. Corzo?

19   A.  No.

20   Q.  But did you, in fact, meet Mr. Melian?

21   A.  Yes.

22   Q.  And where was it that you met him?

23   A.  At 45 Hendricks.

24   Q.  And how did that come about?  Why were you there?

25   A.  I was there to do the build-outs.

Redirect - Larueti                           83

1   Q.  And why was -- why did he show up?

2   A.  He showed up because he was going to choose the flooring

3   for his unit and he was going to meet the people that were

4   going to do the -- that I would -- I offered for him to use to

5   do the build-outs on his penthouse.

6   Q.  Well, the penthouse was actually his mother's, wasn't it?

7   A.  Yes.

8   Q.  At that time did you even know that there was a

9   relationship between Eneida Ramirez and Mr. Melian?

10  A.  Yes, because Mostelac had told me that.

11  Q.  You were asked whether or not you had $158,000 that was

12  sufficient to cover the cash to close for the Melian

13  transaction; remember that?

14  A.  Yes.

15  Q.  Now, sir, at that time you answered "yes" or "no" but you

16  mentioned the word "concessions" and "contributions."

17         What was your understanding as to the amount that

18  Mr. Mostelac had agreed with Mr. Melian that the option holders

19  would contribute to this closing as a contribution in addition

20  to completing the construction necessary to move in?

21  A.  It was -- I don't remember the exact amount, but it was, it

22  was within the guidelines of the lender.

23  Q.  And what are those guidelines?

24  A.  6 percent contribution and 6 percent concession.

25  Q.  So when you had in your account available the $158,000, was

Redirect - Larueti                          84

1    that less than the 6 percent selling price?

2    A.   Yes.

3    Q.   And did you discuss this matter with Michelle Cabrera?

4    A.   Yes, and Galen Frizzie both.

5    Q.   And did you even send or receive a letter from the bank

6    concerning contributions and concessions?

7    A.   Yes.

8    Q.   We went over this during direct examination yesterday, but

9    when it's a family member, such as Mr. De La Cruz, was there

10   any limit to the amount that you could give to him?

11   A.   There's no limit.

12   Q.   And with regard to Mr. Melian, what was the limit if you

13   know?

14   A.   I think it's 12 percent.  6 and 6.

15   Q.   And was the amount of $158,000 that you were contributing,

16   was it less than 6 percent?

17   A.   Yes.

18   Q.   At the time that you were doing that, did you believe that

19   to be proper or improper?

20   A.   I believed it was proper.

21   Q.   Sitting here today do you know whether or not that is

22   proper or improper?

23   A.   I still believe it's proper.

24   Q.   When you were sent the Ramirez money and you got all of the

25   Ramirez money, that 1,600,000 that we've been looking at, did

Redirect - Larueti                    85

1    you talk to Michelle Cabrera?

2    A.   Yes.

3    Q.   Did she give you any explanation why she was sending you

4    all of the money?

5    A.   She told me that the HUD was approved --

6    Q.   And --

7    A.   -- under those conditions.

8    Q.   And did she say whether or not it was intentional or

9    unintentional that you ended up receiving all of the money?

10   A.   She said that that's how Mostelac asked her to put the HUD

11   together, to send me all of the funds.

12   Q.   And at that time before she sent it, did she ever tell you

13   she was going to do that?

14   A.   No.

15   Q.   You were asked by counsel if you sent Galen Frizzie false

16   information.  Do you recall that?

17   A.   Yes, I do.

18   Q.   You were asked by counsel if you sent Mr. Frizzie false

19   bank statement.  Do you recall that?

20   A.   Yes.

21   Q.   And false tax returns?

22   A.   Yes.

23   Q.   Did you know at any time that Mr. Frizzie and the other

24   people at Gordon Lending were taking a position of hiding funds

25   from the bank, hiding information from the bank?

Redirect - Larueti                           86

1    A.   No.

2    Q.   I'm showing you what's in evidence as AB.

3              MS. STEWART:  Objection, Your Honor.  This is beyond

4    the scope.

5              MR. GARVIN:  I'm going to tie it in.

6              MR. KATZ:  The false documents, Your Honor.

7              THE COURT:  All right.  Approach sidebar.

8         (The following proceedings were held at the bench:)

9              THE COURT:  Yes, sir.

10             MR. GARVIN:  Yes, I was going to tie the document in,

11   Your Honor, because the next document, the -- what we have been

12   arguing is a false email that was counterfeited that has those

13   attachments which is the bank statement and the tax return, and

14   it is the same person who is writing not to Mr. Laureti but to

15   a current employee the bank must not know.  And I think they

16   tie together.  Because I asked, well, you heard Mr. Frizzie say

17   that he received false information.  Yes, this is Mr. Frizzie

18   who did it who is lying to the bank.  I think it's proper

19   redirect.

20             THE COURT:  Ms. Stewart, anything further?

21             MS. STEWART:  No, Your Honor.

22             THE COURT:  All right.  I'll overrule the objection.

23        (The following proceedings were held in open court:)

24   BY MR. GARVIN:

25   Q.   Now, Mr. Frizzie -- counsel pointed out during

Redirect - Larueti                    87

1    cross-examination Mr. Frizzie is the one who testified in this

2    case to the ladies and gentlemen of the jury that the

3    documentation that he received he just -- he didn't change any

4    of it.  You heard that testimony, correct?

5    A.  I did.

6    Q.  This is in evidence as Defendant's Exhibit AB.  Mr. Frizzie

7    and other co-employees at Gordon Lending, "WAMU cannot know

8    about the 2nd!!!"

9          Did Mr. -- was Mr. Frizzie making you aware that he

10   was withholding information intentionally from WAMU?

11   A.  No, he did not.

12   Q.  And the exhibit that the United States is referring to

13   which we have in evidence as KH -- strike that.  Well, I'll use

14   this one which is KJ.

15         Is the document with an email that says that there

16   are -- purports that there is information and supported by,

17   quote, total liquidity as per attached documents; do you see

18   that?

19   A.  I do see that, yes.

20   Q.  Now, the person who sent -- forwarded this email is the

21   same Galen Frizzie, correct?

22   A.  Correct.

23   Q.  When I say "the same," the same who we just saw is

24   intentionally withholding information from WAMU, correct?

25   A.  Correct.

Redirect - Larueti                          88

```
 1   Q.  He is the same person who as a person on a computer who

 2   forwards an email, do you know if he has the ability to change

 3   any and all of this information?

 4        MS. STEWART:  Objection.  Leading and also outside of

 5   the scope.

 6        MR. GARVIN:  I'll rephrase because I think that's

 7   right.

 8        THE COURT:  Okay.

 9   BY MR. GARVIN:

10   Q.  I think that we discussed yesterday that there is a

11   difference between this document KJ and the earlier document

12   KH; is that correct?

13   A.  That's correct.  Yes.

14   Q.  And what does that suggest to you, sir?

15   A.  That the email was tampered with.

16   Q.  Did you write this email, sir?

17   A.  I never wrote that email.  My house wasn't even for sale,

18   the other one.

19   Q.  Sir, you were asked when you sign a document, such as

20   Government's 4R, does that mean something to you?

21   A.  Yes, I was asked that question.

22   Q.  Now, would you agree that in a civil matter if you sign a

23   document, you're responsible for whatever is on that document

24   whether you read it or you didn't?  Would you agree with that?

25   A.  Yes.
```

```
 1   Q.  But in this case in a criminal case of fraud that requires
 2   specific intent --
 3           MS. STEWART:  Objection, Your Honor.  It calls for a
 4   legal conclusion.
 5           THE COURT:  Let me hear the rest of the question, then
 6   I'll rule on the objection.
 7           MR. GARVIN:  I'll rephrase, Your Honor, because I lost
 8   my thought.  I'm sorry.
 9           THE COURT:  Okay.
10   BY MR. GARVIN:
11   Q.  In this case did you read that document?
12   A.  I did not.
13   Q.  And in this case, because it's a criminal case -- I'll
14   rephrase it.
15           In this case did you know that the document that you
16   were signing at the closing that Michelle Cabrera was
17   conducting had information that was substantially false?
18   A.  I did not.
19   Q.  When you were at the closing, did you have any reason to
20   question what Galen Frizzie had put on the Uniform Residential
21   Loan Application?
22   A.  No.
23   Q.  Had you even seen the Uniform Residential Loan Applications
24   that he had submitted to the bank without your signature?
25   A.  No.
```

Redirect - Larueti                           90

1    Q.   When you were at the closing and you were asked to sign the

2    documents, describe to the ladies and gentlemen how much time

3    and what was going on and where you were at when you were

4    signing the documents that included the HUD-1 and the Uniform

5    Loan Application in this case.

6              MS. STEWART:  Objection, Your Honor.  Compound.

7              THE COURT:  Sustained.

8    BY MR. GARVIN:

9    Q.   Where were you when you were signing these documents?

10   A.   The signing of the documents took place in my home at 2955

11   North Bay Road.

12   Q.   What was the condition of your wife at that time?

13   A.   I believe she was seven months pregnant.

14   Q.   Was she present?

15   A.   Yes.

16   Q.   Did she have to sign some of the documents?

17   A.   Yes.

18   Q.   Did you have a young child present at the closing?

19   A.   Yes.

20   Q.   How old was Gianna at the time?

21   A.   A year and a half.

22   Q.   Was it daytime or was it nighttime when Michelle Cabrera

23   arrived?

24   A.   It was later in the day.

25   Q.   And when you went through the closing, was the closing --

```
 1   did Michelle Cabrera take her time and explain and go over each

 2   page with you?

 3   A.  No.

 4   Q.  How was the actual signing handled?

 5   A.  Very fast.

 6   Q.  And who was in control of the paperwork?

 7            MS. STEWART:  Objection, Your Honor.  Outside of the

 8   scope.

 9            THE COURT:  Overruled.

10   BY MR. GARVIN:

11   Q.  Who was in control --

12   A.  Michelle Cabrera.

13   Q.  Who was actually -- was anyone actually flipping the pages

14   and pointing sign here, sign there?

15   A.  The -- she was flipping the pages.  The documents already

16   had pre -- those "sign" stickies.

17   Q.  I'm going to close with the lease.  I don't know if I

18   asked, but did that lease, John Olsen lease have anything to do

19   with the 45 Hendricks transactions here?

20   A.  Absolutely not.

21   Q.  Sir, did you intentionally join a scheme to defraud WAMU?

22   A.  No.

23   Q.  Did you know that Galen Frizzie was supplying 1003s to WAMU

24   that had false information?

25   A.  No.
```

Redirect - Larueti                          92

```
 1   Q.  Did you supply false information to Galen Frizzie?

 2   A.  No, I did not.

 3   Q.  Sir, did you know that Michelle Cabrera was receiving

 4   payments from Mr. Mostelac to do something that she thought was

 5   improper?

 6   A.  No, I did not.

 7   Q.  Did you know that the three clients of Mr. Mostelac, and

 8   I'm referring to Corzo, Ramirez, and Melian, were in reality

 9   straw buyers?

10   A.  No, I did not.

11   Q.  Prior to the closings of these transactions did any of

12   these people tell you that they were straw buyers?

13   A.  No.

14   Q.  Did you, sir, intentionally aid these people to commit a

15   crime?

16   A.  No.

17           MR. GARVIN:  I have no further questions.

18           THE COURT:  All right.  Thank you, Mr. Laureti.  You

19   may step down.

20           MS. STEWART:  Your Honor, can I ask one question on

21   recross?

22           THE COURT:  Well, was it something new --

23           MS. STEWART:  Yes, Your Honor.

24           THE COURT:  -- that was not covered by you on cross?

25           MS. STEWART:  I believe so, Your Honor, and I'm happy
```

Redirect - Larueti                    93

```
 1    to proffer to Your Honor sidebar.

 2              THE COURT:  All right.  Approach.

 3        (The following proceedings were held at the bench:)

 4              THE COURT:  Do any of you have a cell phone that's on?

 5              MR. KATZ:  Mine is in airplane mode.

 6              THE COURT:  It has to be off, otherwise it impacts the

 7    audio system.

 8              MR. KATZ:  Okay.

 9              MS. STEWART:  Okay.

10              THE COURT:  It has to be powered off.  It can't be on

11    vibrate.

12              MR. KATZ:  I apologize, Your Honor.

13              MS. STEWART:  Just a while ago on redirect the witness

14    testified that his house wasn't even for sale at the time of

15    his purchase of the San Marino property.  Well, when the

16    defendant provided information to Washington Mutual as part of

17    his hardship matters, he told them when I purchased this home I

18    had a buyer in the pipeline from my previous residence.  I

19    would like to ask him that question because I believe --

20              MR. GARVIN:  I don't know if we're talking about the

21    same residence.

22              MS. STEWART:  Well, this is regarding the 205 East

23    San Marino residence.

24              THE COURT:  I will allow it.

25              MS. STEWART:  Okay.
```

1     (The following proceedings were held in open court:)

2                    RECROSS-EXAMINATION

3  BY MS. STEWART:

4  Q.  Mr. Laureti, you just stated -- if you look at the bottom

5  of Exhibit 4C, it says keep in mind that time of the sale of my

6  home -- sorry.  Keep in mind that at the time of the sale of my

7  home at 2955 North Bay Road the payoff totals are give or take

8  1.85 million.

9            MR. GARVIN:  Your Honor, may I approach again?

10 Because the address.

11           THE COURT:  Yes.

12           MS. STEWART:  Yes.  That's correct, Your Honor.  I'll

13 approach again.

14           THE COURT:  Okay.

15     (The following proceedings were held at the bench:)

16           MS. STEWART:  Your Honor, I believe that what this

17 says is that this is regarding the purchase of the 205 East

18 San Marino property.  He at that time had the 2955 North Bay

19 Road property which was then for sale and that when it was

20 sold, it would increase his liquidity.  I believe that here he

21 is referring to this house which is the same house referring to

22 here being in the pipe; in other words, he would then have two

23 mortgages is how I understand this.

24           MR. GARVIN:  I think that what he said on the stand

25 was -- I had that exhibit up and when I was reading the

Recross - Larueti                    95

```
 1   exhibit, he read the last sentence that says that I haven't
 2   sold my home, meaning not 205 San Marino, meaning 2955 North
 3   Bay Road, right?  So what I'm saying is that that's not a new
 4   matter or an inconsistent matter for recross.
 5        MS. STEWART:  Your Honor, I believe it -- I don't know
 6   if you're thinking or if I can speak.
 7        THE COURT:  Go ahead.
 8        MS. STEWART:  I believe it's inconsistent.  I believe
 9   the defendant just testified that at the time he was purchasing
10   the 205 San Marino property he did not have -- his other house
11   was not for sale.  In this document he says when I purchased
12   this home, as in the 205 East San Marino property, I had a
13   buyer in the pipeline for my previous residence for almost
14   $2.1 million.  I mean, that's how I understand it.  If I'm
15   mistaken, I'm sure the witness will tell me.  But --
16        MR. GARVIN:  The reason why I'm objecting is because
17   it's recross of a matter that was not raised for the first time
18   on -- it would be recross on a matter that was not raised for
19   the first time on redirect.  This document was placed on the
20   stand while counsel did her cross-examination, and now we're
21   going to do it -- and the last sentence is the sentence that
22   we're referring to where it says -- he read as it was up there.
23   I went back to it because it was raised on cross.  Keep in mind
24   that the -- I can't read it upside down, but the sale of the
25   house, 2955 North Bay Road, has not been sold.
```

Recross - Larueti                    96

1              MS. STEWART:  The witness said the house wasn't even

2      for sale.  In fact, in this document he said it was for sale.

3              THE COURT:  I'll let you inquire and I'll permit you a

4      re-redirect on that issue if need be.

5          (The following proceedings were held in open court:)

6      BY MS. STEWART:

7      Q.  Sir, you just testified on redirect that this home wasn't

8      even for sale at the time you were buying the 205 East

9      San Marino property; is that correct?

10     A.  That's correct.  It was not under contract for sale.

11     Q.  And yet later on you provided information to the bank,

12     which is included in Exhibit 4, JP Morgan Chase, in which you

13     said regarding the 205 East San Marino property that when you

14     were purchasing the 205 East San Marino property, I had a buyer

15     in the pipeline for my previous primary residence?

16     A.  That's correct.

17     Q.  Sir, isn't the fact that the previous primary residence is

18     the one stated here which you said was not even for sale?

19     A.  The house was not under contract for sale.

20     Q.  Sir, your testimony was that it wasn't for sale; wasn't

21     that correct?

22     A.  It was not under contract for sale.

23             MS. STEWART:  Okay.  No additional questions.

24             THE COURT:  All right.  Anything further?

25             MR. GARVIN:  No, Your Honor.

Recross - Larueti                    97

1        THE COURT:  All right.  Thank you, Mr. Laureti.  You

2   may step down, sir.

3        THE WITNESS:  Thank you.

4      (Witness was excused.)

5                    *     *     *     *     *

6      (Proceedings were had which are not herein transcribed.)

7

8                    C E R T I F I C A T E

9      I, Karl Shires, Registered Professional Reporter and

10  Federal Certified Realtime Reporter, certify that the foregoing

11  is a correct transcript from the record of proceedings in the

12  above-entitled matter.

13      Dated this 22nd day of November, 2017.

14

15  _____
    Karl Shires, RMR FCRR
16

17

18

19

20

21

22

23

24

25

BY MR. GARVIN: [14]
5/15 5/20 6/12 8/1
9/15 9/19 67/14 70/24
73/16 86/23 88/8 89/9
90/7 91/9
BY MS. STEWART:
[11] 22/6 28/3 31/5
35/18 45/1 49/13 52/3
62/14 62/22 94/2 96/5
MR. GARVIN: [43] 3/4
3/10 3/13 3/16 3/22
4/16 5/12 5/18 6/4 6/9
7/22 9/11 9/18 10/17
11/4 11/7 11/14 12/12
13/14 14/20 17/9
18/25 19/25 20/22
21/14 27/21 31/3
35/15 44/13 49/10
62/20 70/17 70/22
86/4 86/9 88/5 89/6
92/16 93/19 94/8
94/23 95/15 96/24
MR. KATZ: [7] 4/8
4/11 70/21 86/5 93/4
93/7 93/11
MS. STEWART: [45]
10/20 11/1 11/11
11/22 11/25 12/22
12/24 14/1 14/17
14/24 15/5 16/19 17/2
17/20 18/5 18/17
18/23 20/10 20/14
21/9 21/17 21/24 52/2
62/21 67/11 73/14
86/2 86/20 88/3 89/2
90/5 91/6 92/19 92/22
92/24 93/8 93/12
93/21 93/24 94/11
94/15 95/4 95/7 95/25
96/22
THE COURT: [83] 3/1
3/9 3/12 3/15 3/20 4/3
4/6 4/10 4/12 4/17
4/20 4/22 6/7 6/10
7/24 9/14 9/17 10/19
10/23 11/3 11/6 11/9
11/21 11/24 12/11
12/18 12/23 14/16
14/18 14/23 15/1
16/17 16/24 17/8
17/23 18/11 18/22
18/24 19/24 20/5
20/13 21/5 21/16
21/19 21/25 22/3
27/23 31/4 35/17
44/17 44/19 49/12
52/1 61/23 62/5 62/9
67/12 70/20 70/23
73/15 86/6 86/8 86/19
86/21 88/7 89/4 89/8
90/6 91/8 92/17 92/21
92/23 93/1 93/3 93/5
93/9 93/23 94/10
94/13 95/6 96/2 96/23
96/25

DEPUTY: [1] 4/21
THE WITNESS: [4]
28/2 44/18 44/20 97/2

$
$1,095,000 [1] 47/14
$1,683,381.50 [1] 74/9
$1.21 [1] 64/9
$1.21 million [1] 64/9
$1.6 [7] 29/8 29/11
29/13 29/14 29/15
63/19 64/3
$1.6 million [7] 29/8
29/11 29/13 29/14
29/15 63/19 64/3
$1.75 [1] 64/4
$1.75 million [1] 64/4
$10,000 [3] 55/24 57/4
79/14
$105,483.25 [1] 25/17
$157,000 [1] 45/15
$157,917.36 [3] 43/2
44/2 64/25
$158,000 [7] 43/21
44/3 44/5 45/3 83/11
83/25 84/15
$2 [1] 46/18
$2 million [1] 46/18
$2,000 [1] 33/22
$2,050,000 [2] 46/18
63/13
$2.1 [5] 33/5 33/24
47/18 64/7 95/14
$2.1 million [5] 33/5
33/24 47/18 64/7
95/14
$243,791.08 [1] 50/20
$3,778,032.16 [1] 72/2
$3.8 [2] 46/23 62/24
$3.8 million [2] 46/23
62/24
$30,000 [2] 57/1 57/4
$35,000 [1] 59/3
$387,208.92 [2] 50/18
51/5
$420,000 [1] 59/6
$45,000 [8] 34/24
35/12 35/15 35/15
35/21 73/8 73/21
73/23
$5 [1] 19/5
$5,000 [1] 45/18
$50,000 [13] 48/22
49/3 49/9 49/16 49/21
63/10 71/3 71/7 71/10
71/24 72/3 72/7 79/23
$500,000 [1] 19/7
$587,000 [1] 25/23
$70,000 [1] 59/9
$700,000 [1] 63/25
$790,000 [5] 42/13
43/4 43/23 45/6 64/16
$8 [1] 26/3
$8 million [1] 26/3
$890,000 [2] 64/14

-
-v [1] 1/6

1
$1,600,000 [1] 84/25
1.21 million [1] 64/13
1.6 million [1] 63/21
1.75 million [2] 63/16
63/22
1.85 million [1] 94/8
1003 [1] 3/22
1003s [1] 91/23
1099 [1] 56/15
10:31 [2] 62/3 62/4
10:44 [1] 62/9
12 percent [1] 84/14
12/10/2013 [1] 7/10
15-minute [1] 61/25
16-60340-BLOOM/CO
HEN [1] 1/2
17 [1] 8/10

2
2,050,000 [1] 63/15
2.1 million [1] 64/13
20 [1] 16/3
200 [1] 1/21
2006 [3] 30/12 30/14
30/15
2007 [13] 7/8 9/22
30/18 32/1 32/14 34/3
34/17 34/18 34/20
36/8 43/6 53/23 54/18
2008 [1] 58/18
2013 [1] 7/10
2017 [2] 1/8 97/13
203G [1] 1/24
205 [10] 23/10 58/15
93/22 94/17 95/2
95/10 95/12 96/8
96/13 96/14
2055 [1] 53/6
22nd [1] 97/13
243,791.08 [1] 51/6
25 [1] 32/1
26 [2] 7/8 7/16
26th [2] 7/13 7/18
27D [1] 43/8
27th [1] 9/18
2955 [7] 53/3 53/6
90/10 94/7 94/18 95/2
95/25
299 [1] 1/24
2B [3] 52/11 52/14
52/18
2nd [1] 87/8

3
3.8 [1] 63/15
30 [1] 57/20
3150 [1] 1/21
33131 [1] 1/22
33301 [1] 1/25
33394 [1] 1/19
3D [5] 47/12 47/14

4
45 [10] 10/8 32/20
33/1 33/4 46/11 50/1
56/5 68/6 82/23 91/19
4C [1] 94/5
4D [2] 64/6 64/9
4R [2] 25/10 88/20

5
50 [1] 50/13
50 percent [3] 51/1
76/9 76/12
50,000 [1] 79/7
50/50 [1] 50/13
500 [1] 1/19
5133 [1] 25/23
5496 [1] 1/24
56D [2] 70/22 70/23
5D [1] 62/22

6
6 percent [3] 83/24
84/1 84/16
6/26 [1] 7/16
6th [2] 43/20 45/3

7
7/17 [1] 8/10
769-5496 [1] 1/24

8
8:57 [1] 1/9

9
954 [1] 1/24
9:03 [1] 4/20
9:14 [1] 11/1
9:34 [1] 22/3

A
a.m [7] 1/9 4/20 11/1
22/3 62/3 62/4 62/9
AAAB [5] 2/9 3/17
3/20 4/4 4/6
AAAK [1] 51/24
AB [2] 86/2 87/6
ability [1] 88/2
able [7] 12/10 13/12
16/15 17/3 18/10
18/19 21/18
above-entitled [1]
97/12
Absolutely [1] 91/20
accident [4] 4/9 14/4
14/6 14/15
accidently [4] 14/7
40/13 40/16 66/1
accomplice [1] 19/8
account [12] 13/7
13/8 25/22 43/10
43/13 43/15 43/17
43/18 43/21 45/4
75/18 83/25
accountant [1] 56/16
accurate [1] 82/10

4
activities [2] 31/2 31/9
actual [1] 91/4
addendum [5] 60/2
60/3 60/6 60/9 81/5
addition [2] 17/14
83/19
additional [6] 29/11
29/12 29/13 29/15
67/12 96/23
address [6] 52/24
53/1 53/1 58/15 58/15
94/10
addressing [2] 15/4
21/5
admissible [5] 16/19
17/19 18/5 18/7 19/13
admitted [3] 3/19 4/1
9/14
advance [1] 14/5
advise [1] 80/16
advised [1] 67/22
affidavit [1] 38/4
affirmative [1] 5/7
agent [2] 54/8 54/8
agents [3] 13/6 54/21
54/23
ago [2] 72/12 93/13
agree [13] 11/10 23/3
31/20 50/16 52/13
56/19 60/23 61/5
63/21 64/2 64/19
88/22 88/24
agreed [2] 24/23
26/22 26/24 83/18
agreeing [2] 26/14
26/20
agreement [6] 12/4
70/17 71/5 71/6 72/4
78/2
ahead [1] 95/7
aid [1] 92/14
airplane [1] 93/5
Alain [4] 53/19 53/21
53/24 54/2
alleged [2] 8/24 12/16
allow [5] 14/19 18/16
20/9 79/2 93/24
allowance [1] 79/6
allowed [1] 44/15
allowing [1] 3/12
Almazan [3] 54/9
54/12 55/7
altered [5] 15/19
15/20 15/24 16/12
18/24
Alvarez [3] 54/9 54/12
55/7
AMERICA [1] 1/4
American [17] 41/8 45/9
48/2 57/1 57/6 63/25
64/2 71/23 72/1 73/3
73/14 74/11 75/9
83/17 83/21 84/10

amount... [1] 84/15
answer [15] 9/4 9/7
17/5 19/3 19/4 19/14
27/25 27/25 30/3 33/2
34/2 44/12 44/16
44/18 44/19
answered [1] 83/15
answers [1] 19/16
ANTONIO [1] 5/14
anybody [1] 75/25
apartment [2] 78/23
82/2
apologize [1] 93/12
Appearances [1] 1/16
appeared [1] 15/24
appears [2] 7/4 50/17
application [20] 24/12
24/15 24/20 24/22
25/11 26/7 26/23
26/24 27/1 27/17 28/6
28/11 28/20 28/21
33/14 33/22 81/7 81/9
89/21 90/5
applications [2] 24/10
89/23
applied [4] 23/19
23/22 23/24 24/3
appreciate [2] 3/11
44/16
approach [4] 86/7
93/2 94/9 94/13
approached [1] 33/10
appropriate [1] 18/16
approve [1] 33/18
approved [9] 5/24
8/21 28/24 29/2 32/23
33/14 33/23 77/11
85/5
approximately [3]
25/23 29/8 46/23
April [1] 54/18
April 2007 [1] 54/18
area [2] 12/8 20/7
arguing [1] 86/12
argument [1] 12/15
arrived [1] 90/23
asked [25] 9/3 9/6 9/9
11/7 31/11 42/18 58/9
58/14 59/11 67/18
70/16 71/2 74/4 80/3
81/3 81/19 83/11
85/10 85/15 85/18
86/16 88/19 88/21
90/1 91/18
asking [6] 10/6 12/15
19/15 31/12 68/3
80/22
asset [1] 81/9
assets [5] 26/2 26/6
27/5 28/13 30/23
Assistant [1] 1/18
assume [3] 48/3 82/8
82/9
assuming [2] 63/15
64/12

**B**

back [22] 10/24 13/9
14/9 14/20 21/2 26/6
30/1 30/2 44/21 48/14
48/15 63/24 63/25
64/23 65/2 65/3 65/22
68/14 77/12 77/18
82/9 95/23
backed [3] 37/21 38/9
40/3
backup [3] 38/14
38/16 38/17
bank [52] 5/24 8/21
10/7 10/10 10/15
15/12 29/19 30/9 37/2
37/5 37/5 37/8 37/12
37/13 38/24 43/11
43/13 44/21 59/22
59/25 60/15 60/18
60/24 61/6 66/8 66/24
67/5 67/25 68/1 68/2
69/6 69/7 69/9 69/12
69/14 69/15 80/14
80/15 80/18 80/25
81/1 81/2 81/7 84/5
85/19 85/25 85/25
86/13 86/15 86/18
89/24 96/11
bank's [1] 41/22
banker [1] 81/11
banks [1] 30/21
based [5] 27/8 29/4
32/23 33/18 80/20

Bay [10] 52/5 53/1
53/3 53/6 53/6 90/11
94/7 94/18 95/3 95/25
beginning [1] 67/21
begins [1] 10/23
behalf [5] 56/19 56/21
69/9 69/15 74/4
believe [27] 4/7 6/5
12/8 13/11 13/18 15/2
16/5 16/17 17/3 17/6
19/22 22/19 22/21
44/11 44/11 49/25
64/12 84/18 84/23
90/13 92/25 93/19
94/16 94/20 95/5 95/8
95/8
believed [2] 28/20
84/20
bench [4] 16/4 86/8
93/3 94/15
benefit [9] 35/2 35/5
35/8 60/17 60/25 61/6
61/11 67/3 67/10
best [1] 17/11
beyond [1] 86/3
Biscayne [1] 1/21
Blake [5] 15/13 16/2
18/3 21/3 21/17
Blake's [2] 20/10
21/22
BLOOM [1] 1/2
booked [1] 48/18
Born [1] 51/23
borrower [5] 27/12
29/7 30/25 31/2 31/13
borrower's [1] 30/22
borrowers [1] 27/5
31/8 39/4
bottom [6] 10/2 10/3
21/6 26/9 61/14 94/4
bought [1] 23/13
Boulevard [1] 1/19
1/21 1/24
Box [1] 57/10
break [2] 49/15 61/25
bribe [2] 79/19 79/24
bring [13] 4/19 13/8
13/17 14/9 14/12
14/25 22/1 29/11
29/14 62/8 63/24
64/23 65/3
broker [5] 24/21 25/1
30/1 30/2 30/10
brother [1] 24/22
brought [7] 14/13
48/14 48/15 50/23
63/25 65/2 65/22
Broward [2] 1/19 1/24
build [5] 79/11 79/16
82/2 82/25 83/5
build-outs [3] 79/11
82/25 83/5
Built [1] 78/15
burden [1] 17/12
business [2] 80/18

buy [4] 19/5 41/7
41/25 46/10
buyer [12] 13/9 42/10
49/19 49/22 50/2 50/4
51/18 63/4 63/5 93/18
95/13 96/14
buyers [3] 78/2 92/9
92/12
buying [1] 96/8

**C**

cabinetry [1] 79/16
Cabrera [51] 5/23
6/17 7/20 8/19 13/1
13/7 13/16 13/17 14/5
14/7 19/5 28/23 40/13
40/16 40/21 42/12
42/23 43/4 43/23 45/6
53/17 54/10 54/22
55/1 55/5 55/14 56/10
57/6 57/16 63/18
64/16 64/23 65/21
66/1 70/4 70/6 74/11
74/15 75/17 75/22
75/25 76/2 76/18 77/3
84/3 85/1 89/16 90/22
91/1 91/12 92/3
Cabrera's [3] 55/18
56/12 75/2
call [5] 3/1 19/8 27/24
28/1 62/5
called [5] 31/23 32/3
56/13 60/9 81/3
calls [2] 31/4 89/3
candid [1] 16/5
capacity [2] 16/14
73/13
cards [1] 24/10
case [52] 1/2 3/7 3/7
5/1 5/2 5/4 5/6 6/7
10/25 15/10 15/11
15/12 15/22 16/17
16/19 17/12 17/15
17/20 18/8 18/13
19/15 20/12 20/16
21/5 21/7 22/11 23/6
23/8 25/10 31/16
31/21 38/5 40/21
58/16 61/13 62/1
64/16 66/24 67/5
67/21 67/25 68/4 79/2
79/4 87/2 89/1 89/1
89/11 89/13 89/13
89/15 90/5
cash [34] 13/2 14/12
14/14 29/7 40/6 40/9
40/12 42/23 43/1 44/1
44/9 45/9 45/11 45/15
48/7 48/14 48/17
50/23 51/3 51/5 51/8
51/12 54/1 54/7 54/21
54/25 55/11 56/3 63/7
65/9 65/13 65/17
65/22 83/12
cashier's [20] 13/9

categorize [1] 78/22
CDs [19] 15/20 15/21
19/21 19/22 19/23
20/3 40/4 66/8 66/10
66/13 66/16 66/20
66/8 68/9 68/13 68/23
69/17 69/25 70/1
cell [1] 93/4
certain [1] 20/17
certainly [1] 18/15
Certified [1] 97/10
certify [1] 97/10
chair [1] 11/18
change [2] 87/3 88/2
charged [3] 22/17
61/2 61/9
Chase [1] 96/12
check [25] 13/10
14/10 40/6 40/9 41/3
41/7 41/15 41/15
41/20 41/22 41/25
42/3 42/20 45/8 48/15
48/16 50/23 64/24
65/4 65/10 65/17
65/22 71/3 75/24 76/7
checking [4] 43/10
43/17 43/18 45/4
checks [8] 19/6 19/7
40/12 43/15 43/16
43/18 79/17 79/18
Chentell [1] 31/23
child [1] 90/18
childhood [1] 57/18
choose [1] 83/2
Circuit [2] 15/13 20/9
circulation [5] 34/23
35/12 36/13 72/23
73/7
circumstances [1]
80/9
Citibank [1] 25/22
civil [5] 17/12 17/16
67/25 69/6 88/22
claim [1] 37/21
claimed [2] 39/18
57/15
claims [1] 56/7
clear [4] 4/2 4/4 20/11
74/23
clients [1] 92/7
close [34] 13/2 14/12
14/14 40/6 40/9 40/12
42/24 43/1 44/2 44/10
45/9 45/11 45/15
48/13 48/14 48/17
50/23 51/3 51/5 51/9
51/12 54/2 54/7 54/22
54/25 55/11 56/3 63/7
65/10 65/13 65/17
65/22 83/12 91/17

**C**

closets [3]  77/22
78/18 79/17
closing [33]  6/14 6/17
8/14 13/6 13/18 14/6
26/12 28/21 28/23
28/25 51/20 51/21
53/13 53/15 53/17
53/19 65/3 74/18 75/9
76/17 77/7 77/19
81/13 82/13 82/15
82/18 83/19 89/16
89/19 90/1 90/18
90/25 90/25
closings [2]  7/21
92/11
co-counsel [1]  11/24
co-employees [1]
87/7
coconspirator [1]
31/21
Code [1]  18/4
COHEN [1]  1/2
COHN [1]  1/13
coincidence [1]  44/7
coincidentally [1]
44/2
collateral [4]  17/11
19/2 19/13 21/4
come [3]  14/20 19/11
82/24
comfortably [1]  78/23
coming [2]  4/8 4/22
commend [1]  4/24
commission [3]  19/12
30/1 30/2
commit [2]  22/17
92/14
communicated [1]  5/2
companies [3]  23/19
23/22 36/20
company [14]  15/10
20/16 23/24 24/2 24/4
25/15 37/1 37/2 37/5
37/9 50/20 56/13
74/16 79/16
compare [2]  9/24 10/2
compensation [1]
57/1
complete [4]  78/3
78/7 79/3 79/5
completed [2]  78/4
78/18
completely [2]  17/12
75/11
completing [1]  83/20
Compound [1]  90/6
computer [15]  15/20
15/21 15/24 16/1
18/21 37/24 38/2 38/5
38/7 38/9 38/10 38/11
38/13 38/18 88/11
concerned [1]  10/4
concerning [2]  8/13
84/6
concession [1]  83/24

questions [3]  1/20
44/24 83/16 84/6
conclude [2]  8/22
10/6
conclusion [1]  89/4
condition [2]  77/18
90/12
conditions [1]  85/7
condominium [1]
10/11
condos [1]  46/15
conduct [1]  16/17
conducting [1]  89/17
conflict [3]  13/25
13/25 14/3
conspiracy [2]  22/17
55/21
constitutional [1]
11/21
construction [3]  78/8
81/23 83/20
consult [1]  55/10
contained [1]  66/10
continue [4]  5/11 60/3
62/1 62/13
continues [1]  44/14
contract [7]  46/11
50/11 62/24 64/7
96/10 96/19 96/22
contracts [8]  37/9
37/18 38/24 39/3
39/10 39/12 39/15
39/18
contribute [1]  83/19
contributing [1]  84/15
contribution [2]  83/19
83/24
contributions [3]
44/24 83/16 84/6
control [2]  91/6 91/11
conveyed [2]  79/11
82/7
conviction [2]  22/25
23/4
convincing [1]  80/17
copied [1]  7/2
copies [3]  39/8 39/23
39/24
copy [8]  15/23 15/25
38/24 39/2 39/6 39/13
39/16 66/21
correct [228]
correctly [2]  21/11
64/12
Corzo [13]  50/1 50/3
50/16 51/18 52/5
53/12 76/17 77/3 77/7
77/9 82/13 82/18 92/8
Corzo's [5]  51/2 51/8
51/12 51/13 51/16
cost [1]  33/23
counsel [17]  3/3 4/14
11/24 20/2 27/22
44/16 62/7 67/18 69/2
70/16 71/2 72/11
72/12 85/15 85/18

depositions [2]
86/23 90/20
counterfeit [2]  75/6
75/7
counterfeited [2]  19/6
86/12
Couriers [1]  56/13
course [1]  69/6
court [20]  1/1 1/24 3/1
3/18 3/24 3/25 11/11
15/3 17/18 19/12 20/6
21/3 21/14 44/15 62/5
67/22 68/19 86/23
94/1 96/5
Court's [1]  3/11
courthouse [1]  4/10
courtroom [1]  5/4
cover [4]  5/23 7/14
7/21 83/12
covered [2]  3/8 92/24
credibility [7]  16/16
16/24 17/1 17/8 18/8
20/9 21/8
credible [7]  15/17
16/6 16/7 16/11 16/23
18/9 18/14
credit [4]  24/10 30/1
30/10 63/2
credited [1]  44/25
creditor [1]  24/3
crime [1]  92/15
crimes [1]  22/22
criminal [5]  22/25
23/4 68/4 89/1 89/13
cross [24]  2/4 10/20
10/22 12/10 13/13
16/15 16/21 17/2 17/4
18/7 18/19 20/12
21/19 21/20 21/22
22/5 22/6 53/10 70/16
74/5 87/1 92/24 95/20
95/23
cross-examination
[10]  2/4 10/20 10/22
22/5 22/6 53/10 70/16
74/5 87/1 95/20
cross-examine [10]
12/10 13/13 16/21
17/4 18/7 18/19 20/12
21/19 21/20 21/22
cross-examining [1]
17/2
Cruz [36]  6/14 6/17
13/2 13/6 30/12 30/15
30/18 32/3 32/11
32/16 32/19 32/22
33/4 33/7 33/18 34/16
34/19 34/22 35/11
36/7 36/13 47/2 47/11
47/18 48/6 48/9 65/13
65/17 65/25 66/4
72/22 72/23 73/4
73/19 73/23 84/9
Cruz's [4]  31/17 33/14
36/1 47/25
current [1]  86/15
currently [1]  32/8

**D**

D'Agostino [2]  52/10
52/16
D'Agostino's [1]
53/11
Dade [1]  20/8
damaged [2]  68/9
68/23 68/25 69/18
69/20 69/23
date [10]  7/6 7/9 7/12
7/14 7/17 8/9 43/6
45/21 73/3 73/24
Dated [1]  97/13
dates [1]  7/5
DAVID [1]  1/20
day [7]  13/6 26/12
44/1 45/8 51/19 90/24
97/13
daytime [1]  90/22
De [40]  6/14 6/17 13/2
13/6 30/12 30/15
30/18 31/17 32/3
32/11 32/16 32/19
32/22 33/4 33/7 33/14
33/18 34/16 34/19
34/22 35/11 36/1 36/7
36/13 47/2 47/11
47/18 47/25 48/6 48/9
65/13 65/17 65/25
66/4 72/22 72/23 73/4
73/19 73/23 84/9
De La [1]  33/14
De La Cruz's [1]
47/25
deal [1]  78/25
dealing [1]  81/11
December [1]  45/24
decided [1]  3/9
deduction [1]  57/15
defendant [30]  1/8
1/20 5/14 11/11 11/22
12/2 12/4 12/7 12/8
12/21 12/25 13/8 14/3
14/19 15/5 15/14
15/18 15/19 15/22
16/11 16/13 16/16
17/2 17/22 18/3 20/7
20/15 20/18 93/16
95/9
defendant's [23]  2/9
2/9 2/10 4/6 6/2 6/12
7/24 8/1 8/24 9/13
13/5 13/8 15/7 15/10
15/15 15/16 16/6
16/24 18/7 75/1 76/13
76/16 87/6
defense [7]  7/19
17/15 17/21 19/14
37/12 52/2 52/3
defraud [4]  10/7 10/10
10/15 91/21
delivered [3]  78/13
78/14 81/23
denied [2]  19/5 19/7
deny [1]  20/4
deposit [2]  54/4 59/9

D'Agostino [2]  52/10
52/16
desire [1]  4/15
destroyed [18]  15/9
18/20 20/20 20/22
20/25 21/12 36/16
38/2 38/5 38/21 39/2
39/7 39/21 61/17
61/20 66/8 66/13
66/20
destruction [1]  15/9
determination [2]
3/12 17/17
determine [3]  7/11
15/25 39/23
determined [2]  3/7
20/2
developer [1]  81/19
didn't [26]  16/5 26/17
27/1 28/7 28/16 32/25
37/5 37/8 37/13 41/5
41/7 41/8 41/11 41/18
41/19 41/20 41/21
41/22 44/4 57/24 65/3
77/10 80/13 81/25
87/3 88/24
didn't write [1]  41/19
difference [10]  9/25
10/3 13/9 14/9 18/13
46/10 46/25 50/8
64/13 88/11
different [9]  12/5 12/9
12/20 13/11 14/16
17/12 17/18 39/10
61/4
direct [13]  2/3 5/11
5/15 15/7 17/22 18/22
20/19 20/21 20/24
21/21 28/22 68/10
84/8
disbursed [1]  14/8
disbursement [1]
56/3
disbursements [1]
57/7
discuss [5]  10/22
10/25 11/13 62/1 84/3
discussed [2]  5/1
88/10
disk [5]  37/21 38/8
38/11 38/14 66/22
disks [6]  20/5 38/15
38/18 38/21 39/2 39/7
distinction [1]  14/15
distracted [1]  35/3
DISTRICT [3]  1/1 1/1
1/14
distrust [1]  75/21
divided [1]  57/4
divorce [3]  19/17
68/20 81/17
document [44]  3/19
6/3 6/5 6/14 7/4 8/8
8/9 8/11 8/13 8/16 9/6
17/19 59/16 59/22
60/9 60/13 60/15
62/16 70/18 72/11

document... **[24]**
72/13 72/16 72/22
73/7 74/5 74/20 75/2
75/5 76/18 76/21
76/23 86/10 86/11
87/15 88/11 88/11
88/19 88/23 88/23
89/11 89/15 95/11
95/19 96/2
**documentation [1]**
87/3
**documents [21]** 7/11
10/4 26/14 26/19
29/22 39/17 61/13
66/25 67/2 67/9 69/23
73/23 75/19 86/6
87/17 90/2 90/4 90/9
90/10 90/16 91/15
**doing [4]** 19/11 24/5
56/2 84/18
**door [5]** 19/25 20/7
20/8 21/2 21/21
**double [3]** 55/25 56/8
57/7
**drafted [1]** 35/6
**drawers [1]** 19/20
**Drive [2]** 10/16 58/15
**drove [1]** 24/13
**dumped [3]** 19/20
68/15 68/17

**E**

**eager [1]** 58/1
**earlier [2]** 44/15 88/11
**early [4]** 14/8 54/17
56/2 57/7
**earn [1]** 30/6
**East [10]** 1/19 1/24
23/10 58/15 93/22
94/17 95/12 96/8
96/13 96/14
**effect [1]** 60/7
**either [3]** 4/14 4/14
75/18
**El [1]** 73/5
**El Popular [1]** 73/5
**electronic [5]** 39/7
39/9 39/19 39/21
39/24
**elicit [1]** 18/10
**Elite [2]** 8/4 8/25
**email [10]** 52/8 52/10
52/16 86/12 87/15
87/20 88/2 88/15
88/16 88/17
**emails [7]** 15/22 15/22
15/25 16/1 66/10
66/21 66/21
**Emerald [2]** 15/11
37/2
**employed [5]** 32/8
32/12 32/17 36/1 81/2
**employee [2]** 31/23
86/15
**employees [3]** 34/9

**employment [4]** 31/12
31/17 32/5 36/1
**ended [2]** 67/16 85/9
**Eneida [9]** 41/13 63/5
63/12 74/4 74/24 75/8
76/14 82/11 83/9
**entering [1]** 16/12
**entities [1]** 77/4
**entitled [1]** 97/12
**equals [1]** 51/5
**Equities [3]** 9/21
74/16 76/23
**Equities' [1]** 9/9
**equity [1]** 24/5
**Escrow [2]** 8/4 9/1
**ESQ [1]** 1/20
**essentially [1]** 14/7
**estate [6]** 54/15 54/21
54/23 54/24 55/8 55/9
**Estop [1]** 3/22
**event [3]** 72/19 72/20
72/21
**eventually [1]** 16/12
**everybody [1]** 67/22
**evidence [41]** 3/20
3/23 4/1 4/3 4/6 6/6
6/8 6/12 7/24 8/1 9/13
15/9 15/19 15/19
16/12 17/13 17/20
18/4 18/21 20/17
20/18 20/21 20/22
20/25 21/12 36/16
37/14 37/18 37/21
37/24 59/25 61/17
61/20 67/23 70/18
74/3 75/1 76/16 86/2
87/6 87/13
**ex [2]** 20/3 20/5
**ex-foliage [2]** 20/3
20/5
**exact [3]** 45/9 69/3
83/21
**exactly [1]** 12/18
**examination [23]** 2/3
2/4 2/4 2/5 5/11 5/15
10/20 10/22 15/7
17/23 22/5 22/6 28/22
62/13 67/14 68/10
69/18 70/16 74/5 84/8
87/1 94/2 95/20
**examine [10]** 12/10
13/13 16/21 17/4 18/7
18/19 20/12 21/19
21/20 21/22
**examiner [7]** 15/8
15/23 18/22 36/15
36/19 38/20 66/7
**examining [1]** 17/2
**example [3]** 16/2
23/24 46/17
**EXCERPT [1]** 1/12
**excess [8]** 13/17 41/1
41/8 41/19 42/18
45/17 63/25 64/24
**exclude [3]** 11/11

**excuse [3]** 7/5 62/21
70/1
**excused [1]** 97/4
**exhibit [28]** 2/9 2/9
2/10 3/17 4/6 4/15
6/12 8/1 9/13 9/24
25/10 43/8 51/24 52/3
62/21 70/10 70/19
72/9 74/4 75/1 76/13
76/16 87/6 87/12 94/5
94/25 95/1 96/12
**Exhibit 4 [1]** 96/12
**Exhibit 4C [1]** 9/4
**Exhibit 4R [1]** 25/10
**Exhibit AAAK [1]**
51/24
**EXHIBITS [1]** 2/8
**existed [3]** 38/12
38/13 39/19
**expect [1]** 69/14
**expecting [1]** 29/10
**expert [15]** 20/21
21/11 21/15 21/16
21/19 39/22 61/16
61/20 69/4 69/7 69/10
69/12 69/14 69/17
69/18
**explain [5]** 14/22
27/25 44/16 44/20
91/1
**explained [3]** 11/24
77/6 80/9
**explanation [2]** 14/21
85/3
**Expressed [1]** 81/20
**extra [2]** 40/14 65/21

**F**

**fact [25]** 3/19 14/13
17/7 18/7 19/22 20/17
25/7 32/11 36/5 52/20
55/7 56/9 58/14 64/3
66/4 66/13 66/16
68/23 71/2 74/13
77/15 80/3 82/20 96/2
96/17
**facts [3]** 18/1 18/20
20/12
**fair [3]** 25/4 55/16
82/10
**faith [1]** 76/5
**fake [5]** 29/16 29/19
66/24 67/2 67/5
**Fakes [1]** 67/7
**false [11]** 60/23 61/10
85/15 85/18 85/21
86/6 86/12 86/17
89/17 91/24 92/1
**family [5]** 47/3 47/6
47/9 47/17 84/9
**far [3]** 10/4 17/17
21/22
**fast [1]** 91/5
**fatality [2]** 4/11 4/12
**favorably [1]** 69/15

**F/4 7/5 7/6 7/9 7/14
7/21
FCRR [2]** 1/23 97/15
**Federal [2]** 81/19
97/10
**feel [2]** 14/16 18/16
**feels [1]** 12/20
**Felix [4]** 50/14 50/17
50/18 53/15
**file [8]** 29/17 29/20
52/5 52/8 75/2 80/24
80/24 81/2
**filled [5]** 24/9 24/12
24/15 24/20 24/22
**finally [2]** 10/14 72/6
**financed [1]** 23/17
**financial [10]** 35/2
35/5 35/8 60/17 60/25
61/6 61/10 67/3 67/10
81/3
**financing [2]** 24/7
24/12
**find [2]** 68/13 69/18
**finding [9]** 15/8 15/18
16/10 16/11 20/19
20/20 20/24 21/3
36/19
**findings [9]** 16/3
16/16 16/18 17/1
17/24 18/1 20/8 20/10
21/22
**finds [1]** 20/6
**finish [2]** 27/23 44/17
**finishing [2]** 77/24
81/22
**firm [1]** 55/9
**first [10]** 7/6 12/2
17/10 23/12 23/12
50/2 50/3 60/4 95/17
95/19
**fixed [1]** 5/5
**fixtures [1]** 78/20
**flipping [2]** 91/13
91/15
**floor [3]** 68/15 68/15
68/18
**flooring [1]** 83/2
**floors [6]** 19/20 77/20
78/16 79/3 79/5 81/22
**FLORIDA [7]** 1/1 1/8
1/19 1/22 1/25 8/4
8/25
**focus [1]** 74/7
**focused [1]** 40/4
**foliage [2]** 20/3 20/5
**folks [6]** 4/23 10/24
22/4 27/12 55/7 62/10
**follow [2]** 76/3 76/5
**following [6]** 86/8
86/23 93/3 94/1 94/15
96/5
**forced [2]** 19/3 19/4
**foreclosed [2]** 47/22
47/24
**foregoing [1]** 97/10

**forging [1]** 70/7
**form [1]** 14/9 24/20
25/7 35/16 38/24 39/2
39/6 39/7 39/9 39/13
39/16 39/19 39/21
56/23 64/24
**formed [1]** 5/5
**forms [1]** 25/4
**formulate [1]** 69/20
**Fort [3]** 1/8 1/19 1/25
**forwarded [1]** 87/20
**forwards [1]** 88/2
**found [20]** 8/25 15/16
16/6 16/22 17/5 17/7
18/3 18/9 18/14 18/22
19/18 20/22 21/11
21/19 36/16 38/20
40/1 61/16 61/20 66/8
**fraud [4]** 22/18 22/20
49/9 89/1
**free [1]** 14/20
**frequently [1]** 19/10
**friend [1]** 57/18
**Frizzie [21]** 7/3 13/1
29/23 30/1 30/5 30/8
70/9 84/4 85/15 85/18
85/23 86/16 86/17
86/25 87/1 87/6 87/9
87/21 89/20 91/23
92/1
**front [2]** 15/5 26/7
**fully [2]** 78/13 78/14
**fund [3]** 37/5 37/8
37/13
**funds [7]** 14/8 40/21
40/24 41/1 77/13
85/11 85/24
**furniture [2]** 19/19
68/17
**further [4]** 10/18
86/20 92/17 96/24
**future [4]** 72/20 72/21
73/10 73/11

**G**

**Galen [12]** 7/3 29/23
30/1 30/5 30/8 70/9
84/4 85/15 87/21
89/20 91/23 92/1
**GARVIN [7]** 1/20 2/3
2/4 3/4 5/12 12/12
17/9
**general [5]** 36/2 36/11
36/12 72/14 72/17
**gentleman [1]** 3/5
**gentlemen [5]** 5/19
68/10 74/23 87/2 90/2
**getting [1]** 81/24
**Gianna [1]** 90/20
**give [5]** 28/1 75/25
76/7 84/10 85/3 94/7
**given [4]** 41/19 79/6

**G**

go [15]  6/6 8/22 11/12 13/23 20/10 21/22 24/15 47/6 68/19 69/7 77/12 77/18 82/1 91/1 95/7
going [32]  6/2 6/6 13/2 14/19 17/25 28/5 28/17 28/18 30/6 47/6 47/9 50/13 51/1 55/22 69/9 69/12 71/6 71/6 74/7 78/3 79/11 79/16 82/7 83/2 83/3 83/4 85/13 86/5 86/10 90/3 91/17 95/21
good [10]  3/4 3/5 4/24 5/17 5/18 5/19 8/11 22/8 22/9 76/5
Gordon [4]  70/11 70/13 85/24 87/7
government [16]  1/17 3/21 3/24 11/7 12/3 12/20 12/21 13/20 58/2 58/7 88/20 88/20
government's [4]  43/8 51/24 70/19 88/20
graduated [1]  24/18
GS [1]  72/9
guard [3]  32/23 33/7 33/18
guess [1]  50/3
guidelines [2]  83/22 83/23
guilty [6]  49/7 49/9 49/12 49/24 71/3 71/24
gut [1]  12/16

**H**

habitate [1]  78/23
half [1]  90/21
hand [3]  13/5 13/23 13/24
handed [1]  65/9
handled [1]  91/4
handwritten [1]  7/14
happened [8]  15/9 17/6 18/11 42/7 48/16 75/14 79/3 80/24
happy [1]  92/25
Harbour [1]  10/12
hard [11]  15/22 15/25 24/5 38/24 39/1 39/6 39/8 39/13 39/16 39/23 66/21
hardship [1]  93/17
head [1]  70/20
hear [2]  12/16 89/5
heard [11]  3/22 11/4 11/5 18/17 22/13 53/12 56/12 57/9 65/6 86/16 87/4
hearing [2]  15/14 16/2
hears [1]  14/2
Hector [1]  76/17

86/21 93/3 94/1 94/15 96/5
Hendricks [9]  10/8 32/20 33/4 46/11 50/1 56/5 68/6 82/23 91/19
hiding [2]  85/24 85/25
hindsight [1]  60/21
hire [1]  69/7
HJ [1]  76/17
hold [2]  74/24 76/9
holder [1]  74/21
holders [1]  83/18
Holdings [2]  50/22 76/21
home [13]  10/16 19/18 68/14 68/16 81/12 81/15 90/10 93/17 94/6 94/7 95/2 95/12 96/7
honestly [1]  21/1
Honor [58]  3/5 4/17 5/13 6/6 7/23 9/12 10/19 10/21 10/22 11/2 11/12 11/13 11/15 11/23 12/2 12/13 12/23 13/15 14/2 14/18 14/22 14/25 15/6 15/9 16/20 17/3 17/10 17/21 18/6 18/18 19/1 20/11 20/25 21/10 21/25 27/22 35/17 44/14 49/11 70/18 86/3 86/6 86/11 86/21 89/3 89/7 90/6 91/7 92/20 92/23 92/25 93/1 93/12 94/9 94/12 94/16 95/5 96/25
HONORABLE [2]  1/13 15/13
hot [2]  66/13 66/17
house [10]  19/18 68/19 88/17 93/14 94/21 94/21 95/10 95/25 96/1 96/19
housekeeping [1]  3/14
HUD [20]  5/24 8/16 8/21 28/23 29/5 29/7 45/1 52/5 55/25 74/3 74/15 75/15 76/13 76/17 77/3 77/5 77/9 85/5 85/10 90/4
HUD-1 [6]  55/25 74/15 75/15 76/13 76/17 90/4
HUDs [3]  56/8 57/7 77/10
huh [1]  45/23
husband [1]  56/12

**I**

I commend [1]  4/24
I'll [12]  18/16 20/9 27/25 86/22 87/13

94/12 96/3 96/3
I'm [34]  6/2 6/6 7/19 9/17 11/23 14/6 14/19 16/5 17/24 21/13 23/7 23/21 28/10 28/22 29/12 35/3 44/4 51/24 52/5 54/23 54/24 71/5 71/6 80/22 86/2 86/5 89/8 91/17 92/8 92/25 95/3 95/14 95/15 95/16
I've [3]  16/3 16/4 82/12
idea [2]  32/19 76/15
impacts [1]  93/6
implies [1]  13/24
importance [1]  3/6
important [1]  3/7
improper [3]  84/19 84/22 92/5
inadmissible [1]  21/4
included [7]  15/20 19/21 28/9 28/11 28/13 90/4 96/12
income [9]  27/4 28/9 28/11 30/22 31/3 31/13 32/23 33/19 59/25
inconsistency [1]  12/17
inconsistent [4]  12/14 13/23 95/4 95/8
increase [1]  94/20
indicated [3]  14/11 36/2 62/16
indicates [1]  35/20
indicating [1]  15/16
indicted [1]  70/14
individual [1]  16/13
information [40]  5/3 12/11 13/4 27/7 27/9 27/13 28/9 28/17 33/13 35/1 35/4 35/7 36/5 38/7 38/9 38/10 39/6 39/25 40/1 40/3 42/2 42/4 56/17 56/23 58/2 60/24 61/5 61/10 85/16 85/25 86/17 87/10 87/16 87/24 88/3 89/17 91/24 92/1 93/16 96/11
informed [1]  18/14
inhabitable [1]  77/25
initial [1]  81/25
initialed [2]  26/7 26/9
initially [1]  3/24
initials [1]  59/11
inquire [1]  96/3
inquiry [1]  20/7
insane [1]  75/11
institution [1]  61/10
instructed [1]  13/8
instructions [3]  75/25 76/3 76/5
intend [1]  79/18 79/23

65/12 66/4 72/19 73/8
intent [2]  73/1 89/2
intention [4]  52/13 53/9 79/14 79/15
intentional [1]  85/8
intentionally [18]  10/7 10/14 20/20 20/22 20/25 21/12 36/16 38/20 39/22 61/17 61/20 66/8 69/21 69/24 87/10 87/24 91/21 92/14
intentions [2]  52/15 53/11
introduce [1]  16/21
introduction [1]  17/17
investigation [1]  70/14
investors [1]  82/6
involved [3]  55/3 55/21 58/16
iron [2]  66/13 66/17
issue [11]  11/13 12/2 14/25 15/6 16/24 17/22 17/24 18/8 18/19 20/1 96/4
issued [1]  16/10
issues [1]  21/5
issuing [1]  30/21
it's [21]  9/13 12/14 16/7 17/18 17/21 18/16 19/2 21/6 30/8 42/6 48/2 55/9 55/16 61/4 84/9 84/14 84/23 86/18 89/13 95/8 95/17

**J**

JAMES [1]  1/13
January [1]  46/1
John [4]  57/18 58/21 80/3 91/18
Johnson [1]  57/9
join [4]  10/7 10/10 10/14 91/21
joint [1]  34/4
Jorge [33]  30/12 30/15 30/18 31/17 32/3 32/11 32/16 32/19 32/22 33/4 33/7 33/13 33/18 34/16 34/19 34/22 35/11 36/1 36/7 36/13 47/2 47/11 47/18 47/24 48/6 48/9 65/13 65/17 65/25 66/4 72/22 72/23 73/4
JP [1]  96/12
judge [18]  1/14 4/10 4/22 15/12 15/13 15/15 15/18 16/2 16/10 16/22 18/2 18/13 20/9 20/10 21/3 21/7 21/17 21/22
judge's [6]  16/16

17/24 18/1
judgment [2]  47/24 48/6
June [4]  7/8 7/13 7/18 32/1
June 25 [1]  32/1
June 26 [1]  7/8
June 26th [2]  7/13 7/18
juror [1]  4/7
jury [16]  1/14 4/19 4/20 5/20 10/24 11/1 15/4 15/5 18/14 22/1 22/3 62/3 62/8 62/9 68/10 87/2

**K**

KAREN [1]  1/18
Kastigar [4]  12/3 12/17 12/22 14/17
Kathy [1]  8/6
KATZ [1]  1/17
keep [2]  62/1 94/5 94/6 95/23
Kent [2]  72/13 72/16
keys [9]  51/19 52/11 52/14 52/18 53/9 81/19 81/24 82/1 82/1
KH [2]  87/13 88/12
KH -- strike [1]  87/13
kickback [6]  49/3 49/10 63/10 63/11 79/21 80/1
kickbacks [1]  57/16
kind [4]  79/18 79/21 79/24 80/1
Kirschner [2]  72/13 72/17
KJ [2]  87/14 88/11
knew [17]  28/9 28/11 28/13 29/10 32/22 33/10 33/13 41/25 42/9 42/22 46/3 51/1 51/8 55/16 60/6 63/5 66/20
know [47]  6/21 11/6 12/14 12/19 18/4 18/16 27/4 28/16 30/22 30/25 31/12 31/16 33/2 33/2 34/9 34/11 34/13 34/15 44/9 48/18 51/21 53/21 57/25 58/3 58/5 70/6 70/13 74/1 74/20 75/1 81/11 81/14 82/7 83/8 84/13 84/21 85/23 86/15 87/7 88/2 89/15 91/17 91/23 92/3 92/7 93/20 95/5
knowingly [4]  10/6 10/10 10/14 60/24
known [1]  57/20

**L**

La [40]  6/14 6/17 13/2

**La...** [37] 13/6 30/12 30/15 30/18 31/17 32/3 32/11 32/16 32/19 32/22 33/4 33/7 33/14 33/18 34/16 34/19 34/22 35/11 36/1 36/7 36/13 47/2 47/11 47/18 47/25 48/6 49/9 65/13 65/17 65/25 66/4 72/22 72/23 73/4 73/19 73/23 84/9
**lack** [1] 16/16
**ladies** [5] 5/19 68/9 74/23 87/2 90/2
**large** [1] 48/6
**LARUETI** [1] 5/14
**Lauderdale** [3] 1/8 1/19 1/25
**LAURETI** [33] 1/7 3/3 3/8 5/9 5/17 5/22 11/8 11/16 13/18 13/21 19/16 22/8 25/13 25/15 34/10 34/11 34/15 34/21 52/12 52/22 58/19 62/7 62/11 66/7 67/16 71/8 71/11 72/3 72/7 86/14 92/18 94/4 97/1
**Laureti's** [1] 21/8
**law** [1] 55/9
**lawsuit** [10] 36/20 36/23 36/23 37/1 37/17 38/23 39/12 39/15 61/22 66/7
**Leading** [2] 73/15 88/4
**lease** [19] 58/9 58/12 58/18 60/2 60/4 60/6 60/10 61/4 80/7 80/9 80/12 80/14 80/20 80/22 81/7 81/9 91/17 91/18 91/18
**leased** [1] 81/12
**led** [1] 80/9
**legal** [1] 89/4
**legitimate** [1] 75/6
**lend** [2] 27/8 27/11
**lender** [4] 27/2 27/4 31/11 83/22
**Lenders** [1] 31/8
**lending** [5] 24/6 70/11 70/13 85/24 87/7
**letter** [8] 6/21 8/25 12/3 12/18 12/22 14/17 75/10 84/5
**letterhead** [1] 8/3
**letters** [1] 70/7
**license** [1] 25/1
**life** [1] 24/9
**light** [1] 78/20
**limit** [3] 84/10 84/11 84/12
**line** [3] 21/6 41/9 41/18

**liquidity** [2] 87/17 94/20
**list** [3] 4/15 81/7 81/9
**listed** [3] 75/9 76/25 77/4
**listening** [1] 15/14
**lists** [2] 76/21 76/23
**litigation** [1] 69/6
**live** [3] 19/3 19/14 19/14
**lived** [2] 58/14 58/25
**LK** [5] 2/9 6/3 6/8 6/11 6/12
**LLC** [1] 8/4
**loan** [25] 23/24 24/10 25/11 26/24 27/16 28/6 29/17 29/20 29/25 30/6 32/23 32/25 33/14 33/18 37/6 37/8 37/13 41/13 48/2 80/19 80/20 81/4 89/21 89/23 90/5
**loans** [4] 23/19 23/22 24/3 30/22
**LOI** [1] 35/6
**longer** [3] 38/12 38/13 72/22 94/4
**look** [5] 7/6 10/2 66/16 72/22 94/4
**looked** [1] 80/4
**looking** [1] 84/25
**lost** [1] 89/7
**lot** [1] 39/17
**lower** [1] 48/5
**lying** [1] 86/18

**M**

**ma'am** [1] 44/22
**making** [3] 79/9 79/10 87/9
**manager** [10] 34/23 35/12 36/2 36/11 36/12 36/13 72/14 72/17 72/23 73/7
**marble** [2] 79/3 79/5
**MARCO** [11] 1/7 5/14 25/13 52/12 52/22 58/19 61/14 71/8 71/10 72/3 72/7
**Marino** [12] 10/16 23/10 58/15 93/15 93/23 94/18 95/2 95/10 95/12 96/9 96/13 96/14
**Mark** [1] 57/9
**marked** [3] 6/2 7/19 51/24
**material** [1] 15/23
**materially** [3] 15/19 15/20 16/12
**math** [2] 63/15 64/12
**matter** [17] 3/15 16/24 17/4 17/8 17/11 17/16 18/21 19/2 19/13 21/5 84/3 88/22 95/4 95/4 95/17 95/18 97/12

21/24 93/17
**mean** [10] 18/1 18/15 50/8 52/2 78/14 78/16 78/18 78/20 88/20 95/14
**meaning** [3] 21/16 95/2 95/2
**means** [2] 25/8
**meet** [2] 82/20 83/3
**Melian** [31] 40/5 40/17 42/7 42/9 42/13 46/3 48/22 48/25 49/3 49/7 49/16 49/18 49/21 64/6 65/9 65/20 70/17 71/3 71/5 71/24 79/2 79/4 79/8 79/23 82/15 82/20 83/9 83/12 83/18 84/12 92/8
**Melian's** [9] 42/23 43/1 44/1 44/9 45/9 45/11 45/15 49/12 65/6
**member** [1] 84/9
**memory** [3] 59/15 59/20 60/13
**mention** [2] 72/3 72/6
**mentioned** [2] 5/22 83/16
**merely** [1] 40/19
**merits** [1] 5/6
**met** [7] 12/2 82/10 82/12 82/13 82/16 82/18 82/22
**methods** [2] 39/10 40/4
**Miami** [5] 1/22 15/13 20/8 24/16 24/18
**Miami-Dade** [1] 20/9
**Michelle** [49] 5/23 6/17 7/20 8/8 8/19 14/5 14/17 19/5 28/23 40/12 40/16 40/21 42/12 42/22 43/4 43/23 53/17 54/10 54/22 55/1 55/5 55/14 55/18 56/10 56/12 57/6 57/16 63/18 63/24 64/2 64/16 64/23 66/1 74/11 74/15 75/2 75/17 75/21 75/25 76/2 76/18 77/3 84/3 85/1 89/16 90/22 91/1 91/12 92/3
**mid** [1] 61/24
**mid-morning** [1] 61/24
**million** [24] 26/3 29/8 29/11 29/13 29/14 29/15 33/5 33/24 46/18 46/23 47/18 62/24 63/16 63/19 63/21 63/22 64/3 64/4 64/7 64/9 64/13 64/13 94/8 95/14

94/5 94/6 95/23
**Mine** [1] 93/5
**minus** [2] 51/5 63/15
**minute** [2] 10/25 61/25
**misrepresenting** [1] 21/13
**missing** [3] 4/7 4/21 13/20
**mistake** [2] 60/20 65/25
**mistaken** [1] 95/15
**mode** [1] 93/5
**moments** [1] 72/12
**money** [26] 13/7 13/16 13/17 14/5 27/12 30/5 33/15 40/13 40/17 41/9 42/15 46/14 50/5 50/17 65/16 65/21 73/4 73/14 75/17 75/18 75/25 76/7 84/24 84/25 85/4 85/9
**month** [3] 25/17 33/23 59/3
**monthly** [3] 45/17 63/9 77/13
**months** [1] 90/13
**Moran** [1] 19/9
**Moran's** [1] 19/12
**Morgan** [1] 96/12
**morning** [9] 3/4 3/5 4/24 5/17 5/18 5/19 22/8 22/9 61/24
**mortgage** [16] 24/20 25/1 45/12 45/17 48/19 51/13 51/15 63/9 74/9 74/13 74/21 74/24 75/10 76/25 78/9 78/11
**mortgages** [1] 94/23
**Mostelac** [21] 48/16 50/14 50/17 50/18 50/22 51/11 53/15 62/17 70/2 75/14 76/7 76/9 78/2 79/10 79/15 82/4 83/10 83/18 85/10 92/4 92/7
**Mostelac's** [2] 10/11 56/6
**mother** [1] 49/4
**mother's** [1] 83/6
**motivation** [1] 23/4
**mouth** [1] 19/24
**move** [4] 7/24 9/12 80/17 83/20
**moved** [2] 3/23 4/2
**MR** [5] 2/3 2/4 11/7 19/12 87/9
**Mr.** [73] 3/3 3/4 3/8 5/9 5/12 5/17 5/22 10/11 11/8 11/16 12/12 13/1 13/18 13/21 17/9 19/9 19/16 21/8 22/8 34/6 34/9 36/23 37/2 50/22

53/11 53/12 57/24 58/9 58/12 58/25 59/15 60/2 60/12 62/7 62/11 62/17 66/7 67/16 70/2 73/19 73/23 75/14 76/7 76/9 78/2 79/2 82/4 82/13 82/15 82/18 82/20 83/9 83/18 83/18 84/9 84/12 85/18 85/23 86/14 86/16 86/17 86/25 87/1 87/6 87/9 92/4 92/7 92/18 94/4 97/1
**Mr. Corzo** [4] 52/5 53/12 82/13 82/18
**Mr. D'Agostino** [1] 52/10
**Mr. D'Agostino's** [1] 53/11
**Mr. De** [3] 73/19 73/23 84/9
**Mr. Frizzie** [9] 13/1 85/18 85/23 86/16 86/17 86/25 87/1 87/6 87/9
**Mr. Garvin** [4] 3/4 5/12 12/12 17/9
**Mr. Laureti** [19] 3/3 3/8 5/9 5/17 5/22 11/8 11/16 13/18 13/21 19/16 22/8 62/7 62/11 66/7 67/16 86/14 92/18 94/4 97/1
**Mr. Laureti's** [1] 21/8
**Mr. Melian** [5] 82/15 82/20 83/9 83/18 84/12
**Mr. Moran** [1] 19/9
**Mr. Mostelac** [12] 50/22 51/11 62/17 70/2 75/14 76/7 76/9 78/2 82/4 83/18 92/4 92/7
**Mr. Mostelac's** [1] 10/11
**Mr. Olsen** [7] 57/24 58/9 58/12 58/25 59/15 60/2 60/12
**Mr. Pedro** [1] 79/2
**Mr. Piccolo** [1] 36/23
**Mr. Piccolo's** [1] 37/2
**Mr. Torbert** [2] 34/6 34/9
**MS** [5] 2/4 2/5 22/5 45/6 46/20
**Ms.** [14] 13/1 13/7 13/16 13/17 23/9 31/23 32/11 46/20 62/8 62/14 65/21 70/4 70/6 86/20
**Ms. Cabrera** [7] 13/1 13/7 13/16 13/17 65/21 70/4 70/6
**Ms. Chentell** [1] 31/23

**M**

Ms. Jorge [1] 32/11
Ms. Ramirez [1] 46/20
Ms. Stewart [3] 22/9
62/14 86/20
Ms. Thompkins [1]
62/8
MSJ [3] 56/13 56/15
79/13
Mutual [16] 27/17
28/5 28/7 28/17 28/18
28/24 29/2 29/4 29/10
31/16 31/20 31/23
32/16 33/17 36/5
93/16

**N**

name [13] 13/9 25/13
47/25 48/7 52/11
59/18 63/2 70/7 74/16
74/20 75/8 75/15
76/13
named [3] 36/12
72/17 72/19
nasty [1] 68/21
National [2] 15/12
68/2
naturally [1] 17/10
necessary [1] 83/20
necessities [1] 78/22
need [2] 77/24 96/4
needed [2] 78/3 82/1
needs [1] 27/25
Neither [1] 76/25
never [11] 57/12 58/25
59/3 59/6 59/9 60/3
60/7 77/6 82/10 82/12
88/17
new [2] 92/22 95/3
nighttime [1] 90/22
nine [1] 72/4
nine-page [1] 72/4
nonemployee [1] 57/1
nonexistent [1] 64/24
North [9] 53/1 53/3
53/6 53/6 90/11 94/7
94/18 95/2 95/25
Northview [4] 9/9
9/21 74/16 76/23
notes [3] 16/4 16/8
21/13
November [4] 1/8
45/20 45/22 97/11
number [2] 62/21
70/20
numbers [2] 7/5 31/24

**O**

oath [3] 5/10 17/7
62/12
object [8] 12/17 13/24
14/23 17/10 17/19
31/4 35/16 49/11
objected [1] 3/24
objecting [1] 95/16
objection [15] 3/18

3/20 13/6 14/20
7/23 9/14 73/16 86/3
86/22 88/4 89/3 89/6
90/6 91/7
obligated [1] 78/9
obligation [1] 78/11
obtain [9] 35/1 35/4
35/8 60/17 60/24 61/6
61/10 67/3 67/9
obtained [1] 25/1
obviously [2] 15/1
18/8
occasion [1] 16/23
occurred [2] 20/3 20/5
October [1] 9/18
October 27th [1] 9/18
offered [2] 12/9 83/4
offering [1] 6/9
offers [1] 12/4
office [1] 68/16
Official [1] 1/24
okay [26] 3/10 6/22
7/2 9/15 11/25 12/24
13/3 18/23 28/3 33/21
34/3 35/25 38/7 40/5
53/12 56/9 58/9 61/12
63/12 88/8 89/9 93/8
93/9 93/25 94/14
96/23
old [1] 90/20
Olsen [11] 57/18
57/24 58/9 58/12
58/21 58/25 59/15
60/2 60/12 80/3 91/18
once [3] 4/24 16/9
62/11
open [5] 20/8 62/2
86/23 94/1 96/5
opened [3] 19/25 20/7
21/21
operated [2] 23/19
23/22
opinion [1] 69/20
opinions [1] 5/5
opportunity [1] 28/1
option [12] 46/10
46/15 46/17 47/14
47/20 50/8 62/17
63/12 64/9 76/9 76/12
83/18
order [14] 3/1 16/10
16/13 16/17 18/20
35/1 35/4 35/8 46/14
60/17 60/24 62/5 67/2
68/19
original [3] 80/14
80/20 80/22
originally [2] 6/23
37/24
outs [3] 79/11 82/25
83/5
outside [5] 4/9 11/3
15/4 88/4 91/7
outstanding [1] 48/2
overly [1] 58/1
overnight [2] 52/11

52/12
overpayment [4]
40/19 41/11 41/21
66/2
overrule [1] 86/22
overruled [4] 3/18
31/5 35/18 91/9

**P**

Pacific [2] 15/11 68/2
page [16] 2/2 25/17
26/9 26/11 59/12 71/7
71/11 71/13 71/15
71/17 71/19 71/21
72/3 72/4 72/6 91/2
Page 2 [2] 25/17
71/11
Page 3 [1] 71/13
Page 4 [1] 71/15
Page 5 [1] 71/17
Page 6 [1] 71/19
Page 7 [1] 71/21
Page 8 [1] 72/3
pages [4] 8/11 8/12
91/13 91/15
paid [40] 34/19 35/15
35/15 35/21 36/7 43/9
44/1 45/12 45/15
45/17 45/20 45/22
45/24 46/1 48/12
51/11 51/11 51/12
54/1 54/4 54/7 55/22
55/24 56/2 56/8 56/10
57/6 57/16 59/3 59/6
59/9 63/7 63/9 63/10
69/10 69/12 71/7
71/10 73/4 73/23
paperwork [3] 48/3
68/15 91/6
part [14] 19/16 36/20
36/20 37/17 38/23
39/12 39/15 49/9
55/22 56/2 68/20 74/7
78/25 93/16
particular [1] 79/12
particularly [1] 30/25
party [1] 4/14
patience [1] 3/11
pay [20] 19/11 30/15
30/18 32/14 34/18
42/23 44/9 45/11 51/2
51/2 51/8 54/21 54/25
55/11 73/13 73/21
77/13 78/3 78/9 97/1
paying [2] 13/2 34/16
payment [4] 77/13
79/8 79/9 79/10
payments [12] 45/12
45/17 48/19 51/13
51/15 63/9 77/16 78/9
78/11 79/13 79/14
92/4
payoff [4] 8/25 70/6
74/8 94/7
PE [6] 8/24 9/24 10/3
75/2 75/10 75/19

pelted [1] 37/24
52/2
pods [4] 47/20
48/25 49/3 49/7 49/12
49/16 49/18 49/21
70/17 71/2 71/5 71/23
79/2 79/4 79/8
penthouse [7] 46/17
63/3 63/12 79/5 79/12
83/5 83/6
Penthouse F [1] 63/3
people [9] 19/10
37/14 37/18 67/19
81/1 83/3 85/24 92/12
92/14
percent [8] 51/1 76/9
76/12 83/24 83/24
84/1 84/14 84/16
performed [1] 78/8
permit [1] 96/3
person [5] 69/9 86/14
87/20 88/1 88/1
personal [1] 8/13
persons [3] 24/7 37/9
56/9
pertaining [1] 5/3
phone [2] 31/24 93/4
phoneying [1] 70/6
PhotoShop [1] 19/6
physically [1] 19/17
Piccolo [1] 36/24
Piccolo's [1] 37/2
pictures [1] 66/16
piece [1] 57/4
pipe [1] 94/22
pipeline [3] 93/18
95/13 96/15
PL [1] 54/9
place [6] 7/12 44/25
77/20 77/22 81/17
90/10
placed [4] 21/4 66/17
75/8 95/19
plaintiff [4] 1/5 15/11
20/15 20/16
plea [4] 70/16 71/5
71/6 72/4
please [11] 4/19 4/23
10/24 22/2 22/4 33/16
44/22 51/14 62/8
62/10 62/21
pled [6] 49/7 49/9
49/12 49/24 71/3
71/24
PO [1] 57/10
point [6] 8/22 11/16
12/13 19/10 21/1 34/3
pointed [1] 86/25
pointing [2] 7/14
91/14
Popular [1] 73/5
Porsche [1] 24/13
position [1] 85/24
possession [2] 20/3
20/5
possible [2] 33/21
34/1
potential [1] 30/22

powerful [1] 23/4
pre [1] 91/16
precluded [1] 17/25
pregnant [1] 90/13
preparation [1] 77/10
prepared [6] 9/6 56/15
56/21 60/9 74/15
76/18
preponderance [1]
17/13
presence [1] 15/4
present [5] 3/3 11/8
62/7 90/14 90/18
presiding [1] 15/12
pretty [1] 18/3
previous [5] 42/2
93/18 95/13 96/15
96/17
previously [7] 5/14
17/7 18/9 24/10 39/19
61/16 65/24
price [16] 33/5 46/10
46/11 46/15 46/15
46/17 47/14 47/20
48/6 50/8 50/11 62/24
63/12 64/7 64/9 84/1
primary [2] 96/15
96/17
prior [10] 16/23 28/22
73/3 73/23 77/10
77/10 81/13 82/13
82/15 92/11
problem [2] 39/1
39/25
problems [1] 81/25
proceed [2] 12/19
18/18
proceeding [2] 21/9
68/20
proceedings [9] 1/12
86/8 86/23 93/3 94/1
94/15 96/5 97/6 97/11
process [1] 81/5
produce [3] 20/17
20/17 31/3
produced [3] 18/21
59/22 59/25
Professional [1] 97/9
proffer [12] 12/6 12/7
12/10 12/11 12/21
12/23 13/5 13/12
13/14 14/7 14/15 93/1
proffering [1] 12/10
promises [1] 73/12
proof [1] 17/12
proper [6] 11/20 84/19
84/20 84/22 84/23
86/18
properties [5] 23/15
23/17 33/1 46/11
81/23
properties at [1] 33/1
property [48] 23/6
23/8 23/12 23/13
23/16 23/18 27/8

**property... [41]** 27/10
27/11 27/15 29/25
32/20 33/4 33/11
33/23 37/10 37/15
37/19 46/20 47/2 47/3
47/3 47/9 47/11 47/17
47/22 48/5 51/13
51/16 51/19 53/2
53/24 54/2 54/5 58/16
59/1 63/9 80/12 80/17
81/24 93/15 94/18
94/19 95/10 95/12
96/9 96/13 96/14
**protect [1]** 14/23
**provide [10]** 27/7 27/9
27/13 37/9 37/17
38/14 38/17 39/1 39/6
65/13
**provided [33]** 12/5
12/11 13/13 15/22
27/17 29/22 35/1 35/4
35/7 35/25 37/13 38/4
38/23 39/3 39/10
39/12 39/14 39/15
39/17 40/5 40/8 40/12
60/24 61/6 61/14
62/17 66/21 66/24
67/2 67/9 69/17 93/16
96/11
**providing [2]** 40/1
61/9
**Publishing [5]** 25/15
34/10 34/11 34/15
34/21
**punctuality [1]** 4/25
**purchase [15]** 10/11
10/15 32/19 33/10
33/23 37/10 37/14
37/18 47/18 48/23
50/2 63/2 65/16 93/15
94/17
**purchased [11]** 23/15
33/5 45/8 46/21 46/23
47/11 47/17 48/5 65/4
93/17 95/11
**purchaser [4]** 46/4
48/10 49/4 66/5
**purchasing [2]** 95/9
96/14
**purport [1]** 7/2
**purporting [1]** 75/2
**purports [3]** 58/18
60/3 87/16
**purpose [2]** 12/18
28/20
**pursuant [2]** 12/3
12/21
**pursue [1]** 81/4
**put [7]** 17/20 37/10
44/21 74/11 74/20
85/10 89/20
**putting [2]** 37/15
81/22
**PV [3]** 74/4 75/19
76/13

**Q**

**Quadrant [1]** 81/3
**question [26]** 18/10
19/2 19/21 26/18
27/20 27/24 28/1 28/3
30/3 33/3 34/2 35/16
38/16 49/11 51/14
55/10 59/14 61/19
71/13 72/14 72/15
88/21 89/5 89/20
92/20 93/19
**questioned [3]** 13/22
17/22 17/23
**questions [5]** 10/18
67/12 77/12 92/17
96/23
**quick [1]** 70/21
**quote [2]** 69/2 87/17

**R**

**raised [3]** 95/17 95/18
95/23
**Ramirez [20]** 40/8
40/17 40/24 41/13
46/20 48/12 62/20
63/12 65/20 74/4
74/18 74/24 75/9
76/14 77/4 82/11 83/9
84/24 84/25 92/8
**RANDALL [1]** 1/17
**re-redirect [1]** 96/4
**reaction [1]** 12/16
**read [7]** 6/20 27/1
88/24 89/11 95/1
95/22 95/24
**reading [2]** 72/16
94/25
**real [6]** 54/15 54/21
54/23 54/24 55/8 55/9
**reality [1]** 92/8
**Realtime [1]** 97/10
**reason [9]** 11/17 37/8
40/11 65/21 75/21
79/9 79/10 89/19
95/16
**reassessed [1]** 3/6
**recall [15]** 5/25 9/1
26/6 38/6 55/12 58/10
70/19 72/12 72/16
74/5 81/20 85/16
85/19
**receive [3]** 51/19
57/12 84/5
**received [19]** 2/8 4/5
4/6 5/3 5/4 6/11 6/12
7/25 8/1 9/18 49/21
50/17 50/18 50/20
51/6 56/17 80/14
86/17 87/3
**receiving [2]** 85/9
92/3
**recess [2]** 61/24 62/4
**recognize [2]** 6/3 75/5
**recollection [3]** 20/23
21/11 56/7
**reconsideration [1]**

**record [8]** 3/2 4/2 4/4
5/7 14/23 62/6 70/23
97/11
**records [1]** 8/25
**recross [6]** 2/5 92/21
94/2 95/4 95/17 95/18
**RECROSS-EXAMINAT
ION [2]** 2/5 94/2
**redirect [10]** 2/4 14/20
14/22 67/13 67/14
86/19 93/13 95/19
96/4 96/7
**reference [2]** 71/7
71/10
**referenced [1]** 36/24
**referred [1]** 69/2
**referring [6]** 24/5
87/12 92/8 94/21
94/21 95/22
**refers [1]** 6/14
**reflect [4]** 3/2 5/7 62/6
74/16
**refund [3]** 30/10 41/8
41/8
**regard [4]** 10/11 10/15
80/7 84/12
**regarding [17]** 5/2
14/13 15/8 16/16
16/17 17/1 17/22
17/23 20/9 20/12
21/20 38/16 54/25
55/14 93/22 94/17
96/13
**Registered [1]** 97/9
**related [1]** 11/13
**relationship [1]** 83/9
**relevant [3]** 17/8 21/6
21/8
**relied [3]** 13/4 28/7
55/1
**reluctant [2]** 57/24
58/4
**reluctantly [1]** 60/12
**rely [10]** 27/7 27/9
27/10 27/13 27/15
28/6 28/8 28/17 28/18
28/19
**relying [1]** 27/17
**remain [7]** 34/23
35/12 35/14 35/20
36/13 72/23 73/7
**remedy [2]** 14/6 14/8
**remember [9]** 16/3
39/17 59/11 62/1 69/3
72/14 72/15 83/13
83/21
**remind [2]** 5/9 62/11
**removed [1]** 19/17
**repeat [3]** 26/18 28/3
33/16
**rephrase [4]** 51/14
88/6 89/7 89/14
**Reporter [4]** 1/23 1/24
97/9 97/10
**represent [1]** 73/22

**representation [1]** 11/17
73/9 73/9
**represented [3]** 3/3
62/7 79/15
**required [2]** 20/16
37/17
**requires [1]** 89/1
**requiring [1]** 29/14
27/10
**research [2]** 11/19
27/10
**residence [6]** 93/18
93/21 93/23 95/13
96/15 96/17
**residential [4]** 23/12
23/15 89/20 89/23
**residing [1]** 81/14
**respect [1]** 21/7
**respond [2]** 28/7
52/15
**response [2]** 18/11
28/2
**responses [1]** 5/8
**responsible [2]** 56/23
88/23
**rest [1]** 89/5
**restitution [1]** 71/23
**result [1]** 16/10
**RESUMED [2]** 2/3
5/15
**retrieve [1]** 68/14
**return [7]** 41/5 41/11
41/18 41/21 42/18
75/24 86/13
**returned [1]** 41/3
**returning [2]** 40/14
40/19
**returns [4]** 29/16 30/9
67/7 85/21
**review [2]** 18/16 21/13
**reviewing [1]** 7/11
**revisited [1]** 3/25
**right [96]** 3/2 4/4 4/19
4/21 4/23 7/25 11/8
11/21 11/25 13/22
15/2 19/2 20/6 21/18
22/1 23/1 23/13 23/17
23/20 24/4 24/16
24/18 24/24 25/2
25/11 25/18 26/3
26/11 26/15 28/14
31/1 31/13 31/18 33/8
33/11 33/19 34/4
34/10 34/17 35/2 35/5
36/21 36/24 37/3 37/6
37/11 37/15 37/19
37/22 37/25 38/8
38/11 38/15 38/18
38/21 39/4 39/13
39/18 39/19 39/24
40/6 40/9 40/14 40/22
41/13 41/16 42/4
43/21 46/12 46/15
47/4 47/12 47/22
47/25 49/1 50/2 52/24
53/4 53/7 58/19 61/25
62/6 62/10 62/25 66/5

**representation [1]** ...
73/9 73/9
... [column 4 continued]
86/22 88/7 92/18 93/2
95/3 96/24 97/1
**RMR [2]** 1/23 97/15
**Road [9]** 53/2 53/3
53/6 53/7 90/11 94/7
94/19 95/3 95/25
**Rodriguez [3]** 54/9
54/12 55/7
**room [2]** 10/24 67/22
**rule [1]** 89/6
**ruled [1]** 19/12 21/3
21/7
**ruling [1]** 14/22

**S**

**salary [3]** 34/23 35/12
73/8
**sale [15]** 88/17 93/14
94/5 94/6 94/19 95/11
95/24 96/2 96/2 96/8
96/10 96/18 96/19
96/20 96/22
**sales [5]** 37/9 37/14
37/18 38/23 39/3
46/11 50/11 62/24
64/7
**San [12]** 10/16 23/10
58/15 93/15 93/23
94/18 95/2 95/10
95/12 96/9 96/13
96/14
**San Marino [3]** 93/23
94/18 96/9
**sanctions [1]** 16/13
**Sandra [2]** 6/23 6/24
**Sanz [3]** 53/19 53/21
53/24
**Sanz's [1]** 54/2
**sat [1]** 3/19
**savings [4]** 43/13
43/15 43/20 45/4
**saw [3]** 75/5 75/8
87/23
**saying [3]** 13/20 17/25
95/3
**says [20]** 6/20 6/21
20/2 25/17 34/22
34/24 36/12 52/18
53/6 67/23 72/16
72/22 73/7 74/8 87/15
94/5 94/17 95/1 95/11
95/22
**SBA [1]** 23/24
**scheme [4]** 10/7 10/10
10/15 91/21
**schemes [1]** 19/11
**school [1]** 24/15
**scope [3]** 86/4 88/5
91/8
**scratched [1]** 19/22
**seated [4]** 4/23 5/10
22/4 62/10
**second [8]** 9/15 15/6
17/11 26/9 74/8 74/21
75/9 76/25

**security [3]** 32/23 33/7 33/18
**see [20]** 4/14 6/23 6/25 9/15 9/24 10/3 11/17 14/17 43/8 45/21 51/25 52/16 66/17 71/7 72/9 74/9 77/9 77/10 87/17 87/19
**seeing [1]** 28/12
**seeking [1]** 34/3
**seen [3]** 48/3 75/18 89/23
**sell [1]** 46/14
**selling [1]** 84/1
**send [4]** 13/16 53/9 84/5 85/11
**sending [1]** 85/3
**sent [12]** 40/13 40/17 42/15 42/23 49/10 65/21 79/23 84/24 85/12 85/15 85/18 87/20
**sentence [5]** 27/23 36/12 95/1 95/21 95/21
**separate [1]** 77/4
**September [2]** 53/23 58/18
**September 5 [1]** 58/18
**Services [2]** 56/15 79/13
**settlement [3]** 43/6 54/8 54/8
**setup [2]** 74/1 75/12
**seven [1]** 90/13
**sheet [3]** 5/23 7/15 7/21
**show [9]** 6/2 6/8 6/17 7/20 14/20 18/2 18/15 25/10 83/1
**showed [7]** 8/20 28/23 28/25 29/1 42/3 72/12 83/2
**showing [6]** 7/19 9/17 51/24 74/3 76/16 86/2
**shown [3]** 5/23 8/13 8/17
**shows [1]** 43/25
**sidebar [4]** 10/22 11/12 86/7 93/1
**sign [8]** 25/7 88/19 88/22 90/1 90/16 91/14 91/14 91/16
**signature [4]** 9/4 59/18 72/6 89/24
**signed [10]** 24/23 25/4 26/11 27/16 28/6 28/20 28/21 39/4 58/18 60/3
**signing [11]** 26/13 26/19 26/24 59/16 59/20 60/13 89/16 90/4 90/9 90/10 91/4

**similar [1]** 70/20
**simply [4]** 13/7 17/18 41/3 66/1
**sir [132]**
**sitting [2]** 11/18 84/21
**SJ [4]** 9/13 9/15 9/18 10/2
**slide [1]** 21/2
**sold [5]** 53/23 62/16 94/20 95/2 95/25
**somebody [3]** 6/24 11/20 78/23
**son [1]** 63/10
**soon [1]** 78/13
**sorry [14]** 11/23 14/6 23/7 23/21 28/10 29/12 35/3 44/4 47/9 52/3 54/23 54/25 89/8 94/6
**sounds [1]** 14/3
**source [1]** 31/13
**South [1]** 1/21
**SOUTHERN [1]** 1/1
**spare [1]** 31/1
**speak [1]** 95/6
**speaking [2]** 54/20 54/24
**specific [1]** 89/2
**speculation [1]** 31/4
**split [1]** 50/13
**spoke [4]** 5/22 54/22 55/12 55/13
**spread [11]** 46/6 46/9 46/25 50/6 50/13 51/2 62/17 64/3 64/21 76/9 76/12
**stand [4]** 13/19 14/14 94/24 95/20
**standard [1]** 17/18
**Stanford [1]** 15/13
**start [2]** 67/16 68/3
**started [1]** 16/9
**state [1]** 33/22
**stated [12]** 12/9 13/1 26/14 26/20 26/23 29/7 35/17 38/5 44/15 65/24 94/4 96/18
**statement [4]** 34/22 44/21 85/19 86/13
**statements [2]** 12/5 12/6 13/15 13/23 14/1 15/15 29/19 30/9 67/5
**STATES [5]** 1/1 1/4 1/18 12/6 87/12
**stating [3]** 5/23 18/2 73/12
**stationaries [1]** 9/25
**stationery [3]** 9/10 9/21 10/4
**stay [2]** 73/13 73/19
**step [4]** 10/24 11/3 92/19 97/2
**STEWART [7]** 1/18 2/4 2/5 22/5 22/9 62/14 86/20
**stickies [1]** 91/16

**stop [1]** 78/12
**straw [13]** 42/9 46/3 48/10 49/4 49/19 49/22 50/2 50/4 51/18 63/5 66/5 92/9 92/12
**strike [1]** 87/13
**struck [1]** 6/24
**submitted [3]** 60/15 60/17 89/24
**substance [1]** 5/2
**substantially [1]** 89/17
**succeeded [1]** 80/16
**successfully [1]** 81/12
**sued [2]** 37/2 37/5
**sufficient [1]** 83/12
**suggest [1]** 88/14
**Suite [1]** 1/21
**summer [1]** 9/22
**Sunset [1]** 10/11
**supply [1]** 92/1
**supplying [1]** 91/23
**supported [1]** 87/16
**supposed [2]** 15/21 78/12
**sure [5]** 3/19 4/2 21/10 21/13 95/15
**surprised [1]** 19/17
**suspect [1]** 40/1
**sustained [4]** 3/24 49/13 73/16 90/7
**SWORN [1]** 5/14
**system [1]** 93/7

**T**
**take [5]** 7/12 61/24 61/25 91/1 94/7
**taken [2]** 15/3 29/4
**talk [4]** 11/19 67/25 72/9 85/1
**talked [3]** 8/24 20/1 47/2
**talking [3]** 19/23 68/8 93/20
**tampered [1]** 88/15
**tasks [1]** 78/8
**tax [5]** 29/16 30/9 67/7 85/21 86/13
**team [2]** 34/11 34/15
**tell [8]** 13/17 39/2 39/8 70/21 77/3 85/12 92/12 95/15
**telling [2]** 27/12 52/10
**Temecula [2]** 80/15 81/2
**tend [1]** 11/10
**term [1]** 74/1
**terms [1]** 12/4
**territory [1]** 3/8
**testified [49]** 13/21 14/4 15/7 15/14 15/23 17/5 17/17 18/22 19/9 20/18 22/15 24/2 28/22 34/6 34/19

**testify [6]** 53/11 53/12 57/9 58/8 69/9 69/14
**testifying [6]** 18/9 40/16 41/24 58/7 67/19 80/4
**testimony [11]** 11/14 11/17 12/5 12/9 12/25 13/11 13/25 14/3 14/11 14/14 14/16 15/15 15/16 16/6 16/23 19/13 20/21 20/24 22/10 22/15 28/16 30/8 36/24 40/11 41/1 42/6 42/12 46/9 54/20 55/1 55/13 55/18 55/23 56/7 56/12 58/12 65/6 65/11 65/12 87/4 96/20
**Thank [8]** 3/13 4/17 5/13 9/19 70/1 92/18 97/1 97/3
**thing [6]** 15/2 19/8 42/6 61/2 61/9 82/15
**things [4]** 16/8 22/22 78/3 78/22
**think [19]** 4/9 13/15 19/1 19/2 19/3 19/15 20/4 20/4 20/25 21/1 24/22 44/4 75/12 84/14 86/15 86/18 88/6 88/10 94/24
**thinking [2]** 58/8 95/6
**third [1]** 26/11
**Thompkins [1]** 62/8
**thought [8]** 18/6 18/10 33/21 34/1 75/10 75/11 89/8 92/4
**three [8]** 8/12 23/16 57/4 79/13 79/17 79/18 82/6 92/7
**tie [3]** 86/5 86/10 86/16
**time [32]** 7/24 9/12 10/18 16/9 31/1 32/13 36/7 55/16 55/24 60/6 70/13 74/23 75/12 75/21 77/19 83/8 83/15 84/18 85/12 85/23 90/2 90/12 90/20 91/1 93/14 94/5 94/6 94/18 95/9 95/17 95/19 96/8
**times [3]** 24/7 59/15 69/2
**Title [1]** 8/4 8/25 52/5

**today [8]** 15/6 16/24 84/21
**told [19]** 8/19 8/21 13/1 13/13 13/6 14/9 32/8 32/16 34/16 35/11 36/10 42/15 61/16 63/24 64/23 68/9 83/10 85/5 93/17
**top [4]** 7/4 7/6 9/25 70/20
**topic [1]** 12/14
**Torbert [2]** 34/6 34/9
**total [2]** 26/2 87/17
**totals [1]** 94/7
**touch [1]** 54/17
**transaction [26]** 13/3 14/12 40/5 40/8 40/17 40/24 42/7 42/13 43/1 44/23 44/25 48/12 50/1 50/16 50/23 54/7 55/3 55/14 62/20 63/18 64/6 65/13 65/18 65/25 74/8 83/13
**transactions [9]** 10/8 14/13 56/4 56/5 56/5 56/6 65/20 91/19 92/11
**transcribed [1]** 97/6
**transcript [3]** 1/12 16/21 97/11
**transferred [6]** 38/8 38/10 41/15 43/20 44/5 45/3
**trial [4]** 1/12 11/9 11/21 14/11
**true [23]** 13/16 14/1 16/22 17/21 18/11 25/20 26/5 29/22 29/25 32/11 38/4 42/9 42/22 46/3 48/9 51/12 51/15 51/18 53/23 54/1 54/4 57/15 65/24 **truthful [3]** 17/5 17/8 33/13
**truthfully [1]** 33/22
**trying [3]** 21/2 21/4 52/14
**turn [1]** 19/6
**turned [1]** 68/20
**twice [1]** 23/18
**two [13]** 7/4 7/5 9/25 10/3 15/20 19/2 19/22 19/23 38/15 38/18 47/23 68/8 68/9 68/13 68/23 77/4 94/22
**type [3]** 7/20 41/20 41/22
**typo [1]** 53/4

**U**
**U.S [1]** 1/14
**Uh [1]** 45/23
**Uh-huh [1]** 45/23
**Uhm [2]** 23/16 37/16

**U**

ultimately [4] 47/22
59/15 70/14 80/12
uncomfortable [1]
80/5
uncredible [1] 18/3
underlying [2] 18/1
18/20
understand [17]
11/20 14/22 14/24
18/12 22/22 23/23
25/7 26/17 27/21
31/11 31/14 35/14
35/20 35/23 57/25
94/23 95/14
understanding [4]
33/25 44/23 73/18
83/17
understood [11]
26/13 26/17 26/19
26/23 27/16 27/19
28/5 29/1 33/17 82/3
82/6
Uniform [3] 89/20
89/23 90/4
unintentional [1] 85/9
unit [9] 45/12 47/11
47/14 48/19 64/6 64/9
76/10 76/13 83/3
UNITED [5] 1/1 1/4
1/18 12/6 87/12
units [8] 77/13 77/18
77/20 77/22 77/24
78/4 78/13 79/17
University [2] 24/16
24/18
unrelated [1] 17/16
upside [1] 95/24
use [6] 12/6 17/1 47/6
66/4 83/4 87/13

**V**

vacuum [1] 12/16
Valley [2] 80/15 81/2
value [3] 27/10 27/11
27/15
values [1] 27/8
Venezuela [1] 51/23
Venezuelan [1] 51/22
venture [1] 34/4
Ventures [11] 34/4
35/2 35/5 35/6 35/7
35/8 35/11 36/10
72/11 73/12 73/19
verification [1] 35/25
verify [3] 31/17 32/5
39/25
versus [1] 15/11
vibrate [1] 93/11
view [1] 4/16
Village [2] 15/11 37/2
virus [1] 3/6
visit [1] 47/7
volunteer [3] 31/2
31/8 58/1

**W**

Wachovia [4] 41/23
41/24 43/10 43/13
wait [1] 3/9
WAMU [9] 10/7 10/10
10/15 67/9 87/7 87/10
87/24 91/21 91/23
want [16] 8/22 10/6
11/13 18/4 18/12
21/10 21/12 22/25
27/4 30/22 30/25
31/12 37/18 61/13
72/9 77/12
wanted [13] 3/18 4/1
14/25 31/16 31/17
34/9 34/11 34/13
34/15 73/19 79/4 79/4
81/4
wanting [1] 23/3
Washington [16]
27/17 28/5 28/7 28/17
28/18 28/24 29/1 29/4
29/10 31/16 31/20
31/23 32/16 33/17
36/5 93/16
way [7] 12/19 15/25
19/4 39/2 39/8 39/22
39/25
we've [2] 3/9 84/25
weighty [1] 18/4
welcome [1] 4/18
well [23] 11/7 12/13
16/20 20/2 28/25
34/18 36/12 42/2 47/8
49/15 55/9 65/25
72/13 80/18 80/24
81/25 82/9 83/6 86/16
87/13 92/22 93/15
93/22
went [13] 19/18 19/20
41/7 41/24 68/13
75/24 77/5 80/18
80/25 81/1 84/8 90/25
95/23
whatsoever [1] 68/4
wife [3] 19/16 80/17
90/12
willing [1] 37/10
wire [8] 22/18 22/20
41/5 42/23 44/4 49/9
49/21 61/11
wired [18] 13/7 14/5
14/8 40/21 40/24 41/1
42/12 43/4 43/23 44/2
45/6 48/22 49/16
63/18 64/3 64/16 66/1
75/17
wish [1] 3/21
wishes [1] 4/14
withholding [2] 87/10
87/24
witness [13] 2/2 11/2
27/23 44/15 57/24
58/4 58/23 69/10
69/12 93/13 95/15
96/1 97/4
22/13
word [3] 35/20 69/3
83/16
words [14] 14/4 16/6
16/22 17/4 18/11
18/20 20/13 24/3
24/23 29/4 30/5 39/24
58/6 94/22
work [3] 30/12 57/13
77/24
workers [1] 82/1
working [2] 32/13
73/4
write [11] 41/8 41/8
41/11 41/18 41/19
41/21 41/25 43/15
43/16 43/18 88/16
writing [1] 86/14
wrote [3] 41/13 71/3
88/17

**Y**

year [4] 59/7 60/4
73/21 90/21
yearly [2] 34/23 73/8
years [3] 16/3 47/23
57/20
yesterday [16] 3/18
5/22 8/24 9/3 9/6 34/7
36/15 40/11 46/6
55/13 60/20 68/11
80/4 80/10 84/8 88/10
young [1] 90/18

**Z**

Zero [1] 73/6