UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>16-60340-CR-BLOOM(s) (COHN)</u>

UNITED STATES OF AMERICA

v.

MARCO LAURETI,

Defendant.
_____/

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT LAURETI'S OBJECTIONS TO THE PRESENTENCE INVESTGATION REPORT

The United States of America, by and through its undersigned Assistant United States Attorney, hereby responds in opposition to Defendant Marco Laureti's (hereinafter "Defendant" or ("Laureti") Objections to the Presentence Investigation Report (hereinafter "PSI") (DE:133). This response is organized into four parts: (1) the legal and procedural history of this case; (2) an analysis of the defendant's factual objections; (3) an evaluation of the defendant's legal objections; and (4) the conclusion.

## I.     LEGAL & PROCEDURAL HISTORY

In this case, the Superseding Indictment charged Defendant Marco Laureti and a co-conspirator with one count of conspiracy to commit wire fraud affecting a financial institution (Count 1), in violation of Title 18, United States Code, Section 1349, and eight substantive wire fraud offenses, in violation of Title 18, United States Code, Sections 1343 and 2 (Counts 2 through 8). Counts 2 through 8 specifically related to loans on individual properties in the Southern District of Florida (two of the properties had two mortgage loans, hence the two additional counts).

All of the offenses relate to six real estate transactions undertaken in 2007 by the Defendant and others in Broward and Miami-Dade Counties.  These properties include four multi-million dollar condominiums at 45 Hendricks Isle in Fort Lauderdale (Counts 3-5 and 7-9), the Defendant's $6.9 million purchase of his home at 205 E. San Marino Drive in Miami Beach (Count 6) and co-defendant Felix Mostelac's purchase of a $6.5 million dollar condominium at 1800 Sunset Harbor Drive in Miami Beach (Count 2).  Briefly summarized, the Defendant and others perpetrated a fraudulent scheme whereby they submitted, and caused to be submitted, mortgage loan applications and HUD-1 Settlement Statements containing a number of false and fraudulent material misstatements of fact to Washington Mutual Bank ("WAMU").  These material false statements induced the bank to approve the applications and mortgage loans so that the Defendant and others could consummate the aforementioned real estate transactions.  These false and fraudulent material misstatements of fact related to, for example, the borrowers' employment and income, intent to occupy the property, the payment of required cash-to-close funds and a 17% real estate commission on the defendant's 205 E. San Marino Drive property that improperly went to the Defendant and was used to pay a large portion of his required cash-to-close.  The evidence showed that on many occasions, the Defendant misappropriated the bank's loan proceeds and unjustly enriched himself.

After an approximately three-week trial, on November 6, 2017, the jury found the defendant guilty of conspiracy to commit wire fraud affecting a financial institution, and the substantive wire fraud offenses charged in Counts 3 through 9 of the Superseding Indictment.  The defendant was acquitted of one substantive wire fraud charged in Count 2. (See Verdict (DE:88).

## II.    **Defendant's Factual Objections**

The defendant objects to a myriad of factual issues.  These objections are largely self-serving and unfounded.  Most of these objections should be overruled and all the objections are addressed below.

### A.   Objections to Facts Not in PSI or Defendant's Contradicted Testimony

The defendant objects to the fact that his version of case was not in the PSI. (See DE:133 at ¶¶ 1-18).  The defendant's objections contain a lengthy recitation of most of the defendant's trial testimony, which was explicitly discredited by the jury, irreconcilable with the facts presented in documents and testimony, and subject to an enhancement for obstruction of justice.  If the defendant's version of these facts were true -- which they are not -- the defendant would have been acquitted on all counts; however, since these facts are false and were discredited by testimony and exhibits, they should be overruled.  Mr. Laureti's factual objections are similar to his self-serving and perjured testimony, blaming everyone else -- including the real estate market -- and proclaiming his innocence.  These false statements have no place in the PSI.  To paraphrase the Miami-Dade Circuit Judge in another matter addressing the defendant's perjured testimony under oath, the defendant should begin his version of events in this matter with the phrase "Once Upon a Time."[1]  Accordingly, the defendant's objections should be overruled.

---

[1] Significantly, a Miami-Dade County Circuit Judge found that, in a separate case where the defendant testified, that the defendant lied to the Court; that the Judge has never experienced this type of deception by a litigant in over 20 years on the bench; and that  the defendant's lies were of such magnitude that the Court suggested the defendant start his testimony with the phrase "Once upon a time" (transcript attached as Exhibit A at pp. 81-82). Additionally, in this matter defendant should also be held accountable for obstruction of justice for testifying falsely under oath, as described *infra* in Part III(E).

B.  Objections to Specific Paragraphs

The defendant objects to specific paragraphs of the PSI and continues asserting his version of the facts that belied the testimony established at trial.  The United States responds as follows to the defendant's specific objections and respectfully requests that most be overruled:

1.   Objection to Paragraph 1: The Court **should sustain, in part, this objection** and add that the defendant was acquitted of Count 2.

2.   Objection to Paragraph 4:  The Court **should overrule this objection, in part,** because the PSI does not require the listing of parties not charged.  In fact, the section reads "Related Cases."  The PSI, however, should be updated with the sentencings of Cabrera and Melian.

3.   Objection to Paragraph 11:  The Court **should overrule this objection** because Cabrera testified that Laureti instructed her to disburse funds at the closing.  Documentary evidence supported Cabrera's testimony, including wire transfer instructions for monies to be sent to the defendant's accounts.  Laureti's perjured testimony that Cabrera's wire transfers to him were "mistakes" and that he returned these "mistakes" in cashier's checks for the exact amounts of the cash-to-close for the properties contradicts not only the established facts of this case, but also common sense itself.

4.   Objection to Paragraph 12: The Court **should overrule this objection** because Cabrera testified that Laureti instructed her to make false statements in the HUD-1 Settlement Statements and these false statements ensured the conspiracy's success.  Moreover, the trial testimony established that in Laureti's own tax return for his business, Laureti Holdings Co., he claimed a tax deduction for $30,000 paid to MSJ Services, Inc. The defendant perjured himself again by testifying that the $30,000 he paid to MSJ Services, Inc. was for closet work on the 45 Hendricks properties.  Cabrera testified that this money was for kickbacks Laureti agreed to pay her, and

since they were kickbacks, Cabrera asked they be provided to her husband's company MSJ Couriers; Laureti's tax records revealed he obtained a tax deduction for paying $30,000 to MSJ Services Inc., and MSJ Service's owner testified he never met nor did business with Laureti.

5.   Objection to Paragraph 17: The Court **should overrule this objection** for various reasons: because Jorge De La Cruz testified that he never intended to occupy the property himself; that he could not afford the property; that he did not make the salary ($49,000/month) listed in the loan application; and that he did not have the hundreds of thousands of dollars as stated in the loan application.  De La Cruz also testified he never paid the cash-to-close and never had that amount of money in his life.  Significantly, the defendant in his own objections to the PSI admits that De La Cruz was actually a straw buyer by stating that the defendant was the true purchaser of the property, which was consistent with the jury's verdict and the evidence in this case. ("*Mr. Laureti decided to purchase one of the 4 units at 45 Hendricks Isle for his then father-in-law, Jorge De La Cruz*.") See DE:133 at pg. 2, ¶4.

6.   Objection to Paragraph 19: The Court **should overrule this objection** because the defendant was present at Corzo's closing.  The defendant testified that he was not at Hector Corzo's closing (Corzo testified that a Venezuelan man was at the closing where he told this man he was a forklift operator and Corzo later identified this man as Laureti).  Laureti's telephone records, admitted by the defense, showed Laureti was in Miami Beach at the time, where the closing took place.  As Cabrera testified, the defendant was involved in all of the closings, providing instructions and attending most of the closings.

7.   Objection to Paragraph 23: The Court **should overrule this objection** because the facts in paragraph 23 are true.  Contrary to the defendant's objection on page 11 ("[d]espite representations by the Government to the jury during closing arguments, De La Cruz never had a

judgment entered against him"), there appears to be a final judgment of foreclosure ordered against De La Cruz was ordered and filed on September 21, 2010 in Broward County Case No. 2009-CA-031941.

8.    Objection to Paragraph 26:  The Court **should overrule this objection** because the testimony established that the defendant directed Cabrera to disburse funds at his direction and the defendant provided all of the loan applications and supporting false documentation with fraudulent figures.

9.    Objections to Paragraph 28 & 29: The Court **should overrule these objections** because the defendant was integrally involved in the conspiracy and led it, as provided in more detail below in Section III(A), addressing the loss amount and the defendant's involvement.

10.    Objections to Paragraphs 30-32:  The Court **should overrule these objections** because Frizzie testified that he received all of the Form 1003 loan applications from Laureti, including the one for Mostelac's property that contained a plethora of false and fraudulent material statements. Furthermore, even though the defendant was acquitted of Count 2, he remains involved in the conspiracy and is responsible for the loss of this property, as explained in more detail in Section III(A) below.

11.    Objections to Paragraphs 34-36: The Court **should overrule these objections** because the defendant was intimately involved in Corzo's purchase.  The defendant provided the loan application and information to Frizzie; the defendant received hundreds of thousands of dollars from Corzo's purchase, including a real estate commission; the defendant directed Cabrera to illegally wire monies and falsify the HUD-1 Settlement Forms; and the defendant spoke with Corzo at the closing, and Corzo told the defendant he was a forklift operator.

12.    Objections to Paragraphs 38 and 40: The Court **should overrule these objections** because Laureti led the illegal activity underlying his father-in-law's purchase of Unit 3D; Jorge De La Cruz testified that Laureti filled out forms and made him sign them; that he does not speak English; that he could not afford a multi-million dollar property; that he did not have the assets listed in the loan application; that he did not make $49,000 per month; and that he did not work for the defendant.  The defendant verbally verified De La Cruz's employment and directed Cabrera to disburse the monies.  Furthermore, the defendant admitted in his PSI Objections that he was the true buyer of the Jorge De La Cruz's unit: ("*Mr. Laureti decided to purchase one of the 4 units at 45 Hendricks Isle for his then father-in-law, Jorge De La Cruz.*") See DE:133 at pg. 2, ¶4.

13.    Objection to Paragraph 41:    The Court **should overrule this objection**. The loss amount is correct and is explained in more detail in Section III(A) below.

14.    Objection to Paragraph 42: The Court **should overrule this objection** because the defendant submitted grossly false and fraudulent documentation and Form 1003's to Frizzie.  The defendant even e-mailed false account balances to Frizzie, as demonstrated through the government's exhibit (Gx4C).

15.    Objection to Paragraph 44: The Court **should overrule this objection** because Laureti directed Cabrera to wire him the $1.2 million commission that was supposed to go to Harbor Realty.  However, the defendant directed Cabrera to divert the commission to his company, ReTrade, Inc.; the bank did not know about this and a bank representative testified that this fact would have been material to their decision to fund the loan.  Witnesses testified that a 17% residential commission was a tell-tale indicator of fraud.  Laureti then used the illegally obtained $1.2 million commission money to pay the cash-to-close for this property, unbeknownst to the bank.  None of these facts were never disclosed to WAMU.

16.    Objection to Paragraph 45: The Court **should overrule this objection** because the loss amount is correct, as detailed in Section III(A) below.

17.    Objections to Paragraphs 46-49: The Court **should overrule these objections** because the defendant submitted the false mortgage loan applications to Frizzie and directed Cabrera to illegally transfer the funds, and Laureti paid the cash-to-close from his company, Northview Equities, which was not disclosed to the bank. The loss amount is correct and explained in more detail below in Section III(A).

18.    Objections to Paragraphs 50-52: The Court **should overrule these objections** because the defendant submitted the false mortgage loan applications to Frizzie and directed Cabrera to illegally transfer the funds, and Laureti paid the cash-to-close from his company, Northview Equities, which was not disclosed to the bank. Melian also testified the defendant paid the cash-to-close when Melian told the defendant he could not afford it.  Furthermore, Melian testified -- and bank records supported -- the fact that Melian received a $50,000 wire from Laureti's company, Northview Equities, as a kickback for being a straw buyer.  This money was wired after Ramirez's closing, but before Melian's closing on approximately July 25, 2007.

19.    Objections to Paragraphs 54-61: The Court **should overrule these objections** because the defendant submitted the false mortgage loan applications to Frizzie for all of these properties and directed Cabrera to illegally transfer the funds.  Laureti paid the cash-to-close from his company, Northview Equities, which was not disclosed to the bank.  The defendant's conduct involving these properties is further explained in Section III(A) (explaining the $9.5 to $15 million loss amount) below as well as Section III(C) (documenting the defendant's leader/organizer role in the offense).

20.   Objections to Paragraphs 63-66 (the defendant posits this as an objection to paragraph 60, but it is actually paragraph 63): The Court **should overrule these objections** because the evidence showed that the defendant made false statements on the SBA/Bank United loan application, including that the defendant or his businesses were not involved in any lawsuit (the government introduced into evidence a Miami-Dade lawsuit against the defendant's companies); that the defendant was current on the mortgage on his properties (the government introduced evidence that the defendant was months late on two of his properties); the defendant's income (the government introduced evidence showing the defendant's income was inflated); and that a fraudulent lease was submitted to the bank stating that the defendant leased the San Marino Drive property to witness John Olsen for $35,000 a month for two years (John Olsen, the alleged signee on the lease, testified he never rented the defendant's property nor paid the defendant).

21.   Objections to Paragraphs 67-69: The Court **should overrule these objections** because the HUD-1 Settlement Statement and bank records revealed the defendant's company was the seller and that the defendant, through Northview Equities, paid the cash-to-close and deposit for the straw buyer in September 2007, unbeknownst to the bank.  Sanz was a straw buyer, and in the defendant's PSI objections, the defendant admits that Sanz introduced straw buyer Hector Corzo into the fraud.  Furthermore, payments were not made for two years, as the defendant contends; the property actually became delinquent as of April 1, 2008.  Finally, it is important to note that this transaction did not involve Michelle Cabrera, but a different closing agency entirely.

22.   Objection to Paragraph 70:  The Court **should overrule this objection** because the loss amount is correct. This objection is thoroughly addressed in the "Loss Amount" section (Section III(A)) of the legal objections below.

23.    Objection to Paragraph 73: The Court **should overrule this objection** because De La Cruz was a straw buyer, as explained in more detail in paragraph 12 of the Government's response.

24.    Objection to Paragraph 74: The Court **should overrule this objection** because Cabrera testified she was instructed by Laureti regarding the wire transfers and multiple exhibits support Cabrera's testimony.  Cabrera also did not commit perjury, Cabrera stated she did not remember everything, but admitted she was involved in approximately 10-50 other bad acts.

25.    Objection to Paragraph 75: The Court **should overrule this objection** because Frizzie testified Laureti provided him with every document.  Laureti's own telephone records show over a thousand calls during the conspiracy period between Laureti and Frizzie.

26.    Objection to Paragraph 76: The Court **should overrule this objection** because Piccolo's testimony was not contradicted. Piccolo testified he was Laureti's business partner and they talked often about real estate business.  Piccolo questioned the 45 Hendricks Isle units and Laureti admitted to Piccolo that Laureti knew the buyers could not afford the units.  Furthermore, Piccolo testified that Laureti told Piccolo that he (Laureti) was going to and eventually did destroy his (Laureti's) computer because of the FBI investigation.

27.    Objection to Paragraph 77: The Court **should overrule this objection** because the facts are correct and do not imply anything.  The Government agrees, however, that Olsen testified this is routine in the real estate industry; but Olsen also testified that the commission is always disclosed on the HUD-1 Form.  Olsen was shown the HUD-1 Form for Laureti's property and agreed that Laureti's receipt of the commission was not disclosed, thereby hidden from the bank.

28.    Objection to Paragraph 82: The Court **should overrule this objection** because Cabrera testified that this money was for a $10,000 per property kickback that Laureti agreed to pay her, and since they were kickbacks, Cabrera asked that these funds be provided to her

husband's company MSJ Couriers; Laureti's tax records show he obtained a tax deduction for paying $30,000 to MSJ Services Inc., and MSJ Service's owner testified he never met nor did business with Laureti because his company was in Orlando and did not operate during 2007.

29.    Objection to Paragraph 84 (the defendant stated paragraph 85, but likely means paragraph 84): The Court **should overrule this objection** for the reasons stated in paragraph 26 of the Government's response.

30.    Objection to Paragraph 86: The Court **should overrule this objection** because the defendant was the leader and organizer of the fraud.  The objection is thoroughly addressed in the Aggravating Role part, Section III(C), below.

31.    Objection to Paragraph 87: The Court **should overrule this objection** for the reasons stated in paragraph 28 of the Government's response.

32.    Objection to Paragraph 88: The Court **should overrule this objection** because the financial transactions and wire show that Laureti paid Melian for his and his mothers' purchase of the Hendricks Isle properties as straw buyers.  Furthermore, Melian testified to that fact.

33.    Objection to Paragraph 89: The Court **should overrule this objection** for the reasons stated in paragraph 12 of the Government's response.

34.    Objection to Paragraph 90: The Court **should overrule this objection** because the loss amount is correct. This objection is addressed in the "Loss Amount" section (III(A)) of the legal objections below.

35.    Objections to Paragraphs 94 and 95: The Court **should overrule this objection** because the defendant committed perjury on a myriad of materially false matters.   This objection is thoroughly examined in the "Obstruction of Justice" section – Section III(E) -- of the legal objections below.

36.   Objection to Paragraph 100: The Court **should overrule this objection** because the loss amount is correct. This objection is addressed in the "Loss Amount" section (III(A)) of the legal objections below.

37.   Objection to Paragraph 101:  The Court **should overrule this objection** because the scheme involved sophisticated means. This objection is analyzed in the "Sophisticated Means" section -- III(B) --  of the legal objections below.

38.   Objection to Paragraph 104: The Court **should overrule this objection** because the defendant was a leader and organizer of the fraud, and, in fact, profited the most.  This objection is addressed in the "Defendant's Aggravating Role" section – Section III(C) -- of the legal objections below.

39.   Objection to Paragraph 105: The Court **may overrule or sustain this objection** as explained in more detail in the "Abuse of Position of Trust or Special Skill" section – Section III(D) -- of the legal objections below.

40.   Objection to Paragraph 107 and 110: The resolution to this objection will be the result of the Court's determination of loss, role in the offense, sophisticated means, abuse of a position of trust and obstruction of justice.

41.   Objection to Paragraph 124:  The Court **should overrule this objection** because these facts were obtained from court records by the U.S. Probation Office and should remain in the PSI.

42.   Objection to Paragraph 156: The Court **should overrule this objection** because these facts are contradicted by the specific finding of a Miami-Dade County Judge, as explained further in the transcript attached hereto as Exhibit A and explained in footnote one of this response.  The defendant's testimony on this point was specifically discredited by the Circuit Court, as shown in the attached transcript (Exhibit A).

43.   Objection to Paragraph 163:  The resolution to this objection will be the result of the Court's determination of loss, role in the offense, sophisticated means, abuse of a position of trust and obstruction of justice.

## ADDITIONAL FACTUAL OBJECTION OF THE UNITED STATES

44. The United States objects to paragraph 126 of the PSI.  This is self-reported information from the defendant that has no basis known to the Government.

## III.    LEGAL OBJECTIONS

The Government now addresses the defendant's five legal objections.  Part A analyzes the loss amount and advocates that the Court overrule the objection and hold the defendant responsible for the conspiracy loss of between $9.5 million and $15 million.   The sophisticated means enhancement is discussed in Part B and provides ample support for the Court to overrule the defendant's objection because this scheme was intricate and sophisticated.  Next, Part C examines the defendant's leadership role in the scheme and asks the Court to find that Probation correctly decided that a four point aggravating role enhancement applies and to overrule the defendant's objection; The defendant's use of his special skill as a real estate agent and mortgage broker is addressed in Part D, and the Government requests that the Court sustain the defendant's objection if the Court applies the aggravating role enhancement, but overrule the objection if the Court declines to apply the aggravating role enhancement.  Finally, Part E evaluates the defendant's objection to an enhancement for his perjury at trial and the Government respectfully submits that this objection should be overruled because the defendant's trial testimony was riddled with material lies.

### A.   The Defendant is Responsible For The Loss Amount Between $9.5 to $15 Million

In his objections to multiple paragraphs above, the defendant argues that he should not be held responsible for a loss between $9.5 to $15 million because he did not intend to defraud anyone.  The defendant contends that he was duped and deceived by Galen Frizzie, Michelle Cabrera, Felix Mostelac and everyone else who testified against him.  The defendant's baseless objection should be overruled.

Marco Laureti stands convicted of conspiracy to commit wire fraud affecting a financial institution and various substantive wire fraud offenses carried out in furtherance of the mortgage fraud alleged in the Superseding Indictment.  Thus, the loss for which the defendant is responsible should be determined based on the defendant's own conduct and "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  USSG § 1B1.3(a)(1)(B).  As discussed below, the evidence shows that the defendant and Felix Mostelac together originated the conspiracy involving their own properties and the 45 Hendricks properties during the conspiracy. Therefore, the defendant is responsible for all foreseeable losses attributable to the conspiracy during and after that time.  Furthermore, the defendant's relevant conduct involving false and fraudulent statements to financial institutions at trial, involving the Bank United/SBA loan and the Palm Harbor property are also attributable to the defendant.

### 1.   The Defendant knowingly and deliberately joined in the fraud.

The defendant told the Court that he did not knowingly participate in the fraud, did not recruit straw buyers and was duped by Frizzie, Cabrera and Mostelac. (DE 414 at p. 4, ¶ 6.)

14

However, the overwhelming evidence showed that Laureti was the leader and organizer of this fraud and recruited straw borrowers for the purpose of committing wire fraud.

The testimony against the defendant was substantial at trial; records and testimony revealed that the defendant was a licensed Florida mortgage broker from 1994 until 2011 and that he also served as a principal broker and correspondent lender; that the defendant took a state required mortgage broker class at a real estate school and that he passed two examinations, in addition to completing continuing education requirements; that the defendant was a licensed Florida Real Estate Agent since 1990 and that the defendant took a state required real estate class at a real estate school and passed two examinations, in addition to completing continuing education requirements.

Jorge De La Cruz, the defendant's father-in-law and straw buyer of Hendricks Isle Unit 3D, testified that he does not speak English; that the defendant filled out the mortgage loan application and required him to sign the application; that he did not work for the defendant at Laureti Publishing Company during 2007, as stated on the Loan Application; that he never made the amount of monthly income or maintained the assets stated in the loan application; and that he never paid the cash-to-close as stated on the HUD-1 Settlement Form. Moreover, the defendant knew his father-in-law was only a security guard, and had to know that he could not afford a multi-million dollar condominium.

Hector Corzo, the straw buyer of Hendricks Isle Unit 2B, told the jury he never made the amount of monthly income or maintained the assets stated in the loan application; that at the closing, there was a Cuban and Venezuelan man, and that he told these men at the closing that he was a forklift operator; that Corzo identified the Venezuelan man's photograph, which was the defendant; and that Corzo never paid the cash-to-close as stated on the HUD-1 Settlement Form. The defense attempted to show that the developer/seller of the properties, Luis D'Agostino, was

present at the closing, but Corzo testified he never saw Luis D'Agostino before when presented with a photograph of D'Agostino by defense counsel.  In fact, the HUD-1 Settlement Statement for Corzo's property showed that D'Agostino's signature was obtained through "POA" or power of attorney.

Galen Frizzie, a mortgage broker with Gordon Lending, testified that he received every loan application and other documents (including bank and asset statements, which most were later revealed to be false and fraudulent) for the 45 Hendricks, San Marino Drive and Sunset Harbour loans only from the defendant; that all the buyers, including Felix Mostelac, spoke Spanish and Frizzie was unable to communicate with them and Laureti provided the necessary information, follow-up and documents for their transactions; that he did not know these loan applications were fraudulent; that Frizzie did other deals with other parties involved in the case; and that the defendant demanded that Frizzie split the mortgage commission for these properties because the defendant was doing all the work.  Records of substantial money transfers from Frizzie's company to Laureti and Laureti's companies at the time of these loans were also admitted into evidence.

Oscar Piccolo, a former business partner of Laureti's, testified that one of the bank accounts listed on the defendant's Form 1003 for San Marino Drive was a joint business account that did not belong to the defendant and that it contained investors' money; that the defendant told him that the defendant knew the 45 Hendricks straw buyers could not afford the properties; and that the defendant told him he was going to -- and then eventually did -- destroy the defendant's computer because the FBI was looking into the 45 Hendricks properties.

Michelle Cabrera, owner of Florida Elite Title and Escrow, told the jury that Laureti instructed her how to disburse the loan funds as to every property, except Mostelac's Sunset Harbour property; that she knew what she was doing was wrong; that the defendant told her he

worked with WAMU; that the defendant and Mostelac paid her $10,000 in checks and cash to create double HUD-1 Forms through her (then) husband's company, MSJ Couriers; that the defendant instructed her to wire the $1.2 million commission (17% of the purchase price) for the San Marino Drive property to Re-Trade, Inc. (a Florida corporation owned and operated by Laureti) despite the HUD-1 stating that commission went to Harbor Realty; and that she was involved in other fraudulent transactions between ten to fifty times that did not involve the defendant.

Yanelle Barinas, of Barinas & Associates, testified about the defendant's tax returns. Tax returns Barinas filed with the IRS were compared with Laureti's tax returns provided in the application process for the San Marino Drive property. The tax returns did not match and the returns submitted to WAMU showed substantially higher incomes. Barinas also stated she obtained information from the defendant that appeared on his 2007 tax return that $30,000 was sent from a Florida corporation company owned and operated by Laureti to MSJ Services, Inc. and that this was a tax deduction.

Mark Johnson, of MSJ Services, Inc., testified that MSJ only did business for a short time in Orlando and not during the year 2007; that he never met the defendant and did not know about his businesses; and that he never received $30,000 from the defendant nor his companies.

Pedro Melian, straw buyer of 45 Hendricks Unit 4D, testified that he never made the amount of monthly income or maintained the assets stated in the loan application and worked as a waiter at the Sabor Havana Cigar shop; that he met the defendant on several occasions, including once at his work as a waiter at Sabor Havana; that the defendant told him he was a mortgage broker with WAMU; that he never paid the cash-to-close, and, in fact, during the closing, the defendant

waived the cashier's check with the cash-to-close and jokingly stated that Melian could afford to purchase the property.

FBI Forensic Accountant Carmen Cabello testified as to the financials for each transaction, including that Laureti paid the cash-to-close from Northview Equities account for four transactions.

John Olsen, a real estate developer and childhood friend of the defendant, testified that the defendant asked if the defendant could receive a real estate commission for the San Marino Drive property through Harbor Realty.  Olsen testified that he had done this many times before and that this would be reflected on the HUD-1 as a seller's credit, although none was reflected on the San Marino Drive HUD-1.   Olsen testified that a 17% commission on a residential real estate transaction was unusual.  Olsen further testified that he did not lease or pay the defendant, nor sign a lease (or lease addendum), to live at the San Marino Drive property at any time.

FBI Special Agent Darin Didier testified regarding two loans admitted as 404(b) evidence: (1) the $1.2 SBA/Bank United Loan and (2) the Palm Harbor property.  Special Agent Didier testified that the SBA loan package contained multiple lies, including that the defendant or his businesses were not involved in any lawsuit; that the defendant was current on the mortgage on his properties; the defendant's income; and that a fraudulent lease was submitted to the bank stating that the defendant leased the San Marino Drive property to Olsen for $35,000 a month for two years.  For the Palm Harbor property, the HUD-1 Settlement Statement and bank records revealed that another of the defendant's companies was the seller and that the defendant, through Northview Equities, paid the cash-to-close and deposit for the straw buyer, unbeknownst to the bank.

Notably, even the defendant's own exhibits revealed his guilt.  For example, the defendant provided his cellular telephone records for 2007 (Defense Exhibit PN); those records revealed that

he had over fifteen hundred telephone calls with Galen Frizzie, over a thousand telephone calls with Felix Mostelac, over a hundred telephone calls with Michelle Cabrera and at least three telephone calls with Pedro Melian (the telephone calls were between Ramirez's late July 2007 closing and Melian's early August 2007 closing).

Furthermore, the defendant testified in his own defense for two days.  The defendant's testimony was not credible and was directly contradicted by at least seven Government witnesses – Hector Corzo, Galen Frizzie, Jorge De La Cruz, Michelle Cabrera, Pedro Melian, Oscar Piccolo and John Olsen.  Significantly, the defendant testified, among other contradictions, that he was not present at Corzo's closing; that he did not provide the documents to Frizzie and that he did not provide false financial account statements and tax returns to Frizzie; that Jorge De La Cruz worked for him in 2007, but as an unpaid volunteer; that he did not instruct Cabrera to disburse monies and that the monies disbursed by her were mistakes, and he brought them back in the form of cashier's checks for the exact cash-to-close amounts required by the bank for the properties; that he never brought nor waived the cash-to-close check at Melian's closing and made a joking statement along with it; that he never told Piccolo that he destroyed his computer because of the FBI investigation or that he knew the 45 Hendricks straw buyers could not afford the properties; that the $30,000 paid to MSJ Services, Inc. was to install closets at the 45 Hendricks properties; and that Olsen indeed signed the lease (and addendum) for the 205 E. San Marino Drive property.

Moreover, the defendant admitted on his direct and cross examinations that he was found by an expert to have intentionally destroyed evidence – involving real estate contracts and documents – in a civil court case in Miami-Dade County.  In this civil case, the defendant and his business partner were plaintiffs suing a bank for cancelling a residential development construction loan.  The bank allegedly cancelled the loan because there were not enough signed contracts from

prospective buyers. As a basis for his lawsuit, in discovery, the defendant sent the bank hard copies of signed contracts from prospective buyers. The defendant claimed he sent these electronically to the bank before they cancelled the loan. Subsequently, the bank demanded electronic evidence of the transmission; after years of stalling, the defendant eventually produced discs which were severely damaged. The defendant testified in this criminal case that his ex-wife caused the damage in a divorce dispute and that an expert in the civil case concluded that the defendant had intentionally destroyed this evidence. By implication, the defendant also tacitly admitted that there was a possibility he created false and fraudulent real estate contracts because there was no electronic version of them or proof they were transmitted. This was the exact conduct the defendant convicted for in this criminal matter.

### 2. **The Defendant is responsible for a loss of approximately $12.9 million (not including pending SBA/Bank United loan loss)**

The total loss attributable to the conspiracy and the defendant's relevant conduct over $12 million. The loss amount is broken down as follows:

| | |
|---|---|
| 1800 Sunset Harbour Drive, Miami Beach | $2,632,706 |
| 45 Hendricks Isle, Unit 2B, Fort Lauderdale | $1,122,985 (two mortgages) |
| 45 Hendricks Isle, Unit 3D, Fort Lauderdale | $1,205,513 |
| 205 E. San Marino Drive, Miami Beach | $2,105,856 |
| 45 Hendricks Isle, Unit PH-F, Fort Lauderdale | $2,411,921 |
| 45 Hendricks Isle, Unit 4D, Fort Lauderdale | $1,469,860 (two mortgages) |
| 112 Homeport Drive, Palm Harbor | $1,278,289 |
| SBA/Bank United Loan | $686,072 |
| | --------------- |
| **Total Loss** | **$12,913,202** |

These loss figures were from corporate records received from the FDIC and Chase (successors to WAMU), attached hereto as Exhibit B. These loss figures include unpaid principal balances and incurred expenses (escrow and corporate advances to maintain the properties). <u>See</u> <u>United States v. Lopes</u>, 705 Fed.Appx. 855, 857-58 (11th Cir. 2017) (holding that costs associated

with the properties are included in the loss calculation under Section 2B1.1 of the Guidelines). Notably, these loss figures do not include interest or negative amortization, as these expenses are not authorized by the guidelines. See U.S.S.G. § 2B1.1 app. n. 3(D)(i).

The defense provides various inaccurate loss numbers, and in the loss numbers that are seemingly accurate, the defendant fails to take into account the costs, losses and expenses for selling the properties, which are permissibly included under Lopes and other cases. The loss amounts in Exhibit B represent the correct loss amounts due to the FDIC, as successor in interest and criminal restitution to WAMU.

Additionally, even though the defendant was acquitted of Count 2, the defendant's objections to the Court's consideration of his acquitted conduct are contrary to the law and should be overruled. Furthermore, the defendant was convicted of the Conspiracy in Count 1, which includes the Sunset Harbor property, so the defendant is responsible as a member of the conspiracy and for the foreseeable acts of the conspiracy. Not only was the purchase of the Sunset Harbour property foreseeable, the defendant was part of the fraud. For example, Galen Frizzie testified that the defendant provided him all the loan applications and supporting documents, including the Sunset Harbour property; the defendant also had over a thousand telephone calls with Galen Frizzie during the conspiracy period.

Alternatively, the Court should consider Laureti's acquitted and uncharged conduct to compute his offense level and advisory guideline range of imprisonment; provided the facts of such conduct are proved by a preponderance of the evidence.

United States Sentencing Guideline (USSG) § 1B1.3(a) requires that the defendant's base offense level (where the guideline specifies more than one), specific offense characteristics, and Chapter 3 adjustments, "shall be determined" on the basis of his relevant conduct, as defined in

USSG § 1B1.3(a)(1), and USSG § 1B1.3(a)(2) and (3).  <u>See</u> USSG § 1B1.3(a).  In particular,

USSG § 1B1.3(a)(1) defines relevant conduct to include:

> **(A)** all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> **(B**) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

USSG § 1B1.3(a)(1).

Under long-standing Eleventh Circuit precedent, "'[r]elevant conduct of which a defendant was acquitted may be taken into account in sentencing for the offense of conviction, as long as the government proves the acquitted conduct relied upon by a preponderance of the evidence.'" <u>United States v. Faust</u>, 456 F.3d 1342, 1347 (11th Cir. 2006) (quoting <u>United States v. Barakat</u>, 130 F.3d 1448, 1452 (11th Cir. 1997)).  Further, uncharged conduct may constitute relevant conduct.  <u>See</u> <u>United States v. Hamaker</u>, 455 F.3d 1316, 1336 (11th Cir. 2006) ("'[S]entencing courts may consider both uncharged and acquitted conduct in determining the appropriate sentence.'") (<u>quoting</u> <u>United States v. Hasson</u>, 333 F.3d 1264, 1279 n. 19 (11th Cir. 2003)).  Thus, the defendant's relevant conduct under USSG § 1B1.3(a) includes his acquitted and uncharged offense conduct, proved by a preponderance of the evidence.  The fraud in the SBA/Bank United loan as well as the Palm Harbor property loan were proved at trial by more than a preponderance of the evidence, as explained previously in Section III(A)(1).

Even if the Court were to remove the Sunset Harbour Count 2 property loss, this amount would still be over $9.5 million, resulting in a $9,594,424 loss. Therefore, the defendant's objection to the loss amount should be overruled.

**B. <u>The Defendant Utilized Sophisticated Means to Defraud Washington Mutual</u>**

The Defendant's objection to Probation's application of a two-level enhancement for sophisticated means should be overruled. The enhancement is supported by the overwhelming evidence at trial. The defendant's conspiracy to commit wire fraud affecting a financial institution and wire fraud scheme involved: (1) the use of straw borrowers to obtain loans; (2) loan applications with fraudulent misrepresentations of material facts; (3) the use of the defendant's company on a straw borrowers' loan application, including a fraudulent verification of employment by the defendant; (4) the defendant's failure to declare the $1.2 million commission as income on his tax returns; (5) the defendant's destruction of his computer; and importantly, (6) the use of the defendant's various companies to facilitate the fraud and launder the proceeds of the fraud. Further, this case is not a typical mortgage fraud case because the defendant organized a multi-faceted sophisticated scheme, where the lender was defrauded not only in the loan application process, but also in the real estate commission process and in the HUD-1 Settlement statement/cash-to-close process. In essence, the defendant, utilizing sophisticated means, obtained money from every phase of the mortgage and purchasing process. This is precisely the type of case in which the sophisticated means enhancement applies. <u>See</u> United States v. Mesa, 589 Fed. Appx. 429, 432-33 (11th Cir. 2014) (finding sophisticated means enhancement properly applied to mortgage fraud scheme involving fraudulent mortgage documents and HUD-1 Statements and destruction of evidence). Significantly, the <u>Mesa</u> Court held that:

> Coordinated conduct and attempted concealment of the offense, including the destruction of incriminating evidence, may constitute sophisticated means. *See <u>United States v. Bane,</u> 720*

F.3d 818, 826–27 (11th Cir.), *cert. denied,* ⸺ U.S. ⸺, 134 S.Ct. 835, 187 L.Ed.2d 694 (2013).  Additionally, creation of false documents and the use of third parties for money transfers may constitute sophisticated means. *See Ghertler,* 605 F.3d at 1268. The District Court did not clearly err by determining that Mesa's mortgage fraud conspiracy involved sophisticated means. The fraud involved coordinated conduct between organizers, such as Mesa, straw buyers, recruiters of straw buyers, and loan agents, all of which Mesa attempted to conceal from the victim, JP Morgan Chase Bank ("Chase"), by submitting false loan applications, forging HUD statements, and creating third-party bank accounts used solely to perpetuate the fraud. *See Bane,* 720 F.3d at 826–27; *see also Ghertler,* 605 F.3d at 1268.

Notably, the evidence established – and even the defendant agreed that – a myriad of materially false and fraudulent statements were made on the mortgage loan applications and HUD-1 Settlement statements.  In total, the Government proved at least twenty-seven false material statements involving the charged properties at trial.  Furthermore, the defendant utilized his companies to facilitate the conspiracy and launder the fraud proceeds.  For example, the defendant paid cash-to-close for four transactions and for the Palm Harbor property utilizing his company, *Northview Equities*.  *Northview Equities*, as directed by Laureti, also received wires of the fraud proceeds from Michelle Cabrera. *ReTrade*, Inc., another company owned by Laureti, received the $1.2 million real estate commission for his 205 E. San Marino Property.  *Laureti Publishing Company* was fraudulently used to verify the false employment for straw buyer Jorge De La Cruz. Laureti fraudulently sent the $10,000 bribes to Michelle Cabrera, the title agent, hidden through her husband's courier company *MSJ Couriers*, and then the defendant had the gall to claim a tax deduction for these bribes in his *Laureti Holding Company* tax returns by substituting *MSJ Couriers* for *MSJ Services, Inc.,* a company in Orlando whose owner, Mark Johnson, testified at trial had nothing to do with the defendant.  The defendant also paid the mortgage payments on all the charged Hendricks Isle properties through his companies, *M4 Management, Inc.* and *Mellon Management Inc.*, further revealing the defendant's organization of the scheme and the defendant's

knowledge that these purchasers were straw buyers.  Furthermore, the defendant quitclaimed the De La Cruz Hendricks Isle property shortly after the sale to his company *Southeast Invest LLC*, further demonstrating the defendant's involvement and leadership in the scheme.  Lastly, the evidence established that the defendant destroyed his computer once the FBI was on the case.  This is buttressed by the fact that the defendant was found by a Court to have intentionally destroyed evidence in another matter relating to a bank, as discussed, *supra*.

It is important to note that the bank's negligence is irrelevant.  The enhancement applies if the scheme was actually executed by sophisticated means, even if sophisticated means were not required because the victims were susceptible to fraud.  See United States v. Bishop-Oyedepo, 480 Fed. Appx. 431, 434, 2012 WL 1676687, *3 (7th Cir. May 15, 2012) ("Whether successful mortgage fraud *required* sophisticated means has no bearing on whether the actual scheme itself was sophisticated.") (rejecting argument that mortgage fraud scheme was not sophisticated because at the time of the offense loan applications were routinely approved without supporting documentation).

Therefore, because the scheme involved the use of straw borrowers to obtain loans; loan applications with fraudulent misrepresentations of material facts; the use of the defendant's company on a straw borrowers' loan applications; a false and fraudulent verifications of employment by Laureti; the defendant's failure to declare monies received as tax refunds and therefore hide his profits; the defendant's destruction of his computer containing evidence of the offense; and the use of the defendant's various companies to facilitate the fraud and launder the proceeds of the fraud, the defendant's objection should be overruled.

### C. **The Defendant's Aggravating Role Warrants a Four Level Enhancement**

Probation determined that the defendant acted as an organizer or leader of the fraud scheme and applied a four-level aggravating role adjustment pursuant to USSG § 3B1.1(b). The defendant objects that the enhancement should not apply because this is a "straightforward bank fraud case in which the loan applications contain false information." (See DE 133 at p.27, ¶77). The defendant's objection should be overruled because the evidence proves that he was an organizer and leader of a criminal activity that involved five or more participants or was otherwise extensive, and Probation correctly applied U.S.S.G. § 3B1.1.

The four-level enhancement under § 3B1.1 applies in two situations. First, it applies when the defendant plays a leadership role in criminal activity involving five or more participants and the defendant counts as one of the participants. United States v. Holland, 22 F.3d 1040, 1041 n.2 (11th Cir. 1994). Second, even when the activity involves fewer than five participants, a four level enhancement applies where the defendant played a leadership role and the operation is otherwise extensive. United States v. Gupta, 463 F.3d 1182, 1197 (11th Cir. 2006). In determining whether a defendant is an "organizer" or "leader," the Guidelines enumerate seven factors that should be considered: (1) exercising decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of fruits of the crime; (5) the degree of participation in the activity; (6) the nature and scope of the illegal activity; and (7) the degrees of control and authority exercised over others. See U.S.S.G. § 3B1.3, cmt. 4; United States v. Martinez, 584, F.3d 1022, 1026 (11th Cir. 2009). The defendant's relevant conduct and not just the conviction itself is considered when deciding whether a role in the offense enhancement should be applied. See Gupta, 463 F.3d at 1197-1199.

First, this activity involves more than five participants: the defendant, Felix Mostelac, Michelle Cabrera, Pedro Melian, Eneida Ramirez, Alain Sanz, and Hector Corzo, among others. Next, all of these aforementioned factors support Probation's four-point enhancement assessment.

Regarding the first, second, and fifth and seventh factors, the defendant exercised significant decision making authority and control and was the leader of the conspiracy. The defendant was an experienced real estate stakeholder; he was a licensed realtor and mortgage broker for almost two decades. He also was a highly experienced real estate businessman, owning approximately ten companies. Cabrera testified that Laureti directed her to send all the disbursements and the Government presented evidence that Laureti sent payoff slips to Cabrera stating specific account numbers for wiring the fraudulently obtained funds (See, e.g. Government Trial Exhibit 8C, 10C, and 11AC). Cabrera described Laureti as the individual directing the business, while Mostelac was more social. Frizzie testified he received all documents from Laureti, received all instructions from Laureti and that Laureti required him to split his broker fee because Laureti was doing all the work. Melian testified that Laureti came to his (Melian's) work (as a cigar waiter at Sabor Havana Cigars) to meet him and presented himself as a WAMU mortgage broker (thereby Laureti knew Melian was a cigar waiter) and that Laureti provided the cash-to-close for his transaction. Ramirez was Melian's son and did as Melian instructed. Corzo testified a Venezuelan matching Laureti's description was at the closing and later identified the defendant. Corzo told the defendant that he was a forklift operator. De La Cruz, the defendant's father-in-law, testified that the defendant had him sign applications, that he cannot speak English and that he did not work for Laureti in 2007 because Laureti fired him, among other testimony. Moreover, Laureti brought the cash-to-close for four of the six closings and these checks came from the defendant's company, Northview Equities, as well as the closing for Palm Harbor 404(b) property. Lastly, the defendant also paid

the mortgage payments on all the charged Hendricks Isle properties through his companies, *M4 Management, Inc.* and *Mellon Management Inc.*, further revealing the defendant's organization of the scheme and the defendant's knowledge that these purchasers were straw buyers in addition to quitclaiming the De La Cruz Hendricks Isle property shortly after the sale to his company *Southeast Invest LLC*, further demonstrating the defendant's involvement and leadership in the scheme.

Next, for the third factor, the defendant recruited accomplices. The defendant involved Galen Frizzie, the mortgage broker and his father-in-law, Jorge De La Cruz, and Melian testified that Laureti went to Sabor Havana Cigars and represented himself as a WAMU mortgage broker, further recruiting Melian and, in turn, Melian's mother, Eneida Ramirez. Laureti also paid Alain Sanz, the straw buyer for the Palm Harbor property he sold. Laureti also told Cabrera he would pay her $10,000 per property for creating false HUD-1's and making false statements.

The defendant, in evaluating the fourth factor, claimed right to a larger share of fruits of the crime. The defendant profited the most from this scheme, and received money from almost every transaction, including multiple real estate commissions as well as mortgage broker fees. He received money from almost every property and received $1.2 million in an illegal commission from his own property. The defendant's company received a real estate commission on Hector Corzo's property (Counts 3 and 4). Frizzie testimony revealed that the defendant demanded and received half of Frizzie's mortgage broker fees for these properties, which was verified with bank records. In essence, the defendant's hand was in every proverbial money pot of this scheme.

For the sixth factor, the nature and scope of the illegal activity, the scheme was extensive and involved over $20 million in loans and involved false 1003 mortgage loan applications, false HUD-1 Settlement Statements, Laureti's (or Laureti directed) payments of illegal cash-to-close; as well

as Laureti directed illegal commissions.  In every step of the process of the fraud, the defendant was involved.  For example, testimony established that the defendant sent all of the Form 1003's loan applications to Galen Frizzie; that the defendant directed the illegal disbursements of the wires and false statements on the HUD-1 Settlement Forms; that the defendant paid $10,000 kickbacks to Cabrera; and that, though his companies, the defendant made the mortgage payments on all of the 45 Hendricks Isle properties.  In short, the defendant masterminded every step of the scheme.

Therefore, since the scheme involved five or more participants and all seven of the factors weigh in favor of the enhancement, Probation correctly applied the four-point role enhancement and the defendant's objection should be overruled.

### D. <u>The Defendant's Used a Special Skill to Commit the Mortgage Fraud Conspiracy</u>

If the Court applies the aggravating role enhancement, this would not apply because the Guidelines state that a defendant cannot receive both the special skill adjustment and an aggravating role enhancement.  <u>See</u> U.S.S.G. § 3B1.3 ("[I]f this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1").  If the Court were not to apply the aggravating role enhancement, the Government reserves the right to argue and maintain that the defendant used his special skills of being a licensed real estate agent and mortgage broker for almost two decades to perpetuate the fraud.  This testimony was established at trial by Sharon Dawes of Florida's Office of Financial Regulation and Warren Sanger of Florida's Department of Business and Professional Regulation and the records they admitted.  Importantly, even the defendant admits he split the mortgage fees with the other mortgage broker, Galen Frizzie.  Frizzie testified that Laureti demanded half of the mortgage fees because Laureti was doing all the work.

The Eleventh Circuit has specifically found that the special skill enhancement applies to mortgage brokers who use their knowledge to facilitate the mortgage fraud.  See United States v. Grant, 479 Fed. Appx. 904, 906 (11th Cir. 2012) (holding that the defendant's training as a mortgage broker and knowledge of mortgage loan application processes constituted a special skill and warranted the enhancement); See also United States v. Calabrese, 660 Fed. Appx. 97, 100 (7th Cir. 2016) (concluding this enhancement applies where a defendant's special skill as a mortgage broker significantly facilitated the commission or concealment of the offense).

Therefore, if the Court applies the aggravating role enhancement, the Government agrees that this objection should be sustained.  If the Court declines to apply the aggravating role enhancement, the Government requests further argument in favor of this enhancement.

### E.  <u>The Defendant's Perjury Obstructed Justice</u>

The defendant objects to the portion of the PSI that provides an adjustment for Obstruction of Justice (PSI p. 20, ¶¶ 78-84) for his perjured testimony at trial.  The defendant argues that he is "innocent of the charges" and that he was victim because "Mostelac, Corzo, Melian, Cabrera and Frizzie took advantage of him." (DE:133, ¶75).  This contention is self-serving; the defendant was not a victim, he victimized Washington Mutual, led the conspiracy and, in fact, made the most profit from the scheme.  The defendant's testimony was riddled with material false statements and Probation properly applied this adjustment, as explained below.

The Sentencing Guidelines provide that a defendant's offense level may be increased by two levels if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense....

U.S.S.G. § 3C1.1. The commentary to this section provides a non-exhaustive list of conduct warranting an obstruction enhancement, including committing perjury and providing materially false information to a judge. Id. at cmt. n.4(B), (F). "Perjury here is defined as false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Moran, 778 F.3d 942, 981 (11th Cir. 2015) (quotation omitted). To avoid "according the enhancement whenever a defendant testifies on his behalf and is found guilty," which would infringe upon the defendant's constitutional right to testify, the district court "must make an independent factual finding that the defendant willfully gave perjured testimony." United States v. Jones, 32 F.3d 1512, 1519 (11th Cir. 1994). Although specific findings "identifying the materially false statements individually" are preferable, "it is sufficient if the [district] court makes a general finding of obstruction encompassing all the factual predicates of perjury." United States v. Diaz, 190 F.3d 1247, 1256 (11th Cir. 1999).

In United States v. Curry, No. 16-10818, 2017 WL 526036 (Feb. 9, 2017) (unpublished), the Eleventh Circuit recently upheld a two-point increase for obstruction of justice when a defendant's testimony differed from officers on a material fact and the court concluded that "Curry's testimony was not credible and was offered only 'to try to dissuade the jury from convicting him.'" Moreover, in United States v. Copeland, 662 Fed.Appx. 750, 759 (11th Cir. 2016), the Court upheld an obstruction of justice enhancement for false trial testimony, finding that "for the jury to have returned a guilty verdict, it necessarily had to reject Rudd's [a co-defendant's] testimony that he did not know the fraudulent nature of the scheme." In United States v. Adam, 296 F.3d 327, 334-35 (5th Cir. 2005), the Fifth Circuit affirmed the District Court's two-point offense level increase for obstruction of justice where, as here, the defendant offered perjured

testimony under oath.  In upholding the two-point enhancement, the Second Circuit Court of Appeals in United States v. Laano, 58 Fed.Appx. 859, 862 (2d. Cir. 2003), upheld the two-point enhancement after finding that the defendant had asserted facts that were flatly inconsistent with his own statements at his change of plea allocution, and were material to the question of his guilt or innocence.  Moreover, in United States v. Dobbs, 11 F.3d 152, 155 (11th Cir. 1994), the Court of Appeals upheld the application of the enhancement where the testimony of the defendant and a witness for the government were clearly inconsistent on a material point, and the judge accepted the testimony of the government witness.

For purposes of applying this enhancement, perjury is defined as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  United States v. Dunnigan, 507 U.S. 87, 94 (1993).  Four elements are required for the Court to make a perjury finding: "(1) the testimony must be under oath or affirmation; (2) the testimony must be false; (3) the testimony must be material; and (4) the testimony must be given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory."  United States v. Singh, 291 F.3d 756, 763 & n.4 (11th Cir. 2002).

As an initial matter, there can be no dispute that the defendant's testimony at trial was under oath.  As to the second element, the government submits that the defendant's testimony with regard to the following was materially false:

- The defendant testified that Galen Frizzie changed and provided the false and fraudulent Form 1003's to WAMU in support of the loans.  See DE:119 at p.34, line 1-12 (Frizzie testified every document he received was from Laureti and that he never made any changes to the documents);

- The defendant testified that he did not make any false statements on the Form 1003 or HUD-1 for his $6.9 million purchase of his San Marino Drive property. See DE:119 at p.72, and p.73, line 1-23 (Frizzie stated he never made changes to the document and his testimony was bolstered by Gx4C, an e-mail entitled "Liquid Assets" from Laureti to Frizzie showing false assets to purchase the property);

- The defendant testified that Cabrera conducted the unauthorized disbursements of the loan proceeds herself without direction from the defendant and these unauthorized disbursements were simply mistaken overpayments. See DE:119 at p.53, line 5-24 (Cabrera testified that Laureti directed her on all disbursements and her testimony was bolstered by Government Exhibits 8C, 10C, and 11AC, orders from Laureti to transfer wires to his or other companies with accompanying specific wire account information);

- The defendant testified that he was not at Hector Corzo's closing. See DE:119 at p.29, line 13-16. (Corzo testified that a Venezuelan man was at the closing, who Corzo later identified as Laureti.  Corzo told Laureti he was a forklift operator);

- The defendant testified De La Cruz was employed by Laureti Publishing and Frizzie falsely wrote De La Cruz's income ($49,000 per month) and assets in the fraudulent Form 1003.  See DE:119 at p.36, line 4-25 (De La Cruz testified he was not employed by Laureti in 2007 because he was fired years earlier and that Laureti had him sign forms that were filled out and Frizzie testified Laureti provided all the information to him);

- The defendant testified that the $30,000 he paid to MSJ Services, Inc. was for closet work on the 45 Hendricks properties.  See DE:119 at p.81, line 17-25 through p.82 line 1-10 (Cabrera testified that this money was for kickbacks Laureti agreed to pay her, and since they were kickbacks, they be provided to Cabrera's husband's company MSJ Couriers; Laureti's tax

records show obtained a tax deduction for paying $30,000 to MSJ Services Inc., and MSJ Service's owner testified he never met nor did business with Laureti);

- The defendant testified that a $50,000 payment he made to Melian was not a kickback, but to finish the design/construction of Ramirez's Hendricks Isle Unit PH-F.  See DE:119 at p.55, line 4-25 through p.56 line 1-10 (Melian testified he received this money as a kickback for being a straw buyer and the money was wired after Ramirez's closing, but before Melian's closing on July 25, 2007);

- The defendant testified that he did not hand Melian the cash-to-close check at Melian's closing.  See DE:119 at p.58 line 3-11 (Melian testified Laureti laughed at the closing and handed him the cash to close check from Northwest Equities, Laureti's company); and

- The defendant testified that he did not destroy his computer as a result of the FBI's investigation of this case and that he never told Piccolo that he knew the Hendricks Isle buyers were not qualified to purchase the properties.  See DE:119 at p.84 line 19-25 (Piccolo testified that Laureti told him he was going to and then eventually did destroy his computer because the FBI was investigating the Hendricks Isle properties and that Laureti told Piccolo that Laureti knew these buyers weren't qualified to purchase the properties).

In sum, every piece of evidence in the case plainly contradicted the defendant's testimony and not a single piece of evidence corroborated it.  Based on the trial record, the Court should find that the defendant's testimony was knowingly false.

With respect to the third element, the defendant's aforementioned testimony was undoubtedly material, as it was the basis for the criminal charges against the defendant.  A matter is material where "if believed, [it] would tend to influence or affect the issue under determination." Singh, 291 F.3d at 763.

Finally, the nature of the defendant's testimony is such that it could not be the result of mistake, accident, or confusion.   As previously discussed, the defendant's testimony is completely irreconcilable with the evidence in this case and was deliberately designed to mislead the jury into returning a verdict of not guilty.   The only conclusion from the record is that the Defendant's testimony was knowingly and intentionally false.

After listening to all the testimony, including that of the defendant, and reviewing all the evidence, the jury's guilty verdict made clear that they discredited the defendant's testimony. "Credibility determinations are within the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position ... to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002).  Furthermore,

 The United States respectfully submits that the Court should make a factual finding that the defendant offered perjured testimony at trial.   See Singh, 291 F.3d at 763.  Accordingly, the obstruction of justice enhancement in the PSI should be sustained.

## IV.   CONCLUSION

For all the foregoing reasons, most of the defendant's objections to the PSI should be overruled and the Government's factual objection should be sustained.  As such, the defendant's adjusted offense level would remain a level 39, with a Criminal History Category of I, yielding an advisory guideline range of should be 262 to 327 months' imprisonment.

Respectfully submitted,

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

By:   s/ *Randall D. Katz*
RANDALL D. KATZ
ASSISTANT U.S. ATTORNEY
Florida Bar No. 0112036
500 E. Broward Boulevard, Suite 700
Fort Lauderdale, Florida 33394
Tel: (954) 660-5720
Fax: (954) 356-7336
E-mail: Randy.Katz@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 19, 2018, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF and has served the same via U.S. Mail to those counsel(s) who are not authorized to receive electronically Notices of Electronic Filing.

By:    s/ *Randall D. Katz*
RANDALL D. KATZ
ASSISTANT U.S. ATTORNEY

## SERVICE LIST

United States v. Marco Laureti
Case No. 16-60340-CR-BLOOM(s) (COHN)
United States District Court
Southern District of Florida

| Party | Counsel |
|---|---|
| Plaintiff: United States of America | Randall D. Katz<br>Assistant U.S. Attorney<br>Economic Crimes Section<br>United States Attorney's Office<br>500 E. Broward Boulevard, Suite 700<br>Fort Lauderdale, FL 33394<br>E-mail: Randy.Katz@usdoj.gov<br>**via Notice of Electronic Filing generated by CM/ECF** |
| Defendant: Marco Laureti | David M. Garvin<br>David M. Garvin, PA<br>200 South Biscayne Blvd., Suite 3150<br>Miami, FL 33131<br>Email: ontrial2@gmail.com<br>**via Notice of Electronic Filing generated by CM/ECF** |