Page 1

1      IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
       CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA
2                  CIRCUIT CIVIL DIVISION
3                  CASE NO:  09-24685 CA 23
4

   EMERALD VILLAGE, L.L.C.,
5  a Florida corporation,
6         Plaintiff,
7  vs.
8  PACIFIC NATIONAL BANK, N.A.,
   a national banking association,
9
          Defendant.
10 _____/
11                      Miami-Dade County Courthouse
                        73 West Flagler Street
12                      2nd Floor
                        Miami, Florida 33130
13                      2:00 p.m. to 3:36 p.m.
                        Friday, November 14, 2014
14
15
16
17
18
19
20
21      This cause came on for hearing before the
22  Honorable Stanford Blake, Circuit Court Judge,
23  pursuant to notice.
24
25

```
 1    APPEARANCES:
 2         GREGORY M. GARNO, ESQUIRE
           JESUS M. SUAREZ, ESQUIRE
 3         GENOVESE JOBLOVE & BATTISTA
           100 Southeast Second Street
 4         44th Floor
           Miami, Florida 33131
 5         ggarno@gjb-law.com
           jsuarez@gjb-law.com
 6         Attorneys for Plaintiff
 7
 8         GARY E. LEHMAN, ESQUIRE
           FRANCISCO ARMADA, ESQUIRE
 9         AMY STEELE DONNER, ESQUIRE
           BROAD AND CASSEL
10         21st Floor
           2 South Biscayne Boulevard
11         Miami, Florida 33131
           glehman@broadcassel.com
12         adonner@broadandcassel.com
           Attorneys for Defendant
13
14
      ALSO PRESENT:
15
           Marco Laureti
16
17
18
19
20
21
22
23
24
25
```

1

INDEX

2

3   WITNESS                                    PAGE

4   ROBERT MOODY

5       Direct Examination by Mr. Lehman ...............7

6       Cross-Examination by Mr. Suarez   .............22

7       Redirect Examination by Mr. Lehman  ..........42

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Good afternoon.
 2              MR. GARNO:  Good afternoon.
 3              MR. LEHMAN:  Good afternoon, Your Honor.
 4              THE COURT:  Nothing can make a weekend
 5      like having an Emerald Village versus Pacific
 6      National Bank case.  I mean, that's just
 7      like -- it just makes you look forward to them.
 8              MR. GARNO:  It's like a three-day
 9      weekend.
10              THE COURT:  It really is.  It's just like
11      having Labor Day every day.
12              All right.  Let me officially announce it
13      for the record.
14              We have big screens and everything.  I
15      don't have anything that big at home.
16              Emerald Village versus Pacific National
17      Bank, Case Number 09-24685, Division 23.
18              On behalf of Emerald Village, please
19      state your name for the record.
20              MR. GARNO:  Gregory Garno and Jesus
21      Suarez, Genovese Joblove and Battista, on
22      behalf of Emerald Village.  We're also joined
23      in the courtroom today by nonparty Marco
24      Laureti.
25              THE COURT:  Okay.  Thank you.  And who
```

Page 5

```
 1        testified last time.
 2              And, Mr. Lehman, you want to go ahead and
 3        announce yourself for the record.
 4              MR. LEHMAN:  Sure.  On behalf of Pacific
 5        National Bank, N.A., Gary Lehman, Amy --
 6              THE COURT:  I said Lehman because I've
 7        used the Lehman for so long.
 8              MS. STEELE DONNER:  Causeway.
 9              THE COURT:  Bill Lehman and Lehman
10        Causeway, so I'm sorry, Mr. Lehman.
11              Go ahead.
12              MR. LEHMAN:  That's okay.  My father
13        pronounced it Lehman.  I know that Tom
14        pronounces it Lehman.  All the southern coaches
15        in high school said Lehman.  But my father
16        always said Lehman.  So I'm going to say
17        Lehman.
18              THE COURT:  All right.  Well, your father
19        knows best.  I'm glad my father changed
20        Pajolski to Blake.
21              And I don't know how you're going to get
22        that down.
23              MR. LEHMAN:  Gary Lehman, Amy Steele
24        Donner and Francisco Armada, from Broad and
25        Cassell, on behalf of Pacific National Bank,
```

1    N.A.  And with us today is our expert Dr. Moody

2    who --

3         THE COURT:  That's where we left off.

4         MR. LEHMAN:  -- we left off during my

5    direct examination.

6         THE COURT:  Yeah, I didn't think you

7    had -- looking at my notes and then also I saw

8    we have a transcript, I didn't think we had

9    finished up with the direct at that point and

10   there was going to be cross of course.  So --

11        MR. LEHMAN:  Right.

12        THE COURT:  Anyway, so let's finish with

13   Dr. Moody.

14        Doctor, if you'll come forward.

15        You're still under oath from before.  No

16   need to be sworn again.

17        THE WITNESS:  Right here, sir?

18        THE COURT:  Same place, same station.

19   Take your time.

20        MR. LEHMAN:  And although I'm happy about

21   whatever they're doing, I just ask that they

22   turn that off and stop doing it while I'm

23   examining the witness and let them finish or do

24   whatever they do.

25        THE COURT:  Okay.

1          MR. SUAREZ:  This is the computer that

2     has the e-mails that the bank claims are

3     missing.

4          THE COURT:  Oh.

5          MR. SUAREZ:  They're on this computer.

6     So we're just going to show that to you when

7     they're done.

8          THE COURT:  You might use it in cross or

9     something else.

10          MR. SUAREZ:  Yes.

11          THE COURT:  But we'll see.

12          MR. LEHMAN:  Okay.

13          THE COURT:  But it can be used.

14          Well, as long as it's like that, that's

15     fine.

16          Okay.  You may continue, Mr. Lehman.

17               DIRECT EXAMINATION

18  BY MR. LEHMAN:

19     Q.    Dr. Moody, do you realize that you're

20  still under oath?

21     A.    I do.

22     Q.    Now, you may recall, last time, that there

23  was a series of orders that required Mr. Laureti, the

24  managing member or one of the managing members of --

25  one of the members of Emerald Village, to produce a

1  disc that he testified under oath was in his home

2  office in a misplaced file drawer.

3            Do you recall that?

4      A.   I do.

5      Q.   And when he came to your office, albeit

6  lately, he didn't have a single disc that he

7  testified to, but he had two discs.  Isn't that so?

8      A.   That's correct.

9      Q.   And once you determined that neither one

10 of those discs were readable or otherwise usable in

11 any way, shape or form, Mr. Laureti also said that he

12 had a, quote, friend's, unquote, computer that he had

13 downloaded information, according to him, in October

14 of 2009, right?

15     A.   That's -- the timing is a little

16 incorrect.  When Mr. Laureti produced the disc, he

17 informed me at that time that he did have a computer

18 in the car in case there was an issue.  So it was

19 done contemporaneously with producing the disc.

20            THE COURT:  Yeah.  I think he said it was

21       a little unusual to say, "By the way, in case

22       you can't open this, there's a friend's

23       computer in the car that I have if you want to

24       get that."

25            MR. LEHMAN:  Right.

 1          THE WITNESS:  Yes, Judge, that's correct.

 2          So basically the three items were brought

 3     to my office.  What I'm describing was more or

 4     less the conversation.

 5          MR. LEHMAN:  Right.  And just for the

 6     Court to take judicial notice, in his

 7     interrogatory answers to the third set of

 8     interrogatories, there was no mention of a

 9     friend's computer, there was no mention of a

10     second disc.  All it says is that there was a

11     disc and that the original hard drive was

12     destroyed after it ceased working in the

13     fourth quarter of two thousand and --

14          THE COURT:  I know.

15          MR. SUAREZ:  Wait.

16          MR. LEHMAN:  Okay.

17          MR. SUAREZ:  We have an objection.

18          THE COURT:  No.

19          MR. SUAREZ:  There's no question there.

20     It's Mr. Lehman testifying.

21          THE COURT:  It was almost like a Boston

22     Legal where they turn to the camera to talk to

23     the camera explaining why they're doing

24     something, so it was a little weird to actually

25     be living it.

Page 10

1          But go ahead, Mr. Lehman.

2          MR. LEHMAN:  Thank you.

3  BY MR. LEHMAN:

4     Q.    Now, prior to Mr. Laureti telling you on

5  that day that he had this friend's computer in his

6  car just in case the discs weren't readable, were you

7  aware of the existence of this friend's computer?

8     A.    No, sir.

9     Q.    Did Mr. Laureti ever tell you prior to

10  that time that he had stuff backed up on a friend's

11  computer?

12     A.    No, sir.

13     Q.    And do I recall that you testified that

14  after you attempted to read the discs, plural, and

15  determined, as you testified earlier, that they were

16  intentionally destroyed, did you try to retrieve

17  information from the friend's computer?

18     A.    Yes, sir.

19     Q.    And did the information that was placed on

20  there, however it was or whenever it was, didn't it

21  have information from, supposedly, October of 2008

22  all the way up to the time when it supposedly was put

23  on the friend's computer in October of 2009, or did

24  it have a space or a gap?

25          MR. SUAREZ:  Objection, Your Honor.

1      That's a leading question.

2           THE COURT:  No, because the last part got

3      rid of the leading part, "or did it have a

4      space or a gap."  So it gave options.

5           Overruled.

6           THE WITNESS:  I recall that the data

7      found on the computer covered a time frame, I

8      believe, up to December of 2008.  The PST file

9      was generated in November of 2009.  And so,

10     therefore, there was a gap of 10, almost 11

11     months where, if the PST file was generated

12     from the main mail store contemporaneously and

13     not modified so that only certain information

14     was included -- in other words, if I was to

15     make a copy of my backup today, we would

16     believe that the data contained in my PST file

17     would contain data up to today.

18          So the challenge I have with the PST

19     file, as produced, is that I got a gap in time,

20     which means either someone has been selective

21     or there's another issue with it.  There's

22     just -- if my data ends in December, I would

23     expect that that would be the date of the PST

24     file.  The date of the PST file is ten months

25     later.

Page 12

1    BY MR. LEHMAN:

2        Q.    And does the fact that there's this gap

3    that you've just testified to that is unexplained,

4    does that make the information contained on the

5    friend's computer reliable?

6        A.    It's definitely suspect.  My problem is I

7    can't -- I've got, I've got something I can't explain

8    away.  It doesn't fall with what I would expect.  You

9    know, there was no explanation provided to me to

10   explain that away.

11          So with that being said, I have some

12   reliability concerns, yes, sir.

13       Q.    And as an evidentiary matter, where there

14   is this unexplained gap, it's impossible to know how

15   the information that was placed on the friend's

16   computer was manipulated, modified, subtracted from,

17   added to or otherwise; isn't that true?

18       A.    Right.  I have no idea what was involved

19   in creating this set of data.  And we would want to

20   call it a subset of data, given that it covers a time

21   period smaller than what would be as part of -- just

22   a straight archive.

23       Q.    And, therefore, you cannot say, assuming

24   we knew what was on the original discs if they

25   weren't destroyed -- I mean, for all we know, they

1    contain nothing.  They have the original

2    transmissions, whatever they may have been.  There's

3    no way to tell what was on those original discs

4    because they're destroyed and unreadable, right?

5         A.    The discs I had were not -- I could not

6    image and could not process, yes, sir.

7         Q.    Right.  And we already went through the

8    holes and the scraping and all that.

9         A.    Yes, sir.

10              THE COURT:  We did.

11   BY MR. LEHMAN:

12        Q.    But, what I want to know is, can you state

13   to 100 percent certainty that what was on the

14   friend's computer, whatever that was, was the

15   identical thing that was on the destroyed discs?  Yes

16   or no?

17        A.    No, sir.

18        Q.    Next, after our hearing, we got a kind

19   letter from Mr. Garno to myself which I forwarded to

20   you.

21              MR. LEHMAN:  And I believe, Your Honor,

22         just for sake of clarity, it is Exhibit 6 in

23         our book.  And it will just make it easier for

24         you, I think, to let you use my 6.

25              THE COURT:  Okay.

Page 14

1          MR. LEHMAN:  Where Mr. Garno --

2          THE COURT:  I have it right here.  That's

3      okay.

4          MR. LEHMAN:  Yes.

5  BY MR. LEHMAN:

6      Q.    Where Mr. Garno invited me -- I might as

7  well read it into the record so we're clear.

8          "Mr. Lehman, we heard and considered

9  Dr. Moody's testimony that any e-mail sent by

10  Mr. Laureti from Marco@laureti.com should be

11  forensically preserved by GoDaddy.com.  We agree with

12  Dr. Moody's testimony that GoDaddy's servers are the

13  best evidence to forensically confirm the

14  authenticity of the e-mails at issue in the various

15  motions before the Court.

16          "In order to avoid any further

17  misapprehension, Mr. Laureti has agreed to provide

18  Dr. Moody access to his GoDaddy accounts during the

19  relevant time periods, January 1st, 2008, through

20  May 30th, 2008, and subject to the Court's protocol

21  order.

22          "Please advise whether Mr. Laureti may

23  contact Dr. Moody directly to arrange for this

24  inspection."

25          Have you seen that letter, sir?

Page 15

1          A.     Yes, sir, your office forwarded a copy of
2    it to me.
3          Q.     And let me ask you a few preliminary
4    questions.  If you were to look at the GoDaddy server
5    today, is that a reliable, 100 percent indicator of
6    what was the state of the information contained on
7    the disc testified to in 2008?
8          A.     Given that I don't know what the condition
9    was in 2008 and just looking at the e-mails, there
10   would be a reliability concern.
11         Q.     And is it the same problem, that you would
12   not know looking at GoDaddy.com's server six years
13   later that whether or not there had been additions,
14   retractions, subtractions, modifications or
15   manipulations that occurred in the ensuing six years?
16         A.     There would be that problem, yes, sir.
17         Q.     And would there be any way to determine
18   whether or not information was selectively deleted,
19   added, et cetera to the GoDaddy.com website six years
20   later in order to know that that website, the server,
21   was the same as it was during the 2008 time period
22   supposedly appearing on the discs that Mr. Laureti
23   testified was in his home office and the subject of
24   various orders to be produced?  Yes or no?
25         A.     You're going to have to ask that again

Page 16

1    because the question ran on for a bit.

2         Q.    Sure.

3         A.    If you can break it up into chunks, I'd

4    rather answer that.

5         Q.    Is there any way to determine whether or

6    not, based upon the fact that information could have

7    been modified, added or subtracted, deleted, et

8    cetera from the server in the ensuing six years that,

9    if you were to look at the server today, that would

10   tell you to 100 percent certainty the state of those

11   e-mails in 2008?  Yes or no?

12        A.    I think that it would be difficult to do

13   so.  The challenge is that the supporting

14   documentation, being the logs and things of that

15   nature, are not usually maintained for a six-year

16   period.  Usually you're lucky to get six months or a

17   year.  So unless some steps were taken, either by the

18   court or by one of the attorneys, to ensure the

19   preservation of those logs, then no, I would not be

20   able to tell.

21        Q.    And as you sit here today, is it fair to

22   state that the reason why you didn't take Mr. Garno

23   up on this gracious offer of his is because it would

24   be of no probative value or use because you couldn't

25   ascertain by looking at the GoDaddy server today what

1    the state of the server was in 2008 during the

2    relevant time period?

3              MR. SUAREZ:  Objection, Your Honor.

4         That's leading.

5              THE COURT:  Overruled.  Well, it is

6         leading.  Just to move it along.  You're

7         correct it is leading.  I'll overrule it

8         however.

9              THE WITNESS:  I --

10             THE COURT:  I think he's already said

11        that.

12             MR. LEHMAN:  I just want to make it

13        really clear for the record.

14             THE COURT:  I'm trainable.  I figured it

15        out three questions ago.

16             MR. LEHMAN:  Thank you, Your Honor.

17             THE COURT:  Go ahead.

18             THE WITNESS:  Do you wish for me to

19        answer that?

20             THE COURT:  Well, since it's been asked

21        and all -- we've had this conversation -- go

22        ahead and answer it.

23             THE WITNESS:  There's issues with the

24        data, so there would be problems with its

25        value.

1  BY MR. LEHMAN:

2      Q.   Now, did Marco Laureti, who didn't produce

3  these documents -- well, first there was the subpoena

4  in 2011 -- who didn't produce these documents for

5  nearly three and a half years, did you and he have

6  any discussion about his failing to remember that he

7  had his childhood friend who he took some disc and he

8  put it on that computer?  Did you have any discussion

9  with him about that when he came to your office or

10  that he had memory problems or he forgot about his

11  friend?

12     A.   Nothing that I recall specifically.  I

13  mean, it was odd enough for someone to present a

14  computer in that fashion.  But, you know, a lot of

15  our work is, we begin the work, we take what we can

16  get, we work with it and questions develop afterward.

17     Q.   Okay.

18     A.   So I don't recall, you know, a discussion

19  of that nature with Mr. Laureti.

20     Q.   Okay.

21     A.   And I didn't ask.  So it was really like,

22  okay, let's get the data and move forward.

23     Q.   So he didn't say, "Gee, the last three and

24  a half years, I forgot that it was on my childhood

25  best friend's computer, but now coming to your

1  office, I magically -- it jogged my memory and I got

2  the computer"?  He didn't say anything like that to

3  you?

4      A.    I don't recall anything of that nature.

5  It was more of, "I have these discs.  If there's an

6  issue here, I do have a computer in the car," and I

7  kind of left it at that.

8      Q.    And that was his initial presentation to

9  you, right?

10      A.    Pretty much, yes, sir.

11      Q.    Okay.  Now, just to recap.  The

12  information on the disc, which is actually two discs,

13  was intentionally destroyed; was that correct?

14      A.    Yes, sir, it appears that way to me.

15      Q.    The friend's computer, whatever is on

16  there, is unreliable as you've testified; is that

17  correct?

18      A.    There's a big gap between the date that

19  the PST was created.  And that suggests that there's

20  been some modification.  I'm unaware of the

21  modification and I can't verify it, so it's less than

22  reliable.

23      Q.    And the final thing, even though

24  Mr. Laureti only offered up in his sworn testimony

25  and his interrogatory answers about a disc, the

1    GoDaddy server also doesn't provide any relief for us

2    to find out exactly with 100 percent certainty what

3    the state of the server was during the relevant time

4    period in 2008 by looking at it today; is that

5    correct?

6         A.    I believe that's correct, yes, sir.

7         Q.    So it would be fair to state that the

8    information that may have been on those discs,

9    there's no way to find out exactly what was on those

10   discs as of the dates January 1st, 2008, through

11   May 30, 2008, as you sit here today based upon the

12   different things that were offered by Mr. Laureti at

13   the last hearing, and subsequently, with this

14   invitation to go to GoDaddy, true?

15        A.    That's correct.

16             MR. LEHMAN:  Nothing further for this

17        witness.

18             THE COURT:  Thank you.

19             MR. ARMADA:  One more thing.

20             MR. LEHMAN:  Oh, hold on.

21             I'm introducing the photographs into

22        evidence.  I thought we had done that last

23        time.

24             THE COURT:  I saw them.  I know we have

25        the originals here.

```
 1          Any objection to the photographs being
 2     entered?
 3          MR. SUAREZ:  Your Honor, our only
 4     objection is to the extent that the photographs
 5     aren't consistent with the actual discs which
 6     is what you have in your hands.
 7          THE COURT:  I made an observation that
 8     the color that came out on the photographs were
 9     a little different than when I looked at the
10     disc in person, but for that, I think there's
11     a -- the Court, who's the trier of fact in
12     this, will decide how much weight to give it
13     versus the admissibility.
14          It is admitted.
15          MR. LEHMAN:  Thank you, Your Honor.
16          THE COURT:  This will be, then -- well,
17     they're the defendants, so it'll be Defendant's
18     A.
19          THE CLERK:  No, we already have
20     Defendant's A.  In evidence, Defendant's B.
21          THE COURT:  What was A?  Does it say?
22          THE CLERK:  Wait.  Is that the same as
23     this?
24          THE COURT:  Yeah, I think it's the same
25     thing.  I thought it was introduced.
```

Page 22

1              MR. LEHMAN:  Okay.

2              THE COURT:  Mr. Armada is just being very

3        careful.

4              MR. LEHMAN:  I like a thorough colleague.

5              THE COURT:  Well, that's what I

6        understand.

7              MR. LEHMAN:  Thank you.

8              THE COURT:  All right.  Mr. Suarez,

9        Mr. Garno, do you care to cross-examine

10        Dr. Moody?

11              MR. SUAREZ:  Yes, Your Honor.

12                  CROSS-EXAMINATION

13    BY MR. SUAREZ:

14        Q.    How are you, Dr. Moody?

15        A.    I'm good.  How are you?

16        Q.    All right.  Thanks.

17              MR. SUAREZ:  How about this.  Your Honor,

18        if we may proceed, I'd like to begin

19        questioning Dr. Moody, and then we'll turn our

20        attention to the computer.

21              THE COURT:  Fine.

22    BY MR. SUAREZ:

23        Q.    Dr. Moody, just a moment ago you said that

24    the information had been intentionally destroyed.

25    Was your testimony that the information had been

Page 23

```
 1    intentionally destroyed or that the discs had been
 2    intentionally destroyed?
 3        A.    Well, I believe when I -- the recap of my
 4    testimony a few minutes ago was based on my testimony
 5    of the prior time.  And it's my opinion that the
 6    damage to the discs, making them unreadable, is not
 7    like anything I've seen through casual use or
 8    incidental damage and it appeared to be intentional.
 9            So if there were to be data on the disc,
10    okay, the discs that I received could not be read,
11    and more importantly, they could not be imaged.  And
12    we tried several systems to accomplish that.
13            So are you asking me, if a disc is
14    damaged, could it house undamaged information?
15        Q.    No.  I'm sorry if I was unclear.
16        A.    Okay.
17        Q.    I just want to draw a very clear
18    distinction between damaging information and damaging
19    a disc.  Your testimony has been that the disc has
20    been damaged, but I want to turn your focus to the
21    information, what was contained on the discs.
22        A.    Okay.
23        Q.    What was contained on the discs, what I
24    believe Mr. Laureti --
25            MR. LEHMAN:  Objection, Your Honor.
```

Page 24

```
 1          THE COURT:  You guys love to have
 2      speaking leading up to any question.  The
 3      bottom line is this:  If the disc was
 4      unreadable, does that mean whatever was on the
 5      disc, if anything, was removed?
 6          MR. LEHMAN:  The case law, which is the
 7      subject of my objection, says, the spoliator --
 8      you have to assume the worst.  Everything goes
 9      in their favor.  It's a very liberal standard.
10      And since it's destroyed and unreadable, you
11      can't tell what's on there or if nothing was on
12      there.
13          THE COURT:  I understand.
14          MR. LEHMAN:  So I don't want to suggest
15      by Mr. Laureti whatever he said was on there,
16      that that's indicative of something being on
17      there.
18          THE COURT:  The Court had its own chance
19      to look at the demeanor of every witness and
20      make its own determination as to the veracity
21      of what may have been testified to.
22          MR. LEHMAN:  Thank you, Your Honor.
23          THE COURT:  Go ahead.
24          MR. SUAREZ:  I'll try to move it along.
25      I don't want to belabor the point.
```

Page 25

1    BY MR. SUAREZ:

2         Q.    The issue we have, Dr. Moody, is whether

3    e-mails were sent and/or received.  You understand

4    that, right?

5         A.    Yes, sir.

6         Q.    When an e-mail is sent from one computer,

7    it's received by another computer after having gone

8    through the Internet; that's correct?

9         A.    And a bunch of stuff in between, yes, sir.

10        Q.    Correct.  So when an e-mail is actually

11   sent by one person and received by the other, that

12   e-mail exists both in the computer where the e-mail

13   was sent, in the computer where the e-mail was

14   received, and somewhere in between in the Internet.

15        A.    Maybe a couple of servers.  Anywhere from

16   two to four places between the sender and receiver,

17   yes, sir.

18        Q.    So if you're trying to determine that an

19   e-mail, in fact, was sent and/or received when

20   someone says it was sent and/or received, that can be

21   proven with certainty by looking at a number of

22   different sources, the e-mail -- the computer of the

23   person that sent the e-mail, the Internet stuff in

24   the middle, and the computers of the people that

25   received it, correct?

1          MR. LEHMAN:  Objection, Your Honor.

2          THE COURT:  Grounds?

3          MR. LEHMAN:  We're here on a motion to

4     compel for spoliation of evidence.  The only

5     thing that was offered as evidence of these

6     e-mails was this disc.  So talking about all

7     these theoretical other ways it could be is

8     completely irrelevant.  We're only focused on

9     the disc, the only thing offered, not the

10    friend's computer, not anything else, just the

11    disc.  And I think this is all irrelevant.

12         THE COURT:  Okay.

13         MR. SUAREZ:  And I'm happy to respond,

14    Judge, because this is the problem with the

15    bank's misdirection.  And we want to make sure

16    that this point is very clear, okay.

17         The testimony that Mr. Laureti has

18    advanced and the position that Emerald Village

19    has taken is that pre-sale contracts were

20    delivered in person and by e-mail from Emerald

21    Village to the bank.

22         THE COURT:  That's what was said.

23         MR. SUAREZ:  There are seven e-mails,

24    okay.  There are seven pre-sale contracts that

25    were sent by e-mail.

```
 1              THE COURT:  Contracts.
 2              MR. SUAREZ:  Seven e-mails enclosing the
 3         pre-sale contracts.  Six of those seven e-mails
 4         reside on the bank's servers and were produced
 5         by the bank to Emerald Village in discovery in
 6         this case.
 7              So the only thing I'd like Dr. Moody to
 8         confirm is that there's absolutely no issue
 9         with the fact that six of the seven e-mails
10         that we're talking about here today were sent
11         by Mr. Laureti, went through the Internets and
12         were received by the bank, because the bank in
13         turn produced them to us.
14              THE COURT:  If he's aware of that, he may
15         answer.
16              MR. LEHMAN:  Objection, Your Honor.
17         Foundation.
18              MR. SUAREZ:  I'm happy to --
19              THE COURT:  I think that's why I said if
20         he's even aware of it.  He may not be aware of
21         it.
22              MR. LEHMAN:  Oh, sorry.
23              MR. SUAREZ:  And I'm happy to cut to the
24         chase with Dr. Moody to see what he's aware of,
25         what he's not aware of and to get to the point.
```

1          THE COURT:  Doctor, do you know -- have

2      you -- are you aware of any e-mails that were

3      retrieved from the bank's server or anything

4      involving any of the contracts?

5          THE WITNESS:  No, sir.  I haven't done

6      any review at the bank or was not aware of any

7      production made by the bank.

8  BY MR. SUAREZ:

9      Q.    But, Dr. Moody, when you were asked by the

10  bank to review the discs, I presume they must have

11  asked you to look for something on the discs; is that

12  correct?

13     A.    That's correct.

14     Q.    What did they ask you to look for on the

15  discs?

16     A.    Seven specific e-mails.

17     Q.    Seven specific e-mails.  In order to

18  determine whether those seven e-mails were actually

19  sent, correct?

20     A.    If they resided within Mr. Laureti's PST

21  file or e-mail container.

22     Q.    Now, you would agree that the discs, in

23  whatever format they may be, would have been a backup

24  of the original transmittal; is that correct?

25     A.    Sure.  It would have been a PST file.  And

Page 29

1  from Mr. Laureti's testimony last time, he said this

2  was the vehicle that he used to back up things as

3  part of his normal course of business.

4       Q.   And the disk would have contained -- let

5  me withdraw that.

6            The discs themselves would have been a

7  backup of the original source; is that correct?

8       A.   Yes, sir.

9       Q.   The discs never contained the original

10 data?

11      A.   It would have obtained -- it would have

12 contained a copy of what was ever backed up.

13           MR. SUAREZ:  Your Honor, I'd like to hand

14      Dr. Moody -- and I have a copy for the Court

15      and a copy for the bank -- PNB01391 through

16      PNB01390.  And I've rearranged them so that

17      Bates range is 01391 through 01390, that Bates

18      range.

19           And we can go through them one by one.

20      I'd prefer not to do it because that's going to

21      take a lot of time.

22           MR. LEHMAN:  Objection, Your Honor.  He

23      already testified he's unaware of any

24      production, et cetera, and now he's going to

25      introduce production to the expert.

 1          THE COURT:  I'm -- if he's not aware of

 2     it, and you've set up the question that a disc

 3     is what takes it off the original server, what

 4     are the next questions you're going to ask?

 5          MR. SUAREZ:  If we're trying to establish

 6     that the e-mails were, in fact, sent, absolute

 7     proof and evidence of the fact that the e-mails

 8     were sent is the fact that they were received

 9     by the bank.

10          THE COURT:  But he's not -- listen, he

11     didn't look at any of this.  I think you've

12     established the general proposition that if

13     someone sends something, they have received it,

14     at some point it was on their server to send

15     out, such as in discovery.

16          MR. SUAREZ:  Understood.

17          THE COURT:  I don't think there's an

18     issue about that.

19  BY MR. SUAREZ:

20     Q.    Okay.  Hypothetically any e-mail that is

21  contained on one backup -- let me withdraw that, Your

22  Honor.

23          Hypothetically, Dr. Moody, if a backup is

24  made of an original source, that would contain

25  information that was copied off of the backup; is

Page 31

1    that correct?

2         A.    Say that one more time.

3         Q.    If you use the CD to back up your

4    computer --

5         A.    Right.

6         Q.    -- and then loaded that CD into another

7    computer, the information that was on that CD would

8    be copied onto the other computer?

9         A.    May I rephrase it just to make sure?

10        Q.    Please do.

11        A.    My computer has X on it.  I make a backup

12   onto a CD of X.  I take that CD to another computer

13   and I copy the contents of the CD on there.  The new

14   computer would have X.

15              So if you're asking me if I could move X

16   from one computer to another by way of CD and a

17   backup, the answer is yes.

18        Q.    And if you were to follow that process, is

19   there anything in the new computer that has the copy

20   of the backup that wouldn't be contained in the

21   actual backup?

22        A.    Well, my concern, because, unfortunately,

23   I do have to reflect a little bit on what I've seen,

24   okay.  We're talking about backing up e-mails.  And

25   the first concern I have is that I have a backup

Page 32

```
 1   of -- I have a backup of X e-mail that covers a
 2   specific time frame, but the date of the backup, as I
 3   understand it by looking at the friend's computer,
 4   which would be that second computer with X, is dated
 5   almost a year after.
 6            And so it seems like the backup was a
 7   targeted backup.  It wasn't this whole backup, okay.
 8   So specific information was backed up but not -- it
 9   wasn't a complete backup.
10            So I don't know how to answer your
11   question because I have a potential discrepancy in
12   data.  But I can say this:  If I copy -- if I copy X
13   and then I move it over, whatever X represents, it
14   moves from place to place.
15        Q.    And I understand your discrepancy with or
16   your concern with the potential discrepancy.  And I'd
17   like to talk to you about it.  But the backup that
18   was made by the discs -- you saw the discs.  I think
19   they were 650 megabyte Memorex CDs; is that correct?
20        A.    That's correct.
21        Q.    And in 2008, a person's PST file would be
22   much larger than 650 megabytes conceivably with the
23   kind of volume you've seen here?
24        A.    I don't know how big the PST file would
25   be.  You know, up until, you know, a few years ago
```

Page 33

1    standard size was anywhere from, you know, 100

2    megabytes to 500 megabytes, which would fit on a CD.

3    You know, in comparison to mine, and I'm a bad

4    example, I think mine is about four or five

5    gigabytes.  But I'm definitely an outlier.

6           So without having a better understanding

7    of the size of Mr. Laureti's actual mail store, I

8    don't have an opinion as to whether or not the entire

9    thing could fit or that it was a two-disc collection.

10   I mean, I don't know.

11       Q.    The point being, Dr. Moody, that it

12   wouldn't have been uncommon, when someone is backing

13   up their e-mails, to only select certain subject

14   areas that they're interested in and create a backup?

15       A.    You know, I disagree with you on that.

16   Mainly, because the purpose of the backup is to

17   capture the entire store.  And my experience has

18   always been that you're backing up the entire mail

19   store.

20           So there may be a legitimate business

21   reason to carve something out, but my understanding

22   of Mr. Laureti's testimony, and I'm reflecting on

23   that last time, was that this was done as a part of

24   normal course of business, which suggests to me that

25   this would have been an entire backup of his mail

1   store and not just a segment.  So, you know, what my

2   understanding -- it may be different, but my

3   understanding of what I've seen and whatever would

4   suggest that.

5         Q.    But you don't know that for sure?

6         A.    I do not know that for sure.

7         Q.    If we wanted to establish the existence of

8   seven emails that had been sent or received, looking

9   at the recipient's computer would be one way to

10  completely determine if that e-mail had, in fact,

11  been sent; is that correct?

12        A.    It would be a way of determining whether

13  or not the recipient had received it, not whether or

14  not it was sent.

15        Q.    In this case, did you have an opportunity

16  to review the bank's servers to see if they had

17  received e-mails from Mr. Laureti?

18              MR. LEHMAN:  Objection, Your Honor.

19              THE COURT:  Overruled.

20              THE WITNESS:  No, sir, I did not review

21        their stuff.

22  BY MR. SUAREZ:

23        Q.    Prior to Mr. Laureti bringing you the hard

24  drive that day and the discs, had you ever met

25  Mr. Laureti before?

1      A.    No, sir.

2      Q.    Mr. Laureti came to your office with the

3   two discs and the hard drive, that's correct, I think

4   you testified?

5      A.    Yes, sir.

6      Q.    And your testimony has been that he was

7   cooperative and friendly and not in any way

8   obstructive?

9      A.    No, sir, he brought it in and explained

10  what he had and worked with us.  And, in fact,

11  because we had his computer, we actually kept it for

12  the weekend and returned it, and we were able to work

13  through those issues.

14     Q.    So you were able to keep the computer that

15  Mr. Laureti brought over a course of, I think, five

16  days; is that correct?

17     A.    I'm not sure it was five days, but it

18  was -- he dropped it off on Friday.  I believe he

19  picked it up on Monday.  So long weekend.

20     Q.    And during the time that you had the

21  computer, did you have the opportunity to run tests

22  on it or conduct any forensic analysis?

23     A.    That's not what our intent was.  Our

24  intent was to make sure that we had a good forensic

25  image.  And it's important, especially in a situation

1    where we're receiving evidence and it's of a

2    contentious nature such as this, that what

3    Mr. Laureti shares with me and what I agree to do,

4    that we're doing exactly.

5              So I'm very careful about -- we explained

6    to him exactly what we were going to do.  We did

7    exactly that.  There was no poking around or

8    additional analysis or going outside of what we were

9    being permitted to do.

10        Q.    So you did make a forensic copy of the

11   computer?

12        A.    I believe we did, yes.

13        Q.    Have you run any tests on it?

14        A.    Other than doing the analysis for the

15   specific e-mails in question, that's as far as what

16   we would be permitted to do.

17        Q.    And you did, in fact, find the e-mails on

18   the computer; is that correct?

19        A.    Yes, sir.  Just not exactly where we were

20   being told they were.  They were actually contained

21   in another PST file.

22        Q.    Was there any indication that Mr. Laureti

23   had done anything to manipulate the data or to in any

24   way mess with the e-mails and how they had been sent?

25        A.    Well, the PST file that was generated was

```
 1    actually a subset of -- you know, it wasn't a
 2    complete backup.  It was one that was specifically
 3    targeting e-mails contained within a specific folder
 4    and things of that nature.
 5              So in the sense that a PST file was being
 6    created for whatever specific purpose, I don't know
 7    what Mr. Laureti's intent was.  But the idea that --
 8    I would have expected it would have been part of the
 9    entire -- like a backup of the mail store, not just a
10    subset.
11              As far as anything that he shared.  No,
12    sir, he didn't share anything like that.  Anything
13    that we would have found, just the fact that I found
14    the e-mails not where originally stated that we could
15    expect to find them and it was part of a subset,
16    that's it.
17              The log files, the other things which
18    would give me an indicator of what might have been
19    done, understanding that I can go on to my computer
20    and I have a folder called "miscellaneous" and in
21    miscellaneous, I can delete ten items and dispose of
22    them and then do a backup of miscellaneous, and it
23    would now, instead of showing 50, it would show 40.
24    If I then take that and stick it on another computer,
25    the only thing I'm going to see would be the 40
```

1    that's there and there would be no indicator of

2    anything else.  So I did not have the information

3    necessary to conduct that analysis.

4         Q.    I understand the discs were unreadable and

5    you were unable to make a forensic copy of them, but

6    were you able to actually see what was on the discs

7    or get a directory of the drive?

8         A.    We worked with a couple of different

9    computers so -- and we were unable to read the discs

10   at all.

11        Q.    You were unable to see the file names of

12   what was contained on the discs?

13        A.    Yeah, I don't believe we were.  I mean, it

14   was pretty much -- it was a -- we weren't able -- we

15   were unsuccessful in working with the discs.

16        Q.    So you don't know if the data that was on

17   the discs contained a subset of Mr. Laureti's mail

18   store?  Am I using that term right?

19        A.    That's right.

20        Q.    Or the actual mail store?

21        A.    Yeah.  I was unable to determine one way

22   or the other.

23        Q.    Were you able to determine how much

24   capacity had been written into the discs?

25        A.    No, sir, the discs pretty much failed

1    right off.

2         Q.    I want to explore with you for a second,

3    Dr. Moody, the concept about the gap in this backup

4    that you had mentioned.  You testified that it caused

5    you concern that the PST was loaded in '09 but only

6    had e-mails through the end of 2008?

7         A.    No.  I believe I said that the PST was

8    created in November of '09, but it only contained

9    data up through December of '08.  And the fact that

10   at the time of creation something -- you know,

11   someone or for some reason only that period of data

12   was collected, leaving out that gap, was a point of

13   concern.

14        Q.    Are you aware that Emerald Village has

15   alleged in this case that the bank breached its

16   obligations in September of '08 and that we don't

17   think anything that happened after there was much

18   relevant?

19             MR. LEHMAN:  Objection, Your Honor.

20             THE COURT:  Sustained.

21             THE WITNESS:  I wasn't aware of it.

22   BY MR. SUAREZ:

23        Q.    Dr. Moody, I know you've testified in a

24   lot of cases where evidence has been spoliated and

25   that you're very familiar with people destroying

Page 40

1    evidence.  That's correct, right?

2         A.    I have testified in these types of cases,

3    yes, sir.

4         Q.    Why do people usually destroy evidence?

5              MR. LEHMAN:  Objection, Your Honor.

6              THE COURT:  Sustained.

7    BY MR. SUAREZ:

8         Q.    Is it consistent with someone trying to

9    destroy evidence that they would provide you

10   different other avenues of collecting that data?

11             MR. LEHMAN:  Objection, Your Honor.

12             Calls for him to glean someone other -- some

13             other person's mental state.

14             THE COURT:  You're asking:  If

15             Mr. Laureti did something, what was the reason

16             that he would have done it?

17             MR. SUAREZ:  Your Honor, and we're -- if

18             Dr. Moody is not testifying on Mr. Laureti's

19             intent, that's fine, but he's offered an

20             opinion that Mr. Laureti intentionally

21             destroyed discs.

22             THE COURT:  No.  He's saying that the

23             discs that were given to him were intentionally

24             altered or destroyed, whether hot iron or other

25             things that we heard testimony about.

1          Now, Mr. Laureti may have given them.  He

2      didn't say Mr. Laureti did it.  He's just

3      saying he was presented something by

4      Mr. Laureti, they were unreadable because they

5      had been altered and intentionally destroyed

6      from markings that he doesn't normally see,

7      these holes which were these chips, et cetera.

8          MR. SUAREZ:  Understood.

9          THE COURT:  So those were the discs that

10     Mr. Laureti gave, whether he did it or someone

11     else did it or just a bad day getting to the

12     place is for the court to decide ultimately as

13     to the importance of that issue.

14         MR. SUAREZ:  May I confer with my

15     colleague for one second?

16         THE COURT:  Certainly.

17         MR. SUAREZ:  Thank you.

18 BY MR. SUAREZ:

19     Q.   Dr. Moody, do you have any recollection of

20 Mr. Laureti opening the discs on a laptop and being

21 able to see the file names that were on the discs?

22     A.   I don't recall that.

23         THE COURT:  Anything else?

24 BY MR. SUAREZ:

25     Q.   Just to confirm, you were able to look at

```
 1   this computer and find seven e-mails transmitting

 2   pre-sale contracts to Emerald Village -- from Emerald

 3   Village to Pacific National Bank?

 4        A.   The seven e-mails that we were asked to

 5   look at, I believe we found on that computer, yes,

 6   sir.

 7             THE COURT:  Was this the friend's

 8        computer?

 9             THE WITNESS:  Yes, sir.

10             MR. SUAREZ:  Thank you, Your Honor.  No

11        further questions.

12             THE COURT:  Thank you.

13             Redirect?

14             MR. LEHMAN:  I have a couple of

15        questions.

16                  REDIRECT EXAMINATION

17   BY MR. LEHMAN:

18        Q.   If there were e-mails that showed that a

19   particular e-mail was sent by someone and then they

20   received a "not received" message, right, they sent

21   it to the wrong e-mail address or --

22        A.   A bounceback message.

23        Q.   A bounceback.  That wouldn't appear in the

24   bank's records, would it?

25        A.   No, sir.
```

Page 43

1          Q.    And the only one who would be aware if the

2     bank, in this case, didn't receive it, would be the

3     sender, right --

4          A.    That would be correct.

5          Q.    -- based on the bounceback message?

6          A.    Yes, sir, that would be correct.

7          Q.    And would it be possible to delete the

8     bounceback message, then transfer information

9     somewhere without the bounceback message, and say,

10    "Hey, I sent them, the bank received them"?

11         A.    It would be possible to delete the message

12    and then back up the data, yes, sir.

13         Q.    And that wouldn't show, would it?  Under

14    my scenario where they get the bounceback message but

15    the bank is not aware of it because they never got

16    them in the first place, that wouldn't show that they

17    were received by the bank, right?

18         A.    If you're asking me if --

19              MR. SUAREZ:  Objection, Your Honor.

20              THE COURT:  Wait.  Are you saying the

21         bank wouldn't know they haven't received it or

22         are you saying the person who sent them

23         wouldn't know they haven't received it?

24    BY MR. LEHMAN:

25         Q.    No, I'm saying, the bank wouldn't know if

Page 44

```
 1    it never received them and they don't get the
 2    bounceback message, they would never know whether
 3    something was sent or not?
 4            MR. SUAREZ:  Dr. Moody testified he
 5        didn't look at the bank's servers.
 6            THE COURT:  I understand that.  It's a
 7        hypothetical question.  Yes.  If someone
 8        doesn't get something, they don't know they
 9        didn't get something, they don't know they
10        didn't get something.
11            MR. LEHMAN:  Exactly.
12            THE COURT:  I'm glad I went to law school
13        to figure that out.
14            MR. LEHMAN:  And --
15            THE COURT:  And Columbia at that.
16            MR. LEHMAN:  And --
17            THE COURT:  Didn't mean to throw you off,
18        Mr. Lehman.
19            MR. LEHMAN:  I understand.  It's all
20        right.
21    BY MR. LEHMAN:
22        Q.    And those modifications wouldn't be
23    evident, meaning if someone deleted something and
24    then transferred it in the subset like you're talking
25    about to the friend's computer, that could be X
```

1    minus --

2             THE COURT:  Listen, it's clear to the

3        Court that people --

4             MR. LEHMAN:  Okay.  I'll stop.

5             THE COURT:  -- can do things to make

6        things appear to be one way that may not be

7        that way.

8             MR. LEHMAN:  Right.  Thank you.

9             Thank you, Dr. Moody.

10            THE COURT:  Any cross based on that

11       redirect?

12            MR. GARNO:  No.

13            THE COURT:  Okay.  Thank you very much,

14       Dr. Moody.  We appreciate you being back today.

15            Mr. Lehman, anything else?

16            MR. ARMADA:  Gary, may he go?

17            MR. LEHMAN:  You can go, yeah.

18            MR. GARNO:  Any more evidence?

19            THE COURT:  No, that's what I'm wondering

20       about.

21            MR. GARNO:  Yeah, I mean, if we're about

22       to launch into argument, then --

23            THE COURT:  Well, I think you might have

24       some things.  Either that or you just like

25       setting up screens, I don't know.

Page 46

```
 1            MR. GARNO:  We're covered.
 2            MR. LEHMAN:  We're going to rest unless
 3       they have something else that they want to --
 4            THE COURT:  Well, I usually ask you
 5       first.  You have now rested.  Now I'll turn to
 6       them.
 7            Do you have anything on behalf of Emerald
 8       Village and Mr. Laureti?
 9            MR. GARNO:  Judge, on behalf of
10       Mr. Laureti and Emerald Village, we don't have
11       anything further to put on for the court.
12            THE COURT:  Okay.  Then I'll go into
13       argument.
14            And you may proceed, Mr. Lehman.
15            MR. LEHMAN:  This is a case, Your Honor,
16       that, in my 25 years of practicing law, has
17       reached epic proportions.  It is like The
18       Odyssey, only longer.
19            THE COURT:  And I don't have the
20       CliffsNotes.
21            MR. LEHMAN:  That's true.
22            In 2010 Mr. Laureti testified, and he
23       said, under oath at that point in time, that
24       there was a disc.
25            And if you turn to tab 3 on page 5.
```

1              THE COURT:  I have many things with many

2         tabs from you.  Which of the -- I've got lots

3         of tabbed stuff.

4              MS. STEELE DONNER:  No, it's a big book.

5              THE COURT:  The big book.  There's this

6         one over here.  This is the biggest one.  This

7         has more initials.  The next big one.  Let me

8         look for it.  There's a couple of tabs.  No,

9         that's a case.

10             MR. LEHMAN:  Tab 3, page --

11             THE COURT:  That's a case.

12             MR. LEHMAN:  -- 5.

13             THE COURT:  Let me try this one.

14             MR. LEHMAN:  I have one if you want this

15        one.  Because I think it's important that we

16        start at the beginning of this Homeric saga.

17             THE COURT:  If I can find where The Iliad

18        is, then I'll be glad to look at the -- oh,

19        that one, I'm not sure.  Listen, I have so many

20        things back here.

21             MR. LEHMAN:  I just made it easy for you

22        by turning to the page that I'm referring to.

23             THE COURT:  Thank you.

24             And we saved a few hernias in this case.

25             MR. LEHMAN:  So on December 7th, 2012,

```
 1        there were the e-mails, and then Mr. Laureti
 2        was showing up again for his deposition
 3        pursuant to Judge Genden threatening to strike
 4        his pleadings.
 5             By this time we had had the third -- the
 6        answers to the third set of interrogatories
 7        where he said, basically, there's a disc, I --
 8        my computer malfunctioned, the hard drive
 9        crashed, it was disposed of in the normal
10        course of business fourth quarter 2009.
11             And I questioned Mr. Laureti under oath
12        even though there was denial of the motion for
13        protective order before Judge Sigler, then
14        there were two orders that weren't complied
15        with with Judge Genden.
16             MR. GARNO:  Judge, we ran into the same
17        problem with Judge Genden.  That Mr. Lehman
18        loves to come up here and recite history with
19        various --
20             MR. LEHMAN:  Excuse me.
21             MR. GARNO:  Wait.
22             THE COURT:  Wait, wait.
23             MR. GARNO:  If you're going to --
24             MR. LEHMAN:  I'm doing a closing on an
25        evidentiary hearing.
```

```
 1          MR. GARNO:  No.  And I'm objecting
 2     because --
 3          THE COURT:  Well, he's objecting it's
 4     outside the scope of what the evidence is, is
 5     that what --
 6          MR. GARNO:  No.  I'm objecting because,
 7     Judge, those orders that Mr. Lehman is talking
 8     about don't exist, and I would like him to put
 9     them into the record.
10          We went through this with Judge Genden --
11          THE COURT:  Well, I know Judge Genden
12     didn't have -- I think I determined that there
13     wasn't an order from one of Judge Genden's -- I
14     have seen orders.  I mean, I know we had the
15     hearing back in March of '13 on the fees on the
16     extra things that were required because of the
17     weekend depositions.
18          MR. LEHMAN:  Right.
19          THE COURT:  And I think one of the issues
20     was there was or wasn't an order.
21          MR. GARNO:  But if he's going to stand
22     before the Court and tell this court -- because
23     right now, clearly, there's no spoliation issue
24     because I can see the seven e-mails that we're
25     talking about right here.
```

1          MR. LEHMAN:  Excuse me.

2          THE COURT:  Wait.

3          MR. GARNO:  But if he's --

4          THE COURT:  I still think that becomes

5     argument by counsel of what is or what isn't.

6          MR. GARNO:  But, Judge, if he's going to

7     stand before you and tell you that there were

8     two court orders that were violated in December

9     of 2012, I would like Mr. Lehman to put those

10    orders into evidence.  Because this is the

11    second time he's done this.  And those orders

12    doesn't exist.

13         THE COURT:  Your objection is noted.

14         You may continue.

15         MR. LEHMAN:  The motion for protective

16    order was denied where he objected to the

17    subpoenaed documents which we requested

18    originally in 2010.

19         Then he testified under oath, again, page

20    5, tab 3.

21         "Question:  Why weren't these e-mails

22    attaching pre-sales contracts" -- that's added

23    in -- "previously produced if those are from

24    2008, Mr. Laureti?  What's your reason for

25    failing to produce them prior?

1          "Mr. Suarez:  Objection to form.

2          "Answer:  In the last two productions, I

3     made my highest and best effort to produce any

4     and all documents and these were filed in a

5     separate file and I missed them.

6          "Question:  I see.  Where was that file?

7          "Answer:  In a separate backup.

8          "Question:  From whose computer?

9          "Answer:  In a disc.

10         "Question:  From whose computer was that

11    taken, yours?

12         "Answer:  From a disc.

13         "Question:  Where did --

14         "Answer:  Backup discs.

15         "Question:  Right.  From whose computer

16    was the backup disc made, yours?

17         "Mr. Suarez:  Object to the form.  Asked

18    and answered.

19         "The Witness:  I don't understand.

20         "By Mr. Lehman:  Meaning it, the e-mail,

21    says, from Marco Laureti@laureti.com.

22         "Answer:  Okay.

23         "Question:  What is the source of these

24    documents?

25         "Answer:  They were in a disc backup in

Page 52

```
 1        text format.
 2              "Question:  And where was that filed?
 3              "Answer:  In a drawer in my home office."
 4              There's the testimony that led us along
 5        this path.
 6              This court -- this court entered two
 7        orders stating to produce those documents,
 8        meaning the discs.  Not the documents, the
 9        discs.  That wasn't complied with.
10              Then there was another order saying,
11        parties should confer about the protocols.
12        Then we had to come back and get a hearing on
13        that.  And that wasn't complied with.
14              And then you ordered Mr. Laureti to
15        produce the discs that he testified to, the
16        only thing that he testified to.
17              I asked him on three separate occasions,
18        "From whose computer, from whose computer?"  I
19        didn't hear, "Oh, my friend's computer, my
20        childhood friend's computer."
21              He said, no, they were on a disc,
22        singular.
23              MR. GARNO:  Judge, I'm going to object
24        again.  If Mr. Lehman wants to put orders into
25        evidence to support his claims that various
```

1     orders weren't complied with, then he should do

2     so.

3          MR. LEHMAN:  Your Honor, you tell him

4     that he can say whatever he likes on his own

5     argument.

6          THE COURT:  Stop, stop.

7          MR. GARNO:  No, but he can't

8     misrepresent --

9          THE COURT:  Wait, wait.  Guys, I

10    realize -- listen.  I know what verbiage of

11    lawyers are and I know what I've seen for the

12    last two years, and I understand Mr. Laureti

13    was asked to produce certain things.

14         You know, I don't care in regard of when

15    necessarily there was or wasn't an order.  I'm

16    looking at what I have as knowledge of the case

17    and what I've done on the case, and I'm looking

18    at what's referred to as previous testimony of

19    Mr. Laureti back in, I think, 2012, it may have

20    been.

21         MR. GARNO:  Judge, and I appreciate that.

22    And I appreciate that's your perspective and

23    that's where you're coming from.

24         What I'm objecting to is that Mr. Lehman

25    has continuously in this case come before this

```
1        court and talked about all these orders that
2        haven't been complied with and yet somehow
3        these orders aren't in evidence or actually
4        don't exist.
5               THE COURT:  Okay.
6               MR. GARNO:  And that's my objection.
7               THE COURT:  It is noted.  And if I don't
8        see an order, I don't see an order.  And I'll
9        decide how important it is or it isn't.
10              Go ahead, Mr. Lehman, you may continue.
11              MR. LEHMAN:  Sure.
12              Well, I mean, again, if you look at tab
13       2, now that I'm feeling that Mr. Garno has
14       basically sullied my reputation.
15              THE COURT:  Oh, I don't think any
16       reputation has been sullied.
17              MR. LEHMAN:  I understand.
18              If you look at Exhibit A, it looks to be
19       an order granting, in part, Defendant Pacific
20       National Bank's Motion to Compel Emerald
21       Village, LLC and Marco Laureti to provide discs
22       containing alleged e-mails Laureti sent to
23       Pacific enclosing pre-sales contracts.  And
24       that's dated 10/4/13.  That looks like an
25       order.
```

```
 1              THE COURT:  That was the one I saw.
 2              MR. GARNO:  I believe that order also
 3         had --
 4              MR. LEHMAN:  Excuse me.
 5              MR. GARNO:  There was a protocol that
 6         would have to be agreed to and put in place
 7         before --
 8              MR. LEHMAN:  May I?
 9              MR. GARNO:  -- those discs would be
10         turned over.
11              MR. LEHMAN:  Actually, Exhibit B, that
12         shows pursuant to a protocol.  That order,
13         Mr. Laureti shall produce the alleged discs
14         containing -- disc, singular, containing the
15         alleged e-mails within 14 days to Dr. Moody
16         pursuant to the protocols attached.  And that
17         is dated May 15, 2014.
18              So to say that there were no orders --
19              THE COURT:  Well, I think the orders that
20         Mr. Garno was objecting to was orders from
21         Judge Genden or Judge Sigler.
22              MR. GARNO:  Well, also, Judge, frankly
23         too, is that the whole point of his
24         presentation was that the two court orders that
25         he referenced weren't complied with.
```

1            The first court order said that there

2       would be production subject to a protocol.

3            THE COURT:  I'm going to listen to your

4       argument --

5            MR. GARNO:  Okay.

6            THE COURT:  -- when it's your turn.

7            MR. GARNO:  But I just don't like the

8       misrepresentation of this kind of stuff.

9            THE COURT:  All right.  Listen, the issue

10      before me, folks, is what he turned over and

11      whether it was legitimate or not.  I mean,

12      listen --

13           MR. LEHMAN:  Right.  The disc.

14           THE COURT:  I've spent -- I mean, I read

15      the 162 pages again.  I first read over my

16      notes with my own little things and then I saw

17      there was a transcript and said, "Gee, I've got

18      no life, let me go ahead and read this."

19           So I read that and I remembered how much

20      time we spent on this to begin with.  That

21      sometimes, as lawyers, we feel we need to ask

22      questions many, many, many times to get the

23      same answer.  And I appreciate it.  I know what

24      the issue is and I'm just letting you all make

25      your arguments.

Page 57

1          MR. LEHMAN:  Right.

2          THE COURT:  The bottom line is this --

3      let me ask you this, Mr. Lehman.  Are you

4      saying -- you're saying that because of the

5      testimony of Dr. Moody that these were discs

6      that could not be read, there was -- two of

7      them were given.  That for the first time

8      allegedly there's a friend's computer that he

9      mentions when he brings the discs to Dr. Moody

10     that, "If you can't read these, I have a

11     friend's computer that you can read them on."

12     And that Dr. Moody, as the expert, wasn't able

13     to pull any information.  He believes that they

14     were intentionally destroyed.  So therefore,

15     that is the spoliation of evidence, is what

16     you're saying?

17         MR. LEHMAN:  Yes.  And you're not allowed

18     in a post-hoc rationalization to say, "Oh,

19     well, hold it, that's not the case.  I have

20     this friend's computer that I never mentioned a

21     word to."

22         THE COURT:  Well, that goes on the

23     credibility and believability.

24         MR. LEHMAN:  Oh, if we go to GoDaddy.com

25     six years later.  I mean, why did he file

1         motions for protective order repeatedly?

2         There's more than one.  I think there's two or

3         three.

4              THE COURT:  Well, I think one of them was

5         he wasn't a party to the case, and therefore,

6         is a nonparty.

7              MR. LEHMAN:  I understand the nonparty,

8         even though that's belied by the Florida Rules

9         of Civil Procedure that allows you to impose

10        sanctions upon a manager, agent or director or

11        officer under 1.380 --

12             THE COURT:  We'll talk about that if we

13        get there.

14             MR. LEHMAN:  And they filed a writ of

15        certiorari on your $12,000 sanction, and the

16        writ that they filed was dismissed by the Third

17        District Court of Appeal.

18             THE COURT:  So they get it right

19        sometimes.

20             MR. GARNO:  Jurisdictionally.

21             MR. LEHMAN:  Even though there was no --

22             MR. GARNO:  The war is not over there.

23             MR. LEHMAN:  Even though there was no

24        written order by Judge Genden and et cetera.

25             THE COURT:  I understand.

1          MR. LEHMAN:  I don't want to rebuild the

2     Colosseum.  I do want to say this.

3          THE COURT:  Let's just get to the

4     important columns.

5          MR. LEHMAN:  There's a disc, one

6     cylinder, the only thing that he testified to

7     as contained in the super important

8     information, the answer to how to untie the

9     Gordian knot.  That is what was contained on

10    that disc, and it was destroyed and destroyed

11    intentionally.  I'm not saying by whom and I'm

12    not even saying whether or not it was for a

13    nefarious purpose.  It may not have been.

14         But the law says you have a duty to

15    preserve it, and it was turned over to his

16    counsel who's sending us an e-mail saying, this

17    is what's on the disc.  And then we ask for the

18    original disc for Dr. Moody.

19         So sometime after Genovese, Joblove &

20    Battista got it from their client, it was

21    turned over to Dr. Moody, not one but two

22    discs, two discs in one.  Basically, both were

23    destroyed, both were unreadable, and again,

24    Mr. Laureti, upon his presentation, said, "Hey,

25    in the event that these are unreadable, don't

```
1        worry, I brought my friend's computer too."
2             Okay.  Let's limit ourselves to the
3        evidence.  The friend's computer, irrelevant
4        and unreliable.  That's uncontradicted and
5        uncontroverted.
6             GoDaddy, unreliable.  That testimony,
7        uncontroverted and undisputed.
8             And so what does the case law say?  Well,
9        the case law says that we have to indulge every
10       single possible liberal interpretation in favor
11       of the party who seeks to prove their defense.
12            Now why is this critical here?  And this
13       brings about another level of analysis.  They,
14       meaning the plaintiff, they boast, "Well, we
15       showed seven contracts, we showed seven
16       contracts."
17            But the commitment letter, which you may
18       recall having made a comment about a year ago
19       that you had looked at the Utah law, if you may
20       recall, construing what a commitment letter is,
21       meaning, that there's no such thing as
22       substantial compliance but it has to be
23       absolutely complied with in every single
24       respect prior to the duty of the lender having
25       any duty to fund or agree to the terms of the
```

1       loan but to fund the loan.

2             Here it said they have to show at least

3       nine, they said seven.  Mr. Laureti testified

4       and said ten.  Let the record reflect that

5       nowhere in no interrogatory, in no disc, in no

6       place anywhere other than Mr. Laureti saying,

7       "I e-mailed these and they got ten," other than

8       that, there's no evidence.

9             And I would suggest that they failed to

10      fulfill a condition precedent.  But the point

11      is that's central to the bank's defense.

12      That's why I'm talking about it.  Because

13      that's one of the other elements in the

14      spoliation of evidence claim.

15            If you go something to the heart of the

16      matter, the heart of the claim or defense and

17      you are deprived, i.e., unduly prejudiced by

18      this destruction, which we have uncontroverted

19      was intentional here, and you have no other

20      means to obtain that evidence, what does the

21      court say?  Well, strike their pleadings.  It's

22      a harsh sanction.

23            You're the third judge.  Judge Sigler

24      came and went.  Judge Genden said he was going

25      to strike their pleadings and then they

1          produced the 1174 pages.  We don't need to

2          relive that.  And now you're the third judge

3          and you're, I'm told, going to be moving too.

4               THE COURT:  Might be in about ten minutes

5          I think.

6               MR. LEHMAN:  So, Your Honor --

7               THE COURT:  Yes.

8               MR. LEHMAN:  -- this -- the bank, my

9          client, Pacific National Bank, has spent

10         thousands and thousands and thousands of

11         dollars over three and a half years.  Various

12         orders subject to Mr. Garno's objections to

13         what -- the record reflects what it is.  They

14         didn't agree to the protocols.  I had to have

15         two orders compelling them to turn over the

16         disc.  I spent so much time and now if I come

17         before a fourth judge --

18              THE COURT:  No, I'm going to take care --

19         listen --

20              MR. LEHMAN:  -- he or she is going to be

21         looking at this fresh.

22              THE COURT:  I'll hold this case, even if

23         I go across the street, so certain things can

24         be resolved.  I wouldn't do it to any of the

25         parties --

1          MR. LEHMAN:  Fine.

2          THE COURT:  -- to have to start from

3     scratch.

4          MR. LEHMAN:  I'm just saying --

5          THE COURT:  Let me ask you a question.

6     And I'm just going off the top of my head --

7          MR. LEHMAN:  Yes.

8          THE COURT:  -- and I don't recall

9     obviously.  One of the issues has been about

10    whether there had to be a first -- after the

11    contract was signed and the agreement was

12    signed, whatever you want to call it, that the

13    bank was supposed to fund the money for the

14    property and then they had to produce seven,

15    nine, whatever it would be -- to have the

16    additional funding.

17          PNC has focused upon the fact of the

18    number of contracts weren't there.  The other

19    side, Emerald Village, has said, "Well, wait a

20    second.  We don't even get there because they

21    didn't do what they were supposed to do to

22    start with."

23          Now, I understand whether there was a

24    proper debt or not on the initial disclosure

25    and everything else.  But does the fact that

1      this may go as to the second step, does it

2      require a striking of the pleadings or does it

3      allow for me to decide if, in fact, that they

4      had not met or could not meet that burden of

5      showing that there were signed contracts

6      presented to PNC?

7           MR. LEHMAN:  Well, there's two things in

8      response to that.  One will just look at

9      exactly what it says in the commitment letter,

10     number 18 on page 9 which we already gave you.

11          THE COURT:  I have it somewhere.

12          MR. LEHMAN:  "Per Emerald Village's

13     executive summary" --

14          THE COURT:  Wait.  Line 18?

15          MR. LEHMAN:  Yes.

16          THE COURT:  I'm there.

17          MR. LEHMAN:  Section 18, page 9, "Per

18     Emerald Village's executive summary, nine units

19     are presold.  Only have six pre-sales contracts

20     on file.  Need copies of all pre-sales

21     contracts."

22          That's what they signed and agreed to.

23          Now, putting aside the tax issues for the

24     moment.  Secondly, the other lender, i.e., the

25     participating lender, Optimum Bank, said,

1        "Before we'll consider being a participating

2        bank, we need to see nine valid pre-sales

3        contracts."  And they were aware of that.

4              MR. GARNO:  Judge, I'm objecting.

5        There's absolutely no evidence or record before

6        this court to support any of this argument.

7              THE COURT:  That I don't have before me.

8              MR. LEHMAN:  All I'm telling --

9              THE COURT:  I don't.

10              MR. LEHMAN:  Well, that's their sworn

11        deposition testimony.

12              THE COURT:  I understand you guys have

13        had this case for a long time.

14              MR. LEHMAN:  I know.

15              THE COURT:  I've had it two years.

16        That's something new and improved.

17              MR. LEHMAN:  So the clear and unambiguous

18        terms of the commitment letter -- I could sit

19        here and say -- which I'm sure this court

20        knows, probably having seen this 5,000 times --

21        a court is unable to rewrite a contract of the

22        parties even if it's a, quote, a harsh bargain,

23        et cetera, et cetera, that's no means for

24        relief.

25              This is what it states clearly and

1      unambiguously.  They said they had nine.  They

2      only turned over six.  They signed it.  Why are

3      they signing a document that says they only

4      turned over six if, as Mr. Laureti, who signed

5      the contract, says, "What are you talking

6      about?  I turned over ten.  I turned over ten.

7      What do you mean you only turned over six?"

8           And then it said that he had to produce

9      them.  Right there.

10          THE COURT:  Okay.

11          MR. LEHMAN:  So the point of the matter

12     is, they needed to strictly comply and they

13     didn't.  And our ability to show it, right,

14     wrong or otherwise in all this distraction,

15     this beautiful computer here with some terrific

16     e-mails.  And we're getting into all other

17     sources.  You know, maybe the comet with the

18     new landing machine, maybe that could show

19     e-mails.

20          THE COURT:  But that'd be easier to

21     understand than this case.

22          MR. LEHMAN:  Right.

23          But the only thing that matters and the

24     only thing that he said was the source of

25     showing those e-mails was the disc.  The discs

Page 67

1      are destroyed, intentionally by someone, and

2      therefore I, at the least, want sanctions, the

3      least possible, attorney's fees and costs for

4      all the three and a half years that I've had to

5      deal with this and getting this disc.

6           And the case law says that bad faith

7      alone is sufficient circumstantial evidence in

8      which the fact finder can conclude that the

9      evidence was unfavorable to the spoliator.

10          THE COURT:  What was that, the court came

11     to conclude -- what was the first part?

12     Backdated?

13          MR. LEHMAN:  Bad faith.

14          THE COURT:  Oh, bad faith.  I'm sorry.

15          MR. LEHMAN:  Based upon circumstantial

16     evidence.

17          And there were two Third DCA cases right

18     on point.  DeLong v A-Top Air Conditioning

19     Company, 710 So2d 706, Florida Third DCA, 1998.

20          And it said in that case, even where the

21     plaintiff inadvertently, quote, lost or

22     misplaced the piece of relevant, material

23     evidence.  The court in that case dismissed the

24     plaintiff's case.  And the appellate court

25     affirmed because, quote, the defendants

Page 68

```
1      demonstrated their inability to completely set

2      forth their defense without having had the

3      opportunity to examine and test the lost

4      evidence.

5           Also citing Sponco, 656 So2d at 629.  And

6      the citation for Sponco is -- one moment.

7           THE COURT:  And then after you get that,

8      I'll ask you one last question.

9           MR. LEHMAN:  Sure.

10          Hold on one second, Your Honor.

11          It's -- yes.  Sponco Manufacturing, Inc.

12     versus Alcover, 656 So2d 629, Florida Third

13     DCA, 1995.

14          So basically, Your Honor, this isn't an

15     isolated incident.  He was threatened with the

16     striking of his pleadings if -- because

17     remember we had representations from Mr. Suarez

18     twice, if you look at my motion, "He's produced

19     everything in his possession, custody and

20     control.  There is nothing else."

21          So we have representations by counsel,

22     presumably, as told by the client, and we had

23     the client say, "Oh, wow, I found this in my

24     home office."

25          THE COURT:  What about Mr. Laureti as a
```

Page 69

```
 1        nonparty that has been raised by the other

 2        side?

 3              MR. LEHMAN:  Mr. Laureti, as I said,

 4        under Rule 1.380 -- I don't have the exact

 5        subsection in my head.  But that was part of

 6        the certiorari -- yes, I know.  I'm falling

 7        down on the job, Your Honor.

 8              MR. GARNO:  It would be Subsection B,

 9        Your Honor.

10              THE COURT:  Thank you, Mr. Garno.

11              MR. LEHMAN:  What it says is, if you're a

12        member, agent, officer or director, you can be

13        sanctioned on behalf of the entity.  And that's

14        exactly what the court did when it sanctioned

15        Emerald Village for Mr. Laureti's prior past

16        conduct.  That's the $12,000 sanction.

17              THE COURT:  $12,444.

18              MR. LEHMAN:  Exactly.

19              MS. STEELE DONNER:  That was (b)(2).

20              THE COURT:  Yes.

21              MR. LEHMAN:  And this issue was raised,

22        the Court considered and rejected their

23        nonparty.

24              THE COURT:  I'm just asking.

25              MR. LEHMAN:  Yes.  So, therefore, it's
```

Page 70

```
 1        appropriate.  This is just unbelievable in the
 2        type of behavior, because, as I said, if this
 3        gentleman's, quote/unquote, friend was his
 4        childhood friend, as he testified under oath,
 5        and his best friend, you know, it's not like I
 6        randomly put my financial information on a
 7        friend's computer and then I just forget about
 8        it for three and a half years.  That makes no
 9        sense.
10             Logic dictates the ineluctable conclusion
11        that Mr. Laureti has been less than forthcoming
12        with both the defendant and this court.  And
13        that I should have to go through this.
14             This is one of those cases, Your Honor,
15        where the harshest sanction is required.  And
16        that is the striking of the pleadings.
17             And obviously, if the Court thinks of a
18        less drastic sanction, which I think is not
19        warranted in this case, that he be responsible
20        to pay sanctions for all the time for the last
21        three and a half years leading up to this
22        inglorious moment.
23             Thank you, Your Honor.
24             THE COURT:  Thank you.
25             Mr. Garno.
```

```
 1              MR. GARNO:  Yes, sir.  Let me make a few
 2         comments here because we are -- the bank
 3         obviously is seeking the most drastic of
 4         remedies against Mr. Laureti.  Let's talk about
 5         the basis for why they're seeking that.
 6              Mr. Lehman has stood before this court
 7         and said that Mr. Laureti didn't violate one
 8         but two orders.  Well, the first order which
 9         was entered in this court in October 13 was
10         that he would have to provide these disks but
11         they would be subject to a protocol.
12              Now, surprisingly in this case, Judge, we
13         were unable to come to an agreement to the
14         protocol with the bank.  So subsequently, in
15         May of this year, this court entered an order
16         compelling Mr. Laureti to provide these discs
17         to Dr. Moody subject to a protocol.
18              Mr. Laureti has testified and Dr. Moody
19         has confirmed the fact that Mr. Laureti then
20         contacted Dr. Moody and they arranged to
21         deliver these discs.  And so Mr. Laureti
22         delivered the discs to Dr. Moody and we all
23         kind of know what happened there.
24              And Dr. Moody couldn't read the discs,
25         and according to Dr. Moody, he was looking for
```

Page 72

```
 1        seven e-mails.  The glorious seven e-mails is
 2        what this is all about.
 3             And, as Mr. Laureti testified, six of
 4        those e-mails actually, Judge, appear in the
 5        bank's files.  So we're talking about one
 6        e-mail, just one e-mail in terms of what's
 7        been -- the bank was provided a hard copy of
 8        this e-mail back in December, the hysteria
 9        ensued about this e-mail, all the various
10        motions the bank has filed seeking to
11        forensically examine this one electronic
12        e-mail.  Okay.
13             So what we're talking about here is
14        whether Mr. Laureti intentionally destroyed
15        that one e-mail, because the bank has got six.
16        He's produced a hard copy of them, so it's not
17        really lost or destroyed.  But lo and behold on
18        his friend's computer, there it is.
19             MR. LEHMAN:  Objection, Your Honor.
20             MR. GARNO:  That's the one e-mail.
21             THE COURT:  Well --
22             MR. GARNO:  It was actually because
23        Mr. Laureti confirmed, actually, in his
24        testimony that the hard drive that we're
25        showing this court was the one that he
```

Page 73

```
 1          reviewed -- he brought to Dr. Moody and Dr.
 2          Moody imaged and reviewed.
 3               MR. LEHMAN:  Objection.
 4               THE COURT:  Listen, I read back through
 5          Mr. Laureti's testimony to say that he had his
 6          friend's e-mail (sic) and that's, you know, in
 7          his car or the hard drive and that's how he
 8          could read it.
 9               I mean, I'm not sure, quite honestly, my
10          eyes are such that across the courtroom, even
11          though it's a large screen, if those are seven
12          contracts.  I can't read what the subject line
13          is.  I'm squinting.  I think it might be to --
14               MR. GARNO:  It's actually, Judge, these
15          e-mails here, one, two, three, four, six,
16          seven.  Those are the e-mails that actually
17          appear in the bank's files.  The one e-mail
18          that was produced in December of 2012 that the
19          bank had never seen before was this e-mail with
20          contract number five.  So we're talking about
21          one e-mail.
22               THE COURT:  Let me ask you a question.
23          When was the seventh e-mail dated?
24               MR. GARNO:  The seventh e-mail was
25          dated -- I believe it's Valentine's Day 2008.
```

Page 74

```
 1            MR. SUAREZ:  Same day, same time as all
 2       the others.
 3            MR. GARNO:  Yeah.  They're all sent at
 4       the same time.
 5            THE COURT:  So then why did he sign off
 6       on the contract on May 22nd, 2008, which would
 7       have been subsequent to the seventh e-mail
 8       that -- he says, nine units have been presold.
 9       But you have only have six pre-sale contracts.
10       That's paragraph number 18 of page 9.  Why
11       wouldn't he have said seven?  If this was
12       signed in February 14 of 2008, and that's when
13       they got up to number seven, why wouldn't --
14       why did he sign the part that says -- he being
15       Mr. Laureti -- "Per Emerald Village's Executive
16       Summary, nine units are presold.  Only six
17       pre-sale contracts on file."
18            If there was one -- if the seventh one
19       was signed on February 14 of 2008, why some two
20       months later, three months later, whatever it
21       was that he signed and said they only had six.
22            MR. GARNO:  Judge, the record is unclear
23       as to that, but I'll make this point because
24       this is the question that Mr. Lehman didn't
25       actually answer.
```

Page 75

1          THE COURT:  Okay.  Which is?

2          MR. GARNO:  Is that you asked this

3     question, Judge.  If you look at that

4     agreement, these pre-sale contracts don't come

5     into play until the acquisition of -- the

6     acquisition of construction loan actually come

7     into play.

8          You had asked Mr. Lehman a specific

9     question about that and instead of answering

10    that question, because the document which he so

11    vehemently argues should be strictly construed

12    says that, the need for Emerald Village to

13    provide nine pre-sale contracts occurs only

14    after the project breaks ground.  Meaning the

15    acquisition of the land occurs.

16         And as Mr. Laureti testified previously,

17    in September, they never funded the land, the

18    project never broke ground.

19         So under that provision in that contract,

20    which you asked Mr. Lehman specifically about,

21    is that the requirement that Emerald Village

22    provide nine contracts didn't arise until the

23    bank actually funded the acquisition of the

24    property, which they never did.

25         And so this is just a great big sideshow

Page 76

```
1        about an issue that has very little relevance
2        in this case, because unless Mr. Lehman can
3        tell us today and show us some evidence that
4        the bank actually funded the loan and the
5        project was breaking ground, these nine
6        pre-sale contracts don't mean anything in this
7        case.  Because before that event or that
8        condition would have occurred, the bank
9        breached the financing agreement.
10            THE COURT:  Well, let me ask this, that
11       may be a different issue for a different day.
12            MR. GARNO:  No, Judge.
13            THE COURT:  Because they surely -- as
14       part of discovery, if nothing else, contracts
15       that are at least mentioned in this letter
16       agreement of May 27th of 2008, or May 21 of
17       whatever the date it was signed, it surely is
18       part of discovery.  And surely, as I got
19       involved in this case over the last couple of
20       years, the number of contracts, whether or not,
21       as you think, the bank is trying to have the
22       court take its eye off the ball and that it's
23       not going to be as relevant, it's still a part
24       of discovery.
25            MR. GARNO:  Sure.
```

```
 1          THE COURT:  And it could be a large part

 2     of discovery, especially if they show -- you

 3     know, they may think that these were conditions

 4     before they had to do the funding for the

 5     purchase of the land or whatever.  That's a

 6     different issue, a different day.

 7          But I can't just say, well, you know,

 8     this wasn't like -- answer 14(b) of

 9     interrogatory wasn't succinctly dealt with,

10     whether or not maybe more time is put on this

11     than should be.  It's still a pretty big part

12     of this lawsuit is --

13          MR. GARNO:  The bank has made it a big

14     part of this lawsuit.  I don't disagree with

15     that.

16          THE COURT:  Well, I think it is just

17     because it was a requirement of the letter of

18     May 27, 2008.  I mean, there's certain

19     conditions precedent.  Now, whether the first

20     one has or hasn't been met is a different one

21     for a different story.

22          What I have heard, and I just didn't do

23     this because I love seeing you all here, not

24     that I mind it, it's always entertaining.  But

25     nevertheless, I have to still make a
```

1      determination about these contracts.

2           MR. GARNO:  At some point either you or

3      the jury will have to --

4           THE COURT:  Okay.

5           MR. GARNO:  -- for sure.

6           THE COURT:  Well, I've been asked to

7      under the motion for spoliation and contempt

8      and to strike pleadings, et cetera.  It's

9      before me now.  It's not before a jury.

10          MR. GARNO:  I agree.  And, Judge, let me

11     talk about that because I understand the

12     concern you have about the relevance of these

13     nine pre-sale contracts.

14          THE COURT:  And I'm not discarding your

15     theory of the case.

16          MR. GARNO:  Yeah.  But certainly one of

17     the things that they have to show by clear and

18     convincing evidence in order to get this relief

19     is that this is the central -- the evidence

20     goes to the central issue of the case.

21          But, Judge, the whole point here of

22     spoliation is that the evidence is lost.  And

23     that is exactly what Mr. Lehman argued to you

24     here today is that spoliation is an issue when

25     the evidence is gone.  When it's lost.  When

Page 79

1     someone mistakenly does something.  Or I've

2     been -- actually was involved in a case where

3     someone intentionally wiped a hard drive.  That

4     that is gone.

5           The one e-mail we're talking about

6     exists.

7           THE COURT:  Wait.  The e-mail that exists

8     is on a friend's computer that he forgot about.

9     It's like, when I was younger, we didn't have

10    computers.  We would share information on our

11    abacus.  But it's the kind of thing where with

12    some of the prior answers, whether depositions,

13    interrogatories and the discussions we had,

14    this seventh e-mail, quote, that exists is the

15    one that allegedly exists on his friend's

16    e-mail.

17          MR. GARNO:  No, no.  I'll -- let me be

18    clear about this.  It's not just -- these are

19    also the e-mails that the bank have in their

20    files.

21          MR. LEHMAN:  Objection, Your Honor.

22          MR. GARNO:  The only e-mail --

23          THE COURT:  Let him finish.  And then

24    I'll hear your objection.

25          MR. GARNO:  The only e-mail in here

1          that's not in the bank's files as being

2          received in this case is the one related to

3          contract number five.

4                    THE COURT:  Right.

5                    MR. GARNO:  And so in December of this

6          year, Mr. Laureti provided an e-mail that

7          showed that this contract number five was sent.

8                    THE COURT:  All right.  But it still gets

9          down to the fact, yes, the bank has provided

10          six e-mails that they had copies of.  Six

11          e-mails are talked about in the letter of

12          May 2008 that Mr. Laureti signs off on.  Just

13          because Mr. Laureti says, "I sent it," doesn't

14          mean, A, it went there or, B, that he sent it.

15                    You know, so it does come down to

16          Mr. Laureti's credibility of whether there was

17          something on the disc that showed there were

18          only six and not seven no matter what shows up

19          on his friend's computer at a later time.

20                    Because that's something I think I need

21          to decide based upon the motion that's been

22          presented and the testimony I've taken over the

23          last two days, let alone the argument between

24          the court.

25                    Here's the bottom line.  I went back

Page 81

1      through my notes, even before I read back

2      through the transcript.  And when I take notes,

3      which I take copious notes, at least enough so

4      I recall what I need to.  I make in the columns

5      notes to myself, whether something makes sense,

6      how does this fit into this, whether someone is

7      believable or not.

8           In all due deference to Mr. Laureti who's

9      sitting there, I don't believe him.  I don't

10      believe him.  It's not credible.  Some of the

11      things he said, and the notes I made, they

12      should have started with "Once upon a time."

13      That should have been the preface to some of

14      the things he said.

15           I have to believe with all the litigation

16      we've had of him producing discs that are going

17      to show these things, that all of a sudden

18      they've forgotten about and then he shows up at

19      the same time, by the way, I've got my friend's

20      computer that if you need to read it in case

21      you can't read it, it's going to come up.  And

22      then, "Oh, my gosh, it's all on GoDaddy.com."

23      I could have had a V8.  It is not believable.

24      It was -- it was incredible.  It just isn't

25      believable.

Page 82

```
 1              Now whether there's a seventh contract
 2         around, it surely wasn't found on the disc.
 3         And I believe the evidence surely shows, by
 4         clear and convincing -- preponderance probably
 5         beyond a reasonable doubt, that those -- that
 6         evidence on whatever disc existed, either were
 7         destroyed or altered in a way where they were
 8         not able to be recovered.
 9              It's not a reflection, believe me, upon
10         the attorneys in this case.  We don't pick and
11         choose our witnesses.  But with what's gone on
12         in this case and listening to Mr. Laureti
13         himself last time he testified, I don't
14         remember in the 20 years I've been on the bench
15         that I've made that many notes about something
16         that I didn't believe.  I'm being as candid as
17         I can be.
18              And to sit there and show that, look,
19         here's the computer of his friend that he gave
20         this information to years ago and he didn't
21         think about it with all -- we're going back
22         when this case was filed back in, whenever it
23         was filed, 2009.  And he wouldn't think when
24         there became the first discussion, "I have a
25         big server, GoDaddy.com.  They do commercials
```

1      for the Super Bowl every year.  They're going

2      to have what it is."  Not some five or six

3      years later then now let's go look to see what

4      it is.

5          Because, as Mr. Moody testified, lots of

6      things can be juggled and made to look the way

7      they are.  And, quite candidly, having an

8      e-mail saying, "I sent it to them."  You know,

9      if the bank wanted to hide everything in that

10     regard, they wouldn't have even sent six.  They

11     sent the six that we have.

12         The letter of May 27, 2008, signed by

13     Mr. Laureti under oath says that, we have

14     six -- we have nine pre-sales, but I have six

15     copies of things.  That's what we all say.  Is

16     that only an extra one?  Yes.  Where is it

17     going to come down the path?  I'm not sure.

18     Some jury instruction or whatever?  Fine.

19         Do I think the case should be dismissed?

20     No.  Because I think there's other issues.  I'm

21     not striking your pleadings.  I think that is

22     too harsh.

23         But I do believe that there is going to

24     be -- because of my not believing Mr. Laureti,

25     that at some point there will be attorney's

Page 84

1      fees assessed against him -- not against the

2      law firm -- assessed against him for extra

3      work, time and effort that was done in this

4      case.  Because it really, in all due

5      deference -- and listen, I represented a lot of

6      criminals, so after awhile, I would believe

7      what they would tell me too.

8          But that being said, it just was

9      unbelievable.  Knowing the issues that we've

10     dealt with.  Did he comply with showing up with

11     Dr. Moody?  Absolutely.  Did he bring stuff to

12     Dr. Moody?  Absolutely.

13         So I'm not, I'm not finding that he

14     didn't comply with what he -- in the -- using

15     the words exactly, but something was done to

16     those discs before they were given to

17     Dr. Moody, in my opinion, and it was done by

18     Mr. Laureti who had these in his possession.

19     And to say that, "I forgot I gave it to a

20     friend," and at the same time he brings the

21     discs, "Just in case you have a problem with

22     it, I've got my friend's computer in the car.

23     They can probably read it and you can see

24     what's on there."  It just isn't believable.

25             MR. GARNO:  I do appreciate your comments

Page 85

1       and your thought processes.  Clearly, I don't

2       think --

3               THE COURT:  I give my thought process --

4               MR. GARNO:  I'm not --

5               THE COURT:  -- so everyone knows.  It's

6       not a secret.

7               MR. GARNO:  I'm not going to sway you on

8       what you feel about the credibility issues.

9       But I really want to talk about the spoliation

10      issue for a second.

11              THE COURT:  Okay.

12              MR. GARNO:  And I understand that the

13      Court is concerned and has become fixated on

14      the discs and everything else and what the

15      conditions of those discs.

16              The point here being is that they have

17      claimed that there's a loss of evidence.  The

18      loss of evidence that we've talked about

19      Dr. Moody -- Dr. Moody's engagement was to find

20      seven e-mails.  Dr. Moody testified here today

21      that he found those seven e-mails on the hard

22      drive.

23              I know you don't --

24              THE COURT:  That's a friend's hard drive,

25      right?  That's what he's referring to the extra

1    computer that shows up several years later

2    supposedly has the seven and everything else.

3    No, I understand.  I just want to clarify for

4    the record.  I'm not --

5            MR. GARNO:  Because the problem here is

6    that I understand that the Court is

7    uncomfortable with Mr. Laureti's conduct in

8    certain evidence, but we're talking about

9    spoliation here.

10            And what I want to be clear is that,

11    based upon what Dr. Moody testified here today,

12    is that there was no spoliation of evidence.

13    Is that --

14            THE COURT:  No, no.

15            MR. LEHMAN:  Objection, Your Honor.

16            MR. GARNO:  Well, actually I'll -- you're

17    right.  I'll correct myself, Gary, because it's

18    important to be forthcoming.

19            Is that, Judge, is that he testified that

20    he found the seven e-mails that he was looking

21    for as part of his engagement on the friend's

22    hard drive.

23            MR. LEHMAN:  Objection, Your Honor.

24            THE COURT:  No.  He found seven e-mails.

25    Whether it was something he was looking for, he

1      found seven e-mails.

2           Listen, let me maybe narrow what I'm

3      saying a little closer.  Whether there is proof

4      of other e-mails by other ways that become

5      believable to the court or a jury might be a

6      different question for a different day.

7           What's before me is whether there's been

8      spoliation so that it surely is something that

9      would be -- make it clear, if these things

10     existed, have been destroyed.

11          And we have spent the time that we've

12     spent and a lot of it because of the actions,

13     in my opinion -- and if I'm wrong, we have a

14     higher authority, and not Hebrew National but

15     the Third District, they can tell me I'm wrong.

16          So I am finding there was spoliation

17     created by Mr. Laureti.  That is what the

18     evidence points to every which way I could look

19     at it, because I found him not to be credible

20     in so many things that he said.

21          So where does that leave as far as this

22     motion?  I do find it's been spoiled.  I do

23     find that Mr. Laureti is going to be

24     responsible for attorney's fees.  The amount to

25     be determined at a later time.

```
 1            I am not striking the pleadings because I
 2       believe there are other issues in the case.
 3            Now what I ultimately do, if we get
 4       past -- even if we didn't get past door number
 5       one, which the bank thinks is different than
 6       your interpretation of the contract.  But if we
 7       get past whether or not they did what they were
 8       supposed to do under the contract or whether
 9       the contract was void ab initio because of
10       fraud or something, can be determined later on
11       by whoever is going to determine that.
12            MR. GARNO:  Understood.
13            THE COURT:  The only determination I'm
14       making is whether there was spoliation of the
15       evidence that was turned over, and I find there
16       was.
17            MR. GARNO:  And as part of your ruling
18       here today, the relief, based upon that finding
19       of spoliation, is going to be the sanctioning
20       of attorney's fees against Mr. Laureti?
21            THE COURT:  Correct.
22            MR. GARNO:  And is there a particular
23       appropriate compensation for attorney's fees
24       for the bank in terms of the work that they've
25       done?
```

Page 89

```
 1          THE COURT:  Well, they're going to have
 2     to present that, I'm sure, at a later time.
 3          MR. GARNO:  But, Judge, last time we were
 4     here we got an affidavit for like $200,000 as
 5     their fees on a $12,000 sanction.
 6          THE COURT:  Well, you know, I think I
 7     kind of cleared that up.
 8          MR. GARNO:  Yeah.
 9          THE COURT:  And I said that was nice but
10     I'm not giving the fees for the whole case.
11     I'm giving the fees for the weekend that you
12     spent busting your chops getting ready for
13     things that were presented on a Friday for a
14     Monday deposition, if I remember correctly.
15          MR. GARNO:  And is there a similar, like,
16     instruction to give --
17          MR. LEHMAN:  Objection to pre-ruling or
18     pre-judging.
19          THE COURT:  No, but he's asking.
20          MR. GARNO:  This is the relief under his
21     order, Gary.  What's the pre-judging about
22     that?
23          THE COURT:  Mr. Garno, was just saying --
24          MR. GARNO:  What's the relief?
25          THE COURT:  -- that the relief that you
```

Page 90

1      are seeking should be the relief that actually

2      was.  There's a lot of work that's gone into

3      this case.  It's not only been involved with

4      the pretrial contracts.

5           MR. LEHMAN:  Yes.

6           THE COURT:  I mean, the pre-sale

7      contracts.

8           MR. LEHMAN:  Right.

9           THE COURT:  So I think as a preemptive

10     strike, for lack of a better word, Mr. Garno is

11     saying, "Please keep your hours to what was put

12     in this."

13          Now, listen, I've spent a lot of time

14     just reading over this stuff, and I know a lot

15     of stuff has been done.  And I know it's going

16     to be substantially more than what was cause

17     for a weekend.

18          MR. LEHMAN:  Yes.

19          THE COURT:  And Mr. Laureti in all due

20     deference is going to be responsible for it.

21          MR. LEHMAN:  And I would also ask,

22     because we asked for it in our motion, that it

23     also be against Emerald Village, that they be

24     jointly and severally liable because an entity

25     can only act through its representatives.

```
 1              The only other thing that I wanted to
 2      say, since you mentioned it, about a jury
 3      instruction.  On page 10 of our motion in tab
 4      3, trying to hold him in contempt, citing
 5      Pacific Coast Marine Windshields, LTD, v.
 6      Malibu Boats, LLC, 2012 Westlaw 10817204 which
 7      is a Middle District of Florida, November 30,
 8      2012, case.
 9              It says, "As the Pacific Coast Marine
10      court explained, quote, there is no jury
11      instruction, however, that can effectively
12      protect the victim of a willful spoliation from
13      the prejudice created by willful deletion of
14      files.  Nor is there a jury instruction that
15      could adequately deter conduct which amounts to
16      an affront to the integrity of the judicial
17      process."
18              THE COURT:  Well, you know where it may
19      lie?  It may lie that the court doesn't find
20      that there is sufficient evidence of contracts
21      being --
22              MR. LEHMAN:  I understand.
23              THE COURT:  -- being raised, then there
24      is surely a different opinion by Pacific
25      National and Emerald Village about whether or
```

Page 92

1           not the first part, i.e., Emerald Village says

2           that this was breached from the beginning when

3           you didn't fund the purchase of the land, and

4           therefore, the number of contracts wouldn't

5           even come into play if you didn't do that.

6                   MR. LEHMAN:  Right.

7                   THE COURT:  So if, in fact, I find that

8           the contract became dependent upon that,

9           they're not probably going to be able to cross

10          that hurdle, you know, if at whatever point.

11          That's what I'm saying.

12                  MR. LEHMAN:  All I'm saying is, he

13          testified, "I sent ten contracts."  I mean, we

14          lose sight of what he says.

15                  MR. GARNO:  No, no.  Actually what he did

16          testify, Gary --

17                  MR. LEHMAN:  Excuse me.

18                  MR. GARNO:  -- is that there were -- ten

19          contracts were delivered.  You went through

20          this in September ad nauseam.

21                  MR. LEHMAN:  Whatever your permutation.

22          He said, "Somehow I sent ten contracts."  I

23          know he didn't send them this way, that way.

24          None of that is true.  There's not ten

25          contracts anywhere other than out of the mouth

Page 93

```
 1        of Mr. Laureti.
 2              THE COURT:  I'm ruling upon --
 3              MR. LEHMAN:  I understand.
 4              THE COURT:  -- what's brought before me.
 5        I appreciate all of you want me to go to a
 6        place where no man has gone before.
 7              MR. LEHMAN:  May --
 8              THE COURT:  I'm not going there.
 9              MR. LEHMAN:  May we get the request
10        against both Mr. Laureti and Emerald Village?
11              THE COURT:  He is a representative.
12              MR. GARNO:  Judge -- well, first of
13        all --
14              THE COURT:  Why wouldn't it be against
15        both?
16              MR. GARNO:  Because the discovery at
17        issue here was it was a subpoena served on him
18        individually, not as any kind of corporate
19        representative.  The motion that was filed
20        against him was against him individually.  The
21        order that was entered by this court on both
22        occasions were against him individually.
23              THE COURT:  Okay.  Stop.  He's right.
24        I'm only going against Mr. Laureti.
25              I understand what your feelings are, but
```

Page 94

```
 1        it's against Mr. Laureti personally.
 2             MR. LEHMAN:  Well, he's only acted in a
 3        representational capacity.
 4             THE COURT:  That's a different story
 5        under 1.280(b) or whatever, but all the actions
 6        were brought, the subpoena was against him
 7        individually, the motion was against him
 8        individually.
 9             MR. LEHMAN:  Well, it was actually -- the
10        motion was against him individually and against
11        Emerald Village.
12             THE COURT:  Well, I'm going to find that
13        Mr. Laureti is responsible.
14             MR. LEHMAN:  Okay.  We'll file a motion
15        to have the Court determine the reasonableness
16        of fees, because I'm certain that we won't be
17        able to agree on the sanction amount.
18             THE COURT:  Call it a hunch.  I think
19        you're right.
20             MR. LEHMAN:  Thank you, Your Honor, I
21        appreciate your time.
22             MR. GARNO:  Thank you, Judge.
23             MR. LEHMAN:  Can I get that, please in a
24        miniscript.
25             Have a great weekend.
```

Page 95

1             THE COURT:  Thank you.  You also.

2             MR. LEHMAN:  And I look forward to seeing

3        you soon, sir.

4             THE COURT:  Oh, I can hardly wait.  I'll

5        hold my breath.

6             THE CLERK:  Can I give back this?

7             THE COURT:  Yes.  Whoever's discs those

8        are, you can give it back.

9             MR. LEHMAN:  And may we draft the order

10       from the transcript?

11            THE COURT:  You may draft the order from

12       the transcript.

13            MR. LEHMAN:  Great.

14            THE COURT:  Very good idea.

15            Let me give you back this book.

16            (The hearing was concluded at 3:36 p.m.)

17

18

19

20

21

22

23

24

25

Page 96

1                          HEARING CERTIFICATE

2

3          I, DEBBIE L. OATES, Registered Professional

4    Reporter, certify that I was authorized and did

5    stenographically report the foregoing proceedings and

6    that this transcript is a true record of the

7    proceedings before the Court.

8          I further certify that I am not a relative,

9    employee, attorney, or counsel for any of the parties

10   nor am I a relative or employee of any of the

11   parties' attorney or counsel connected with the

12   action, nor am I financially interested in the

13   action.

14

          Dated this 24th day of November, 2014.

15

16

                              _____

17                            DEBBIE L. OATES, RPR

18

19

20

21

22

23

24

25

**&**

**&**   2:3 59:19

**0**

**01390**   29:17
**01391**   29:17
**08**   39:9,16
**09**   39:5,8
**09-24685**   1:3 4:17

**1**

**1.280**   94:5
**1.380**   58:11 69:4
**10**   11:10 91:3
**10/4/13**   54:24
**100**   2:3 13:13 15:5
  16:10 20:2 33:1
**10817204**   91:6
**11**   11:10
**1174**   62:1
**12,000**   58:15 69:16
  89:5
**12,444**   69:17
**13**   49:15 71:9
**14**   1:13 55:15 74:12
  74:19 77:8
**15**   55:17
**162**   56:15
**18**   64:10,14,17 74:10
**1995**   68:13
**1998**   67:19
**1st**   14:19 20:10

**2**

**2**   2:10 54:13 69:19
**20**   82:14
**200,000**   89:4
**2008**   10:21 11:8
  14:19,20 15:7,9,21
  16:11 17:1 20:4,10
  20:11 32:21 39:6
  50:24 73:25 74:6,12
  74:19 76:16 77:18
  80:12 83:12
**2009**   8:14 10:23 11:9
  48:10 82:23

**2010**   46:22 50:18
**2011**   18:4
**2012**   47:25 50:9
  53:19 73:18 91:6,8
**2014**   1:13 55:17
  96:14
**21**   76:16
**21st**   2:10
**22**   3:6
**22nd**   74:6
**23**   1:3 4:17
**24th**   96:14
**25**   46:16
**27**   77:18 83:12
**27th**   76:16
**2:00**   1:13
**2nd**   1:12

**3**

**3**   46:25 47:10 50:20
  91:4
**30**   20:11 91:7
**30th**   14:20
**33130**   1:12
**33131**   2:4,11
**3:36**   1:13 95:16

**4**

**40**   37:23,25
**42**   3:7
**44th**   2:4

**5**

**5**   46:25 47:12 50:20
**5,000**   65:20
**50**   37:23
**500**   33:2

**6**

**6**   13:22,24
**629**   68:5,12
**650**   32:19,22
**656**   68:5,12

**7**

**7**   3:5

**706**   67:19
**710**   67:19
**73**   1:11
**7th**   47:25

**9**

**9**   64:10,17 74:10

**a**

**ab**   88:9
**abacus**   79:11
**ability**   66:13
**able**   16:20 35:12,14
  38:6,14,23 41:21,25
  57:12 82:8 92:9
  94:17
**absolute**   30:6
**absolutely**   27:8 60:23
  65:5 84:11,12
**access**   14:18
**accomplish**   23:12
**accounts**   14:18
**acquisition**   75:5,6,15
  75:23
**act**   90:25
**acted**   94:2
**action**   96:12,13
**actions**   87:12 94:5
**actual**   21:5 31:21
  33:7 38:20
**ad**   92:20
**added**   12:17 15:19
  16:7 50:22
**additional**   36:8 63:16
**additions**   15:13
**address**   42:21
**adequately**   91:15
**admissibility**   21:13
**admitted**   21:14
**adonner**   2:12
**advanced**   26:18
**advise**   14:22
**affidavit**   89:4
**affirmed**   67:25
**affront**   91:16

**afternoon**   4:1,2,3
**afterward**   18:16
**agent**   58:10 69:12
**ago**   17:15 22:23 23:4
  32:25 60:18 82:20
**agree**   14:11 28:22
  36:3 60:25 62:14
  78:10 94:17
**agreed**   14:17 55:6
  64:22
**agreement**   63:11
  71:13 75:4 76:9,16
**ahead**   5:2,11 10:1
  17:17,22 24:23 54:10
  56:18
**air**   67:18
**albeit**   8:5
**alcover**   68:12
**alleged**   39:15 54:22
  55:13,15
**allegedly**   57:8 79:15
**allow**   64:3
**allowed**   57:17
**allows**   58:9
**altered**   40:24 41:5
  82:7
**amount**   87:24 94:17
**amounts**   91:15
**amy**   2:9 5:5,23
**analysis**   35:22 36:8
  36:14 38:3 60:13
**announce**   4:12 5:3
**answer**   16:4 17:19,22
  27:15 31:17 32:10
  51:2,7,9,12,14,22,25
  52:3 56:23 59:8
  74:25 77:8
**answered**   51:18
**answering**   75:9
**answers**   9:7 19:25
  48:6 79:12
**anyway**   6:12
**appeal**   58:17
**appear**   42:23 45:6
  72:4 73:17

**appearances** 2:1
**appeared** 23:8
**appearing** 15:22
**appears** 19:14
**appellate** 67:24
**appreciate** 45:14
  53:21,22 56:23 84:25
  93:5 94:21
**appropriate** 70:1
  88:23
**archive** 12:22
**areas** 33:14
**argued** 78:23
**argues** 75:11
**argument** 45:22
  46:13 50:5 53:5 56:4
  65:6 80:23
**arguments** 56:25
**armada** 2:8 5:24
  20:19 22:2 45:16
**arrange** 14:23
**arranged** 71:20
**ascertain** 16:25
**aside** 64:23
**asked** 17:20 28:9,11
  42:4 51:17 52:17
  53:13 75:2,8,20 78:6
  90:22
**asking** 23:13 31:15
  40:14 43:18 69:24
  89:19
**assessed** 84:1,2
**association** 1:8
**assume** 24:8
**assuming** 12:23
**attached** 55:16
**attaching** 50:22
**attempted** 10:14
**attention** 22:20
**attorney** 96:9,11
**attorney's** 67:3 83:25
  87:24 88:20,23
**attorneys** 2:6,12
  16:18 82:10

**authenticity** 14:14
**authority** 87:14
**authorized** 96:4
**avenues** 40:10
**avoid** 14:16
**aware** 10:7 27:14,20
  27:20,24,25 28:2,6
  30:1 39:14,21 43:1
  43:15 65:3
**awhile** 84:6

**b**

**b** 21:20 55:11 69:8,19
  77:8 80:14 94:5
**back** 29:2 31:3 43:12
  45:14 47:20 49:15
  52:12 53:19 72:8
  73:4 80:25 81:1
  82:21,22 95:6,8,15
**backdated** 67:12
**backed** 10:10 29:12
  32:8
**backing** 31:24 33:12
  33:18
**backup** 11:15 28:23
  29:7 30:21,23,25
  31:11,17,20,21,25
  32:1,2,6,7,7,9,17
  33:14,16,25 37:2,9
  37:22 39:3 51:7,14
  51:16,25
**bad** 33:3 41:11 67:6
  67:13,14
**ball** 76:22
**bank** 1:8 4:6,17 5:5
  5:25 7:2 26:21 27:5
  27:12,12 28:6,7,10
  29:15 30:9 39:15
  42:3 43:2,10,15,17
  43:21,25 62:8,9
  63:13 64:25 65:2
  71:2,14 72:7,10,15
  73:19 75:23 76:4,8
  76:21 77:13 79:19
  80:9 83:9 88:5,24

**bank's** 26:15 27:4
  28:3 34:16 42:24
  44:5 54:20 61:11
  72:5 73:17 80:1
**banking** 1:8
**bargain** 65:22
**based** 16:6 20:11
  23:4 43:5 45:10
  67:15 80:21 86:11
  88:18
**basically** 9:2 48:7
  54:14 59:22 68:14
**basis** 71:5
**bates** 29:17,17
**battista** 2:3 4:21
  59:20
**beautiful** 66:15
**beginning** 47:16 92:2
**behalf** 4:18,22 5:4,25
  46:7,9 69:13
**behavior** 70:2
**behold** 72:17
**belabor** 24:25
**belied** 58:8
**believability** 57:23
**believable** 81:7,23,25
  84:24 87:5
**believe** 11:8,16 13:21
  20:6 23:3,24 35:18
  36:12 38:13 39:7
  42:5 55:2 73:25 81:9
  81:10,15 82:3,9,16
  83:23 84:6 88:2
**believes** 57:13
**believing** 83:24
**bench** 82:14
**best** 5:19 14:13 18:25
  51:3 70:5
**better** 33:6 90:10
**beyond** 82:5
**big** 4:14,15 19:18
  32:24 47:4,5,7 75:25
  77:11,13 82:25
**biggest** 47:6

**bill** 5:9
**biscayne** 2:10
**bit** 16:1 31:23
**blake** 1:22 5:20
**boast** 60:14
**boats** 91:6
**book** 13:23 47:4,5
  95:15
**boston** 9:21
**bottom** 24:3 57:2
  80:25
**boulevard** 2:10
**bounceback** 42:22,23
  43:5,8,9,14 44:2
**bowl** 83:1
**breached** 39:15 76:9
  92:2
**break** 16:3
**breaking** 76:5
**breaks** 75:14
**breath** 95:5
**bring** 84:11
**bringing** 34:23
**brings** 57:9 60:13
  84:20
**broad** 2:9 5:24
**broadandcassel.com**
  2:12
**broadcassel.com**
  2:11
**broke** 75:18
**brought** 9:2 35:9,15
  60:1 73:1 93:4 94:6
**bunch** 25:9
**burden** 64:4
**business** 29:3 33:20
  33:24 48:10
**busting** 89:12

**c**

**ca** 1:3
**call** 12:20 63:12
  94:18
**called** 37:20

**calls** 40:12
**camera** 9:22,23
**candid** 82:16
**candidly** 83:7
**capacity** 38:24 94:3
**capture** 33:17
**car** 8:18,23 10:6 19:6
  73:7 84:22
**care** 22:9 53:14 62:18
**careful** 22:3 36:5
**carve** 33:21
**case** 1:3 4:6,17 8:18
  8:21 10:6 24:6 27:6
  34:15 39:15 43:2
  46:15 47:9,11,24
  53:16,17,25 57:19
  58:5 60:8,9 62:22
  65:13 66:21 67:6,20
  67:23,24 70:19 71:12
  76:2,7,19 78:15,20
  79:2 80:2 81:20
  82:10,12,22 83:19
  84:4,21 88:2 89:10
  90:3 91:8
**cases** 39:24 40:2
  67:17 70:14
**cassel** 2:9
**cassell** 5:25
**casual** 23:7
**cause** 1:21 90:16
**caused** 39:4
**causeway** 5:8,10
**cd** 31:3,6,7,12,12,13
  31:16 33:2
**cds** 32:19
**ceased** 9:12
**central** 61:11 78:19
  78:20
**certain** 11:13 33:13
  53:13 62:23 77:18
  86:8 94:16
**certainly** 41:16 78:16
**certainty** 13:13 16:10
  20:2 25:21

**certificate** 96:1
**certify** 96:4,8
**certiorari** 58:15 69:6
**cetera** 15:19 16:8
  29:24 41:7 58:24
  65:23,23 78:8
**challenge** 11:18
  16:13
**chance** 24:18
**changed** 5:19
**chase** 27:24
**childhood** 18:7,24
  52:20 70:4
**chips** 41:7
**choose** 82:11
**chops** 89:12
**chunks** 16:3
**circuit** 1:1,1,2,22
**circumstantial** 67:7
  67:15
**citation** 68:6
**citing** 68:5 91:4
**civil** 1:2 58:9
**claim** 61:14,16
**claimed** 85:17
**claims** 7:2 52:25
**clarify** 86:3
**clarity** 13:22
**clear** 14:7 17:13
  23:17 26:16 45:2
  65:17 78:17 79:18
  82:4 86:10 87:9
**cleared** 89:7
**clearly** 49:23 65:25
  85:1
**clerk** 21:19,22 95:6
**client** 59:20 62:9
  68:22,23
**cliffsnotes** 46:20
**closer** 87:3
**closing** 48:24
**coaches** 5:14
**coast** 91:5,9
**colleague** 22:4 41:15

**collected** 39:12
**collecting** 40:10
**collection** 33:9
**color** 21:8
**colosseum** 59:2
**columbia** 44:15
**columns** 59:4 81:4
**come** 6:14 48:18
  52:12 53:25 62:16
  71:13 75:4,6 80:15
  81:21 83:17 92:5
**comet** 66:17
**coming** 18:25 53:23
**comment** 60:18
**comments** 71:2 84:25
**commercials** 82:25
**commitment** 60:17
  60:20 64:9 65:18
**company** 67:19
**comparison** 33:3
**compel** 26:4 54:20
**compelling** 62:15
  71:16
**compensation** 88:23
**complete** 32:9 37:2
**completely** 26:8
  34:10 68:1
**compliance** 60:22
**complied** 48:14 52:9
  52:13 53:1 54:2
  55:25 60:23
**comply** 66:12 84:10
  84:14
**computer** 7:1,5 8:12
  8:17,23 9:9 10:5,7,11
  10:17,23 11:7 12:5
  12:16 13:14 18:8,14
  18:25 19:2,6,15
  22:20 25:6,7,12,13
  25:22 26:10 31:4,7,8
  31:11,12,14,16,19
  32:3,4 34:9 35:11,14
  35:21 36:11,18 37:19
  37:24 42:1,5,8 44:25
  48:8 51:8,10,15

**collected** 52:18,18,19,20 57:8
  57:11,20 60:1,3
  66:15 70:7 72:18
  79:8 80:19 81:20
  82:19 84:22 86:1
**computers** 25:24
  38:9 79:10
**conceivably** 32:22
**concept** 39:3
**concern** 15:10 31:22
  31:25 32:16 39:5,13
  78:12
**concerned** 85:13
**concerns** 12:12
**conclude** 67:8,11
**concluded** 95:16
**conclusion** 70:10
**condition** 15:8 61:10
  76:8
**conditioning** 67:18
**conditions** 77:3,19
  85:15
**conduct** 35:22 38:3
  69:16 86:7 91:15
**confer** 41:14 52:11
**confirm** 14:13 27:8
  41:25
**confirmed** 71:19
  72:23
**connected** 96:11
**consider** 65:1
**considered** 14:8
  69:22
**consistent** 21:5 40:8
**construction** 75:6
**construed** 75:11
**construing** 60:20
**contact** 14:23
**contacted** 71:20
**contain** 11:17 13:1
  30:24
**contained** 11:16 12:4
  15:6 23:21,23 29:4,9
  29:12 30:21 31:20
  36:20 37:3 38:12,17

39:8 59:7,9
**container** 28:21
**containing** 54:22
55:14,14
**contemporaneously**
8:19 11:12
**contempt** 78:7 91:4
**contentious** 36:2
**contents** 31:13
**continue** 7:16 50:14
54:10
**continuously** 53:25
**contract** 63:11 65:21
66:5 73:20 74:6
75:19 80:3,7 82:1
88:6,8,9 92:8
**contracts** 26:19,24
27:1,3 28:4 42:2
50:22 54:23 60:15,16
63:18 64:5,19,21
65:3 73:12 74:9,17
75:4,13,22 76:6,14
76:20 78:1,13 90:4,7
91:20 92:4,13,19,22
92:25
**control** 68:20
**conversation** 9:4
17:21
**convincing** 78:18
82:4
**cooperative** 35:7
**copied** 30:25 31:8
**copies** 64:20 80:10
83:15
**copious** 81:3
**copy** 11:15 15:1
29:12,14,15 31:13,19
32:12,12 36:10 38:5
72:7,16
**corporate** 93:18
**corporation** 1:5
**correct** 8:8 9:1 17:7
19:13,17 20:5,6,15
25:8,10,25 28:12,13
28:19,24 29:7 31:1

32:19,20 34:11 35:3
35:16 36:18 40:1
43:4,6 86:17 88:21
**correctly** 89:14
**costs** 67:3
**counsel** 50:5 59:16
68:21 96:9,11
**county** 1:1,11
**couple** 25:15 38:8
42:14 47:8 76:19
**course** 6:10 29:3
33:24 35:15 48:10
**court** 1:1,22 4:1,4,10
4:25 5:6,9,18 6:3,6
6:12,18,25 7:4,8,11
7:13 8:20 9:6,14,18
9:21 11:2 13:10,25
14:2,15 16:18 17:5
17:10,14,17,20 20:18
20:24 21:7,11,16,21
21:24 22:2,5,8,21
24:1,13,18,18,23
26:2,12,22 27:1,14
27:19 28:1 29:14
30:1,10,17 34:19
39:20 40:6,14,22
41:9,12,16,23 42:7
42:12 43:20 44:6,12
44:15,17 45:2,3,5,10
45:13,19,23 46:4,11
46:12,19 47:1,5,11
47:13,17,23 48:22
49:3,11,19,22,22
50:2,4,8,13 52:6,6
53:6,9 54:1,5,7,15
55:1,19,24 56:1,3,6,9
56:14 57:2,22 58:4
58:12,17,18,25 59:3
61:21 62:4,7,18,22
63:2,5,8 64:11,14,16
65:6,7,9,12,15,19,21
66:10,20 67:10,10,14
67:23,24 68:7,25
69:10,14,17,20,22,24
70:12,17,24 71:6,9

71:15 72:21,25 73:4
73:22 74:5 75:1
76:10,13,22 77:1,16
78:4,6,14 79:7,23
80:4,8,24 85:3,5,11
85:13,24 86:6,14,24
87:5 88:13,21 89:1,6
89:9,19,23,25 90:6,9
90:19 91:10,18,19,23
92:7 93:2,4,8,11,14
93:21,23 94:4,12,15
94:18 95:1,4,7,11,14
96:7
**court's** 14:20
**courthouse** 1:11
**courtroom** 4:23
73:10
**covered** 11:7 46:1
**covers** 12:20 32:1
**crashed** 48:9
**create** 33:14
**created** 19:19 37:6
39:8 87:17 91:13
**creating** 12:19
**creation** 39:10
**credibility** 57:23
80:16 85:8
**credible** 81:10 87:19
**criminals** 84:6
**critical** 60:12
**cross** 3:6 6:10 7:8
22:9,12 45:10 92:9
**custody** 68:19
**cut** 27:23
**cylinder** 59:6

**d**

**dade** 1:1,11
**damage** 23:6,8
**damaged** 23:14,20
**damaging** 23:18,18
**data** 11:6,16,17,22
12:19,20 17:24 18:22
23:9 29:10 32:12
36:23 38:16 39:9,11

40:10 43:12
**date** 11:23,24 19:18
32:2 76:17
**dated** 32:4 54:24
55:17 73:23,25 96:14
**dates** 20:10
**day** 4:8,11,11 10:5
34:24 41:11 73:25
74:1 76:11 77:6 87:6
96:14
**days** 35:16,17 55:15
80:23
**dca** 67:17,19 68:13
**deal** 67:5
**dealt** 77:9 84:10
**debbie** 96:3,17
**debt** 63:24
**december** 11:8,22
39:9 47:25 50:8 72:8
73:18 80:5
**decide** 21:12 41:12
54:9 64:3 80:21
**defendant** 1:9 2:12
54:19 70:12
**defendant's** 21:17,20
21:20
**defendants** 21:17
67:25
**defense** 60:11 61:11
61:16 68:2
**deference** 81:8 84:5
90:20
**definitely** 12:6 33:5
**delete** 37:21 43:7,11
**deleted** 15:18 16:7
44:23
**deletion** 91:13
**deliver** 71:21
**delivered** 26:20
71:22 92:19
**delong** 67:18
**demeanor** 24:19
**demonstrated** 68:1
**denial** 48:12

**denied** 50:16
**dependent** 92:8
**deposition** 48:2
  65:11 89:14
**depositions** 49:17
  79:12
**deprived** 61:17
**describing** 9:3
**destroy** 40:4,9
**destroyed** 9:12 10:16
  12:25 13:4,15 19:13
  22:24 23:1,2 24:10
  40:21,24 41:5 57:14
  59:10,10,23 67:1
  72:14,17 82:7 87:10
**destroying** 39:25
**destruction** 61:18
**deter** 91:15
**determination** 24:20
  78:1 88:13
**determine** 15:17 16:5
  25:18 28:18 34:10
  38:21,23 88:11 94:15
**determined** 8:9
  10:15 49:12 87:25
  88:10
**determining** 34:12
**develop** 18:16
**dictates** 70:10
**different** 20:12 21:9
  25:22 34:2 38:8
  40:10 76:11,11 77:6
  77:6,20,21 87:6,6
  88:5 91:24 94:4
**difficult** 16:12
**direct** 3:5 6:5,9 7:17
**directly** 14:23
**director** 58:10 69:12
**directory** 38:7
**disagree** 33:15 77:14
**disc** 8:1,6,16,19 9:10
  9:11 15:7 18:7 19:12
  19:25 21:10 23:9,13
  23:19,19 24:3,5 26:6
  26:9,11 30:2 33:9

46:24 48:7 51:9,12
  51:16,25 52:21 55:14
  56:13 59:5,10,17,18
  61:5 62:16 66:25
  67:5 80:17 82:2,6
**discarding** 78:14
**disclosure** 63:24
**discovery** 27:5 30:15
  76:14,18,24 77:2
  93:16
**discrepancy** 32:11,15
  32:16
**discs** 8:7,10 10:6,14
  12:24 13:3,5,15
  15:22 19:5,12 20:8
  20:10 21:5 23:1,6,10
  23:21,23 28:10,11,15
  28:22 29:6,9 32:18
  32:18 34:24 35:3
  38:4,6,9,12,15,17,24
  38:25 40:21,23 41:9
  41:20,21 51:14 52:8
  52:9,15 54:21 55:9
  55:13 57:5,9 59:22
  59:22 66:25 71:16,21
  71:22,24 81:16 84:16
  84:21 85:14,15 95:7
**discussion** 18:6,8,18
  82:24
**discussions** 79:13
**disk** 29:4
**disks** 71:10
**dismissed** 58:16
  67:23 83:19
**dispose** 37:21
**disposed** 48:9
**distinction** 23:18
**distraction** 66:14
**district** 58:17 87:15
  91:7
**division** 1:2 4:17
**doctor** 6:14 28:1
**document** 66:3 75:10
**documentation** 16:14

**documents** 18:3,4
  50:17 51:4,24 52:7,8
**doing** 6:21,22 9:23
  36:4,14 48:24
**dollars** 62:11
**donner** 2:9 5:8,24
  47:4 69:19
**door** 88:4
**doubt** 82:5
**downloaded** 8:13
**dr** 6:1,13 7:19 14:9
  14:12,18,23 22:10,14
  22:19,23 25:2 27:7
  27:24 28:9 29:14
  30:23 33:11 39:3,23
  40:18 41:19 44:4
  45:9,14 55:15 57:5,9
  57:12 59:18,21 71:17
  71:18,20,22,24,25
  73:1,1 84:11,12,17
  85:19,19,20 86:11
**draft** 95:9,11
**drastic** 70:18 71:3
**draw** 23:17
**drawer** 8:2 52:3
**drive** 9:11 34:24 35:3
  38:7 48:8 72:24 73:7
  79:3 85:22,24 86:22
**dropped** 35:18
**due** 81:8 84:4 90:19
**duty** 59:14 60:24,25

**e**

**e** 2:8 7:2 14:9,14 15:9
  16:11 25:3,6,10,12
  25:12,13,19,22,23
  26:6,20,23,25 27:2,3
  27:9 28:2,16,17,18
  28:21 30:6,7,20
  31:24 32:1 33:13
  34:10,17 36:15,17,24
  37:3,14 39:6 42:1,4
  42:18,19,21 48:1
  49:24 50:21 51:20
  54:22 55:15 59:16

61:7 66:16,19,25
  72:1,1,4,6,6,8,9,12
  72:15,20 73:6,15,16
  73:17,19,21,23,24
  74:7 79:5,7,14,16,19
  79:22,25 80:6,10,11
  83:8 85:20,21 86:20
  86:24 87:1,4
**earlier** 10:15
**easier** 13:23 66:20
**easy** 47:21
**effectively** 91:11
**effort** 51:3 84:3
**either** 11:20 16:17
  45:24 78:2 82:6
**electronic** 72:11
**elements** 61:13
**eleventh** 1:1
**emails** 34:8
**emerald** 1:4 4:5,16
  4:18,22 7:25 26:18
  26:20 27:5 39:14
  42:2,2 46:7,10 54:20
  63:19 64:12,18 69:15
  74:15 75:12,21 90:23
  91:25 92:1 93:10
  94:11
**employee** 96:9,10
**enclosing** 27:2 54:23
**ends** 11:22
**engagement** 85:19
  86:21
**ensued** 72:9
**ensuing** 15:15 16:8
**ensure** 16:18
**entered** 21:2 52:6
  71:9,15 93:21
**entertaining** 77:24
**entire** 33:8,17,18,25
  37:9
**entity** 69:13 90:24
**epic** 46:17
**especially** 35:25 77:2
**esquire** 2:2,2,8,8,9

establish   30:5 34:7
established   30:12
et   15:19 16:7 29:24
  41:7 58:24 65:23,23
  78:8
event   59:25 76:7
evidence   14:13 20:22
  21:20 26:4,5 30:7
  36:1 39:24 40:1,4,9
  45:18 49:4 50:10
  52:25 54:3 57:15
  60:3 61:8,14,20 65:5
  67:7,9,16,23 68:4
  76:3 78:18,19,22,25
  82:3,6 85:17,18 86:8
  86:12 87:18 88:15
  91:20
evident   44:23
evidentiary   12:13
  48:25
exact   69:4
exactly   20:2,9 36:4,6
  36:7,19 44:11 64:9
  69:14,18 78:23 84:15
examination   3:5,6,7
  6:5 7:17 22:12 42:16
examine   22:9 68:3
  72:11
examining   6:23
example   33:4
excuse   48:20 50:1
  55:4 92:17
executive   64:13,18
  74:15
exhibit   13:22 54:18
  55:11
exist   49:8 50:12 54:4
existed   82:6 87:10
existence   10:7 34:7
exists   25:12 79:6,7,14
  79:15
expect   11:23 12:8
  37:15
expected   37:8

experience   33:17
expert   6:1 29:25
  57:12
explain   12:7,10
explained   35:9 36:5
  91:10
explaining   9:23
explanation   12:9
explore   9:2
extent   21:4
extra   49:16 83:16
  84:2 85:25
eye   76:22
eyes   73:10

**f**

fact   12:2 16:6 21:11
  25:19 27:9 30:6,7,8
  34:10 35:10 36:17
  37:13 39:9 63:17,25
  64:3 67:8 71:19 80:9
  92:7
failed   38:25 61:9
failing   18:6 50:25
fair   16:21 20:7
faith   67:6,13,14
fall   12:8
falling   69:6
familiar   39:25
far   36:15 37:11 87:21
fashion   18:14
father   5:12,15,18,19
favor   24:9 60:10
february   74:12,19
feel   56:21 85:8
feeling   54:13
feelings   93:25
fees   49:15 67:3 84:1
  87:24 88:20,23 89:5
  89:10,11 94:16
figure   44:13
figured   17:14
file   8:2 11:8,11,16,19
  11:24,24 28:21,25
  32:21,24 36:21,25

37:5 38:11 41:21
  51:5,6 57:25 64:20
  74:17 94:14
filed   51:4 52:2 58:14
  58:16 72:10 82:22,23
  93:19
files   37:17 72:5 73:17
  79:20 80:1 91:14
final   19:23
financial   70:6
financially   96:12
financing   76:9
find   20:2,9 36:17
  37:15 42:1 47:17
  85:19 87:22,23 88:15
  91:19 92:7 94:12
finder   67:8
finding   84:13 87:16
  88:18
fine   7:15 22:21 40:19
  63:1 83:18
finish   6:12,23 79:23
finished   6:9
firm   84:2
first   18:3 31:25 43:16
  46:5 56:1,15 57:7
  63:10 67:11 71:8
  77:19 82:24 92:1
  93:12
fit   33:2,9 81:6
five   33:4 35:15,17
  73:20 80:3,7 83:2
fixated   85:13
flagler   1:11
floor   1:12 2:4,10
florida   1:1,5,12 2:4
  2:11 58:8 67:19
  68:12 91:7
focus   23:20
focused   26:8 63:17
folder   37:3,20
folks   56:10
follow   31:18
foregoing   96:5

forensic   35:22,24
  36:10 38:5
forensically   14:11,13
  72:11
forget   70:7
forgot   18:10,24 79:8
  84:19
forgotten   81:18
form   8:11 51:1,17
format   28:23 52:1
forth   68:2
forthcoming   70:11
  86:18
forward   4:7 6:14
  18:22 95:2
forwarded   13:19
  15:1
found   11:7 37:13,13
  42:5 68:23 82:2
  85:21 86:20,24 87:1
  87:19
foundation   27:17
four   25:16 33:4
  73:15
fourth   9:13 48:10
  62:17
frame   11:7 32:2
francisco   2:8 5:24
frankly   55:22
fraud   88:10
fresh   62:21
friday   1:13 35:18
  89:13
friend   18:7,11 70:3,4
  70:5 82:19 84:20
friend's   8:12,22 9:9
  10:5,7,10,17,23 12:5
  12:15 13:14 18:25
  19:15 26:10 32:3
  42:7 44:25 52:19,20
  57:8,11,20 60:1,3
  70:7 72:18 73:6 79:8
  79:15 80:19 81:19
  84:22 85:24 86:21

**friendly** 35:7
**fulfill** 61:10
**fund** 60:25 61:1
  63:13 92:3
**funded** 75:17,23 76:4
**funding** 63:16 77:4
**further** 14:16 20:16
  42:11 46:11 96:8

**g**

**gap** 10:24 11:4,10,19
  12:2,14 19:18 39:3
  39:12
**garno** 2:2 4:2,8,20,20
  13:19 14:1,6 16:22
  22:9 45:12,18,21
  46:1,9 48:16,21,23
  49:1,6,21 50:3,6
  52:23 53:7,21 54:6
  54:13 55:2,5,9,20,22
  56:5,7 58:20,22 65:4
  69:8,10 70:25 71:1
  72:20,22 73:14,24
  74:3,22 75:2 76:12
  76:25 77:13 78:2,5
  78:10,16 79:17,22,25
  80:5 84:25 85:4,7,12
  86:5,16 88:12,17,22
  89:3,8,15,20,23,24
  90:10 92:15,18 93:12
  93:16 94:22
**garno's** 62:12
**gary** 2:8 5:5,23 45:16
  86:17 89:21 92:16
**gee** 18:23 56:17
**genden** 48:3,15,17
  49:10,11 55:21 58:24
  61:24
**genden's** 49:13
**general** 30:12
**generated** 11:9,11
  36:25
**genovese** 2:3 4:21
  59:19

**gentleman's** 70:3
**getting** 41:11 66:16
  67:5 89:12
**ggarno** 2:5
**gigabytes** 33:5
**give** 21:12 37:18 85:3
  89:16 95:6,8,15
**given** 12:20 15:8
  40:23 41:1 57:7
  84:16
**giving** 89:10,11
**gjb** 2:5,5
**glad** 5:19 44:12
  47:18
**glean** 40:12
**glehman** 2:11
**glorious** 72:1
**go** 5:2,11 10:1 17:17
  17:21 20:14 24:23
  29:19 37:19 45:16,17
  46:12 54:10 56:18
  57:24 61:15 62:23
  64:1 70:13 83:3 93:5
**godaddy** 14:18 15:4
  16:25 20:1,14 60:6
**godaddy's** 14:12
**godaddy.com** 15:19
  57:24
**godaddy.com's** 15:12
**godaddy.com.** 14:11
  81:22 82:25
**goes** 24:8 57:22
  78:20
**going** 5:16,21 6:10
  7:6 15:25 29:20,24
  30:4 36:6,8 37:25
  46:2 48:23 49:21
  50:6 52:23 56:3
  61:24 62:3,18,20
  63:6 76:23 81:16,21
  82:21 83:1,17,23
  85:7 87:23 88:11,19
  89:1 90:15,20 92:9
  93:8,24 94:12

**good** 4:1,2,3 22:15
  35:24 95:14
**gordian** 59:9
**gosh** 81:22
**gracious** 16:23
**granting** 54:19
**great** 75:25 94:25
  95:13
**gregory** 2:2 4:20
**ground** 75:14,18
  76:5
**grounds** 26:2
**guys** 24:1 53:9 65:12

**h**

**half** 18:5,24 62:11
  67:4 70:8,21
**hand** 29:13
**hands** 21:6
**happened** 39:17
  71:23
**happy** 6:20 26:13
  27:18,23
**hard** 9:11 34:23 35:3
  48:8 72:7,16,24 73:7
  79:3 85:21,24 86:22
**harsh** 61:22 65:22
  83:22
**harshest** 70:15
**head** 63:6 69:5
**hear** 52:19 79:24
**heard** 14:8 40:25
  77:22
**hearing** 1:21 13:18
  20:13 48:25 49:15
  52:12 95:16 96:1
**heart** 61:15,16
**hebrew** 87:14
**hernias** 47:24
**hey** 43:10 59:24
**hide** 83:9
**high** 5:15
**higher** 87:14
**highest** 51:3

**history** 48:18
**hoc** 57:18
**hold** 20:20 57:19
  62:22 68:10 91:4
  95:5
**holes** 13:8 41:7
**home** 4:15 8:1 15:23
  52:3 68:24
**homeric** 47:16
**honestly** 73:9
**honor** 4:3 10:25
  13:21 17:3,16 21:3
  21:15 22:11,17 23:25
  24:22 26:1 27:16
  29:13,22 30:22 34:18
  39:19 40:5,11,17
  42:10 43:19 46:15
  53:3 62:6 68:10,14
  69:7,9 70:14,23
  72:19 79:21 86:15,23
  94:20
**honorable** 1:22
**hot** 40:24
**hours** 90:11
**house** 23:14
**hunch** 94:18
**hurdle** 92:10
**hypothetical** 44:7
**hypothetically** 30:20
  30:23
**hysteria** 72:8

**i**

**i.e.** 61:17 64:24 92:1
**idea** 12:18 37:7 95:14
**identical** 13:15
**iliad** 47:17
**image** 13:6 35:25
**imaged** 23:11 73:2
**importance** 41:13
**important** 35:25
  47:15 54:9 59:4,7
  86:18
**importantly** 23:11

impose  58:9
impossible  12:14
improved  65:16
inability  68:1
inadvertently  67:21
incident  68:15
incidental  23:8
included  11:14
incorrect  8:16
incredible  81:24
index  3:1
indication  36:22
indicative  24:16
indicator  15:5 37:18
  38:1
individually  93:18
  93:20,22 94:7,8,10
indulge  60:9
ineluctable  70:10
information  8:13
  10:17,19,21 11:13
  12:4,15 15:6,18 16:6
  19:12 20:8 22:24,25
  23:14,18,21 30:25
  31:7 32:8 38:2 43:8
  57:13 59:8 70:6
  79:10 82:20
informed  8:17
inglorious  70:22
initial  19:8 63:24
initials  47:7
initio  88:9
inspection  14:24
instruction  83:18
  89:16 91:3,11,14
integrity  91:16
intent  35:23,24 37:7
  40:19
intentional  23:8
  61:19
intentionally  10:16
  19:13 22:24 23:1,2
  40:20,23 41:5 57:14
  59:11 67:1 72:14
  79:3

interested  33:14
  96:12
internet  25:8,14,23
internets  27:11
interpretation  60:10
  88:6
interrogatories  9:8
  48:6 79:13
interrogatory  9:7
  19:25 61:5 77:9
introduce  29:25
introduced  21:25
introducing  20:21
invitation  20:14
invited  14:6
involved  12:18 76:19
  79:2 90:3
involving  28:4
iron  40:24
irrelevant  26:8,11
  60:3
isolated  68:15
issue  8:18 11:21
  14:14 19:6 25:2 27:8
  30:18 41:13 49:23
  56:9,24 69:21 76:1
  76:11 77:6 78:20,24
  85:10 93:17
issues  17:23 35:13
  49:19 63:9 64:23
  83:20 84:9 85:8 88:2
it'll  21:17
items  9:2 37:21

**j**

january  14:19 20:10
jesus  2:2 4:20
job  69:7
joblove  2:3 4:21
  59:19
jogged  19:1
joined  4:22
jointly  90:24
jsuarez  2:5

judge  1:22 9:1 26:14
  46:9 48:3,13,15,16
  48:17 49:7,10,11,13
  50:6 52:23 53:21
  55:21,21,22 58:24
  61:23,23,24 62:2,17
  65:4 71:12 72:4
  73:14 74:22 75:3
  76:12 78:10,21 86:19
  89:3 93:12 94:22
judging  89:18,21
judicial  1:1 9:6 91:16
juggled  83:6
jurisdictionally
  58:20
jury  78:3,9 83:18
  87:5 91:2,10,14

**k**

keep  35:14 90:11
kept  35:11
kind  13:18 19:7
  32:23 56:8 71:23
  79:11 89:7 93:18
knew  12:24
knot  59:9
know  5:13,21 9:14
  12:9,14,25 13:12
  15:8,12,20 18:14,18
  20:24 28:1 32:10,24
  32:25,25 33:1,3,10
  33:15 34:1,5,6 37:1,6
  38:16 39:10,23 43:21
  43:23,25 44:2,8,9
  45:25 49:11,14 53:10
  53:11,14 56:23 65:14
  66:17 69:6 70:5
  71:23 73:6 77:3,7
  80:15 83:8 85:23
  89:6 90:14,15 91:18
  92:10,23
knowing  84:9
knowledge  53:16
knows  5:19 65:20
  85:5

**l**

l  96:3,17
l.l.c.  1:4
labor  4:11
lack  90:10
land  75:15,17 77:5
  92:3
landing  66:18
laptop  41:20
large  73:11 77:1
larger  32:22
lately  8:6
launch  45:22
laureti  2:15 4:24
  7:23 8:11,16 10:4,9
  14:10,17,22 15:22
  18:2,19 19:24 20:12
  23:24 24:15 26:17
  27:11 34:17,23,25
  35:2,15 36:3,22
  40:15,20 41:1,2,4,10
  41:20 46:8,10,22
  48:1,11 50:24 51:21
  52:14 53:12,19 54:21
  54:22 55:13 59:24
  61:3,6 66:4 68:25
  69:3 70:11 71:4,7,16
  71:18,19,21 72:3,14
  72:23 74:15 75:16
  80:6,12,13 81:8
  82:12 83:13,24 84:18
  87:17,23 88:20 90:19
  93:1,10,24 94:1,13
laureti's  28:20 29:1
  33:7,22 37:7 38:17
  40:18 69:15 73:5
  80:16 86:7
laureti.com  14:10
laureti.com.  51:21
law  24:6 44:12 46:16
  59:14 60:8,9,19 67:6
  84:2
law.com  2:5,5

**lawsuit** 77:12,14
**lawyers** 53:11 56:21
**leading** 11:1,3 17:4,6
  17:7 24:2 70:21
**leave** 87:21
**leaving** 39:12
**led** 52:4
**left** 6:3,4 19:7
**legal** 9:22
**legitimate** 33:20
  56:11
**lehman** 2:8 3:5,7 4:3
  5:2,4,5,6,7,9,9,10,12
  5:13,14,15,16,17,23
  5:23 6:4,11,20 7:12
  7:16,18 8:25 9:5,16
  9:20 10:1,2,3 12:1
  13:11,21 14:1,4,5,8
  17:12,16 18:1 20:16
  20:20 21:15 22:1,4,7
  23:25 24:6,14,22
  26:1,3 27:16,22
  29:22 34:18 39:19
  40:5,11 42:14,17
  43:24 44:11,14,16,18
  44:19,21 45:4,8,15
  45:17 46:2,14,15,21
  47:10,12,14,21,25
  48:17,20,24 49:7,18
  50:1,9,15 51:20
  52:24 53:3,24 54:10
  54:11,17 55:4,8,11
  56:13 57:1,3,17,24
  58:7,14,21,23 59:1,5
  62:6,8,20 63:1,4,7
  64:7,12,15,17 65:8
  65:10,14,17 66:11,22
  67:13,15 68:9 69:3
  69:11,18,21,25 71:6
  72:19 73:3 74:24
  75:8,20 76:2 78:23
  79:21 86:15,23 89:17
  90:5,8,18,21 91:22
  92:6,12,17,21 93:3,7
  93:9 94:2,9,14,20,23

95:2,9,13
**lender** 60:24 64:24
  64:25
**letter** 13:19 14:25
  60:17,20 64:9 65:18
  76:15 77:17 80:11
  83:12
**letting** 56:24
**level** 60:13
**liable** 90:24
**liberal** 24:9 60:10
**lie** 91:19,19
**life** 56:18
**likes** 53:4
**limit** 60:2
**line** 24:3 57:2 64:14
  73:12 80:25
**listen** 30:10 45:2
  47:19 53:10 56:3,9
  56:12 62:19 73:4
  84:5 87:2 90:13
**listening** 82:12
**litigation** 81:15
**little** 8:15,21 9:24
  21:9 31:23 56:16
  76:1 87:3
**living** 9:25
**llc** 54:21 91:6
**lo** 72:17
**loaded** 31:6 39:5
**loan** 61:1,1 75:6 76:4
**log** 37:17
**logic** 70:10
**logs** 16:14,19
**long** 5:7 7:14 35:19
  65:13
**longer** 46:18
**look** 4:7 15:4 16:9
  24:19 28:11,14 30:11
  41:25 42:5 44:5 47:8
  47:18 54:12,18 64:8
  68:18 75:3 82:18
  83:3,6 87:18 95:2
**looked** 21:9 60:19

**looking** 6:7 15:9,12
  16:25 20:4 25:21
  32:3 34:8 53:16,17
  62:21 71:25 86:20,25
**looks** 54:18,24
**lose** 92:14
**loss** 85:17,18
**lost** 67:21 68:3 72:17
  78:22,25
**lot** 18:14 29:21 39:24
  84:5 87:12 90:2,13
  90:14
**lots** 47:2 83:5
**love** 24:1 77:23
**loves** 48:18
**lucky** 16:16

## m

**m** 2:2,2
**machine** 66:18
**magically** 19:1
**mail** 11:12 14:9 25:6
  25:10,12,12,13,19,22
  25:23 26:20,25 28:21
  30:20 32:1 33:7,18
  33:25 34:10 37:9
  38:17,20 42:19,21
  51:20 59:16 72:6,6,8
  72:9,12,15,20 73:6
  73:17,19,21,23,24
  74:7 79:5,7,14,16,22
  79:25 80:6 83:8
**mailed** 61:7
**mails** 7:2 14:14 15:9
  16:11 25:3 26:6,23
  27:2,3,9 28:2,16,17
  28:18 30:6,7 31:24
  33:13 34:17 36:15,17
  36:24 37:3,14 39:6
  42:1,4,18 48:1 49:24
  50:21 54:22 55:15
  66:16,19,25 72:1,1,4
  73:15,16 79:19 80:10
  80:11 85:20,21 86:20
  86:24 87:1,4

**main** 11:12
**maintained** 16:15
**making** 23:6 88:14
**malfunctioned** 48:8
**malibu** 91:6
**man** 93:6
**manager** 58:10
**managing** 7:24,24
**manipulate** 36:23
**manipulated** 12:16
**manipulations** 15:15
**manufacturing**
  68:11
**march** 49:15
**marco** 2:15 4:23
  14:10 18:2 51:21
  54:21
**marine** 91:5,9
**markings** 41:6
**material** 67:22
**matter** 12:13 61:16
  66:11 80:18
**matters** 66:23
**mean** 4:6 12:25 18:13
  24:4 33:10 38:13
  44:17 45:21 49:14
  54:12 56:11,14 57:25
  66:7 73:9 76:6 77:18
  80:14 90:6 92:13
**meaning** 44:23 51:20
  52:8 60:14,21 75:14
**means** 11:20 61:20
  65:23
**meet** 64:4
**megabyte** 32:19
**megabytes** 32:22
  33:2,2
**member** 7:24 69:12
**members** 7:24,25
**memorex** 32:19
**memory** 18:10 19:1
**mental** 40:13
**mention** 9:8,9
**mentioned** 39:4
  57:20 76:15 91:2

mentions   57:9
mess   36:24
message   42:20,22
  43:5,8,9,11,14 44:2
met   34:24 64:4 77:20
miami   1:1,11,12 2:4
  2:11
middle   25:24 91:7
mind   77:24
mine   33:3,4
miniscript   94:24
minus   45:1
minutes   23:4 62:4
misapprehension
  14:17
miscellaneous   37:20
  37:21,22
misdirection   26:15
misplaced   8:2 67:22
misrepresent   53:8
misrepresentation
  56:8
missed   51:5
missing   7:3
mistakenly   79:1
modification   19:20
  19:21
modifications   15:14
  44:22
modified   11:13 12:16
  16:7
moment   22:23 64:24
  68:6 70:22
monday   35:19 89:14
money   63:13
months   11:11,24
  16:16 74:20,20
moody   3:4 6:1,13
  7:19 14:18,23 22:10
  22:14,19,23 25:2
  27:7,24 28:9 29:14
  30:23 33:11 39:3,23
  40:18 41:19 44:4
  45:9,14 55:15 57:5,9
  57:12 59:18,21 71:17

71:18,20,22,24,25
  73:1,2 83:5 84:11,12
  84:17 85:19,20 86:11
moody's   14:9,12
  85:19
motion   26:3 48:12
  50:15 54:20 68:18
  78:7 80:21 87:22
  90:22 91:3 93:19
  94:7,10,14
motions   14:15 58:1
  72:10
mouth   92:25
move   17:6 18:22
  24:24 31:15 32:13
moves   32:14
moving   62:3

**n**

n.a.   1:8 5:5 6:1
name   4:19
names   38:11 41:21
narrow   87:2
national   1:8,8 4:6,16
  5:5,25 42:3 54:20
  62:9 87:14 91:25
nature   16:15 18:19
  19:4 36:2 37:4
nauseam   92:20
nearly   18:5
necessarily   53:15
necessary   38:3
need   6:16 56:21 62:1
  64:20 65:2 75:12
  80:20 81:4,20
needed   66:12
nefarious   59:13
neither   8:9
never   29:9 43:15
  44:1,2 57:20 73:19
  75:17,18,24
nevertheless   77:25
new   31:13,19 65:16
  66:18

nice   89:9
nine   61:3 63:15
  64:18 65:2 66:1 74:8
  74:16 75:13,22 76:5
  78:13 83:14
nonparty   4:23 58:6,7
  69:1,23
normal   29:3 33:24
  48:9
normally   41:6
noted   50:13 54:7
notes   6:7 56:16 81:1
  81:2,3,5,11 82:15
notice   1:23 9:6
november   1:13 11:9
  39:8 91:7 96:14
number   4:17 25:21
  63:18 64:10 73:20
  74:10,13 76:20 80:3
  80:7 88:4 92:4

**o**

oates   96:3,17
oath   6:15 7:20 8:1
  46:23 48:11 50:19
  70:4 83:13
object   51:17 52:23
objected   50:16
objecting   49:1,3,6
  53:24 55:20 65:4
objection   9:17 10:25
  17:3 21:1,4 23:25
  24:7 26:1 27:16
  29:22 34:18 39:19
  40:5,11 43:19 50:13
  51:1 54:6 72:19 73:3
  79:21,24 86:15,23
  89:17
objections   62:12
obligations   39:16
observation   21:7
obstructive   35:8
obtain   61:20
obtained   29:11

obviously   63:9 70:17
  71:3
occasions   52:17
  93:22
occurred   15:15 76:8
occurs   75:13,15
october   8:13 10:21
  10:23 71:9
odd   18:13
odyssey   46:18
offer   16:23
offered   19:24 20:12
  26:5,9 40:19
office   8:2,5 9:3 15:1
  15:23 18:9 19:1 35:2
  52:3 68:24
officer   58:11 69:12
officially   4:12
oh   7:4 20:20 27:22
  47:18 52:19 54:15
  57:18,24 67:14 68:23
  81:22 95:4
okay   4:25 5:12 6:25
  7:12,16 9:16 13:25
  14:3 18:17,20,22
  19:11 22:1 23:10,16
  23:22 26:12,16,24
  30:20 31:24 32:7
  45:4,13 46:12 51:22
  54:5 56:5 60:2 66:10
  72:12 75:1 78:4
  85:11 93:23 94:14
once   8:9 81:12
open   8:22
opening   41:20
opinion   23:5 33:8
  40:20 84:17 87:13
  91:24
opportunity   34:15
  35:21 68:3
optimum   64:25
options   11:4
order   14:16,21 15:20
  28:17 48:13 49:13,20
  50:16 52:10 53:15

54:8,8,19,25 55:2,12
56:1 58:1,24 71:8,15
78:18 89:21 93:21
95:9,11
**ordered**   52:14
**orders**   7:23 15:24
48:14 49:7,14 50:8
50:10,11 52:7,24
53:1 54:1,3 55:18,19
55:20,24 62:12,15
71:8
**original**   9:11 12:24
13:1,3 28:24 29:7,9
30:3,24 59:18
**originally**   37:14
50:18
**originals**   20:25
**outlier**   33:5
**outside**   36:8 49:4
**overrule**   17:7
**overruled**   11:5 17:5
34:19

**p**

**p.m.**   1:13,13 95:16
**pacific**   1:8 4:5,16 5:4
5:25 42:3 54:19,23
62:9 91:5,9,24
**page**   3:3 46:25 47:10
47:22 50:19 64:10,17
74:10 91:3
**pages**   56:15 62:1
**pajolski**   5:20
**paragraph**   74:10
**part**   11:2,3 12:21
29:3 33:23 37:8,15
54:19 67:11 69:5
74:14 76:14,18,23
77:1,11,14 86:21
88:17 92:1
**participating**   64:25
65:1
**particular**   42:19
88:22

**parties**   52:11 62:25
65:22 96:9,11
**party**   58:5 60:11
**path**   52:5 83:17
**pay**   70:20
**people**   25:24 39:25
40:4 45:3
**percent**   13:13 15:5
16:10 20:2
**period**   12:21 15:21
16:16 17:2 20:4
39:11
**periods**   14:19
**permitted**   36:9,16
**permutation**   92:21
**person**   21:10 25:11
25:23 26:20 43:22
**person's**   32:21 40:13
**personally**   94:1
**perspective**   53:22
**photographs**   20:21
21:1,4,8
**pick**   82:10
**picked**   35:19
**piece**   67:22
**place**   6:18 32:14,14
41:12 43:16 55:6
61:6 93:6
**placed**   10:19 12:15
**places**   25:16
**plaintiff**   1:6 2:6
60:14 67:21
**plaintiff's**   67:24
**play**   75:5,7 92:5
**pleadings**   48:4 61:21
61:25 64:2 68:16
70:16 78:8 83:21
88:1
**please**   4:18 14:22
31:10 90:11 94:23
**plural**   10:14
**pnb01390**   29:16
**pnb01391**   29:15
**pnc**   63:17 64:6

**point**   6:9 24:25 26:16
27:25 30:14 33:11
39:12 46:23 55:23
61:10 66:11 67:18
74:23 78:2,21 83:25
85:16 92:10
**points**   87:18
**poking**   36:7
**position**   26:18
**possession**   68:19
84:18
**possible**   43:7,11
60:10 67:3
**post**   57:18
**potential**   32:11,16
**practicing**   46:16
**pre**   26:19,24 27:3
42:2 50:22 54:23
64:19,20 65:2 74:9
74:17 75:4,13 76:6
78:13 83:14 89:17,18
89:21 90:6
**precedent**   61:10
77:19
**preemptive**   90:9
**preface**   81:13
**prefer**   29:20
**prejudice**   91:13
**prejudiced**   61:17
**preliminary**   15:3
**preponderance**   82:4
**present**   2:14 18:13
89:2
**presentation**   19:8
55:24 59:24
**presented**   41:3 64:6
80:22 89:13
**preservation**   16:19
**preserve**   59:15
**preserved**   14:11
**presold**   64:19 74:8
74:16
**presumably**   68:22
**presume**   28:10

**pretrial**   90:4
**pretty**   19:10 38:14,25
77:11
**previous**   53:18
**previously**   50:23
75:16
**prior**   10:4,9 23:5
34:23 50:25 60:24
69:15 79:12
**probably**   65:20 82:4
84:23 92:9
**probative**   16:24
**problem**   12:6 15:11
15:16 26:14 48:17
84:21 86:5
**problems**   17:24
18:10
**procedure**   58:9
**proceed**   22:18 46:14
**proceedings**   96:5,7
**process**   13:6 31:18
85:3 91:17
**processes**   85:1
**produce**   7:25 18:2,4
50:25 51:3 52:7,15
53:13 55:13 63:14
66:8
**produced**   8:16 11:19
15:24 27:4,13 50:23
62:1 68:18 72:16
73:18
**producing**   8:19
81:16
**production**   28:7
29:24,25 56:2
**productions**   51:2
**professional**   96:3
**project**   75:14,18 76:5
**pronounced**   5:13
**pronounces**   5:14
**proof**   30:7 87:3
**proper**   63:24
**property**   63:14 75:24
**proportions**   46:17

**proposition** 30:12
**protect** 91:12
**protective** 48:13
  50:15 58:1
**protocol** 14:20 55:5
  55:12 56:2 71:11,14
  71:17
**protocols** 52:11
  55:16 62:14
**prove** 60:11
**proven** 25:21
**provide** 14:17 20:1
  40:9 54:21 71:10,16
  75:13,22
**provided** 12:9 72:7
  80:6,9
**provision** 75:19
**pst** 11:8,11,16,18,23
  11:24 19:19 28:20,25
  32:21,24 36:21,25
  37:5 39:5,7
**pull** 57:13
**purchase** 77:5 92:3
**purpose** 33:16 37:6
  59:13
**pursuant** 1:23 48:3
  55:12,16
**put** 10:22 18:8 46:11
  49:8 50:9 52:24 55:6
  70:6 77:10 90:11
**putting** 64:23

**q**

**quarter** 9:13 48:10
**question** 9:19 11:1
  16:1 24:2 30:2 32:11
  36:15 44:7 50:21
  51:6,8,10,13,15,23
  52:2 63:5 68:8 73:22
  74:24 75:3,9,10 87:6
**questioned** 48:11
**questioning** 22:19
**questions** 15:4 17:15
  18:16 30:4 42:11,15
  56:22

**quite** 73:9 83:7
**quote** 8:12 65:22
  67:21,25 70:3 79:14
  91:10

**r**

**raised** 69:1,21 91:23
**ran** 16:1 48:16
**randomly** 70:6
**range** 29:17,18
**rationalization** 57:18
**reached** 46:17
**read** 10:14 14:7
  23:10 38:9 56:14,15
  56:18,19 57:6,10,11
  71:24 73:4,8,12 81:1
  81:20,21 84:23
**readable** 8:10 10:6
**reading** 90:14
**ready** 89:12
**realize** 7:19 53:10
**really** 4:10 17:13
  18:21 72:17 84:4
  85:9
**rearranged** 29:16
**reason** 16:22 33:21
  39:11 40:15 50:24
**reasonable** 82:5
**reasonableness**
  94:15
**rebuild** 59:1
**recall** 7:22 8:3 10:13
  11:6 18:12,18 19:4
  41:22 60:18,20 63:8
  81:4
**recap** 19:11 23:3
**receive** 43:2
**received** 23:10 25:3,7
  25:11,14,19,20,25
  27:12 30:8,13 34:8
  34:13,17 42:20,20
  43:10,17,21,23 44:1
  80:2
**receiver** 25:16

**receiving** 36:1
**recipient** 34:13
**recipient's** 34:9
**recite** 48:18
**recollection** 41:19
**record** 4:13,19 5:3
  14:7 17:13 49:9 61:4
  62:13 65:5 74:22
  86:4 96:6
**records** 42:24
**recovered** 82:8
**redirect** 3:7 42:13,16
  45:11
**referenced** 55:25
**referred** 53:18
**referring** 47:22
  85:25
**reflect** 31:23 61:4
**reflecting** 33:22
**reflection** 82:9
**reflects** 62:13
**regard** 53:14 83:10
**registered** 96:3
**rejected** 69:22
**related** 80:2
**relative** 96:8,10
**relevance** 76:1 78:12
**relevant** 14:19 17:2
  20:3 39:18 67:22
  76:23
**reliability** 12:12
  15:10
**reliable** 12:5 15:5
  19:22
**relief** 20:1 65:24
  78:18 88:18 89:20,24
  89:25 90:1
**relive** 62:2
**remedies** 71:4
**remember** 18:6
  68:17 82:14 89:14
**remembered** 56:19
**removed** 24:5
**repeatedly** 58:1

**receiving** —
**rephrase** 31:9
**report** 96:5
**reporter** 96:4
**representational**
  94:3
**representations**
  68:17,21
**representative** 93:11
  93:19
**representatives**
  90:25
**represented** 84:5
**represents** 32:13
**reputation** 54:14,16
**request** 93:9
**requested** 50:17
**require** 64:2
**required** 7:23 49:16
  70:15
**requirement** 75:21
  77:17
**reside** 27:4
**resided** 28:20
**resolved** 62:24
**respect** 60:24
**respond** 26:13
**response** 64:8
**responsible** 70:19
  87:24 90:20 94:13
**rest** 46:2
**rested** 46:5
**retractions** 15:14
**retrieve** 10:16
**retrieved** 28:3
**returned** 35:12
**review** 28:6,10 34:16
  34:20
**reviewed** 73:1,2
**rewrite** 65:21
**rid** 11:3
**right** 4:12 5:18 6:11
  6:17 8:14,25 9:5
  12:18 13:4,7 14:2
  19:9 22:8,16 25:4
  31:5 38:18,19 39:1

40:1 42:20 43:3,17
44:20 45:8 49:18,23
49:25 51:15 56:9,13
57:1 58:18 66:9,13
66:22 67:17 80:4,8
85:25 86:17 90:8
92:6 93:23 94:19
**robert** 3:4
**rpr** 96:17
**rule** 69:4
**rules** 58:8
**ruling** 88:17 89:17
93:2
**run** 35:21 36:13

**s**

**saga** 47:16
**sake** 13:22
**sale** 26:19,24 27:3
42:2 74:9,17 75:4,13
76:6 78:13 90:6
**sales** 50:22 54:23
64:19,20 65:2 83:14
**sanction** 58:15 61:22
69:16 70:15,18 89:5
94:17
**sanctioned** 69:13,14
**sanctioning** 88:19
**sanctions** 58:10 67:2
70:20
**saved** 47:24
**saw** 6:7 20:24 32:18
55:1 56:16
**saying** 40:22 41:3
43:20,22,25 52:10
57:4,4,16 59:11,12
59:16 61:6 63:4 83:8
87:3 89:23 90:11
92:11,12
**says** 9:10 24:7 25:20
51:21 59:14 60:9
64:9 66:3,5 67:6
69:11 74:8,14 75:12
80:13 83:13 91:9
92:1,14

**scenario** 43:14
**school** 5:15 44:12
**scope** 49:4
**scraping** 13:8
**scratch** 63:3
**screen** 73:11
**screens** 4:14 45:25
**second** 2:3 9:10 32:4
39:2 41:15 50:11
63:20 64:1 68:10
85:10
**secondly** 64:24
**secret** 85:6
**section** 64:17
**see** 7:11 27:24 34:16
37:25 38:6,11 41:6
41:21 49:24 51:6
54:8,8 65:2 83:3
84:23
**seeing** 77:23 95:2
**seeking** 71:3,5 72:10
90:1
**seeks** 60:11
**seen** 14:25 23:7
31:23 32:23 34:3
49:14 53:11 65:20
73:19
**segment** 34:1
**select** 33:13
**selective** 11:20
**selectively** 15:18
**send** 30:14 92:23
**sender** 25:16 43:3
**sending** 59:16
**sends** 30:13
**sense** 37:5 70:9 81:5
**sent** 14:9 25:3,6,11
25:13,19,20,23 26:25
27:10 28:19 30:6,8
34:8,11,14 36:24
42:19,20 43:10,22
44:3 54:22 74:3 80:7
80:13,14 83:8,10,11
92:13,22

**separate** 51:5,7 52:17
**september** 39:16
75:17 92:20
**series** 7:23
**served** 93:17
**server** 15:4,12,20
16:8,9,25 17:1 20:1,3
28:3 30:3,14 82:25
**servers** 14:12 25:15
27:4 34:16 44:5
**set** 9:7 12:19 30:2
48:6 68:1
**setting** 45:25
**seven** 26:23,24 27:2,3
27:9 28:16,17,18
34:8 42:1,4 49:24
60:15,15 61:3 63:14
72:1,1 73:11,16
74:11,13 80:18 85:20
85:21 86:2,20,24
87:1
**seventh** 73:23,24
74:7,18 79:14 82:1
**severally** 90:24
**shape** 8:11
**share** 37:12 79:10
**shared** 37:11
**shares** 36:3
**show** 7:6 37:23 43:13
43:16 61:2 66:13,18
76:3 77:2 78:17
81:17 82:18
**showed** 42:18 60:15
60:15 80:7,17
**showing** 37:23 48:2
64:5 66:25 72:25
84:10
**shows** 55:12 80:18
81:18 82:3 86:1
**sic** 73:6
**side** 63:19 69:2
**sideshow** 75:25
**sight** 92:14
**sigler** 48:13 55:21
61:23

**sign** 74:5,14
**signed** 63:11,12 64:5
64:22 66:2,4 74:12
74:19,21 76:17 83:12
**signing** 66:3
**signs** 80:12
**similar** 89:15
**single** 8:6 60:10,23
**singular** 52:22 55:14
**sir** 6:17 10:8,12,18
12:12 13:6,9,17
14:25 15:1,16 19:10
19:14 20:6 25:5,9,17
28:5 29:8 34:20 35:1
35:5,9 36:19 37:12
38:25 40:3 42:6,9,25
43:6,12 71:1 95:3
**sit** 16:21 20:11 65:18
82:18
**sitting** 81:9
**situation** 35:25
**six** 15:12,15,19 16:8
16:15,16 27:3,9
57:25 64:19 66:2,4,7
72:3,15 73:15 74:9
74:16,21 80:10,10,18
83:2,10,11,14,14
**size** 33:1,7
**smaller** 12:21
**so2d** 67:19 68:5,12
**soon** 95:3
**sorry** 5:10 23:15
27:22 67:14
**source** 29:7 30:24
51:23 66:24
**sources** 25:22 66:17
**south** 2:10
**southeast** 2:3
**southern** 5:14
**space** 10:24 11:4
**speaking** 24:2
**specific** 28:16,17
32:2,8 36:15 37:3,6
75:8

**specifically** 18:12 37:2 75:20

**spent** 56:14,20 62:9 62:16 87:11,12 89:12 90:13

**spoiled** 87:22

**spoliated** 39:24

**spoliation** 26:4 49:23 57:15 61:14 78:7,22 78:24 85:9 86:9,12 87:8,16 88:14,19 91:12

**spoliator** 24:7 67:9

**sponco** 68:5,6,11

**squinting** 73:13

**stand** 49:21 50:7

**standard** 24:9 33:1

**stanford** 1:22

**start** 47:16 63:2,22

**started** 81:12

**state** 4:19 13:12 15:6 16:10,22 17:1 20:3,7 40:13

**stated** 37:14

**states** 65:25

**stating** 52:7

**station** 6:18

**steele** 2:9 5:8,23 47:4 69:19

**stenographically** 96:5

**step** 64:1

**steps** 16:17

**stick** 37:24

**stood** 71:6

**stop** 6:22 45:4 53:6,6 93:23

**store** 11:12 33:7,17 33:19 34:1 37:9 38:18,20

**story** 77:21 94:4

**straight** 12:22

**street** 1:11 2:3 62:23

**strictly** 66:12 75:11

**strike** 48:3 61:21,25 78:8 90:10

**striking** 64:2 68:16 70:16 83:21 88:1

**stuff** 10:10 25:9,23 34:21 47:3 56:8 84:11 90:14,15

**suarez** 2:2 3:6 4:21 7:1,5,10 9:15,17,19 10:25 17:3 21:3 22:8 22:11,13,17,22 24:24 25:1 26:13,23 27:2 27:18,23 28:8 29:13 30:5,16,19 34:22 39:22 40:7,17 41:8 41:14,17,18,24 42:10 43:19 44:4 51:1,17 68:17 74:1

**subject** 14:20 15:23 24:7 33:13 56:2 62:12 71:11,17 73:12

**subpoena** 18:3 93:17 94:6

**subpoenaed** 50:17

**subsection** 69:5,8

**subsequent** 74:7

**subsequently** 20:13 71:14

**subset** 12:20 37:1,10 37:15 38:17 44:24

**substantial** 60:22

**substantially** 90:16

**subtracted** 12:16 16:7

**subtractions** 15:14

**succinctly** 77:9

**sudden** 81:17

**sufficient** 67:7 91:20

**suggest** 24:14 34:4 61:9

**suggests** 19:19 33:24

**sullied** 54:14,16

**summary** 64:13,18 74:16

**super** 59:7 83:1

**support** 52:25 65:6

**supporting** 16:13

**supposed** 63:13,21 88:8

**supposedly** 10:21,22 15:22 86:2

**sure** 5:4 16:2 26:15 28:25 31:9 34:5,6 35:17,24 47:19 54:11 65:19 68:9 73:9 76:25 78:5 83:17 89:2

**surely** 76:13,17,18 82:2,3 87:8 91:24

**surprisingly** 71:12

**suspect** 12:6

**sustained** 39:20 40:6

**sway** 85:7

**sworn** 6:16 19:24 65:10

**systems** 23:12

**t**

**tab** 46:25 47:10 50:20 54:12 91:3

**tabbed** 47:3

**tabs** 47:2,8

**take** 6:19 9:6 16:22 18:15 29:21 31:12 37:24 62:18 76:22 81:2,3

**taken** 16:17 26:19 51:11 80:22

**takes** 30:3

**talk** 9:22 32:17 58:12 71:4 78:11 85:9

**talked** 54:1 80:11 85:18

**talking** 26:6 27:10 31:24 44:24 49:7,25 61:12 66:5 72:5,13 73:20 79:5 86:8

**targeted** 32:7

**targeting** 37:3

**tax** 64:23

**tell** 10:9 13:3 16:10 16:20 24:11 49:22 50:7 53:3 76:3 84:7 87:15

**telling** 10:4 65:8

**ten** 11:24 37:21 61:4 61:7 62:4 66:6,6 92:13,18,22,24

**term** 38:18

**terms** 60:25 65:18 72:6 88:24

**terrific** 66:15

**test** 68:3

**testified** 5:1 8:1,7 10:13,15 12:3 15:7 15:23 19:16 24:21 29:23 35:4 39:4,23 40:2 44:4 46:22 50:19 52:15,16 59:6 61:3 70:4 71:18 72:3 75:16 82:13 83:5 85:20 86:11,19 92:13

**testify** 92:16

**testifying** 9:20 40:18

**testimony** 14:9,12 19:24 22:25 23:4,4 23:19 26:17 29:1 33:22 35:6 40:25 52:4 53:18 57:5 60:6 65:11 72:24 73:5 80:22

**tests** 35:21 36:13

**text** 52:1

**thank** 4:25 10:2 17:16 20:18 21:15 22:7 24:22 41:17 42:10,12 45:8,9,13 47:23 69:10 70:23,24 94:20,22 95:1

**thanks** 22:16

**that'd** 66:20

**theoretical** 26:7

**theory** 78:15
**thing** 13:15 19:23
  20:19 21:25 26:5,9
  27:7 33:9 37:25
  52:16 59:6 60:21
  66:23,24 79:11 91:1
**things** 16:14 20:12
  29:2 37:4,17 40:25
  45:5,6,24 47:1,20
  49:16 53:13 56:16
  62:23 64:7 78:17
  81:11,14,17 83:6,15
  87:9,20 89:13
**think** 6:6,8 8:20
  13:24 16:12 17:10
  21:10,24 26:11 27:19
  30:11,17 32:18 33:4
  35:3,15 39:17 45:23
  47:15 49:12,19 50:4
  53:19 54:15 55:19
  58:2,4 62:5 70:18
  73:13 76:21 77:3,16
  80:20 82:21,23 83:19
  83:20,21 85:2 89:6
  90:9 94:18
**thinks** 70:17 88:5
**third** 9:7 48:5,6
  58:16 61:23 62:2
  67:17,19 68:12 87:15
**thorough** 22:4
**thought** 20:22 21:25
  85:1,3
**thousand** 9:13
**thousands** 62:10,10
  62:10
**threatened** 68:15
**threatening** 48:3
**three** 4:8 9:2 17:15
  18:5,23 52:17 58:3
  62:11 67:4 70:8,21
  73:15 74:20
**throw** 44:17
**time** 5:1 6:19 7:22
  8:17 10:10,22 11:7
  11:19 12:20 14:19

15:21 17:2 20:3,23
  23:5 29:1,21 31:2
  32:2 33:23 35:20
  39:10 46:23 48:5
  50:11 56:20 57:7
  62:16 65:13 70:20
  74:1,4 77:10 80:19
  81:12,19 82:13 84:3
  84:20 87:11,25 89:2
  89:3 90:13 94:21
**times** 56:22 65:20
**timing** 8:15
**today** 4:23 6:1 11:15
  11:17 15:5 16:9,21
  16:25 20:4,11 27:10
  45:14 76:3 78:24
  85:20 86:11 88:18
**told** 36:20 62:3 68:22
**tom** 5:13
**top** 63:6 67:18
**trainable** 17:14
**transcript** 6:8 56:17
  81:2 95:10,12 96:6
**transfer** 43:8
**transferred** 44:24
**transmissions** 13:2
**transmittal** 28:24
**transmitting** 42:1
**tried** 23:12
**trier** 21:11
**true** 12:17 20:14
  46:21 92:24 96:6
**try** 10:16 24:24 47:13
**trying** 25:18 30:5
  40:8 76:21 91:4
**turn** 6:22 9:22 22:19
  23:20 27:13 46:5,25
  56:6 62:15
**turned** 55:10 56:10
  59:15,21 66:2,4,6,6,7
  88:15
**turning** 47:22
**twice** 68:18
**two** 8:7 9:13 19:12
  25:16 33:9 35:3

48:14 50:8 51:2 52:6
  53:12 55:24 57:6
  58:2 59:21,22 62:15
  64:7 65:15 67:17
  71:8 73:15 74:19
  80:23
**type** 70:2
**types** 40:2

**u**

**ultimately** 41:12 88:3
**unable** 38:5,9,11,21
  65:21 71:13
**unambiguous** 65:17
**unambiguously** 66:1
**unaware** 19:20 29:23
**unbelievable** 70:1
  84:9
**unclear** 23:15 74:22
**uncomfortable** 86:7
**uncommon** 33:12
**uncontradicted** 60:4
**uncontroverted** 60:5
  60:7 61:18
**undamaged** 23:14
**understand** 22:6
  24:13 25:3 32:3,15
  38:4 44:6,19 51:19
  53:12 54:17 58:7,25
  63:23 65:12 66:21
  78:11 85:12 86:3,6
  91:22 93:3,25
**understanding** 33:6
  33:21 34:2,3 37:19
**understood** 30:16
  41:8 88:12
**undisputed** 60:7
**unduly** 61:17
**unexplained** 12:3,14
**unfavorable** 67:9
**unfortunately** 31:22
**units** 64:18 74:8,16
**unquote** 8:12 70:3
**unreadable** 13:4 23:6
  24:4,10 38:4 41:4

59:23,25
**unreliable** 19:16 60:4
  60:6
**unsuccessful** 38:15
**untie** 59:8
**unusual** 8:21
**usable** 8:10
**use** 7:8 13:24 16:24
  23:7 31:3
**usually** 16:15,16 40:4
  46:4
**utah** 60:19

**v**

**v** 67:18 91:5
**v8** 81:23
**valentine's** 73:25
**valid** 65:2
**value** 16:24 17:25
**various** 14:14 15:24
  48:19 52:25 62:11
  72:9
**vehemently** 75:11
**vehicle** 29:2
**veracity** 24:20
**verbiage** 53:10
**verify** 19:21
**versus** 4:5,16 21:13
  68:12
**victim** 91:12
**village** 1:4 4:5,16,18
  4:22 7:25 26:18,21
  27:5 39:14 42:2,3
  46:8,10 54:21 63:19
  69:15 75:12,21 90:23
  91:25 92:1 93:10
  94:11
**village's** 64:12,18
  74:15
**violate** 71:7
**violated** 50:8
**void** 88:9
**volume** 32:23
**vs** 1:7

**w**

**wait**  9:15 21:22
43:20 48:21,22,22
50:2 53:9,9 63:19
64:14 79:7 95:4
**want**  5:2 8:23 12:19
13:12 17:12 23:17,20
24:14,25 26:15 39:2
46:3 47:14 59:1,2
63:12 67:2 85:9 86:3
86:10 93:5
**wanted**  34:7 83:9
91:1
**wants**  52:24
**war**  58:22
**warranted**  70:19
**way**  8:11,21 10:22
13:3 15:17 16:5
19:14 20:9 31:16
34:9,12 35:7 36:24
38:21 45:6,7 81:19
82:7 83:6 87:18
92:23,23
**ways**  26:7 87:4
**we've**  17:21 81:16
84:9 85:18 87:11
**website**  15:19,20
**weekend**  4:4,9 35:12
35:19 49:17 89:11
90:17 94:25
**weight**  21:12
**weird**  9:24
**went**  13:7 27:11
44:12 49:10 61:24
80:14,25 92:19
**west**  1:11
**westlaw**  91:6
**whoever's**  95:7
**willful**  91:12,13
**windshields**  91:5
**wiped**  79:3
**wish**  17:18
**withdraw**  29:5 30:21

**witness**  3:3 6:17,23
9:1 11:6 17:9,18,23
20:17 24:19 28:5
34:20 39:21 42:9
51:19
**witnesses**  82:11
**wondering**  45:19
**word**  57:21 90:10
**words**  11:14 84:15
**work**  18:15,15,16
35:12 84:3 88:24
90:2
**worked**  35:10 38:8
**working**  9:12 38:15
**worry**  60:1
**worst**  24:8
**wow**  68:23
**writ**  58:14,16
**written**  38:24 58:24
**wrong**  42:21 66:14
87:13,15

**x**

**x**  31:11,12,14,15 32:1
32:4,12,13 44:25

**y**

**yeah**  6:6 8:20 21:24
38:13,21 45:17,21
74:3 78:16 89:8
**year**  16:15,17 32:5
60:18 71:15 80:6
83:1
**years**  15:12,15,19
16:8 18:5,24 32:25
46:16 53:12 57:25
62:11 65:15 67:4
70:8,21 76:20 82:14
82:20 83:3 86:1
**younger**  79:9