# Exhibit C

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
                     Case No. 16-60340-BLOOM/COHEN
 3

 4   UNITED STATES OF AMERICA,)
                              )
 5           Plaintiff,       )
                              )
 6       -v-                  )
                              )
 7   MARCO LAURETI,           )
                              )
 8           Defendant.       )   Fort Lauderdale, Florida
                              )   November 2, 2017
 9   _____)

10

11

12                   EXCERPT TRANSCRIPT OF TRIAL

13              BEFORE THE HONORABLE JAMES I. COHN

14               U.S. DISTRICT JUDGE, AND A JURY

15

16   Appearances:

17
     For the Government:        RANDALL D. KATZ
18                              KAREN STEWART
                                Assistant United States Attorneys
19                              500 East Broward Boulevard
                                Fort Lauderdale, Florida  33394
20
     For the Defendant:         DAVID GARVIN, ESQ.
21                              200 South Biscayne Boulevard
                                Suite 3150
22                              Miami, Florida  33131

23
     Reporter:                  Karl Shires, RMR, FCRR
24   (954) 769-5496             Official Court Reporter
                                299 East Broward Boulevard, # 203G
25                              Fort Lauderdale, Florida  33301
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
1                        I N D E X

2    WITNESS                                        PAGE

3    MARCO ANTONIO LAURETI, DEFENDANT, SWORN ...................3
     DIRECT EXAMINATION BY MR. GARVIN .........................3
4

5

6    EXHIBITS                                    RECEIVED

7    DEFENDANT'S EXHIBIT(S) T .................................9
     DEFENDANT'S EXHIBIT(S) CX ...............................15
8    DEFENDANT'S EXHIBIT(S) BP ...............................64

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Direct - Laureti                    3

```
1                    *    *    *    *    *

2         (Proceedings were had which are not herein transcribed.)

3         (Jury in at 1:30 p.m.)

4              THE COURT:  All right, folks.  Please be seated.

5              Mr. Garvin, you may call your next witness.

6              MR. GARVIN:  Yes, Your Honor.  At this time the

7    defense calls Mr. Laureti to testify.

8              THE COURT:  All right.  Mr. Laureti, if you would

9    please step forward over to the left of the witness stand.

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  Remain standing.  Raise your right hand.

12                MARCO ANTONIO LAURETI, DEFENDANT, SWORN

13             THE COURT:  Would you please be seated.  Please pull

14   your chair up close to the microphone.  If you need to adjust

15   the microphone, feel free to do so.

16             Please state your name and spell your last name for

17   the record.

18             THE WITNESS:  My name is Marco Antonio Laureti.  It's

19   spelled M-A-R-C-O, A-N-T-O-N-I-O.  And last name is

20   L-U-A-R-E-T-I.

21             THE COURT:  Mr. Garvin, you may inquire.

22                        DIRECT EXAMINATION

23   BY MR. GARVIN:

24   Q.  Good afternoon, Mr. Laureti.

25   A.  Good afternoon, Mr. Garvin.
```

Direct - Laureti                    4

```
1              MR. GARVIN:  Good afternoon, ladies and gentlemen.

2   BY MR. GARVIN:

3   Q.  Sir, can you please tell us where you live?

4   A.  I currently live in 17201 Collins Avenue, Sunny Isles

5   Beach, Florida.

6   Q.  And how long have you lived in South Florida, sir?

7   A.  I've been in South Florida since 1976.

8   Q.  And how many years would that be approximately?

9   A.  Uhm --

10  Q.  40 years?

11  A.  40 years.

12  Q.  How old are you, sir?

13  A.  Right now 46, I think.  I'll be 47.

14  Q.  And are you married?

15  A.  I am divorced.

16  Q.  Do you have any children?

17  A.  Three children.

18  Q.  And what are your children's names?

19  A.  My eldest is -- her name is Gianna Laureti.  She is 12.  My

20  middle child is Marco Laureti.  He's 10.  And my smaller one is

21  Angelina Laureti, and she's 7.

22  Q.  And where did you go to school at, sir?

23  A.  I went -- I started in North Beach Elementary School in

24  Miami Beach, then I went to Nautilus Senior High, then I went

25  to Miami Beach Senior High, and then I went to University of
```

1    Miami.

2    Q.  And what is your occupation?

3    A.  Real estate investment banking.

4    Q.  And for the ladies and gentlemen of the jury, could you

5    tell us what that means?

6    A.  What I primarily do is I do structured financing for

7    ground-up development projects or commercial real estate

8    projects.

9    Q.  And can you tell us generally, do you have any extensive

10   experience in residential sales?

11   A.  No.

12   Q.  Sir, I want to talk about the Form 1003, Uniform

13   Residential Loan Application.  Do you know that document?

14   A.  Yes.

15   Q.  In your -- how long have you been a broker?

16   A.  Since 19 -- early 1990s.  Early '90s.

17   Q.  In all of time you've been a licensed broker, how many

18   Uniform Residential Loan Applications have you filled out?

19   A.  I personally haven't filled out any of them.

20   Q.  And, on the other hand, when it comes to commercial

21   transactions, how many commercial transactions have you been

22   involved in?

23   A.  I can't remember the exact number, but over 20, 30.

24   Q.  So tell us, what licenses do you hold?

25   A.  Currently I hold a real estate broker's license.

Direct - Laureti                    6

1   Q.  And have you ever held a mortgage broker's license?

2   A.  Yes.

3   Q.  And how long did you have that license?

4   A.  I had it up until I believe 2010.  I don't recall exactly

5   the date that it expired.

6   Q.  Are you familiar with a company called High Point?

7   A.  Yes.

8   Q.  And can you tell us what kind of business is High Point?

9   A.  High Point was a developer of luxury condos.

10  Q.  And have you had any dealings with High Point?

11  A.  Yes.

12  Q.  And please tell us what your dealings were, if any, with

13  High Point.

14  A.  The principals of High Point hired me to secure a ground-up

15  construction loan for their project.

16  Q.  What was the name of that project?

17  A.  Bellagio.

18  Q.  And the Bellagio project, what kind of project was that?

19  A.  It was a luxury condo.

20  Q.  And how much in financing were the principals of High Point

21  looking for for that project?

22  A.  Over 11 million.

23  Q.  Were you successful in assisting them?

24  A.  Yes.

25  Q.  Please tell the ladies and gentlemen of the jury what, if

Direct - Laureti                    7

1    anything, you accomplished.

2    A.   I obtained a construction loan for High Point Group from a

3    bank out of Naples called Orion Bank.

4    Q.   And did you have anything in writing?

5    A.   Yes.

6    Q.   What did you have in writing?

7    A.   I had a document which in our industry is called an

8    engagement letter.  It's basically a contract for fees.

9    Q.   And what letter, if any, did you get from Orion?

10   A.   I obtained a loan commitment from Orion Bank.

11   Q.   What, if anything, did you do with the loan commitment from

12   Orion Bank?

13   A.   I presented it to the developer, to the High Point Group.

14   Q.   And did you have a written agreement with them?

15   A.   Yes.

16   Q.   And when you presented that, were any monies due to you

17   under that written agreement?

18   A.   Yes.

19   Q.   And how much money was due to you under that written

20   agreement?

21   A.   Approximately $410,000.

22   Q.   Who did you deal with primarily at High Point?

23   A.   Luis D'Agostino.

24   Q.   Did Mr. D'Agostino write you a check for $410,000?

25   A.   No.

Direct - Laureti                            8

1    Q.  What was his position as to whether or not you were owed

2    the money?

3    A.  He was having trouble with his partners, and he told me

4    that he couldn't pay me at the moment, and we kind of had a

5    dispute over the fees.

6    Q.  Did he -- did High Point end up using Orion for the

7    financing?

8    A.  No.

9    Q.  Did they use some other bank?

10   A.  Yes.

11   Q.  Was the document that -- the letter of intent or the loan

12   commitment from Orion used at all by High Point?

13   A.  Yes, High Point basically took my loan commitment that I

14   obtained for them from Orion Bank and shopped the loan

15   commitment to renegotiate better terms with ING Bank.

16   Q.  At the time that they negotiated better terms with ING

17   Bank, was there any exclusivity that you held?

18   A.  Yes, the engagement letter would trigger an exclusivity

19   period for one year upon securing a bona fide loan commitment.

20   Q.  And did you secure a bona fide loan commitment?

21   A.  Yes.

22   Q.  Okay.  Your dispute with Mr. D'Agostino over this, was it

23   resolved at any point?

24   A.  Yes.

25   Q.  And how was it resolved?

```
1    A.  It was resolved through an option to purchase units at 45

2    Hendricks.

3    Q.  And when you say "options," was this some form of

4    agreement?

5    A.  Yes.

6    Q.  Was is it in writing?

7    A.  Yes.

8    Q.  I'm showing you now what has been marked for identification

9    purposes as Defendant's Exhibit T.  Ask if you recognize that

10   document, sir.

11   A.  Yes, I do.

12   Q.  Is that the document that you were just referring to?

13   A.  Yes.

14        MR. GARVIN:  Your Honor, at this time we would move

15   Defense Exhibit T into evidence.

16        MS. STEWART:  No objection.

17        THE COURT:  Defendant's T will be received.

18     (Received in evidence Defendant's Exhibit(s) T.)

19   BY MR. GARVIN:

20   Q.  Sir, I'm showing you a document that says "Option to

21   Purchase" across the top and it says, "this option to purchase

22   agreement".  Is that the document that you were referring to

23   that was the quote/unquote option with High Point?

24   A.  Yes, it was.

25   Q.  Can you explain to the ladies and gentlemen of the jury
```

1   what did this option entitle you to if anything?

2   A.   The option agreement entitled me to purchase one or more

3   units out of the -- from 45 Hendricks.

4   Q.   Was there anything that had to happen before you could

5   purchase a particular unit?

6   A.   Yes, his original buyers had to default on closing.

7   Q.   Were -- how many units were at High Point -- or, excuse me,

8   45 Hendricks condominium?

9   A.   It was a 14 unit mid-rise -- low-rise building.

10  Q.   And ultimately were those units sold before the date of

11  this agreement?

12  A.   I'm sorry.  Can you repeat the question?

13  Q.   Yes.  Let me establish the date of this agreement.

14        Defendant's Exhibit T, does it show dates on it?

15  A.   Yes.

16  Q.   And what is that, sir?

17  A.   30th day of April, 2006.

18  Q.   All right.  Now, you said a few moments ago that in order

19  for you to exercise the option on any unit, the buyer would

20  have to default on the closing.  What does that mean?

21  A.   The building -- the 45 Hendricks condominium was pretty

22  much pre-sold, so there weren't any units available for sale

23  except for the -- I believe it was one of the big penthouses

24  that the developer wanted to keep for himself.

25  Q.   All right.  And were these sold after the construction was

Direct - Laureti                                11

```
 1   complete or before the construction was complete?  How were

 2   they sold?

 3   A.   They were all pretty much sold in preconstruction, before

 4   groundbreaking.

 5   Q.   When they were sold in preconstruction, what happened after

 6   that?  Did the building actually get built?

 7   A.   Yes.

 8   Q.   And was the building delivered on time?

 9   A.   No.

10   Q.   And as a result of the building not being delivered on

11   time, were there any issues with some of the people who had

12   placed the deposit going forward?

13   A.   Yes.

14   Q.   How far behind was the construction of 45 Hendricks?

15   A.   If I recall correctly, it was about a year.

16   Q.   And so ultimately how many units became available for you

17   to exercise the option on it?

18   A.   Four units.

19   Q.   And those four units, did you have sufficient funds of your

20   own to purchase four units at that time?

21   A.   No.

22   Q.   So what, if anything, did you do to try to take advantage

23   of having an option on four units even though you didn't have

24   sufficient funds to buy four units?

25   A.   I went out to the market, I spoke with brokers, and I tried
```

Direct - Laureti                                    12

1    to sell the units to third parties.

2    Q.   And what ultimately happened?

3    A.   I met Felix Mostelac.

4    Q.   How did you meet Felix Mostelac?

5    A.   Through a reputable real estate broker from Miami Beach

6    that dealt in luxury waterfront homes.

7    Q.   And when you met Felix Mostelac, what if any understanding

8    did you have as to the business he was in?

9    A.   He was -- he claimed to be in the oil business.

10   Q.   And did he indicate where he was from?

11   A.   He said he was born in Cuba but he was a Spaniard citizen.

12   Q.   From the referral that you got, when you met Mr. Mostelac,

13   what was your thought process as to who he was?

14   A.   I thought that he was a -- just a businessman.

15   Q.   What, if anything, was discussed about your option with

16   Mr. Mostelac?

17   A.   I spoke to him about the option that I had on these units,

18   and I offered him if he would be interested in purchasing a

19   unit.

20   Q.   And did he agree to purchase a unit?

21   A.   No, he wanted to be part of the option agreement.

22   Q.   Now, explain to the ladies and gentlemen of the jury, how

23   do you make money?  Because you told us that you were owed

24   $400,000, but you took the option instead.  How are you

25   expecting, if you were, to make money with this option?

Direct - Laureti                          13

```
1   A.  I was expecting to at least buy one unit or sell one unit,

2   resell one unit and make the spread because I had an option to

3   buy the units at preconstruction prices from two years ago.

4   Q.  And I'm going to use round numbers.  For the average unit

5   of the four units that became available, what was the

6   approximate preconstruction price from two years before?

7   A.  They ranged anywhere between 900,000 and a million-five.

8   Q.  And what was the appraised value for that same unit in

9   2007?

10  A.  They were -- for the smaller units they were between a

11  million-six and three-million plus.

12  Q.  The three-million plus being what type of unit?

13  A.  The penthouses.

14  Q.  So you used the word "spread."  What did you mean when you

15  said "spread"?

16  A.  I'm sorry.  The spread is if I have the option to purchase

17  a unit for a dollar and it's worth $2, I can make a dollar.

18  Q.  And in this case if you had a unit that was worth

19  preconstruction price a million dollars, what was the

20  approximate spread that you were expecting?

21  A.  A million dollars.

22  Q.  Now, the one thing that you said earlier was you didn't

23  have enough money to buy those four units, correct?

24  A.  That's correct.  Yes.

25  Q.  And did you explain that to Felix Mostelac?
```

Direct - Laureti                                    14

```
 1    A.  Yes.

 2    Q.  And as a result of that what, if anything, occurred between

 3    you and Mr. Mostelac at that time?

 4    A.  Mr. Mostelac offered to purchase into the option,

 5    50 percent of the option.

 6    Q.  And did you accept his offer?

 7    A.  Yes.

 8    Q.  And did he make any representations to you regarding his

 9    ability to find buyers for these units?

10    A.  Yes.

11    Q.  What was that representation?

12    A.  He said he had investors to buy units because he had been

13    involved in flipping units in The Jade at Brickell and some

14    other -- some of the buildings in Brickell Avenue.

15    Q.  Did you ultimately agree to allow him to acquire 50 percent

16    interest in your option agreement?

17    A.  Yes.

18    Q.  Did you enter a written agreement with him to confirm that?

19    A.  Yes, I did.

20    Q.  I'm now showing you what is Defense Exhibit CX and ask you

21    if you recognize that document.

22    A.  Yes, I do.

23    Q.  Is your signature on that document?

24    A.  Yes, it is.

25    Q.  Is that the document that we were just referring to?
```

```
 1    A.  Yes.

 2              MR. GARVIN:  Your Honor, at this time we would move

 3    CX, Defendant's CX in evidence.

 4              THE COURT:  Any objection?

 5              MS. STEWART:  May I see it, Your Honor?

 6              THE COURT:  Yes.

 7              MS. STEWART:  No objection.

 8              THE COURT:  CX will be received.

 9         (Received in evidence Defendant's Exhibit(s) CX.)

10    BY MR. GARVIN:

11    Q.  This document is entitled "Assignment of Option to

12    Purchase."  Is this the document that you were referring to?

13    A.  Yes, it is.

14    Q.  Northview Equities is listed on the document as the

15    assignor.

16    A.  Yes.

17    Q.  Who is Northview Equites?

18    A.  It's one of my companies.

19    Q.  And what amount had Felix Mostelac agreed, if any, to pay

20    for 50 percent of this option?

21    A.  About $182,000.

22    Q.  Is that Mr. Mostelac's signature?

23    A.  Yes.

24    Q.  And it says "American Holding Group, a Florida limited

25    liability company."  What was your understanding of what that
```

```
1   business was?

2   A.   It was -- I believe that was Mr. Mostelac's company.

3   Q.   After this document was signed, what percentage of the

4   option agreement did you own?

5   A.   50 percent.

6   Q.   And what percentage of the option agreement did he own?

7   A.   50 percent.

8   Q.   Now, of the four units, was there an understanding as to

9   all four units or three units or two units?  Was it all four

10  units or was there some other understanding?

11  A.   Three units.

12  Q.   And why?

13  A.   Because I wanted to keep one for myself and my

14  father-in-law.

15  Q.   And did Mostelac agree that the option would be for three

16  units?

17  A.   Yes.

18  Q.   Do you know a person by the name of Galen Frizzie?

19  A.   Yes.

20  Q.   Please tell the ladies and gentlemen of the jury how you

21  first heard of Galen Frizzie.

22  A.   In 2005 I was seeking to -- seeking a home equity line of

23  credit on my home at the time, and I was not being successful

24  applying for that home equity line of credit, and I received a

25  cold call from him and he offered to help me look for that home
```

1    equity line of credit.

2    Q.   What company did Galen Frizzie work with if you know?

3    A.   Gordon Lending.

4    Q.   And what type of occupation was Gordon Lending in, what

5    type of business?

6    A.   They were residential lenders.

7    Q.   And what type of occupation did Galen Frizzie have at

8    Gordon Lending?

9    A.   I believe he was a supervising mortgage broker.

10   Q.   Did you meet Galen Frizzie face to face in 2005?

11   A.   No.

12   Q.   Did you meet Galen Frizzie face to face in 2006?

13   A.   No.

14   Q.   2007?

15   A.   No.

16   Q.   2008?

17   A.   No.

18   Q.   What happened?  You said that you agreed to let him try.

19   So what happened after that?

20   A.   He, he obtained the -- he got me the loan that I was

21   looking for.  It was a $200,000 home equity line of credit.

22   Q.   Did you fill out any loan application for him to do that?

23   A.   No.

24   Q.   Did you send him any records to accomplish that?

25   A.   No.

Direct - Laureti                                        18

1    Q.  What did he tell you, if anything, about his ability to get

2    hard-to-close loans?

3    A.  He represented to me that he was -- Gordon Lending was

4    licensed in 50 states and that they were -- they had a -- they

5    were -- they were actually the lenders and that they had a --

6    what is that called?  It's a -- some sort of preferential

7    treatment with the banks because they had over 50 licenses and

8    they had a lot of volume, so they could get any loan done.

9    Q.  And did they get your loan done?

10   A.  They got my loan done, yes.

11   Q.  I'm showing you now what is in evidence as Defendant's

12   Exhibit AB and ask you if you see the date, Thursday, July 27,

13   2006.  Was that about the time that you were being helped by

14   Mr. Frizzie to close the loan that you just referred to?

15   A.  That, that was actually the second time that I was shopping

16   for a loan because the first time was in last quarter of 2005.

17   This was in the summer of 2006.  So he was, he was getting me a

18   first mortgage refi from Washington Mutual and another second

19   mortgage on that home.

20   Q.  I'm reading -- or can you please read what Galen Frizzie

21   put in his email to Claudine Bryant, the first sentence?

22   A.  "WAMU cannot know about the 2nd".

23   Q.  What does that mean to you now that you're reading that?

24   A.  It means --

25            MS. STEWART:  Objection, Your Honor.  Calls for

 1  speculation.

 2           THE COURT:  As phrased, sustained.

 3  BY MR. GARVIN:

 4  Q.  Mr. Laureti, at the time that this was occurring, did you

 5  ever instruct Mr. Frizzie to withhold information from WAMU?

 6  A.  Absolutely not.

 7  Q.  And did Mr. Frizzie ever tell you that he was withholding

 8  information from WAMU while trying to get or close your loan?

 9  A.  No.

10  Q.  After Mr. Frizzie was successful of getting you a loan, did

11  you ever have occasion to refer Mr. Frizzie any business?

12  A.  Yes.

13  Q.  How much business as far as generating commissions did you

14  refer him if you know?

15  A.  I think I referred him -- I referred him quite a bit of

16  business in 2006, as of 2006.

17  Q.  Well, did there come a time when you asked Mr. Frizzie for

18  a referral fee or to split the commissions?

19  A.  Yes.

20  Q.  And at that time were you a licensed mortgage broker?

21  A.  At that time I had my co- -- I was a licensed mortgage

22  broker and I had a company that was a correspondent lender.

23  Q.  And was there any prohibition to you splitting the

24  commission with him?

25  A.  No.

Direct - Laureti                          20

```
1    Q.  Why didn't you just do it yourself and keep 100 percent?

2    A.  I don't have any -- I wasn't -- my company Northview

3    Capital was, number one, not set up to do residential lending

4    and, number two, I had zero experience on processing and

5    submitting these documents to a lender.

6    Q.  Did you actually have Galen Frizzie even doing your own

7    personal loan?

8    A.  Yes.

9    Q.  In total did you keep track of the total commissions that

10   resulted in the referrals that you gave to Gordon Lending and

11   Galen Frizzie?

12   A.  I, I -- the total for 2007, is that --

13   Q.  No.  Just the total, period.

14   A.  Including 2006?

15   Q.  Yes.

16   A.  Probably $700,000.

17   Q.  And did you get a substantial piece of that as a referral

18   fee?

19   A.  Uhm, I haven't checked what I got in 2006, but in 2007 I

20   received about 190,000.

21   Q.  Okay.  Before -- did there come a time when you used Galen

22   Frizzie for the 45 Hendricks transactions?

23   A.  Yes.

24   Q.  And did those four units end up being purchased from High

25   Point during 2007?
```

1    A.  Yes.

2    Q.  And before the 45 Hendricks, did Mr. Mostelac -- did you

3    have occasion to introduce Galen Frizzie to Mr. Mostelac?

4    A.  Yes.

5    Q.  And, to your knowledge, did Mr. Mostelac and Galen Frizzie

6    have any transactions before the 45 Hendricks --

7    A.  Yes.

8    Q.  -- property?

9            Was one of those transactions a gentleman by the name

10   of Estop?

11   A.  Yes.

12   Q.  In actuality, did Mr. Estop have two transactions before

13   the 45 Hendricks closings?

14   A.  Yes.

15   Q.  And was one of those transactions for 6493 Allison Road?

16   A.  Yes.

17   Q.  Was the other transaction 3701 De Garmo Lane?

18   A.  Yes.

19   Q.  Showing you what is in evidence as Defendant's Exhibit

20   AAAA, and I'm focusing now, sir, on the name of the

21   buyer/borrower.  And can you read that?

22   A.  Yes, I can.

23   Q.  Please tell us what it says.

24   A.  Andrew Estop, a single man.

25   Q.  And can you read the address?

1    A.   6493 Allison Road, Miami Beach, Florida, 33139.

2    Q.   And is this one of the purchases that you just alluded to

3    by Mr. Estop?

4    A.   Yes.

5    Q.   And was this handled by Mr. Frizzie?

6    A.   Yes.

7    Q.   What was the amount of the new loan?  You see it says "new

8    loan"?

9    A.   3,680,000.

10   Q.   Was that document signed in 2007?

11   A.   Yes.

12   Q.   What was the date it was signed?

13   A.   April 9, 2007.

14   Q.   So as of April 9, 2007, Mr. Andrew Estop had acquired a

15   property on Allison Road and with that acquisition incurred how

16   much debt?

17   A.   $3,680,000.

18   Q.   Now, I'm showing you what is in evidence as Defendant's

19   Exhibit AAAB.  What property is that?

20   A.   3701 De Garmo Lane, Miami, Florida.

21   Q.   And was this another property that was purchased by

22   Mr. Andrew Estop?

23   A.   Yes.

24   Q.   Did Mr. Frizzie prepare the loan application for this

25   document?

1   A.   Yes.

2   Q.   And is this document signed in May of 2007?

3   A.   Yes.

4   Q.   So the previous Allison Road document was signed in which

5   month?

6   A.   April.

7   Q.   And this document on De Garmo is signed in which month?

8   A.   March.

9   Q.   Is that a five?

10  A.   Five, yeah.  May.  I'm sorry.  I always confuse the two.

11  Q.   Sir, I'm showing you the liability section of the 1003,

12  Uniform Residential Loan Application, prepared by Mr. Frizzie.

13           Do you see the amounts listed on the document?

14  A.   Yes.

15  Q.   Do you see the total monthly expense?

16  A.   Yes.

17  Q.   What is the total monthly expense listed?

18  A.   $559.

19  Q.   Do you see in the liabilities a column that states "Unpaid

20  Balance"?

21  A.   Yes.

22  Q.   Do you see in that column the $3,680,000 from the mortgage

23  loan on the Allison Avenue property that Mr. Estop purchased

24  the month before in April?

25  A.   No.

Direct - Laureti                                    24

```
1    Q.  At the time that you were dealing with Mr. Frizzie, did you

2    know that the Uniform Residential Loan Application that he

3    prepared for Mr. Estop understated liabilities by $3,680,000?

4    A.  No, I did not know that.

5    Q.  Now, did there come a time when Mr. Mostelac -- well, let

6    me back up.

7           Did you have any involvement in the Estop loan?

8    A.  No.

9    Q.  Did there come a time when Mr. Mostelac purchased an

10   apartment at Sunset Harbour?

11   A.  Yes.

12   Q.  And do you know if the person who processed that loan

13   application, who that was?

14   A.  Galen Frizzie.

15   Q.  I'm showing you now what is in evidence as the HUD-1

16   identified as Defendant's Exhibit IT.  Do you recognize this

17   document, sir?

18   A.  It's a HUD-1.

19   Q.  And it's a HUD-1 for whom?

20   A.  Felix Mostelac.

21   Q.  And what is the address?

22   A.  1800 Sunset Harbour Drive, TS-3, Miami Beach.

23   Q.  Did you ever visit that address with Mr. Mostelac?

24   A.  Not that I remember.

25   Q.  The purchase price was what?
```

1    A.   6,500,000.

2    Q.   This document, did you have any interest in the proceeds

3    other than your referral fee, if any, from Galen Frizzie for

4    the brokerage fees?

5    A.   No.

6    Q.   On this document, sir, do you see an amount here for escrow

7    hold back/home improvements?

8    A.   Yes.

9    Q.   Did you have any interest in that amount of 3,150,000?

10   A.   No.

11   Q.   Did you even know about that amount at the time?

12   A.   No.

13   Q.   Were you at Mr. Mostelac's closing?

14   A.   No.

15   Q.   Did you have any agreement with Mr. Mostelac regarding his

16   purchase of that Sunset Harbour apartment to defraud any bank?

17   A.   No.

18   Q.   Did you have any agreement with Galen Frizzie to --

19   A.   No.

20   Q.   -- defraud WAMU by supplying false documents?

21   A.   No.

22   Q.   Did you ever supply Galen Frizzie false documents?

23   A.   No.

24   Q.   What about Michelle Cabrera?

25        Let me back up.  Who introduced you to Michelle

```
 1    Cabrera?

 2    A.   Felix Mostelac.

 3    Q.   Had -- did you know anything about Michelle Cabrera doing

 4    that HUD-1 for 1800 Sunset Harbour for Mr. Mostelac?

 5    A.   No.

 6    Q.   At that time, back in June of 2007, did you know that

 7    Mr. Mostelac used -- one way or the other did you know that he

 8    did or did not use any part of that $3,150,000 as cash to

 9    close?

10    A.   No, I did not.

11    Q.   Sir, at this time I would like to turn to a gentleman by

12    the name of Hector Corzo.  Do you recognize that name?

13    A.   Yes.

14    Q.   Did you see Mr. Corzo in this courtroom?

15    A.   Yes, I did.

16    Q.   Had you ever seen Mr. Corzo socially on the streets before

17    this case started?

18    A.   No.

19    Q.   Now, did you recognize the name Corzo as being one of

20    Mr. Mostelac's buyers or investors?

21    A.   Yes.

22    Q.   But did you have any reason to talk to Mr. Corzo about his

23    finances or his job, anything that would relate to money back

24    in June of 2007?

25    A.   No.
```

1   Q.   I'm going to show you what is in evidence as Defendant's

2   HK.   Do you recognize this document?

3   A.   Yes.

4   Q.   Can you read to the ladies and gentlemen of the jury what

5   the title of this document is?

6   A.   "Gordon Lending Corporation, Uniform Residential Loan

7   Application."

8   Q.   And who did Mr. Frizzie work for at the time?

9   A.   Gordon Lending Corporation.

10  Q.   Now, I want to show you some fax information at the top.

11  Do you see that, sir?

12  A.   Yes.

13  Q.   Do you see the fax number there that says 978 -- I'm going

14  to enlarge it a little bit to see if that helps us.   978-769 --

15  I can't read the number one.   It is either a 0 or a 5, 233.   Do

16  you see that number?

17  A.   Yes.

18  Q.   Are you familiar with whose number that is?

19  A.   Galen Frizzie's fax number.

20  Q.   Now, did you have anything to do with the loan application

21  of Hector Corzo?

22  A.   No.

23  Q.   And I want to show you the name Hector Corzo.   Do you see

24  it, sir?

25  A.   Yes.

Direct - Laureti                                    28

```
1    Q.   Now, when you introduced Galen Frizzie to Mr. Mostelac,

2    what language was Mr. Mostelac fluent in?

3    A.   Spanish.

4    Q.   And what language was Mr. Frizzie fluent in?

5    A.   English.

6    Q.   And did there ever come a time when Mr. Frizzie raised that

7    issue with you?

8    A.   Yes.

9    Q.   And what, if anything, did he say to you about it, about

10   the fact that Mr. Mostelac was fluent in Spanish?

11   A.   If I could translate.

12   Q.   And did you translate?

13   A.   Yes.

14   Q.   When Mr. Frizzie needed to request a document from

15   Mr. Mostelac or one of Mr. Mostelac's buyers, what, if

16   anything, was your involvement?

17   A.   Translating.

18   Q.   Did you receive documents from Mr. Mostelac or his buyers

19   and then turn around and forward those documents to

20   Mr. Frizzie?

21   A.   No.

22   Q.   This fax number or fax indication at the top, is that

23   yours?

24   A.   No.

25   Q.   I'm showing you what is reported as the monthly income of
```

Direct - Laureti                              29

```
 1   Hector Corzo, and it over -- although it's very poorly --

 2   barely legible.  It appears to be over $35,000 a month.  Do you

 3   see that?

 4   A.  Yes.

 5   Q.  Did you ever see this 1003?

 6   A.  No.

 7   Q.  Would you have had any knowledge as to what Mr. Corzo's

 8   true income was at that time?

 9   A.  No.

10   Q.  If Mr. Frizzie put that on there, was the source of that

11   information you?

12   A.  No.

13   Q.  Sir, did you go to the closing of Mr. Corzo?

14   A.  No.

15   Q.  And do you know where the closing of Mr. Corzo occurred?

16   A.  No.

17   Q.  Did you ever sit in the apartment of Mr. Mostelac for

18   several hours waiting for Michelle Cabrera to come to do a

19   closing for Mr. Corzo at Michelle Cabrera's -- or, excuse me,

20   with Michelle Cabrera?

21   A.  No.

22   Q.  I'm focusing your attention on June 25th of 2007 at

23   5 o'clock, approximately, as the closing time.

24         Where were you?  Did -- have you tried to determine

25   where you were at that time?
```

```
1   A.   Yes, I was in my home office in Miami Beach.

2   Q.   Have you looked at your telephone records?

3   A.   Yes.

4   Q.   Do you have incoming calls from these people, meaning

5   either Galen Frizzie, Felix Mostelac, or Michelle Cabrera,

6   about that time?

7   A.   Yes.

8   Q.   And what did that, if anything, indicate to you?

9   A.   That I was not present at that closing.

10  Q.   And that's consistent with your recollection?

11  A.   Yes.

12  Q.   Have you ever told Mr. Corzo that he was a straw buyer?

13  A.   No.

14  Q.   I'm going to show you what is in evidence as Defendant's

15  Exhibit HJ.  Do you see that?

16  A.   Yes.

17  Q.   You see that the name of the buyer is Hector Corzo?

18  A.   Yes, I do.

19  Q.   And the name of the seller is High Point?

20  A.   Yes.

21  Q.   And the name of the settlement agent is Florida Elite Title

22  & Escrow.  Do you see that?

23  A.   Yes.

24  Q.   And who is the owner of Florida Elite Title & Escrow?

25  A.   Michelle Cabrera.
```

1  Q.  And please tell me, where does this document say that the

2  closing took place?  Where did the settlement take place?

3  A.  4801 South University Drive, Suite 125, Davie, Florida,

4  33328.

5  Q.  And is this document dated on June 25, 2007, at

6  approximately 4:57 p.m.?

7  A.  Yes.

8  Q.  Are you familiar with Davie, Florida, and in particular

9  University Drive?

10  A.  Not too much.

11  Q.  Do you know where in South Florida that generally is

12  located?

13  A.  A little north of -- northwest of Miami-Dade.

14  Q.  And how far would that be driving under normal

15  circumstances with no traffic to get from there to South Beach

16  where Felix Mostelac purchased the condo at Sunset Harbour?

17  A.  45 minutes to an hour.

18  Q.  And at 5 o'clock in the afternoon dead in the middle of

19  rush-hour traffic how long would it be?

20  A.  Probably an hour and a half to two hours.

21  Q.  Sir, if this document was printed on June 25, 2007, at

22  4:57 p.m., could there have been a closing at Mostelac's at

23  5 o'clock?

24  A.  No.

25  Q.  If Mr. Mostelac -- or, excuse me, if Mr. Corzo stated that

 1   he recalled or believed that he saw you ten years ago at the

 2   closing at Mostelac -- and that the closing was at Mostelac's

 3   apartment, would that based on your knowledge be correct or

 4   incorrect?

 5   A.  Incorrect.

 6   Q.  Now, I had just showed you the closing statement for that

 7   document.  Let me rephrase that.

 8        I just showed you the closing statement for that piece

 9   of property.  Do you know if there was an amount for the cash

10   to close?

11   A.  Yes.

12   Q.  I'm showing you again so the ladies and gentlemen of the

13   jury have the benefit of the actual document.

14        Was there approximately $143,417.08 necessary cash to

15   close?

16   A.  Yes.

17   Q.  Do you have any knowledge as to whether or not Mr. Mostelac

18   paid that amount?

19   A.  No.

20   Q.  However, we look at the amount that's listed here, one for

21   American Holdings and one for Northview Equities.  Do you see

22   that, sir?

23   A.  Yes.

24   Q.  Why is your company on Mr. Corzo's HUD-1 to your knowledge?

25   A.  The assignment fees due to me on the sale of the unit.

Direct - Laureti                               33

```
 1   Q.  And when you say "the assignment fee," are you referring to

 2   your option that you held on this property?

 3   A.  Yes.

 4   Q.  And were you charging an assignment fee for not exercising

 5   that option and letting a third party purchase it?

 6   A.  Yes.

 7   Q.  In this case your 50 percent -- you're talking about

 8   50 percent ownership; is that correct?

 9   A.  I'm sorry.  50 percent ownership of?

10   Q.  Of the assignment.

11   A.  Yes.

12   Q.  Of the option.  Is that right?

13   A.  Yes.

14   Q.  So the amount of 243,791 and some change, what does that

15   represent?

16   A.  Option monies.  Assignment fees.

17   Q.  Okay.  Now, you see that American Holdings, that's

18   Mostelac's company, correct?

19   A.  Yes.

20   Q.  And the amount for them is higher, right?

21   A.  Yes.

22   Q.  But if you take out of that amount the cash to close,

23   did -- built into this number is part of that number the

24   50 percent option fee?

25   A.  Yes.
```

```
1    Q.  Did you ever agree to defraud the bank with regard to the

2    Corzo closing?

3    A.  Absolutely not.

4    Q.  Did you ever agree to defraud the bank by agreeing for

5    Mr. Frizzie to write down the wrong amounts of income on the

6    Uniform Residential Loan Application, Form 1003, for Mr. Corzo?

7    A.  No.

8    Q.  Did you agree with Mr. Mostelac to defraud the bank?

9    A.  No.

10   Q.  And finally, did you agree with Michelle Cabrera to defraud

11   the bank?

12   A.  No.

13   Q.  I now want to talk about Mr. Jorge De La Cruz.  Is that

14   name familiar with you?

15   A.  Yes.

16   Q.  Why is that name familiar with you?

17   A.  He was my father-in-law.

18   Q.  And, sir, during that period of time did you own a

19   newspaper?

20   A.  Yes.

21   Q.  What was the name of that newspaper?

22   A.  El Popular.

23   Q.  And during that period of time what, if anything -- what,

24   if any, involvement did Mr. Cruz have with El Popular?

25   A.  He would help out with managing the circulation, the people
```

1    that were doing the distribution of the newspapers.

2    Q.   And how was your relationship with him during this period

3    of time?

4    A.   My relationship with my father-in-law has always been up

5    and down.

6    Q.   And why is that, sir?

7    A.   You know, he's set in his ways and he -- he came here from

8    Cuba at a later time in his life, and he is set in his way of

9    doing things with his ideas from Cuba.

10   Q.   And did you have any periods of time where you did not talk

11   to each other during this time frame?

12   A.   No, not in 2007.  No.

13   Q.   All right.  Did you pay him when he worked for your company

14   or helped at your company?

15   A.   It depends on the time frame, on what years.

16   Q.   In 2007.

17   A.   2007, no.

18   Q.   And did he at some point in time purchase a unit at 45

19   Hendricks?

20   A.   Yes.

21   Q.   Now, was this unit included in the agreement with Mr. Felix

22   Mostelac, that is, the 50/50 split?

23   A.   No.

24   Q.   And tell me how it is that a person who's helping you with

25   a newspaper who's being paid little or nothing is buying a unit

Direct - Laureti                                    36

```
 1    on the water off of Las Olas Boulevard here in Fort Lauderdale?

 2    A.  Because the, the loan -- the loan amount was a very low

 3    loan-to-value.

 4    Q.  Were you actively assisting Mr. De La Cruz in this

 5    purchase?

 6    A.  Yes, it was for the family, the apartment.

 7    Q.  And I'm going to show you what's in evidence as Defendant's

 8    IR.  Do you recognize that as being -- well, I'll ask you.

 9    What is it?

10    A.  That is a Gordon Lending Corporation Uniform Residential

11    Loan Application.

12    Q.  And who is it for?

13    A.  That is for Jorge De La Cruz.

14    Q.  Did you -- tell us how much monthly income -- well, first

15    of all, who prepared the 1003?

16    A.  Galen Frizzie.

17    Q.  And how much income monthly did Galen Frizzie list for your

18    father-in-law?

19    A.  49,000.

20    Q.  Is there any way in the world that that could be correct?

21    A.  No.

22    Q.  And, sir, did you supply that information to Galen Frizzie?

23    A.  Absolutely not.

24    Q.  And is this Galen Frizzie's signature on the 1003 form?

25    A.  Yes.
```

Direct - Laureti                                    37

```
 1    Q.  Did you ever see this document, the 1003, before the

 2    closing?

 3    A.  No.

 4    Q.  Now, Mr. De La Cruz did close on the transaction; is that

 5    correct?

 6    A.  Yes.

 7    Q.  And when you saw the HUD-1, what was the amount that he

 8    owed as cash to close?

 9    A.  I believe it was 596,000, approximately.

10    Q.  I'm showing you what's in evidence as Defendant's IL and

11    I'm showing you the cash to close.

12            Where was that money coming from, the cash to close?

13    A.  From me.

14    Q.  And did you have an opportunity to discuss -- well, first,

15    did you expect repayment of this money or was this money

16    intended to be a gift?

17    A.  I did not expect repayment and it was intended to be a

18    gift.

19    Q.  Did you discuss that with either Mr. Frizzie or with

20    Michelle Cabrera?

21    A.  With both of them.

22    Q.  What, if anything -- or let's back up.

23            Why would you discuss it with both of them?

24    A.  So they knew that I was putting the down payment.

25    Q.  And who had more experience in residential loans, you or
```

Direct - Laureti                          38

1    Mr. Frizzie?

2    A.   Frizzie.

3    Q.   And who had more experience in closing residential loans,

4    you or Michelle Cabrera?

5    A.   Michelle Cabrera.

6    Q.   When you asked them, did they give you a reply?

7    A.   Yes.

8    Q.   And did you reply -- did you rely upon their reply?

9    A.   I did, yes.

10   Q.   And did you disclose to them all of the facts?

11   A.   Yes.

12   Q.   Did you withhold any information from them regarding this

13   loan?

14   A.   No.

15   Q.   What was the reply from each of them as to whether or not

16   you can gift the money to your father-in-law to close this

17   deal?

18           MS. STEWART:   Objection, Your Honor.   Calls for a

19   hearsay.

20           THE COURT:   Do you wish to be heard sidebar?

21           MR. GARVIN:   Yes, Your Honor.

22       (The following proceedings were held at the bench:)

23           MR. GARVIN:   It goes to the intent and good faith

24   reliance, and you have to establish what he was told in order

25   to determine whether he had the intent to commit fraud or

Direct - Laureti                        39

```
 1   whether he had the intent for good faith reliance.  I'm not
 2   trying to establish that their advice was correct.  I'm only
 3   establishing that they made the statement.
 4          Now that we are here in trial, of course the issue has
 5   been made as to whether or not you can make a gift, although I
 6   believe their experts said you can, it just depends how you
 7   disclose it.
 8          So the point is, Your Honor, it is not hearsay.  I am
 9   not trying to prove that what he was doing was correct.  I am
10   trying to prove that they rendered an opinion and he in good
11   faith relied upon it.
12          MS. STEWART:  Your Honor, I think he's right.
13          THE COURT:  Okay.
14          MS. STEWART:  I withdraw it.
15          THE COURT:  Okay.  Your objection is withdrawn.
16       (The following proceedings were held in open court:)
17   BY MR. GARVIN:
18   Q.  I was asking you, sir, what did Galen Frizzie reply when
19   you gave him that information?
20   A.  That it was fine.
21   Q.  And what did Michelle Cabrera reply?
22   A.  That it was fine.
23   Q.  And did you rely upon their superior knowledge?
24   A.  Yes.
25   Q.  And did you go forward in good faith with the transaction?
```

Direct - Laureti                    40

```
 1   A.   Yes.
 2   Q.   Now, I'm showing you IL again.  There we go.  And I want to
 3   draw your attention to Northview Equities and the 955.  You see
 4   that?
 5   A.   Yes.
 6   Q.   Earlier you had told the ladies and gentlemen of the jury
 7   that with regard to the option there's this thing called the
 8   spread, right?
 9   A.   Yes.
10   Q.   Now, when we see this document and we see Northview
11   Equities with that amount, what does that represent?
12   A.   The spread.
13   Q.   Now, please notice that above Line 506 there's a Line 505
14   that says "Payoff of Second Mortgage."
15        Did you ever represent to anyone that Northview
16   Equities' position was a mortgage?
17   A.   No.
18   Q.   Did you ever give a payoff letter to Michelle Cabrera
19   stating that there was a certain amount due on your mortgage?
20   A.   No.
21   Q.   So going back to this amount, the spread of 955,000, did
22   you have other funds available to you to make the cash to close
23   payment without having to utilize the $955,000 of your spread
24   money?
25   A.   Yes, I did.
```

Direct - Laureti                          41

```
 1    Q.  With regard to the spread money being on the face of the

 2    HUD-1, did Michelle Cabrera tell you that there was any type of

 3    restriction on you using that $955,000?

 4    A.  No.

 5    Q.  I'm now showing you what's in evidence as Defendant's

 6    Exhibit EL.  And can you read what this is, sir?

 7    A.  It's a request for verification of employment.

 8    Q.  And did you receive this as the De La Cruz closing or loan

 9    was being processed?

10    A.  I did.

11    Q.  And does it have a date?

12    A.  Yes, it's 5/17/2007.

13    Q.  And is that your signature?

14    A.  Yes.

15    Q.  Now, did you verify -- what did you verify with this

16    document?

17    A.  I verified that my father-in-law worked in my company.

18    Q.  And is that his name right there --

19    A.  Yes.

20    Q.  -- Jorge De La Cruz?

21    A.  Yes.

22    Q.  What amount did you say he made?

23    A.  Zero.

24    Q.  Now, during that period of time did Mr. De La Cruz have any

25    other jobs?
```

Direct - Laureti                          42

1    A.  Yes.

2    Q.  And do you know what kind of job that was?

3    A.  He was head of security at a hospital.  I think it was a

4    hospital.

5    Q.  I'm going to show you what is in evidence as Defendant's

6    FA.  You see that?

7    A.  Yes.

8    Q.  And do you see Mr. Jorge De La Cruz's name on this

9    document?

10   A.  I do.

11   Q.  And I'm going to show you this document came from the

12   bank's loan file records.  Do you see that?

13   A.  Yes.

14   Q.  Do you see the loan number?

15   A.  Yes.

16   Q.  And do you see who's the borrower?

17   A.  Jorge De La Cruz.

18   Q.  And what is the total annual income reflected to the bank?

19   A.  6,000 per year.

20   Q.  Mr. Laureti, did you ever represent to anyone connected

21   with this loan application that your father-in-law was making

22   more than $6,000 a year?

23   A.  No, not even the 6,000 I represented.

24   Q.  With regard to this transaction, did you agree to assist

25   anyone in committing wire fraud or mail fraud or bank fraud?

Direct - Laureti                                    43

1  A.  Absolutely not.

2  Q.  Did you have any agreement to do anything illegal or

3  improper with Galen Frizzie?

4  A.  No.

5  Q.  Did you know what Galen Frizzie was putting on the Uniform

6  Loan Applications?

7  A.  I did not.

8  Q.  Did you ever sign a document for your father-in-law at the

9  closing?

10 A.  No.

11 Q.  Were you present at the closing?

12 A.  Yes.

13 Q.  Did you observe how Michelle Cabrera conducts a closing

14 while you were at the closing of your father-in-law?

15 A.  Yes.

16 Q.  Can you describe what you observed?

17 A.  Just like pretty much like any other closing.  They put a

18 stack of papers in front of you with sign it, sign it, sign

19 here stickies, and you just sign and move on.

20 Q.  Did you even look at those documents?

21 A.  No.

22 Q.  Why didn't you look at the documents?

23 A.  I, I had been doing business with Galen for over a year or

24 two years and I didn't have any reason to suspect that anything

25 would be wrong with them.

```
 1   Q.   Did you ever ask Mr. Frizzie to withhold any information

 2   from WAMU?

 3   A.   No.

 4   Q.   Okay.   I would like to turn to the Eneida Ramirez closing.

 5           THE COURT:   Why don't we take a break at this point.

 6           MR. GARVIN:   Yes, sir.

 7           THE COURT:   Folks --

 8           THE JUROR:   Thank you.

 9           THE COURT:   You're welcome.

10           We'll take a 15-minute break.   Remember, do not

11   discuss the case, continue to keep an open mind.

12       (Jury out at 2:44 p.m.)

13       (Call to Order of the Court.)

14           THE COURT:   All right.   The record will reflect that

15   Mr. Laureti is present, represented by counsel.

16           Let's bring in the jury, please.

17       (Jury in at 2:59 p.m.)

18           THE COURT:   All right, folks.   Please be seated.

19           Mr. Laureti, I remind you that you're still under

20   oath.

21           We will continue with direct examination by

22   Mr. Garvin.

23           THE WITNESS:   Yes, sir.

24   BY MR. GARVIN:

25   Q.   Mr. Laureti, I would like to change now to the person known
```

```
1    as Eneida Ramirez.
2            Did you know Eneida Ramirez before this case started?
3    A.  No.
4    Q.  And had you ever spoken to Eneida Ramirez up until the time
5    that she testified in this case?
6    A.  No.
7    Q.  Had you ever been at a closing with Ms. Eneida Ramirez at
8    any time?
9    A.  No.
10   Q.  So Ms. Eneida Ramirez was one of the purchasers of 45
11   Hendricks; is that correct?
12   A.  Yes.
13   Q.  And was Ms. Eneida Ramirez viewed as one of Mr. Mostelac's
14   clients?
15   A.  Yes.
16   Q.  I'm going to show you what is in evidence as Defendant's
17   PH, ask if you recognize this document once I zoom it out.
18   What type of document is it?
19   A.  It's a Gordon Lending Corporation Uniform Residential Loan
20   Application.
21   Q.  And does this document relate to Ms. Ramirez, Eneida
22   Ramirez?
23   A.  Yes.
24   Q.  Now, this Gordon Lending loan documentation relates to what
25   piece of property?
```

Direct - Laureti                            46

1   A.   45 Hendricks Isle, Penthouse F.

2   Q.   Before Eneida Ramirez acquired this property, did Galen

3   Frizzie represent Eneida Ramirez on another piece of property?

4   A.   Yes, he did.

5   Q.   And what was that unit called?

6   A.   I believe it was The Mark condominium.

7   Q.   And what unit was it?

8   A.   1903.

9   Q.   And what was the amount of debt accumulated from that

10  closing?

11  A.   I believe it was $762,000.

12  Q.   I am now showing you PH.  Do you see that this document is

13  signed?

14  A.   Yes.

15  Q.   And what date?

16  A.   7/20/07.

17  Q.   And do you see an indication as to who the interviewer was

18  that filled out this 1003?

19  A.   Galen Frizzie.

20  Q.   And is there also an indication as to how he received this

21  supporting documentation?

22  A.   By mail.

23  Q.   Did you mail any supporting documentation to Galen Frizzie

24  regarding this 1003?

25  A.   No.

1    Q.   Regarding Eneida Ramirez in general?

2    A.   No.

3    Q.   I'm now showing you the liability page of the 1003.  Do you

4    see that?

5    A.   Yes.

6    Q.   I'm going to zoom out just a little bit and manipulate

7    that.

8         What is the total amount of the liabilities that Galen

9    Frizzie listed on Eneida Ramirez's 1003?

10   A.   $150,108.

11   Q.   Approximately 150 or 160,000; is that correct?

12   A.   It looks -- yeah, it looks like a six.

13   Q.   And did Galen Frizzie list the $642,000 liability from The

14   Mark, Condominium 1903?

15   A.   No, he did not.

16   Q.   And are you certain that Mr. Frizzie did the 1003 for that

17   purchase also?

18   A.   That's what the interviewer's name is on the application,

19   yes.

20   Q.   And is this the same thing that he did in the Estop case?

21   A.   Yes.

22   Q.   Did you know that one of the buyers that you were going to

23   charge an option spread on, that their 1003 was false?

24   A.   No, I did not know that.

25   Q.   What about the monthly income for Eneida Ramirez, can we

1   read what it is?

2   A.  It seems like it says 91,982.01.

3   Q.  Did you supply that information to Mr. Galen Frizzie?

4   A.  No.

5   Q.  Did you see this 1003 at any time?

6   A.  No.

7   Q.  Did you ever sign this 1003 or any other 1003 for Eneida

8   Ramirez?

9   A.  No.

10  Q.  Had you known that the 1003 for Eneida Ramirez was false,

11  would you have gone through with the closing?

12  A.  No.

13  Q.  I want to show you in the asset section of Eneida Ramirez.

14  Do you see that, sir?

15  A.  Yes.

16  Q.  Can you please read to the ladies and gentlemen of the jury

17  what is the amount of the market value of that asset?

18  A.  $320,000.

19  Q.  And what is the address of that asset?

20  A.  754 West 44th Place.

21  Q.  Now, sir, in preparation for this case did you see that

22  same address on another 1003 prepared by Mr. Galen Frizzie?

23  A.  Yes, I did.

24  Q.  And whose 1003 would that have been?

25  A.  Pedro Melian's.

Direct - Laureti                                   49

```
1    Q.  And who is Pedro Melian in relation to Eneida Ramirez?

2    A.  He's Mrs. Ramirez's son.

3    Q.  And what amount did Galen Frizzie put for the present value

4    of the same property on Pedro Melian's 1003?

5    A.  700,000.

6    Q.  Is that more than double the amount that was placed on

7    Eneida Ramirez's 1003?

8    A.  Yes.

9    Q.  Sir, I'm now showing you what's in evidence as Defendant's

10   Exhibit PV.  I ask if you recognize this document once I zoom

11   it out.  Do you recognize the type of document?

12   A.  Yes.

13   Q.  And what type of document is it?

14   A.  It's a Settlement Statement.

15   Q.  And who is the purchaser listed on this Settlement

16   Statement?

17   A.  Ms. Eneida Ramirez.

18   Q.  And for what piece of property?

19   A.  45 Hendricks Isle, Unit Penthouse F.

20   Q.  And what is the purchase price?

21   A.  Three million-eight.

22   Q.  And on this document I'm showing you Line 505.  Can you

23   read Line 505?

24   A.  Yes.  It says, payoff of second mortgage loan.

25   Q.  And what amount does it reflect?
```

1    A.   1,683,381.

2    Q.   Again, were you physically at the Eneida Ramirez closing?

3    A.   No.

4    Q.   And who prepared the HUD-1 for Eneida Ramirez?

5    A.   Michelle Cabrera.

6    Q.   Did you ever tell Michelle Cabrera that you had a second

7    mortgage loan against the Penthouse F of 45 Hendricks?

8    A.   Absolutely not.

9    Q.   Did you ever authorize Michelle Cabrera to falsely put on a

10   HUD-1 that you did have a second mortgage loan?

11   A.   Absolutely not.

12   Q.   Sir, where is your option spread on this form?

13   A.   She placed it on Line 505.

14   Q.   Where is Mr. Mostelac's option spread on this form?

15   A.   It's no longer there.

16   Q.   So was this the first time that a HUD was made in which

17   Mr. Mostelac's option spread is no longer on the HUD at all?

18   A.   Yes.

19   Q.   And did you authorize that all of the money would be put

20   under your name?

21   A.   No.

22   Q.   Did that money, in fact, get wired to you?

23   A.   Yes.

24   Q.   And did you know that it was being wired to you before it

25   actually got wired?

Direct - Laureti                              51

```
 1   A.  I'm sorry.  Could you --

 2   Q.  Did you know that Michelle Cabrera was going to wire that

 3   money to you before it was actually wired?

 4   A.  No.

 5   Q.  I'm showing you now what is in evidence as Defendant's

 6   Exhibit PE.  Is this a Northview Equities letterhead?

 7   A.  No.

 8   Q.  Is the document that I am showing you as PE, is that

 9   document a payoff letter that was prepared by you?

10   A.  No.

11   Q.  Is that your signature on this document?

12   A.  No.

13   Q.  However, does this document state that there is a loan

14   payoff amount of $1,663,381.50?  Does that document say that?

15   A.  Yes, it does.

16   Q.  And is that amount equal to or is it greater than your

17   option spread and Mr. Mostelac's option spread combined?

18   A.  It's equal to.

19   Q.  I'm going to go over the numbers with you.

20           The amount that is there is equal to the amount that's

21   on the HUD-1; is that correct.

22   A.  Yes.

23   Q.  But is that amount greater than the option spread itself?

24   A.  Yes.

25   Q.  Let's go back to PE.  First of all, was there any loan in
```

```
 1   existence on Penthouse F that was due to Northview Equities or

 2   to you?

 3   A.  No.

 4   Q.  Did you authorize anyone to prepare this letter?

 5   A.  No, I did not.

 6   Q.  Did you authorize anyone to sign your signature?

 7   A.  No.

 8   Q.  This document was found in the files of Florida Elite Title

 9   & Escrow owned by Michelle Cabrera.  You understand that?

10   A.  Yes.

11   Q.  Did you authorize anyone at Florida Elite Title & Escrow to

12   prepare this document?

13   A.  I did not.

14   Q.  When was first time that you ever laid eyes on this

15   document?

16   A.  As a result of this case.

17   Q.  I'm now flipping it over so that you can see the fax that

18   is on this document.

19         Do you see the purported fax number that the document

20   came from?

21   A.  Yes.

22   Q.  Please read to the ladies and gentlemen of the jury the

23   name of the company that it purportedly came from.

24   A.  Bay Title Company.

25   Q.  Did you have an occasion to go through the entire Bay Title
```

1    Company file on this transaction?

2    A.   Yes.

3    Q.   And is this document in that file?

4    A.   No.

5    Q.   When you discovered that your account had just been wired

6    $1,663,000 -- actually, $1,683,000, did you have an opportunity

7    to discuss this with Michelle Cabrera?

8    A.   Yes.

9    Q.   Please tell the ladies and gentlemen of the jury what

10   happened when you talked to her.

11   A.   I asked her, I asked her why she wired all of the monies to

12   me and she left out Mostelac, and she said that that's what --

13   that he instructed her to do that.

14   Q.   And were you okay with that?

15   A.   Not really.

16   Q.   And what, if anything, did she tell you regarding the

17   amount that you had?  Let me go back.

18          Did you have more money than you were entitled to

19   pursuant to your option spread?

20   A.   Yes.

21   Q.   So what, if any, discussion did you have about this excess

22   money?

23   A.   I asked her if this was approved, and she told me that this

24   HUD was approved by the bank.

25   Q.   What did you do with the money?

Direct - Laureti                                    54

```
1    A.  I purchased a cashier's check and I gave it back to her.

2    Q.  And what about Mr. Mostelac?

3    A.  I actually gave it to him, and I wired him -- I'm sorry.

4    What about Mr. Mostelac?

5    Q.  Did you give her all of the money or did you give

6    Mr. Mostelac any of the money?

7    A.  I gave Mr. Mostelac the money.  I wired him money.  And I

8    purchased a cashier's check, and I gave him the cashier's

9    check.

10   Q.  So Mr. Mostelac got some money by wire; is that correct?

11   A.  Yes.

12   Q.  And what was that money for?

13   A.  For the option.

14   Q.  His 50 percent option?

15   A.  Yes.

16   Q.  Okay.  With your option spread and his option spread, was

17   there still money left over that she wired to you?

18   A.  Yes.

19   Q.  And what did you do with that money?

20   A.  I -- there was money left over that was going towards the

21   build-out of the apartments.

22   Q.  What did you do with the money?

23   A.  I wired -- I believe I wired 50,000 to Melian's Investment

24   Group.

25   Q.  From Eneida Ramirez?
```

1    A.   Yes.

2    Q.   And did you return any of the money to Michelle Cabrera?

3    A.   Yes.

4    Q.   Now, let's talk the $50,000 that went to Pedro Melian.

5              Why are you giving Pedro Melian $50,000?

6    A.   Because I was told that they would be handling the

7    build-out of that penthouse.

8    Q.   Please describe to the ladies and gentlemen of the jury

9    what the inside of that penthouse looked like at that time.

10   A.   The penthouse -- all of the -- pretty much all of the

11   apartments were lacking flooring, light fixtures, closet

12   build-outs.  These were decorator-ready apartments.  They were

13   not built-out.  They had the kitchens, the bathrooms, but you

14   needed to put flooring and all of the upgrades in order to move

15   in.

16   Q.   And what type of flooring are we talking about?  I mean,

17   are we --

18   A.   Concrete.  Could be create.

19   Q.   I mean, are we talking about putting in carpet, tile,

20   marble?  What are we talking about?

21   A.   Marble.  And on the Corzo I was told to put wood floors.

22   Q.   Did you, in fact, get involved in installing the floors?

23   A.   Yes, I did.

24   Q.   Now, was there a cost involved in making these improvements

25   or finishing the job?

Direct - Laureti                          56

```
 1    A.  Yes.

 2    Q.  And tell us, why did you send $50,000 to Pedro Melian?

 3    A.  Because I was told by Mostelac that he would -- that they

 4    wanted to handle the flooring on the penthouse for his mother.

 5    Q.  That he wanted to handle it instead of you?

 6    A.  Yes.

 7    Q.  Was there an allowance given to him for that purpose?

 8    A.  Yes.

 9    Q.  And what was that allowance?

10    A.  The 50,000.

11    Q.  Sir, I'm going to go to the next closing which is Pedro

12    Melian's, the person that you were just talking about.

13         I'm showing you what's in evidence as Defendant's RN,

14    as in R-N.  You see that document?

15    A.  Yes.

16    Q.  And do you see Mr. Melian's name on this document?

17    A.  Yes, I do.

18    Q.  What type of document is this?

19    A.  That is a Settlement Statement.

20    Q.  Okay.  So let's talk about the Settlement Statement for one

21    second.  Do you see the name of your company on this Settlement

22    Statement?

23    A.  Yes, I do.

24    Q.  On this occasion your company is no longer listed as a

25    payoff of a second mortgage; isn't that correct?
```

1   A.  That's correct.

2   Q.  And it is on Line 506 now?

3   A.  Yes.

4   Q.  What was your understanding as to why your company would be

5   on Line 506?

6   A.  Because that's the assignment fees or the option monies.

7   Q.  In this particular case, do you see Mr. Mostelac's?

8   A.  No.

9   Q.  Sir, up until the time that you got to Ramirez and Melian,

10  mother and son, was Mr. Mostelac's company also on the HUDs?

11  A.  Yes.

12  Q.  But once you got to Ms. Ramirez and her son Melian, did

13  Mr. Mostelac's company remain on the HUDs or did it no longer

14  be placed on the HUDs?

15  A.  It was no longer placed on the HUD.

16  Q.  Did anybody ask you about that before they did that?

17  A.  No.

18  Q.  And the amount of money that you received, was that just

19  your option spread?

20  A.  No.

21  Q.  Did it also include anything else?

22  A.  Yes, Mostelac's option, 50 percent.

23  Q.  And did it include anything else from there?

24  A.  The monies for the build-outs and --

25  Q.  Was there money that was taken from the 790 and used to pay

1   the cash to close?

2   A.  Yes.

3   Q.  And those funds that were used to cash to close -- did you

4   go to the Pedro Melian closing?

5   A.  No, I did not.

6   Q.  Did you ever carry in a check into a closing and throw the

7   check on the table and say who says Pedro Melian can't buy the

8   house?

9   A.  No, I would never disrespect someone like that.

10  Q.  Did anything like that remotely happen?

11  A.  I wouldn't know because I wasn't at the closing.

12  Q.  Now, sir, do you know a person by the name of -- well, let

13  me say it a different way.

14          Mr. Mostelac, was he single or married at the time

15  that you met him?

16  A.  I believe him to be married.

17  Q.  And what's the name of the person you believed him to be

18  married to?

19  A.  Norvis Diaz.

20  Q.  And after these closings took place, did you learn who

21  Pedro Melian was actually married to?

22  A.  Yes.

23  Q.  And who was that?

24  A.  Norvis Diaz.

25  Q.  And in reviewing the documentation from the money from the

Direct - Laureti                              59

```
 1   closings from Eneida Ramirez and Pedro Melian, the money that
 2   was left over, do you know where that money went?
 3   A.  It went to a bank account in Spain belonging to Norvis
 4   Diaz.
 5   Q.  At any time, sir, did you know whether or not Pedro Melian
 6   and Felix Mostelac were partners?
 7   A.  I did not.
 8   Q.  When you saw Pedro Melian, where did you see him at?
 9   A.  I saw him at 45 Hendricks after the purchase of the unit.
10   Q.  Did you see him there for what purpose?
11   A.  They were choosing the flooring that they were going to --
12   that they wanted the build-outs.
13   Q.  And did you see what vehicle he arrived in?
14   A.  Pedro Melian arrived in a S55 Mercedes, silver
15   Mercedes-Benz with a black interior.
16   Q.  And that was a long time ago.  How is it that that stuck in
17   your mind?
18   A.  It was a really nice car.
19   Q.  And what, to your knowledge, does a car like that cost?
20   A.  At that time I think that a vehicle like that would cost
21   about 120,000.
22   Q.  So were there other occasions that you saw Pedro Melian at
23   45 Hendricks?
24   A.  Yes, I saw Pedro Melian again at 45 Hendricks when he came
25   to inspect the finished floors in his Unit.
```

Direct - Laureti                          60

```
1    Q.  And what, if anything, did Pedro Melian tell you at that
2    time?
3    A.  He told me that he wasn't going to built out his mother's
4    unit because they were thinking about not moving into the
5    building.
6    Q.  And was that the first time that you heard about that?
7    A.  Yes.
8    Q.  I want to show you what's in evidence as Defendant's QP.
9    Do you recognize this document as the 1003 from Gordon Lending?
10   A.  Yes, it's a Gordon Lending Corporation Uniform Residential
11   Loan Application.
12   Q.  And do you see a fax number at the top of this document?
13   A.  Yes, I do.  It's (978)769-5233.
14   Q.  Sir, in going through the documents and looking in the loan
15   files, did you also see another fax number on the top of these
16   documents that went to Gordon Lending?
17   A.  Yes, I did.
18   Q.  And that fax number -- do you recall the first six digits
19   of that fax number?
20   A.  It was (305)442.
21   Q.  And did you endeavor to track down the fax number to find
22   the identity of the owner of that fax number?
23   A.  Yes.
24   Q.  And were you successful in finding that?
25   A.  Yes.
```

1    Q.  And who did you track that down to?

2    A.  I tracked that number down to a company called Avatar

3    Mortgage.

4    Q.  On the document did you see First Continental?

5    A.  Yes.

6    Q.  And how did that relate to Avatar Mortgage?

7    A.  I don't know how it related.

8    Q.  Okay.  Did you have anything to do with Avatar Mortgage?

9    A.  No, I did not.

10   Q.  Did you have anything to do with First Continental Avatar?

11   A.  I did not.

12   Q.  Did you send those faxes to Galen Frizzie from that fax

13   number in Coral Gables?

14   A.  I did not.

15   Q.  At the time that some of those faxes are taking place in

16   Coral Gables, do you have -- where do your telephone records

17   say that you were at?

18   A.  Mostly Miami Beach.

19   Q.  Okay.  I want to go forward with this document and show

20   that this is for which of Mr. Mostelac's clients?

21   A.  Pedro Melian.

22   Q.  And the document is for which unit?

23   A.  4D.

24   Q.  This document says that Mr. Melian is making 49,000 -- over

25   $49,000 a month.  Do you see that?

```
1    A.   I do.

2    Q.   Did you supply that information to Galen Frizzie?

3    A.   No.

4    Q.   Did you supply any of the information on this 1003 to

5    Mr. Frizzie?

6    A.   No.

7    Q.   And now turning to the market value.  What is the amount of

8    the market value of the asset listed there?

9    A.   700,000.

10   Q.   And what is the property address?

11   A.   75 West 44th Place.

12   Q.   And that's the same property that we just saw for Eneida

13   Ramirez?

14   A.   Yes, we did.

15   Q.   And, however, wasn't Eneida Ramirez's a different market

16   value?

17   A.   Yes.

18   Q.   And were both of those 1003s prepared by Gordon Lending?

19   A.   Yes.

20   Q.   And in particular Mr. Galen Frizzie?

21   A.   Yes.

22   Q.   And is that Galen Frizzie's signature?

23   A.   Yes.

24   Q.   Okay.  Sir, I would like to now go to your closing and

25   discuss the closing that you had.
```

Direct - Laureti                                    63

```
 1              First, did you have a contract for the property that
 2   you purchased on 205 San Marino Drive?
 3   A.  Yes, I did.
 4   Q.  And who was the seller of that property?
 5   A.  Dale Hightower.
 6   Q.  What occupation is Dale Hightower?
 7   A.  Lawyer.
 8   Q.  And your purchase agreement, did it make -- did it have any
 9   addendums?
10   A.  Yes.
11   Q.  And what was the addendum for?
12   A.  The addendum described some of the items that needed to be
13   addressed on the purchase of the home which included the seller
14   contribution for remodeling the home and it included upgrading
15   the windows to new hurricane impact windows.
16   Q.  You say a seller contribution.  What was the amount of that
17   seller contribution?
18   A.  6 percent, $414,000.
19   Q.  Did you make any effort to discuss seller contributions
20   with Galen Frizzie?
21   A.  Yes, I did.
22   Q.  I'm showing you what's been marked for identification
23   purposes as Exhibit BP and ask that you look at the document
24   but not tell us what it is quite yet.
25   A.  Yes, I recognize the document.
```

Direct - Laureti                              64

```
1   Q.  And is this document a document that relates to

2   contributions and your closing?

3   A.  Yes.

4   Q.  And is this document what you referred to only a few

5   moments ago as your attempts to discuss this subject matter

6   with Galen Frizzie?

7   A.  Yes.

8           MR. GARVIN:  Your Honor, at this time we would move

9   into evidence BP.

10          MS. STEWART:  No objection.

11          THE COURT:  BP will be received.

12       (Received in evidence Defendant's Exhibit(s) BP.)

13   BY MR. GARVIN:

14   Q.  I'm showing you Exhibit BP.  And you see this is from whom?

15   A.  Galen Frizzie.

16   Q.  And it was sent on what day?

17   A.  March 23, 2007.

18   Q.  And it was sent to whom?

19   A.  Marco Laureti.

20   Q.  And what was the subject?

21   A.  Seller concessions.

22   Q.  So let's talk about concessions for a second and

23   contributions.

24           Are they the exact same thing or are they two

25   different things when it comes to a residential closing?
```

```
 1   A.  My understanding is that there's two different things.

 2   Q.  And so tell us how did this document come about?  In plain

 3   words, why are they sending this document to you?

 4   A.  Because I wanted -- I asked Galen Frizzie to find out from

 5   Washington Mutual their guidelines on contributions and

 6   concessions.

 7   Q.  So can you please describe what a contribution is to the

 8   ladies and gentlemen of the jury?

 9   A.  A contribution is a -- is funds that are utilized towards

10   your cash to close.

11   Q.  And what is a concession?

12   A.  Concession are funds that are going to be used towards

13   your -- towards upgrades or remodeling.  Or maybe I have them

14   backwards.

15   Q.  Okay.  So let's take a look at this.

16         The document says "contributions" and it's from

17   Jennifer Owens.  And do you -- can you read that email address?

18   A.  Yes, it's jennifer.owens@wamu.net.

19   Q.  And the subject is "seller concessions" but the first title

20   is what?

21   A.  Contributions.

22   Q.  Can you please read to us the two sentences that follow the

23   title "contributions"?

24   A.  "Interested party contributions are funds or credits given

25   or applied to the borrower at closing by the seller, builder,
```

1    developer, real estate broker or other participant in the

2    transaction that reduces the transaction costs to the borrower.

3    Funds contributed by non-interested parties, such as an

4    employer, family member (including a domestic partner, fiancee

5    or fiance), municipality or nonprofit organization are

6    generally not considered contributions."

7    Q.   Okay.  So let's go over that.  A contribution is funds or

8    credits given to the borrower at closing by the seller; is that

9    right?

10   A.   Yes.

11   Q.   So how does that affect your cash to close if it is

12   properly listed on the first page of the HUD-1?

13   A.   It reduces the cash to close.

14   Q.   So now let's go to if funds are contributed by

15   non-interested parties, such as an employer, family member, or

16   a municipality or nonprofit organization, they're generally not

17   considered contributions.

18           So is there -- if you're a family member, is there any

19   limitation to your contribution?

20   A.   No.

21   Q.   In the case of Jorge De La Cruz, was he considered to be a

22   family member for you?

23   A.   Yes.

24   Q.   And did you discuss that fact with Galen Frizzie?

25   A.   Yes.

1    Q.  And did you discuss that fact with Michelle Cabrera?

2    A.  Yes.

3    Q.  And was there any discussion that the money you gave to

4    your father-in-law for cash to close there was no limitation

5    because you are deemed to be a non-interested party?

6    A.  Yes.

7    Q.  And was that your understanding?

8    A.  Yes.

9    Q.  So what was your understanding based upon your letters that

10   you -- or emails that you received from WAMU and your

11   discussions with Galen Frizzie and Michelle Cabrera as to

12   whether there was a limitation to contributions?

13   A.  There was -- if it was a family member, it didn't have a

14   limitation.

15   Q.  Okay.  Now, let's talk about if it's not a family member.

16   What is the limitation?

17   A.  Concession was 6 percent and contributions was 6 percent.

18   Q.  On your contract did you have a addendum that provided for

19   a seller contribution?

20   A.  Yes.

21   Q.  And was that what you were alluding to a few moments ago

22   when you said 6 percent or $414,000?

23   A.  Yes.

24   Q.  Now, I'm showing you what is in evidence as Defendant's

25   Exhibit OS.  Do you recognize this document?

1    A.   Yes.

2    Q.   On the front page of the document do you see $414,000 of

3    contributions?

4    A.   Uhm, no, I do not.

5    Q.   Were you provided a document, a HUD-1 days before this

6    final HUD-1?  Were you given a HUD-1 that was unsigned days

7    before on your property?

8    A.   Yes, I was.

9    Q.   And on that one, as I think we've seen during the course of

10   this trial, was there the 414,000 contribution?

11   A.   Yes, there was.

12   Q.   On this document it says $1,200,000 as a commission to

13   Harbour Realty.  Do you see that?

14   A.   Yes.

15   Q.   In your contract were you supposed to receive $1,200,000

16   to -- as commission to Harbour Realty?

17   A.   No.

18   Q.   What was the amount supposed to be?

19   A.   786,000.

20   Q.   But if you add 414,000 onto the 786,000, what number do you

21   arrive at?

22   A.   1,200,000.

23   Q.   Did you have -- did you know who the owner of Harbour

24   Realty was?

25   A.   Yes.

Direct - Laureti                              69

1    Q.   Who was that?

2    A.   John Olsen.

3    Q.   And did you have any discussion with John Olsen about

4    assigning the commission?

5    A.   Yes.

6    Q.   And what, if anything, did John Olsen tell you?

7    A.   Okay.

8    Q.   I'm sorry?

9    A.   Yes.

10   Q.   He said "yes"?

11   A.   Yes.

12   Q.   And so was there ever an issue with John Olsen about the

13   commission?

14   A.   No.

15   Q.   Now, when you saw this HUD-1, was there any discussion with

16   Michelle Cabrera about it?

17   A.   Yes.

18   Q.   And what, if anything, did Michelle Cabrera tell you?

19   A.   She told me that the bank knew that I was receiving the

20   commission, and the seller contribution was mine anyway, so

21   then they preferred to put it all in one lump sum into the

22   commission.  And she also showed me a fax cover sheet with an

23   approved by the bank HUD.

24   Q.   You mean it said approved on the fax cover sheet?

25   A.   Yes.

Direct - Laureti                        70

```
1    Q.  But moving the $414,000 from the front page, what does that

2    do to your cash from borrower amount?

3    A.  It increased the cash to close.

4    Q.  Prior to her moving amounts around, did you have the funds

5    to pay for the cash to close?

6    A.  Yes.

7    Q.  So had Michelle Cabrera put 6 percent as concessions and 6

8    percent as contributions, would you have had the cash to close

9    without any money coming from your assigned commission?

10   A.  Yes.

11   Q.  However, if you are on the HUD and the bank approves the

12   million-two, once that check is written is there any

13   restriction on your use of those funds?

14   A.  No.

15   Q.  Did you discuss that with anyone?

16   A.  With Michelle.

17   Q.  And did you rely upon what Michelle told you?

18   A.  Yes.

19   Q.  And why would you rely upon Michelle?

20   A.  Because that's her business.  I'm not --

21   Q.  Who was communicating directly with the bank; you or

22   Michelle?

23   A.  Michelle was.

24   Q.  Who was doing closings every day, residential closings; you

25   or Michelle?
```

1   A.  Michelle.

2   Q.  Who owned a title company; you or Michelle?

3   A.  Michelle.

4   Q.  And did you communicate to Michelle all of the facts before

5   you relied upon her advice?

6   A.  Yes.

7   Q.  Now, I want to go to the Gordon Lending Uniform Residential

8   Loan Application which is Defendant's LD, Exhibit LD.  You see

9   that, sir?

10  A.  Yes.

11  Q.  The first thing that I want to talk about is, did you sign

12  any 1003 for Gordon Frizzie?

13  A.  No.

14  Q.  And with regard to --

15  A.  It's actually Galen Frizzie.

16  Q.  Oh, I'm sorry.  For anyone at Gordon Lending?

17  A.  No, I did not.

18  Q.  And during this period of time did you email Mr. Frizzie on

19  occasion?

20  A.  Yes.

21  Q.  And when Mr. Frizzie asked you for any -- well, did he ask

22  you for any documentation?

23  A.  Yes.

24  Q.  And when he did -- did you provide him accurate

25  documentation?

```
 1   A.  Yes, I did.

 2   Q.  Now, I'm turning now to Page 2 of the document that is LD,

 3   Defendant's LD, and point at the monthly borrower income listed

 4   by Mr. Frizzie on this 1003 application.  Do you see that

 5   amount, sir?

 6   A.  Yes.

 7   Q.  Can you tell us what that amount is?

 8   A.  105,483.25 per month.

 9   Q.  And let's go back and make sure that we've got this right.

10   And what address is this loan for?

11   A.  205 East -- actually, 205 San Marino Drive.  It's missing

12   the east.

13   Q.  And who is the name of the borrower?

14   A.  Marco Laureti.

15   Q.  Did you ever tell Mr. Frizzie that you made $105,000 a

16   month?

17   A.  No.

18   Q.  And did you ever sign this document?

19   A.  I did not.

20   Q.  Did you ever see this document?

21   A.  No.

22   Q.  But did Mr. Frizzie sign the document?

23   A.  Yes.

24   Q.  And do we know if this document was submitted to the bank

25   to begin processing your loan?
```

Direct - Laureti                          73

```
 1    A.   I'm sorry?

 2    Q.   Do you know if this 1003 loan application was submitted to

 3    the bank to begin processing your loan?

 4    A.   Yes.

 5    Q.   Was this document found in the bank's files?

 6    A.   Yes.

 7    Q.   Sir, where did Mr. Frizzie get the information that you

 8    made $105,000 a month?

 9    A.   I have absolutely no idea.

10    Q.   Is it your contention that that is accurate or it's just

11    false?

12    A.   False.

13    Q.   I am now going to show you another Uniform Loan Application

14    for the same property.  It's Defendant's FJ.  Can you see that?

15    A.   Yes.

16    Q.   And the name of the borrower on this loan application?

17    A.   Marco Laureti.

18    Q.   And again, who was contacting the bank on your loan

19    application for the 1003?

20    A.   Galen Frizzie.

21    Q.   Were you contacting the bank for your loan application on

22    your 1003?

23    A.   No.

24    Q.   I want to back up because I just noticed something.

25              If Mr. Corzo or Mr. Melian said that you drove a
```

```
 1    Mercedes in 2007, would they be right?

 2    A.   Depends on the Mercedes.

 3    Q.   Well, let me ask you, what kind of car did you drive?

 4    A.   A Porsche.

 5    Q.   So during 2007 was the car that you drove a Porsche?

 6    A.   Yes.

 7    Q.   Let's go back to the income that is reported on this 1003.

 8    What is the amount of the income on this 1003?

 9    A.   $148,026 per month.

10    Q.   But a few moments ago the 1003 that Galen Frizzie prepared

11    and signed that is LD said what amount a month?

12    A.   $105,483.25.

13    Q.   And now assuming that this document that is on the screen

14    now is the earlier document, FJ, what is the amount on that

15    document?

16    A.   $148,026.

17    Q.   So there is approximately a $43,000 a month difference in

18    those two documents; is that correct?

19    A.   Yes.

20    Q.   And one of the two documents, the one with the $148,000, is

21    dated what date?

22    A.   The 1st of June, 2007.

23    Q.   And who -- what company prepared the 1003?

24    A.   Gordon Lending Corporation.

25    Q.   And who was the interviewer?
```

```
 1    A.   Galen Frizzie.

 2    Q.   And when you do -- look at the other one.  What was the

 3    date that it was faxed?

 4    A.   14th of June.

 5    Q.   So in the same period of time, beginning of June 2007, we

 6    have two 1003s prepared by Mr. Frizzie; is that correct?

 7    A.   Yes.

 8    Q.   One reflecting $105,000 a month in income, correct?

 9    A.   Yes.

10    Q.   And the other reflecting $148,000; is that right?

11    A.   Yes.

12    Q.   Did you ever see either one of these during the time that

13    the loan was being processed?

14    A.   No, I did not.

15    Q.   Did you know -- strike that.

16             I'm going to show you now what is in evidence as

17    Defendant's KH.  Can you see that?

18    A.   Yes.

19    Q.   This document purports to be from who?

20    A.   From me.

21    Q.   And to whom?

22    A.   Galen Frizzie, Junior.

23    Q.   Do you see the amounts that are listed on this email?

24    A.   Yes.

25    Q.   Did you ever type those amounts there?
```

Direct - Laureti                                76

1    A.   No.

2    Q.   This email was forwarded.   Do you see that?

3    A.   Yes.

4    Q.   And it says that it was from Galen Frizzie.   Do you see

5    that?

6    A.   Yes.

7    Q.   Now, sir, is this email a legitimate email?

8    A.   No.

9    Q.   Did you prepare this email or did somebody else prepare

10   this email, meaning the bottom email, that says from Marco

11   Laureti?

12   A.   I never prepared that email.

13   Q.   The top email that was sent by -- forwarded by Galen

14   Frizzie, you see that, right?

15   A.   Yes.

16   Q.   And we know that the bank received this email because it

17   was filed in the -- found in the bank's files, right?

18   A.   Yes.

19   Q.   Are you familiar with forwarding emails?

20   A.   I am now.

21   Q.   And when you forward an email, how much effort, if any, is

22   there to amend an email and put in all new numbers?

23   A.   Very easy.   You can even change the sender and the date and

24   time, everything.   You can change the whole thing.

25   Q.   And once you forward that email, is the person who receives

1    the forwarded email, do they have any way of knowing that the

2    email that has been forwarded to them has been amended?

3    A.   No.

4    Q.   The original email, would that be the only way to know what

5    the original email said is if you have the original email

6    before it was forwarded?

7    A.   Yes.  And from what I've learned through the case, the

8    Internet headers.

9    Q.   Mr. Frizzie has turned over a total of 82 pages in this

10   case representing his complete file.  Did you go through each

11   and every page of that?

12   A.   I did.

13   Q.   Is this email in there?

14   A.   No.

15   Q.   Is any original email in that file?

16   A.   No.

17   Q.   Did you go through each and every document produced by

18   Gordon Lending?

19   A.   Yes, I did.

20   Q.   Do they have any documentation of substance relating to

21   this transaction other than the HUD-1 that was signed at

22   closing?

23   A.   Nothing.

24   Q.   Is the original email in there?

25   A.   No.

1    Q.  I am showing you KH and KJ.  These are two exhibits.  And

2    I'm going to do my best to put them side by side so that we can

3    talk about them at the same time.

4          Let's start with the basic.  Did you prepare either

5    one of these emails that was forwarded to the bank?

6    A.  No, I did not.

7    Q.  In addition to the entire -- all of the amounts on the --

8    well, let me start with basics.

9          All of the amounts on the email, are they true amounts

10   or are they false amounts?

11   A.  Some of them seem true and some of them seem false.

12   Q.  And with regard to the email, is there any portion of this

13   email that you recall preparing?

14   A.  No.

15   Q.  Now, I want to show you that on the email to the right that

16   is in evidence as KJ, do you see the amount of space between

17   the line that says Laureti Holdings Company Wachovia, 778,000,

18   and the line that says total liquidity as per attached docs,

19   2.433 million?  Do you see any space between those two lines?

20   A.  On the one on the right-hand side, no space.

21   Q.  Is that single spaced?

22   A.  Yes.

23   Q.  Now, let's go to the one on the left.  Is there a large

24   space between those same two lines?

25   A.  Yes.

Direct - Laureti                              79

```
1    Q.  Now, sir, if you are simply forwarding an email, wouldn't

2    the two documents be identical?

3    A.  Yes.

4    Q.  But when -- what does that suggest to you?

5    A.  That someone tampered with this email.

6    Q.  But is the tampering limited to just this space or does it

7    include many other things on the email?

8    A.  Well, the tampering is -- the entire email has been

9    tampered with.

10   Q.  Did you ever represent to anyone that there -- in writing

11   or orally that your liquidity on June 12th, 2007, was

12   2.433 million?

13   A.  I did not.

14   Q.  Did you authorize Galen Frizzie to phoney up an email and

15   forward it to the bank overstating your assets and your income?

16          MS. STEWART:  Object to the form of the question.

17          THE COURT:  Sustained.

18   BY MR. GARVIN:

19   Q.  Did you ever authorize anyone to prepare an email for you?

20   A.  I did not.

21   Q.  Sir, I'm now going to put on the ELMO what is in evidence

22   as KI, and I'm going to put that next to what is in evidence as

23   KH and see if we can look at something else on this email.  The

24   email to the right, which is KI.

25          Do you know what the key on an email -- on a computer
```

1    that's italicized means?

2    A.   Yes.

3    Q.   And when you italicize a word, does it tend to slant the

4    word slightly?

5    A.   Yes.

6    Q.   The document that I have my finger on that is KI, it appear

7    that the Galen Frizzie has been italicized?

8    A.   Yes.

9    Q.   Whereas the document that is KH, does it appear to be

10   straight up and down in normal type?

11   A.   Yes.

12   Q.   If you are simply forwarding an email, would you expect

13   both emails to be identical?

14   A.   Yes, I would.

15   Q.   So we have -- I believe we've covered the transactions in

16   the indictment, but I still have a few questions that I want to

17   ask you.

18           Did you sell a piece of property or a home in Palm

19   Harbor?

20   A.   Yes, I did.

21   Q.   And in that case did you as the seller pay for the cash to

22   close?

23   A.   Yes.

24   Q.   And before you agreed to pay the cash to close in that

25   transaction, had you spoken with anyone concerning whether or

Direct - Laureti                          81

```
 1    not it was a problem?

 2    A.   Yes.

 3    Q.   And do you recall whether the person that you spoke to was

 4    Michelle Cabrera?

 5    A.   Yes.

 6    Q.   And what did she tell you if anything?

 7    A.   That that was allowed.

 8    Q.   I want to circle back to Michelle Cabrera.

 9         The entire time that you dealt with Michelle Cabrera

10    in 2007, had you ever met her husband?

11    A.   Never.

12    Q.   Did you know what her husband's name was?

13    A.   Back then I didn't know what her husband's name was.

14    Q.   Did there come a time when Felix Mostelac spoke to you

15    about sharing the cost of building out the closets?

16    A.   Yes.

17    Q.   And what was the amount that you were supposed to

18    contribute for building out the closets for the three units

19    that you had an option spread for?

20    A.   It was a total of 30,000.

21    Q.   What was the amount for each unit?

22    A.   10,000.

23    Q.   And did you write a check to pay that?

24    A.   I did.

25    Q.   And who did you write that check out to?
```

1    A.   MSJ Services.

2    Q.   Are you certain, sir, that it was not MSJ Courier Services?

3    A.   Yes.

4    Q.   And when you wrote that check to MSJ Services, did you know

5    that that was going to -- those checks -- was it one check or

6    three checks?

7    A.   I believe it was three checks.

8    Q.   Did you know that those three checks were going to end up

9    with Michelle Cabrera's husband?

10   A.   I did not.

11   Q.   When it came time to do your income taxes --

12   A.   Yes.

13   Q.   -- did you tell your accountant about the three checks?

14   A.   Yes.

15   Q.   And did you endeavor to give that company a 1099 for

16   receiving those three checks?

17   A.   Yes.

18   Q.   Did you look up on Sunbiz or how did you endeavor?   How did

19   you know what their federal ID number was or their address?

20   A.   The only company with MSJ Services on public record was the

21   company that was listed on the 1099.

22   Q.   And to your knowledge, did your accountant issue that 1099

23   and send it?

24   A.   Yes, she did.

25   Q.   Did you ever get a call from anyone saying, hey, you sent

Direct - Laureti                                    83

```
 1   me a 1099 and I don't know who you are?

 2   A.  No.

 3   Q.  When was the first time that you found out that the checks

 4   actually were cashed by MSJ Courier Service and that Michelle

 5   Cabrera's husband was a signatory on that account?

 6   A.  When the -- when the prosecution pointed it out to you.

 7   Q.  There's been some discussion in this case about a cigar

 8   shop at 2309 Ponce de Leon Boulevard called Sabor Havana

 9   Cigars.  Did you hear that?

10   A.  Yes.

11   Q.  Have you ever set foot inside of Sabor Havana Cigars?

12   A.  No.

13   Q.  Did you ever meet Pedro Melian outside of Sabor Havana

14   Cigars?

15   A.  Not that I remember, no.

16   Q.  When your father-in-law was at the closing, I think you

17   described how Michelle -- you witnessed how Michelle Cabrera

18   did the closing, correct?

19   A.  Yes.

20   Q.  When you did your closing, was it handled in a similar

21   fashion or was it handled differently?

22   A.  It was handled in a similar fashion, but there was a lot

23   more things going on.  The closing took place in my house.

24   Q.  And when you say a lot more things were going on, what were

25   a lot more things that you were alluding to?
```

Direct - Laureti

1   A.  Well, my ex-wife was already seven, eight months pregnant,

2   and I had the -- my oldest daughter, which was a year and a

3   half or two years old, running around all over the house.

4   Q.  And when you had the documentation there to sign, were

5   you -- did you sit down and study it carefully?

6   A.  No.

7   Q.  Sir, why didn't you sit down and study it carefully?

8   A.  Because I had, I had used Gordon Lending and Galen Frizzie

9   for my loans in the past and I didn't -- I trusted them.

10  Q.  I want to now talk about subsequent to 2007.

11  A.  Okay.

12  Q.  Did there a come a time unrelated to the 45 Hendricks

13  transactions and unrelated to Mr. Mostelac or Michelle Cabrera,

14  did there come a time when you got into a business relationship

15  with Oscar Piccolo?

16  A.  Yes, it's actually before.

17  Q.  Okay.

18  A.  2006, I believe.

19  Q.  And at any time did you ever tell Oscar Piccolo that you

20  had been -- that the FBI had asked you for your computer and

21  that you were going to need to destroy it?

22  A.  No.

23  Q.  Did you ever tell Oscar Piccolo that don't worry, before I

24  destroy it I'll make a copy of the hard drive?

25  A.  No.

Direct - Laureti                                   85

```
1    Q.  Did you ever -- in fact, did you ever destroy anything?

2    A.  No.

3    Q.  Now, did you indeed have a problem with a CD with emails at

4    your house?

5    A.  Yes, I did.

6    Q.  And can you explain how that problem came to that

7    particular CD?

8    A.  It was actually two CDs, and it was CDs that were the

9    backup emails to -- that pertained to the litigation that we

10   had against a bank by the name Pacific National Bank.

11   Q.  And what happened to those two CDs?

12   A.  Those two CDs were sitting inside a filing cabinet.  And

13   when I was asked to produce again emails regarding the case, I

14   didn't have access to them because I was in the middle of a

15   divorce.  Actually, I was in the beginning of the divorce and I

16   didn't have access to the house.  I needed a court order from

17   the divorce judge to allow me to go back in the house.

18   Q.  Now, when you got back into the house, did you endeavor to

19   go to your home office?

20   A.  I did.

21   Q.  And how did you find your home office?

22   A.  Well, I found everything in my files was thrown on the

23   floor, everything inside -- actually, everything inside of the

24   filing cabinets and the drawers of my desk were thrown all over

25   the floor, and my furniture had disappeared, my office
```

Direct - Laureti                                      86

```
 1   furniture in my home office.
 2   Q.  Did you learn what happened to that furniture?
 3   A.  Yes, my ex-wife sold all the furniture.  She actually
 4   auctioned it off.
 5   Q.  What happened to those particular CDs?
 6   A.  Those CDs were on the floor.  I put all my paperwork in a
 7   bag and took them with me, and I turned over the CDs to the
 8   expert witness for the bank.
 9   Q.  What did he determine?
10   A.  He determined that the CDs had been intentionally
11   destroyed.
12   Q.  And were they?
13   A.  No.
14   Q.  Were they, in fact, scratched to the point where you
15   couldn't use them?
16   A.  You could -- they were scratched.  They were scratched.
17   You could put them in the computer.  They would spin and you
18   could see there was a file in there, but you could not extract
19   the file out of the CD.  So they --
20   Q.  Did that have anything to do with the FBI?
21   A.  Absolutely nothing.
22   Q.  Did the FBI ever ask you for your computer?
23   A.  They never did.
24   Q.  Now, did there come a time when you applied for a loan and
25   there was a request or some discussion about a lease?
```

```
 1    A.   Yes.

 2    Q.   Please describe to the ladies and gentlemen of the jury how

 3    did this come about?

 4    A.   The -- in mid 2008 I applied for a loan to refinance a

 5    commercial building.  The application of that loan was made

 6    through a bank out of California called Temecula Valley Bank.

 7    During the process of the application the bank suggested that I

 8    should lease my home because they were concerned about my

 9    personal overhead being too high.

10    Q.   Now, this particular loan, was this a personal loan or was

11    this some type of business loan that you were guaranteeing?

12    A.   This was a real estate loan that was going to be guaranteed

13    by myself and my companies, and the borrower was to be

14    Southeast Corner, LLC, the entity that owned the property.

15    Q.   Okay.  And in 2008 what was happening to your real estate

16    business?

17    A.   Real estate business was, was --

18              MS. STEWART:  Objection, Your Honor.  Relevance.

19              THE COURT:  What is the relevance?

20              MR. GARVIN:  He's going to tie in on why he went along

21    with the lease, Your Honor.

22              THE COURT:  All right.  I'll overrule.

23              THE WITNESS:  I can answer?

24    BY MR. GARVIN:

25    Q.   Yes, answer.
```

1   A.   Okay.  So basically they suggested I should go out and

2   leases the house.  So I thought about leasing the house.  I

3   discussed it with my ex-wife.  She told me, look, I -- we just

4   got done remodeling this house, putting all of this money in

5   the house.  She was being very difficult about leasing the

6   house.  So I told her, look, I'm -- I called up -- I called up

7   John.  I told him, do you -- would you lease the house for me.

8   And he said, you know, I'm not going to move into the house.

9   I'll lease the house from you, but I'm going to sublease the

10  house to a third party.  I said, okay, fine, we can do that.

11  The house was never leased.  And prior to that bank funding

12  that loan, Temecula Valley Bank, they went out of business.

13  Q.   But the bank had --

14  A.   They had the lease in the file.

15  Q.   But did your wife ever agree to move out?

16  A.   She did not agree to move out.

17  Q.   And did that loan at that time close with --

18  A.   No, it did not.  That bank went out of business.

19  Q.   Okay.  Was that the end of it or did something else happen?

20  A.   No, that was not the end of it.  What happened was that the

21  people that work at Temecula Valley Bank, they took all of the

22  loan files that had not closed and they took it to their new

23  job at Quadrant Financial.

24  Q.   All right.  And so now they have the loan file?

25  A.   Yes.

Direct - Laureti                            89

```
 1   Q.  What year are we in now?

 2   A.  We're in 2009.  So in -- all of the applications, all of

 3   the documentation from 2008 traveled over to 2009 because the

 4   bank went out of business, as most banks were going out of

 5   business at that time.  So in 2009 the applications and

 6   everything together with the lease traveled over to Quadrant.

 7   Q.  We saw during the course of this trial that Quadrant's

 8   application has boxes checked on it.  Did you check those

 9   boxes?

10   A.  I did not.

11   Q.  Was the information that was already in the file from the

12   previous bank, was that information in part used to prepare the

13   loan application at Quadrant?

14   A.  Yes.

15           MS. STEWART:  Leading, Your Honor.

16           THE COURT:  I'm sorry?

17           MS. STEWART:  Objection.  Leading.

18           THE COURT:  Sustained.

19   BY MR. GARVIN:

20   Q.  What affect, if anything, did it have on -- how was, if you

21   know, the loan application prepared at Quadrant?

22   A.  The loan --

23           MS. STEWART:  Objection, Your Honor.  Calls for

24   speculation.

25           THE COURT:  Sustained.
```

```
 1   BY MR. GARVIN:
 2   Q.  Well, let me back up a little bit.
 3          Did you provide all of the information for the new
 4   loan applications?
 5   A.  No, they -- should I finish the sentence, sir?
 6   Q.  As long as it's not speculation, sir.  If it's speculation,
 7   than you can't finish the sentence.
 8   A.  No.
 9   Q.  All right.  So please tell us, was that the end of this
10   lease?
11   A.  No, that was not the end of the lease.
12   Q.  Let me back up.
13          Did you sign that lease for John or did John sign the
14   lease for John?
15   A.  John signed the lease for John.
16   Q.  And were you there when he did it or how did this -- how
17   did this work out?
18   A.  No, no.  I wasn't there when he did it.
19   Q.  So you don't have firsthand knowledge watching it with your
20   own two eyes?
21   A.  No, I don't.
22   Q.  Well, then what makes you confident enough to say that you
23   believed that John signed the lease?
24   A.  Because I picked it up in his office.
25   Q.  Okay.  So was that the end of it?
```

Direct - Laureti                              91

1   A.   No, that was not the end of it.

2   Q.   So were you still trying to get funding for Southeast

3   Corners in 2009?

4   A.   I was, yes.

5   Q.   Does this have anything to do with 45 Hendricks?

6   A.   No, it does not.

7   Q.   Does it have anything to do with Mr. Mostelac's purchasing

8   of the Sunset Harbour condominium?

9   A.   No.

10   Q.   And does it have anything to do with your purchase in 2007

11   of the home at San Marino Drive?

12   A.   No.

13   Q.   Okay.  So what happens next?

14   A.   What happens next is that the new, the new lender --

15   because I don't believe Quadrant was a bank.  They're a lender

16   or a correspondent lender.  The new lender basically brought up

17   the lease.  He said, look, this lease is expiring.  I told him,

18   look, this house was never rented.  When I submitted this, the

19   idea was to sublease it to someone.  The house -- I never moved

20   out of the house.  They said, well, why don't you try to go and

21   rent it, get me an addendum to extend the lease and try to rent

22   it before we close.  And that's what I did.

23   Q.   But were you successful in renting the property?

24   A.   I was not successful in renting the property.

25   Q.   Did you list that lease as an asset on your loan

Direct - Laureti                                    92

1    application, the final application that you signed for

2    Quadrant?

3    A.  I did not.

4    Q.  Did you list the income from that lease on your final loan

5    application for Quadrant that you signed?

6    A.  I did not list that income on my personal financial

7    statement or on the loan application.

8    Q.  Now, Quadrant's in possession of it.  Did you tell them at

9    any point, look, the lease thing is not going to work out?

10   A.  Yes, I did.

11   Q.  And was there a ramification to that?

12   A.  Yes.

13   Q.  And what was the ramification?

14   A.  That I had to deposit a $50,000 CD that would

15   cross-collateralize the loan.  In case there was any kind of

16   default, they would draw out of the $50,000 CD into the bank

17   loan.

18   Q.  And at that time did you, in fact, put up the $50,000?

19   A.  I did at closing, yes.  It's on the HUD.

20   Q.  And at that point did they know that the issue with the

21   lease was dead?

22   A.  Yes.

23   Q.  Sir, I will ask you one more time, that transaction that we

24   just described, in hindsight was it a mistake on your part to

25   submit that lease before you actually had a tenant in the

1   property?

2   A.  Yes, it was.

3   Q.  Was it ever your intention to mislead the lender by

4   providing that lease or the extension to the lease?

5   A.  Absolutely -- I'm sorry?

6   Q.  Or the extension to the lease.

7   A.  Could you repeat the question?

8   Q.  Was it ever your intention --

9   A.  No, no.  It was not.

10  Q.  -- to mislead the lender?

11  A.  No.

12  Q.  Did you, in fact, tell the lender before closing that the

13  lease -- that it just wasn't going to happen, that your wife

14  was not going to agree, and that nobody was going to be leasing

15  the property?

16  A.  Yes.

17  Q.  Now, let's talk about a couple of things that were raised

18  in that application.

19          Were you the person who actually put the check box on

20  "Do you have any pending litigation"?

21  A.  Well, that's where the issue comes in.  The applications

22  were transcribed from the 2008 loan application into the 2009

23  loan application.  That's what happened.  So the answer is yes

24  and no.  Because in 2008 I did do that and then in 2009 they

25  just moved over all of the information to the application.

Direct - Laureti

```
 1  Q.  And during 2009 at some point one of your entities or more
 2  than one was named as a defendant in a foreclosure action; is
 3  that correct?
 4  A.  Yes.
 5  Q.  Did you view that you had any stake in that foreclosure
 6  action?
 7  A.  It's very common.  I was a heartache with a lender.  So
 8  it's very common for you to be named in a lawsuit when you're a
 9  junior lienholder as a lender.  So you have -- as a lender if
10  there's no equity to recover, you're not going to go in and
11  defend that lawsuit.  You just let it go.
12  Q.  Was anybody actually seeking any money from you or your
13  companies?
14  A.  No.
15  Q.  So really were you in the position where you either joined
16  in against the defendant or just let your lien go?
17  A.  Let the lien go, yes.
18  Q.  Now --
19  A.  Actually, can I say something?  On two of those I had
20  already been paid.
21  Q.  And when you -- you mean you were named in the lawsuit as a
22  defendant down the list but you were already paid?
23  A.  I was already fully paid, yes.
24  Q.  So you had how much interest in that lawsuit?
25  A.  Zero.
```

1   Q.  And again, just because you're named in that lawsuit, was

2   anybody seeking anything from you?

3   A.  No.

4         THE COURT:  All right.  It's 4:30.  We're going to

5   recess.  We're not going to be able to complete Mr. Laureti's

6   testimony today.  It's 4:30.

7         MR. GARVIN:  Yes, sir.

8         THE COURT:  And I'm not going to keep the jury any

9   longer.

10        We'll reconvene as usual at 9 o'clock tomorrow.  No

11  civil hearings.  No civil hearings at 9:00.  So wake up bright

12  and early, you know.

13        And remember the Court's continuing admonition, which

14  is do not discuss the case or otherwise communicate with anyone

15  regarding the substance of the case.

16        Once again, should there be something reported in the

17  media, do not read, watch, or listen to it; albeit I haven't

18  seen any journalists here during the course of the trial.

19        Do not do any independent research, and continue to

20  keep an open mind.

21        See you at 9 o'clock tomorrow morning.

22        (Jury out at 4:31 p.m.)

23                  *     *     *     *     *

24        (Proceedings were had which are not herein transcribed.)

25

1                     C E R T I F I C A T E

2          I, Karl Shires, Registered Professional Reporter and

3   Federal Certified Realtime Reporter, certify that the foregoing

4   is a correct transcript from the record of proceedings in the

5   above-entitled matter.

6          Dated this 22nd day of November, 2017.

7

8   _____
    Karl Shires, RMR FCRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**BY MR. GARVIN: [12]**
3/22 4/1 9/18 15/9
19/2 39/16 44/23
64/12 79/17 87/23
89/18 89/25
**MR. GARVIN: [10]** 3/5
3/25 9/13 15/1 38/20
38/22 44/5 64/7 87/19
95/6
**MS. STEWART: [13]**
9/15 15/4 15/6 18/24
38/17 39/11 39/13
64/9 79/15 87/17
89/14 89/16 89/22
**THE COURT: [27]** 3/3
3/7 3/10 3/12 3/20
9/16 15/3 15/5 15/7
19/1 38/19 39/12
39/14 44/4 44/6 44/8
44/13 44/17 64/10
79/16 87/18 87/21
89/15 89/17 89/24
95/3 95/1
**THE DEFENDANT:**
**[1]** 3/9
**THE JUROR: [1]** 44/7
**THE WITNESS: [3]**
3/17 44/22 87/22

**$**

**$1,200,000 [2]** 68/12
68/15
**$1,663,000 [1]** 53/6
**$1,663,381.50 [1]**
51/14
**$1,683,000 [1]** 53/6
**$105,000 [3]** 72/15
73/8 75/8
**$105,483.25 [1]** 74/12
**$143,417.08 [1]** 32/14
**$148,000 [2]** 74/20
75/10
**$148,026 [2]** 74/9
74/16
**$150,108 [1]** 47/10
**$182,000 [1]** 15/21
**$2 [1]** 13/17
**$200,000 [1]** 17/21
**$3,150,000 [1]** 26/8
**$3,680,000 [3]** 22/17
23/22 24/3
**$320,000 [1]** 48/18
**$35,000 [1]** 29/2
**$400,000 [1]** 12/24
**$410,000 [2]** 7/21 7/24
**$414,000 [4]** 63/18
67/22 68/2 70/1
**$43,000 [1]** 74/17
**$49,000 [1]** 61/25
**$50,000 [6]** 55/4 55/5
56/2 92/14 92/16
92/18
**$559 [1]** 23/18
**$6,000 [1]** 42/22
**$642,000 [1]** 47/13

**$700,000 [1]** 46/1
**$762,000 [1]** 46/11
**$955,000 [2]** 40/23
41/3

**'**

**'90s [1]** 5/16

**-**

**-v [1]** 1/6

**0**

**07 [1]** 46/16

**1**

**1,200,000 [1]** 68/22
**1,683,381 [1]** 50/1
**10 [1]** 4/20
**10,000 [1]** 81/22
**100 percent [1]** 20/1
**1003 [32]** 5/12 23/11
29/5 34/6 36/15 36/24
37/1 46/18 46/24 47/3
47/9 47/16 47/23 48/5
48/7 48/7 48/10 48/22
48/24 49/4 49/7 60/9
62/4 71/12 72/4 73/2
73/19 73/22 74/7 74/8
74/10 74/23
**1003s [2]** 62/18 75/6
**105,483.25 [1]** 72/8
**1099 [4]** 82/15 82/21
82/22 83/1
**11 million [1]** 6/22
**12 [1]** 4/19
**120,000 [1]** 59/21
**125 [1]** 31/3
**12th [1]** 79/11
**14 [1]** 10/9
**14th [1]** 75/4
**15-minute [1]** 44/10
**150 [1]** 47/11
**16-60340-BLOOM/CO**
**HEN [1]** 1/2
**160,000 [1]** 47/11
**17201 [1]** 4/4
**1800 [2]** 24/22 26/4
**19 [1]** 5/16
**190,000 [1]** 20/20
**1903 [2]** 46/8 47/14
**1976 [1]** 4/7
**1990s [1]** 5/16
**1:30 [1]** 3/3
**1st [1]** 74/22

**2**

**2.433 million [2]**
78/19 79/12
**20 [1]** 5/23
**200 [1]** 1/21
**2005 [3]** 16/22 17/10
18/16
**2006 [9]** 10/17 17/12
18/13 18/17 19/16
19/16 20/14 20/19
84/18
**2007 [27]** 13/9 17/14

**$700,000 [1]** 46/1
22/11 22/13 22/14
23/2 26/6 26/24 29/22
31/5 31/21 35/12
35/16 35/17 41/12
64/17 74/1 74/5 74/22
75/5 79/11 81/10
84/10 91/10
**2008 [6]** 17/16 87/4
87/15 89/3 93/22
93/24
**2009 [7]** 89/2 89/3
89/5 91/3 93/22 93/24
94/1
**2010 [1]** 6/4
**2017 [2]** 1/8 96/6
**203G [1]** 1/24
**205 [3]** 63/2 72/11
72/11
**22nd [1]** 96/6
**23 [1]** 64/17
**2309 [1]** 83/8
**233 [1]** 27/15
**243,791 [1]** 33/14
**25 [2]** 31/5 31/21
**25th [1]** 29/22
**27 [1]** 18/12
**299 [1]** 1/24
**2:44 [1]** 44/12
**2:59 [1]** 44/17
**2nd [1]** 18/22

**3**

**3,150,000 [1]** 25/9
**3,680,000 [1]** 22/9
**30 [1]** 5/23
**30,000 [1]** 81/20
**305 [1]** 60/20
**30th [1]** 10/17
**3150 [1]** 1/21
**33131 [1]** 1/22
**33139 [1]** 22/1
**33301 [1]** 1/25
**33328 [1]** 31/4
**33394 [1]** 1/19
**3701 [2]** 21/17 22/20

**4**

**40 [2]** 4/10 4/11
**414,000 [2]** 68/10
68/20
**442 [1]** 60/20
**44th [2]** 48/20 62/11
**45 [20]** 9/1 10/3 10/8
10/21 11/14 20/22
21/2 21/6 21/13 31/17
35/18 45/10 46/1
49/19 50/7 59/9 59/23
59/24 84/12 91/5
**46 [1]** 4/13
**47 [1]** 4/13
**4801 [1]** 31/3
**49,000 [2]** 36/19 61/24
**4:30 [2]** 95/4 95/6
**4:31 [1]** 95/22
**4:57 p.m [2]** 31/6

**4D [1]** 61/23

**5**

**5 o'clock [3]** 29/23
31/18 31/23
**5/17/2007 [1]** 41/12
**50 [3]** 18/4 18/7 35/22
**50 percent [11]** 14/5
14/15 15/20 16/5 16/7
33/7 33/8 33/9 33/24
54/14 57/22
**50,000 [2]** 54/23 56/10
**50/50 [1]** 35/22
**500 [1]** 1/19
**505 [4]** 40/13 49/22
49/23 50/13
**506 [3]** 40/13 57/2
57/5
**5233 [1]** 60/13
**5496 [1]** 1/24
**596,000 [1]** 37/9

**6**

**6 percent [5]** 63/18
67/17 67/17 67/22
70/7
**6,000 [2]** 42/19 42/23
**6,500,000 [1]** 25/1
**6493 [2]** 21/15 22/1

**7**

**7/20/07 [1]** 46/16
**700,000 [2]** 49/5 62/9
**75 [1]** 62/11
**754 [1]** 48/20
**769 [1]** 27/14
**769-5233 [1]** 60/13
**769-5496 [1]** 1/24
**778,000 [1]** 78/17
**786,000 [2]** 68/19
68/20
**790 [1]** 57/25

**8**

**82 [1]** 77/9

**9**

**900,000 [1]** 13/7
**91,982.01 [1]** 48/2
**954 [1]** 1/24
**955 [1]** 40/3
**955,000 [1]** 40/21
**978 [2]** 27/13 60/13
**978-769 [1]** 27/14
**9:00 [1]** 95/11

**A**

**A-N-T-O-N-I-O [1]**
3/19
**AAAA [1]** 21/20
**AAAB [1]** 22/19
**AB [1]** 18/12
**ability [2]** 14/9 18/1
**able [1]** 95/5
**above-entitled [1]**
96/5

**4D [1]** 34/3 36/23 43/1 50/8
50/11 73/9 86/21 93/5
**accept [1]** 14/6
**access [2]** 85/14
85/16
**accomplish [1]** 17/24
**accomplished [1]** 7/1
**account [2]** 53/5 59/3
83/5
**accountant [2]** 82/13
82/22
**accumulated [1]** 46/9
**accurate [2]** 71/24
73/10
**acquire [1]** 14/15
**acquired [2]** 22/14
46/2
**acquisition [1]** 22/15
**action [2]** 94/2 94/6
**actively [1]** 36/4
**actual [1]** 32/13
**actuality [1]** 21/12
**add [1]** 68/20
**addendum [4]** 63/11
63/12 67/18 91/21
**addendums [1]** 63/9
**addition [1]** 78/7
**address [9]** 21/25
24/21 24/23 48/19
48/22 62/10 65/17
72/10 82/19
**addressed [1]** 63/13
**adjust [1]** 3/14
**admonition [1]** 95/13
**advantage [1]** 11/22
**advice [2]** 39/2 71/5
**affect [2]** 66/11 89/20
**afternoon [4]** 3/24
3/25 4/1 31/18
**agent [1]** 30/21
**ago [7]** 10/18 13/3
32/1 59/16 64/5 67/21
74/10
**agree [11]** 12/20
14/15 16/15 34/1 34/4
34/8 34/10 42/24
88/15 88/16 93/14
**agreed [3]** 15/19
17/18 80/24
**agreeing [1]** 34/4
**agreement [18]** 7/14
7/17 7/20 9/4 9/22
10/2 10/11 10/13
12/21 14/16 14/18
16/4 16/6 25/15 25/18
35/21 43/2 63/5
**albeit [1]** 95/17
**Allison [5]** 21/15 22/1
22/15 23/4 23/23
**allow [2]** 14/15 85/17
**allowance [2]** 56/7
56/9
**allowed [1]** 81/7
**alluded [1]** 22/2
**alluding [1]** 67/21

**alluding... [1]** 83/25
**amend [1]** 76/22
**amended [1]** 77/2
**AMERICA [1]** 1/4
**American [3]** 15/24
32/21 33/17
**amount [42]** 15/19
22/7 25/6 25/9 25/11
32/9 32/18 32/20
33/14 33/20 33/22
36/2 37/7 40/11 40/19
40/21 41/22 46/9 47/8
48/17 49/3 49/6 49/25
51/14 51/16 51/20
51/20 51/23 53/17
57/16 62/7 63/16
68/18 70/2 72/5 72/7
74/8 74/11 74/14
78/16 81/17 81/21
**amounts [9]** 23/13
34/5 70/4 75/23 75/25
78/7 78/9 78/9 78/10
**Andrew [3]** 21/24
22/14 22/22
**Angelina [1]** 4/21
**annual [1]** 42/18
**answer [3]** 87/23
87/25 93/23
**ANTONIO [2]** 3/12
3/18
**anybody [3]** 57/16
94/12 95/2
**anyway [1]** 69/20
**apartment [5]** 24/10
25/16 29/17 32/3 36/6
**apartments [3]** 54/21
55/11 55/12
**appear [2]** 80/6 80/9
**Appearances [1]** 1/16
**appears [1]** 29/2
**application [34]** 5/13
17/22 22/24 23/12
24/2 24/13 27/7 27/20
34/6 36/11 42/21
45/20 47/18 60/11
71/8 72/4 73/2 73/13
73/16 73/19 73/21
87/5 87/7 89/8 89/13
89/21 92/1 92/1 92/5
92/7 93/18 93/22
93/23 93/25
**applications [6]** 5/18
43/6 89/2 89/5 90/4
93/21
**applied [3]** 65/25
86/24 87/4
**applying [1]** 16/24
**appraised [1]** 13/8
**approved [4]** 53/23
53/24 69/23 69/24
**approves [1]** 70/11
**approximate [2]** 13/6
13/20
**approximately [8]** 4/8
7/21 29/23 31/6 32/14

**April [5]** 10/17 22/13
22/14 23/6 23/24
**April 9 [2]** 22/13 22/14
**arrive [1]** 68/21
**arrived [2]** 59/13
59/14
**asked [9]** 19/17 38/6
53/11 53/11 53/23
65/4 71/21 84/20
85/13
**asking [1]** 39/18
**asset [5]** 48/13 48/17
48/19 62/8 91/25
**assets [1]** 79/15
**assigned [1]** 70/9
**assigning [1]** 69/4
**assignment [7]** 15/11
32/25 33/1 33/4 33/10
33/16 57/6
**assignor [1]** 15/15
**assist [1]** 42/24
**Assistant [1]** 1/18
**assisting [2]** 6/23
36/4
**assuming [1]** 74/13
**attached [1]** 78/18
**attempts [1]** 64/5
**attention [2]** 29/22
40/3
**Attorneys [1]** 1/18
**auctioned [1]** 86/4
**authorize [7]** 50/9
50/19 52/4 52/6 52/11
79/14 79/19
**available [4]** 10/22
11/16 13/5 40/22
**Avatar [4]** 61/2 61/6
61/8 61/10
**Avenue [4]** 4/4 14/14
23/23
**average [1]** 13/4

---

**B**

**back [19]** 24/6 25/7
25/25 26/6 26/23
37/22 40/21 51/25
53/17 54/1 72/9 73/24
74/7 81/8 81/13 85/17
85/18 90/2 90/12
**back/home [1]** 25/7
**backup [1]** 85/9
**backwards [1]** 65/14
**bag [1]** 86/7
**Balance [1]** 23/20
**bank [43]** 7/3 7/3 7/10
7/12 8/9 8/14 8/15
8/17 25/16 34/1 34/4
34/8 34/11 42/18
42/25 53/24 59/3
69/19 69/23 70/11
70/21 72/24 73/3
73/18 73/21 76/16
78/5 79/15 85/10
85/10 86/8 87/6 87/6
87/7 88/11 88/12

**89/4 89/12 91/15
92/16
**bank's [3]** 42/12 73/5
76/17
**banking [1]** 5/3
**banks [3]** 18/7 89/4
**barely [1]** 29/2
**based [2]** 32/3 67/9
**basic [1]** 78/4
**basically [4]** 7/8 8/13
88/1 91/16
**basics [1]** 78/8
**bathrooms [1]** 55/13
**Bay [2]** 52/24 52/25
**Beach [10]** 4/5 4/23
4/24 4/25 12/5 22/1
24/22 30/1 31/15
61/18
**beginning [2]** 75/5
85/15
**believe [14]** 6/4 10/23
16/2 17/9 37/9 39/6
46/6 46/11 54/23
58/16 80/15 82/7
84/18 91/15
**believed [3]** 32/1
58/17 90/23
**Bellagio [2]** 6/17 6/18
**belonging [1]** 59/3
**bench [1]** 38/22
**benefit [1]** 32/13
**Benz [1]** 59/15
**best [1]** 78/2
**better [2]** 8/15 8/16
**big [1]** 10/23
**Biscayne [1]** 1/21
**bit [4]** 19/15 27/14
47/6 90/2
**black [1]** 59/15
**BLOOM [1]** 1/2
**bona [2]** 8/19 8/20
**born [1]** 12/11
**borrower [10]** 21/21
42/16 65/25 66/2 66/8
70/2 72/3 72/13 73/16
87/13
**bottom [1]** 76/10
**Boulevard [5]** 1/19
1/21 1/24 36/1 83/8
**box [1]** 93/19
**boxes [2]** 89/8 89/9
**BP [6]** 2/8 63/23 64/9
64/11 64/12 64/14
**break [2]** 44/5 44/10
**Brickell [2]** 14/13
14/14
**bright [1]** 95/11
**bring [1]** 44/16
**broker [7]** 5/15 5/17
12/5 17/9 19/20 19/22
66/1
**broker's [2]** 5/25 6/1
**brokerage [1]** 25/4
**brokers [1]** 11/25
**brought [1]** 91/16

**Bryant [1]** 18/21
**build [5]** 54/21 55/7
55/12 57/24 59/12
**build-out [2]** 54/21
55/7
**build-outs [3]** 55/12
57/24 59/12
**builder [1]** 65/25
**building [9]** 10/9
10/21 11/6 11/8 11/10
60/5 81/15 81/18 87/5
**buildings [1]** 14/14
**built [4]** 11/6 33/23
55/13 60/3
**built-out [1]** 55/13
**business [18]** 6/8
12/8 12/9 16/1 17/5
19/11 19/13 19/16
43/23 70/20 84/14
87/11 87/16 87/17
88/12 88/18 89/4 89/5
**businessman [1]**
12/14
**buy [6]** 11/24 13/1
13/3 13/23 14/12 58/7
**buyer [4]** 10/19 21/21
30/12 30/17
**buyer/borrower [1]**
21/21
**buyers [6]** 10/6 14/9
26/20 28/15 28/18
47/22
**buying [1]** 35/25

---

**C**

**cabinet [1]** 85/12
**cabinets [1]** 85/24
**Cabrera [32]** 25/24
26/1 26/3 29/18 29/20
30/5 30/25 34/10
37/20 38/4 38/5 39/21
40/18 41/2 43/13 50/5
50/6 50/9 51/2 52/9
53/7 55/2 67/1 67/11
69/16 69/18 70/7 81/4
81/8 81/9 83/17 84/13
**Cabrera's [3]** 29/19
82/9 83/5
**California [1]** 87/6
**call [4]** 3/5 16/25
44/13 82/25
**called [11]** 6/6 7/3 7/7
18/6 40/7 46/5 61/2
83/8 87/6 88/6 88/6
**calls [5]** 3/7 18/25
30/4 38/18 89/23
**Capital [1]** 20/3
**car [4]** 59/18 59/19
74/3 74/5
**carefully [2]** 84/5 84/7
**carpet [1]** 55/19
**carry [1]** 58/6
**case [20]** 1/2 13/18
26/17 33/7 44/11 45/2
45/5 47/20 48/21

**circulation [1]** 34/25
**circumstances [1]**
31/15
**citizen [1]** 12/11
**civil [2]** 95/11 95/11
**claimed [1]** 12/9
**Claudine [1]** 18/21
**clients [2]** 45/14 61/20
**close [27]** 3/14 18/2
18/14 19/8 26/9 32/10
32/15 33/22 37/4 37/8
37/11 37/12 38/16
40/22 58/1 58/3 65/10
66/11 66/13 67/4 70/3
70/5 70/8 80/22 80/24
88/17 91/22
**closed [1]** 88/22
**closet [1]** 55/11
**closets [2]** 81/15
81/18
**closing [45]** 10/6
10/20 25/13 29/13

**cash [20]** 26/8 32/9
32/14 33/22 37/8
37/11 37/12 40/22
58/1 58/3 65/10 66/11
66/13 67/4 70/2 70/3
70/5 70/8 80/21 80/24
**cashed [1]** 83/4
**cashier's [3]** 54/1 54/8
54/8
**CD [5]** 85/3 85/7 86/19
92/14 92/16
**CDs [8]** 85/8 85/8
85/11 85/12 86/5 86/6
86/7 86/10
**certain [3]** 40/19
47/16 82/2
**Certified [1]** 96/3
**certify [1]** 96/3
**chair [1]** 3/14
**change [4]** 33/14
44/25 76/23 76/24
**charge [1]** 47/23
**charging [1]** 33/4
**check [13]** 7/24 54/1
54/8 54/9 58/6 58/7
70/12 81/23 81/25
82/4 82/5 89/8 93/19
**checked [2]** 20/19
89/8
**child [1]** 4/20
**children [2]** 4/16 4/17
**children's [1]** 4/18
**choosing [1]** 59/11
**cigar [1]** 83/7
**Cigars [3]** 83/9 83/11
83/14
**circle [1]** 81/8

**C**

closing... [41] 29/15
29/19 29/23 30/9 31/2
31/22 32/2 32/2 32/6
32/8 34/2 37/2 38/3
41/8 43/9 43/11 43/13
43/14 43/17 44/4 45/7
46/10 48/11 50/2
56/11 58/4 58/6 58/11
62/24 62/25 64/2
64/25 65/25 66/8
77/22 83/16 83/18
83/20 83/23 92/19
93/12
closings [5] 21/13
58/20 59/1 70/24
70/24
COHEN [1] 1/2
COHN [1] 1/13
cold [1] 16/25
collateralize [1] 92/15
Collins [1] 4/4
column [2] 23/19
23/22
combined [1] 51/17
come [12] 19/17 20/21
24/5 24/9 28/6 29/18
65/2 81/14 84/12
84/14 86/24 87/3
comes [3] 5/20 64/25
93/21
coming [2] 37/12 70/9
commercial [4] 5/7
5/20 5/21 87/5
commission [8] 19/24
68/12 68/16 69/4
69/13 69/20 69/22
70/9
commissions [3]
19/13 19/18 20/9
commit [1] 38/25
commitment [7] 7/10
7/11 8/12 8/13 8/15
8/19 8/20
committing [1] 42/25
common [2] 94/7 94/8
communicate [2] 71/4
95/14
communicating [1]
70/21
companies [3] 15/18
87/13 94/13
company [26] 6/6
15/25 16/2 17/2 19/22
20/2 32/24 33/18
35/13 35/14 41/17
52/23 52/24 53/1
56/21 56/24 57/4
57/10 57/13 61/2 71/2
74/23 78/17 82/15
82/20 82/21
complete [4] 11/1
11/1 77/10 95/5
computer [4] 79/25
84/20 86/17 86/22
concerned [1] 87/8

concealing [1] 82/25
concession [3] 65/11
65/12 67/17
concessions [5]
64/21 64/22 65/6
65/19 70/7
Concrete [1] 55/18
condo [2] 6/19 31/16
condominium [5]
10/8 10/21 46/6 47/14
91/8
condos [1] 6/9
conducts [1] 43/13
confident [1] 90/22
confirm [1] 14/18
confuse [1] 23/10
connected [1] 42/20
considered [3] 66/6
66/17 66/21
consistent [1] 30/10
construction [5] 6/15
7/2 10/25 11/1 11/14
contacting [2] 73/18
73/21
contention [1] 73/10
Continental [2] 61/4
61/10
continue [3] 44/11
44/21 95/19
continuing [1] 95/13
contract [4] 7/8 63/1
67/18 68/15
contribute [1] 81/18
contributed [2] 66/3
66/14
contribution [10]
63/14 63/16 63/17
65/7 65/9 66/7 66/19
67/19 68/10 69/20
contributions [14]
63/19 64/2 64/23 65/5
65/16 65/21 65/23
65/24 66/6 66/17
67/12 67/17 68/3 70/8
copy [1] 84/24
Coral [2] 61/13 61/16
Corner [1] 87/14
Corners [1] 91/3
Corporation [6] 27/6
27/9 36/10 45/19
60/10 74/24
correct [21] 13/23
13/24 32/3 33/8 33/18
36/20 37/5 39/2 39/9
45/11 47/11 51/21
54/10 56/25 57/1
74/18 75/6 75/8 83/18
94/3 96/4
correctly [1] 11/15
correspondent [2]
19/22 91/16
Corzo [18] 26/12
26/14 26/16 26/19
26/22 27/21 27/23
29/1 29/13 29/15
29/19 30/12 30/17

continuing... [2] 31/3
73/25 107
Corzo's [2] 29/7 32/24
cost [4] 55/24 59/19
59/20 81/15
costs [1] 66/2
counsel [1] 44/15
couple [1] 93/17
Courier [2] 82/2 83/4
course [4] 39/4 68/9
89/7 95/18
court [5] 1/1 1/24
39/16 44/13 85/16
Court's [1] 95/13
courtroom [1] 26/14
cover [2] 69/22 69/24
covered [1] 80/15
create [1] 55/18
credit [4] 16/23 16/24
17/1 17/21
credits [2] 65/24 66/8
cross [1] 92/15
cross-collateralize [1]
92/15
Cruz [10] 34/13 34/24
36/4 36/13 37/4 41/8
41/20 41/24 42/17
66/21
Cruz's [1] 42/8
Cuba [3] 12/11 35/8
35/9
currently [2] 4/4 5/25
CX [6] 2/7 14/20 15/3
15/3 15/8 15/9

**D**

D'Agostino [3] 7/23
7/24 8/22
Dade [1] 31/13
Dale [2] 63/5 63/6
date [10] 6/5 10/10
10/13 18/12 22/12
41/11 46/15 74/21
75/3 76/23
dated [3] 31/5 74/21
96/6
dates [1] 10/14
daughter [1] 84/2
DAVID [1] 1/20
Davie [2] 31/3 31/8
day [4] 10/17 64/16
70/24 96/6
days [2] 68/5 68/6
de [14] 21/17 22/20
23/7 34/13 36/4 36/13
37/4 41/8 41/20 41/24
42/8 42/17 66/21 83/8
dead [2] 31/18 92/21
deal [2] 7/22 38/17
dealing [1] 24/1
dealings [2] 6/10 6/12
dealt [2] 12/6 81/9
debt [2] 22/16 46/9
decorator [1] 55/12
decorator-ready [1]
55/12

default [3] 10/6 10/20
92/16
defend [1] 94/11
defendant [6] 1/8 1/20
3/12 94/2 94/16 94/22
Defendant's [30] 2/7
2/7 2/8 9/9 9/17 9/18
10/14 15/3 15/9 18/11
21/19 22/18 24/16
27/1 30/14 36/7 37/10
41/5 42/5 45/16 49/9
51/5 56/13 60/8 64/12
67/24 71/8 72/3 73/14
75/17
defense [3] 3/7 9/15
14/20
defraud [6] 25/16
25/20 34/1 34/4 34/8
34/10
delivered [2] 11/8
11/10
depends [3] 35/15
39/6 74/2
deposit [2] 11/12
92/14
describe [4] 43/16
55/8 65/7 87/2
described [3] 63/12
83/17 92/24
desk [1] 85/24
destroy [3] 84/21
84/24 85/1
destroyed [1] 86/11
determine [3] 29/24
38/25 86/9
determined [1] 86/10
developer [4] 6/9 7/13
10/24 66/1
development [1] 5/7
Diaz [3] 58/19 58/24
59/4
didn't [11] 11/23
13/22 20/1 43/22
43/24 67/13 81/13
84/7 84/9 85/14 85/16
difference [1] 74/17
different [4] 58/13
62/15 64/25 65/1
differently [1] 83/21
difficult [1] 88/5
digits [1] 60/18
direct [3] 2/3 3/22
44/21
directly [1] 70/21
disappeared [1] 85/25
disclose [2] 38/10
39/7
discovered [1] 53/5
discuss [12] 37/14
37/19 37/23 44/11
53/7 62/25 63/19 64/5
66/24 67/1 70/15
95/14
discussed [2] 12/15
88/3

discussion [2] 53/21
67/3 69/3 69/15 83/7
86/25
discussions [1] 67/11
dispute [2] 8/5 8/22
disrespect [1] 58/9
distribution [1] 35/1
DISTRICT [3] 1/1 1/1
1/14
divorce [3] 85/15
85/15 85/17
divorced [1] 4/15
docs [1] 78/18
document [90] 5/13
7/7 8/11 9/10 9/12
9/20 9/22 14/21 14/23
14/25 15/11 15/12
15/14 16/3 22/10
22/25 23/2 23/4 23/7
23/13 24/17 25/2 25/6
27/2 27/5 28/14 31/1
31/5 31/21 32/7 32/13
37/1 40/10 41/16 42/9
42/11 43/8 45/17
45/18 45/21 46/12
49/10 49/11 49/13
49/22 51/8 51/9 51/11
51/13 51/14 52/8
52/12 52/15 52/18
52/19 53/3 56/14
56/16 56/18 60/9
60/12 61/4 61/19
61/22 61/24 63/23
63/25 64/1 64/1 64/4
65/2 65/3 65/16 67/25
68/2 68/5 68/12 72/2
72/18 72/20 72/22
72/24 73/5 74/13
74/14 74/15 75/19
77/17 80/6 80/9
documentation [9]
45/24 46/21 46/23
58/25 71/22 71/25
77/20 84/4 89/3
documents [12] 20/5
25/20 25/22 28/18
28/19 43/20 43/22
60/14 60/16 74/18
74/20 79/2
doing [7] 20/6 26/3
35/1 35/9 39/9 43/23
70/24
dollar [2] 13/17 13/17
dollars [2] 13/19
13/21
domestic [1] 66/4
double [1] 49/6
draw [2] 40/3 92/16
drawers [1] 85/24
drive [8] 24/22 31/3
31/9 63/2 72/11 74/3
84/24 91/11
driving [1] 31/14
drove [2] 73/25 74/5
due [5] 7/16 7/19
32/25 40/19 52/1

**E**

**earlier [3]** 13/22 40/6 74/14
**early [3]** 5/16 5/16 95/12
**east [4]** 1/19 1/24 72/11 72/12
**easy [1]** 76/23
**effort [2]** 63/19 76/21
**eight [2]** 49/21 84/1
**either [3]** 27/15 30/5 37/19 75/12 78/4 94/15
**El [3]** 34/22 34/24 41/6
**eldest [1]** 4/19
**Elementary [1]** 4/23
**Elite [4]** 30/21 30/24 52/8 52/11
**ELMO [1]** 79/21
**email [38]** 18/21 65/17 71/18 75/23 76/2 76/7 76/7 76/9 76/10 76/10 76/12 76/13 76/16 76/21 76/22 76/25 77/1 77/2 77/4 77/5 77/5 77/13 77/15 77/24 78/9 78/12 78/13 78/15 79/1 79/5 79/7 79/8 79/14 79/19 79/23 79/24 79/25 80/12
**emails [7]** 67/10 76/19 78/5 80/13 85/3 85/9 85/13
**employer [2]** 66/4 66/15
**employment [1]** 41/7
**endeavor [4]** 60/21 82/15 82/18 85/18
**Eneida [25]** 44/4 45/11 45/2 45/4 45/7 45/10 45/13 45/21 46/2 46/3 47/1 47/9 47/25 48/7 48/10 48/13 49/1 49/7 49/17 50/2 50/4 54/25 59/1 62/12 62/15
**engagement [2]** 7/8 8/18
**English [1]** 28/5
**enlarge [1]** 27/14
**enter [1]** 14/18
**entire [4]** 52/25 78/7 79/8 81/9
**entities [1]** 94/1
**entitle [1]** 10/1
**entitled [4]** 10/2 15/11 53/18 96/5
**entity [1]** 87/14
**equal [3]** 51/16 51/18 51/20
**Equites [1]** 15/17
**Equities [6]** 15/14 32/21 40/3 40/11 51/6 52/1
**Equities' [1]** 40/16
**equity [5]** 16/22 16/24

escrow [5] 25/6 30/22 30/24 52/9 52/11
**ESQ [1]** 1/20
**establish [3]** 10/13 38/24 39/2
**establishing [1]** 39/3
**estate [8]** 5/3 5/7 5/25 12/5 66/1 87/12 87/15 87/17
**Estop [10]** 21/10 21/12 21/24 22/3 22/14 22/22 23/23 24/3 24/7 47/20
**evidence [26]** 9/5 9/18 15/3 15/9 18/11 21/19 22/18 24/15 27/1 30/14 36/7 37/10 41/5 42/5 45/16 49/9 51/5 56/13 60/8 64/9 64/12 67/24 75/16 78/16 79/21 79/22
**ex [3]** 84/1 86/3 88/3
**ex-wife [3]** 84/1 86/3 88/3
**exact [2]** 5/23 64/24
**exactly [1]** 6/4
**examination [3]** 2/3 3/22 44/21
**EXCERPT [1]** 1/12
**excess [1]** 53/21
**exclusivity [2]** 8/17 8/18
**excuse [3]** 10/7 29/19 31/25
**exercise [2]** 10/19 11/17
**exercising [1]** 33/4
**Exhibit [22]** 2/7 2/7 2/8 9/9 9/15 9/18 10/14 14/20 15/9 18/12 21/19 22/9 24/16 30/15 41/6 49/10 51/6 63/23 64/12 64/14 67/25 71/8
**exhibits [2]** 2/6 78/1
**existence [1]** 52/1
**expect [3]** 37/15 37/17 80/12
**expecting [3]** 12/25 13/1 13/20
**expense [2]** 23/15 23/17
**experience [4]** 5/10 20/4 37/25 38/3
**expert [1]** 86/8
**experts [1]** 39/6
**expired [1]** 6/5
**expiring [1]** 91/17
**explain [4]** 9/25 12/22 13/25 85/6
**extend [1]** 91/21
**extension [2]** 93/4 93/6
**extensive [1]** 5/9

extracted [1] 80/18
**eyes [2]** 52/14 90/20

**F**

**FA [1]** 42/6
**face [5]** 17/10 17/10 17/12 17/12 41/1
**fact [9]** 28/10 50/22 55/22 66/24 67/1 85/1 86/14 92/18 93/12
**facts [2]** 38/10 71/4
**faith [4]** 38/23 39/1 39/11 39/25
**false [8]** 25/20 25/22 47/23 48/10 73/11 73/12 78/10 78/11
**falsely [1]** 50/9
**familiar [6]** 6/6 27/18 31/8 34/14 34/16 76/19
**family [7]** 36/6 66/4 66/15 66/18 66/22 67/13 67/15
**far [3]** 11/14 19/13 31/14
**fashion [2]** 83/21 83/22
**father [11]** 16/14 34/17 35/4 36/18 38/16 41/17 42/21 43/8 43/14 67/4 83/16
**father-in-law [11]** 16/14 34/17 35/4 36/18 38/16 41/17 42/21 43/8 43/14 67/4 83/16
**fax [16]** 27/10 27/13 27/19 28/22 28/22 52/17 52/19 60/12 60/15 60/18 60/19 60/21 60/22 61/12 69/22 69/24
**faxed [1]** 75/3
**faxes [2]** 61/12 61/15
**FBI [3]** 84/20 86/20 86/22
**FCRR [2]** 1/23 96/8
**federal [2]** 82/19 96/3
**fee [6]** 19/18 20/18 25/3 33/1 33/4 33/24
**feel [1]** 3/15
**fees [6]** 7/8 8/5 25/4 32/25 33/16 57/6
**Felix [12]** 12/3 12/4 12/7 13/25 15/19 24/20 26/2 30/5 31/16 35/21 59/6 81/14
**fiance [1]** 66/5
**fiancee [1]** 66/4
**fide [2]** 8/19 8/20
**file [10]** 42/12 53/1 53/3 77/10 77/15 86/18 86/19 88/14 88/24 89/11
**filed [1]** 76/17
**files [6]** 52/8 60/15

88/22
**filing [2]** 85/12 85/24
**fill [1]** 17/22
**filled [5]** 5/18 5/19 46/18
**final [3]** 68/6 92/1 92/4
**finally [1]** 34/10
**finances [1]** 26/23
**financial [2]** 88/23 92/6
**financing [3]** 5/6 6/20 8/7
**find [4]** 14/9 60/21 65/4 85/21
**finding [1]** 60/24
**fine [3]** 39/20 39/22 88/10
**finger [1]** 80/6
**finish [2]** 90/5 90/7
**finished [1]** 59/25
**finishing [1]** 55/25
**first [18]** 16/21 18/16 18/18 18/21 36/14 37/14 50/16 51/25 52/14 60/6 60/18 61/4 61/10 63/1 65/19 66/12 71/11 83/3
**firsthand [1]** 90/19
**five [2]** 13/7 23/9 23/10
**fixtures [1]** 55/11
**FJ [2]** 73/14 74/14
**flipping [1]** 14/13
**floor [3]** 85/23 85/25 86/6
**flooring [5]** 55/11 55/14 55/16 56/4 59/11
**floors [3]** 55/21 55/22 59/25
**FLORIDA [18]** 1/1 1/8 1/19 1/22 1/25 4/5 4/6 4/7 15/24 22/1 22/20 30/21 30/24 31/3 31/8 31/11 52/8 52/11
**fluent [3]** 28/2 28/4 28/10
**focusing [2]** 21/20 29/22
**folks [3]** 3/4 44/7 44/18
**follow [1]** 65/22
**following [2]** 38/22 39/16
**foot [1]** 83/11
**foreclosure [2]** 94/2 94/5
**foregoing [1]** 96/3
**form [7]** 5/12 9/3 34/6 36/24 50/12 50/14 79/16
**Fort [4]** 1/8 1/19 1/25 36/1
**Fort Lauderdale [1]**

forward [8] 3/9 11/12 28/19 39/25 61/19 76/21 76/25 79/15
**forwarded [6]** 76/2 76/13 77/1 77/2 77/6 78/5
**forwarding [3]** 76/19 79/1 80/12
**found [5]** 52/8 73/5 76/17 83/3 85/22
**four [11]** 11/18 11/19 11/20 11/23 11/24 13/5 13/23 16/8 16/9 16/9 20/24
**frame [2]** 35/11 35/15
**fraud [4]** 38/25 42/25 42/25 42/25
**free [1]** 3/15
**Frizzie [83]** 16/18 16/21 17/2 17/7 17/10 17/12 18/14 18/20 19/5 19/7 19/10 19/11 19/17 20/6 20/11 20/22 21/3 21/5 22/5 22/24 23/12 24/1 24/14 25/3 25/18 25/22 27/8 28/1 28/4 28/6 28/14 28/20 29/10 30/5 34/5 36/16 36/17 36/22 37/19 38/1 38/2 39/18 43/3 43/5 44/1 46/3 46/19 46/23 47/9 47/13 47/16 48/3 48/22 49/3 61/12 62/2 62/5 62/20 63/20 64/6 64/15 65/4 66/24 67/11 71/12 71/15 71/18 71/21 72/4 72/15 72/22 73/7 73/20 74/10 75/1 75/6 75/22 76/4 76/14 77/9 79/14 80/7 84/8
**Frizzie's [3]** 27/19 36/24 62/22
**front [3]** 43/18 68/2 70/1
**fully [1]** 94/23
**funding [2]** 88/11 91/2
**funds [12]** 11/19 11/24 40/22 58/3 65/9 65/12 65/24 66/3 66/7 66/14 70/4 70/13
**furniture [4]** 85/25 86/1 86/2 86/3

**G**

**Gables [2]** 61/13 61/16
**Galen [55]** 16/18 16/21 17/2 17/7 17/10 17/12 18/20 20/6 20/11 20/21 21/3 21/5 24/14 25/3 25/18 25/22 27/19 28/1 30/5 36/16 36/17 36/22

**G**

Galen... **[33]** 36/24 39/18 43/3 43/5 43/23 46/2 46/19 46/23 47/8 47/13 48/3 48/22 49/3 61/12 62/2 62/20 62/22 63/20 64/6 64/15 65/4 66/24 67/11 71/15 73/20 74/10 75/1 75/22 76/4 76/13 79/14 80/7 84/8
Garmo **[3]** 21/17 22/20 23/7
GARVIN **[6]** 1/20 2/3 3/5 3/21 3/25 44/22
general **[1]** 47/1
generally **[4]** 5/9 31/11 66/6 66/16
generating **[1]** 19/13
gentleman **[2]** 21/9 26/11
gentlemen **[15]** 4/1 5/4 6/25 9/25 12/22 16/20 27/4 32/12 40/6 48/16 52/22 53/9 55/8 65/8 87/2
getting **[2]** 18/17 19/10
Gianna **[1]** 4/19
gift **[4]** 37/16 37/18 38/16 39/5
give **[5]** 38/6 40/18 54/5 54/5 82/15
given **[4]** 56/7 65/24 66/8 68/6
giving **[1]** 55/5
go **[28]** 4/22 29/13 39/25 40/2 51/19 51/25 52/25 53/17 56/11 58/4 61/19 62/24 66/7 66/14 71/7 72/9 74/7 77/10 77/17 78/23 85/17 85/19 88/1 91/20 94/10 94/11 94/16 94/17
goes **[1]** 38/23
going **[43]** 11/12 13/4 27/1 27/13 30/14 36/7 40/21 42/5 42/11 45/16 47/6 47/22 51/2 51/19 54/20 56/11 59/11 60/3 60/14 65/12 73/13 75/16 78/2 79/21 79/22 82/5 82/8 83/23 83/24 84/21 87/12 87/20 88/8 88/9 89/4 92/9 93/13 93/14 93/14 94/10 95/4 95/5 95/8
good **[7]** 3/24 3/25 4/1 38/23 39/1 39/10 39/25
Gordon **[20]** 17/3 17/4 17/8 18/3 20/10 27/6 27/9 36/10 45/19 45/24 60/9 60/10

**H**

half **[2]** 31/20 84/3
hand **[3]** 3/11 5/20 78/20
handle **[2]** 56/4 56/5
handled **[4]** 22/5 83/20 83/21 83/22
handling **[1]** 55/6
happen **[4]** 10/4 58/10 88/19 93/13
happened **[10]** 11/5 12/2 17/18 17/19 53/10 85/11 86/2 86/5 88/20 93/23
happening **[1]** 87/15
happens **[2]** 91/13 91/14
Harbor **[1]** 80/19
Harbour **[9]** 24/10 24/22 25/16 26/4 31/16 68/13 68/16 68/23 91/8
hard **[2]** 18/2 84/24
hard-to-close **[1]** 18/2
Havana **[2]** 83/8 83/11 83/13
head **[1]** 42/3
headers **[1]** 77/8
hear **[1]** 83/9
heard **[3]** 16/21 38/20 60/6
hearings **[2]** 95/1 95/11
hearsay **[2]** 38/19 39/8
heartache **[1]** 94/7
Hector **[5]** 26/12 27/21 27/23 29/1 30/17
held **[5]** 6/1 8/17 33/2 38/22 39/16
help **[2]** 16/25 34/25
helped **[2]** 18/13 35/14
helping **[1]** 35/24
helps **[1]** 27/14
Hendricks **[19]** 9/2 10/3 10/8 10/21 11/14 20/22 21/2 21/6 21/13

49/1 49/7 59/9 59/23 59/24 84/12 91/5
hey **[1]** 82/25
high **[20]** 4/24 4/25 6/6 6/8 6/9 6/10 6/13 6/14 6/20 7/2 7/13 7/22 8/6 8/12 8/13 9/23 10/7 20/24 30/19 87/9
higher **[1]** 33/20
Hightower **[2]** 63/5 63/6
hindsight **[1]** 92/24
hired **[1]** 6/14
HJ **[1]** 30/15
HK **[1]** 27/2
hold **[3]** 5/24 5/25 25/7
Holding **[1]** 15/24
Holdings **[2]** 33/21 33/17 78/17
home **[16]** 16/22 16/23 16/24 16/25 17/21 18/19 25/7 30/1 63/13 63/14 80/18 85/19 85/21 86/1 87/8 91/11
homes **[1]** 12/6
Honor **[15]** 3/6 3/10 9/14 15/2 15/5 18/25 38/18 38/21 39/8 39/12 64/8 87/18 87/21 89/15 89/23
HONORABLE **[1]** 1/13
hospital **[2]** 42/3 42/4
hour **[3]** 31/17 31/19 31/20
hours **[3]** 29/18 31/20 31/20
house **[20]** 58/8 83/23 84/3 85/4 85/16 85/17 85/18 88/2 88/22 88/4 88/5 88/6 88/7 88/8 88/9 88/10 88/11 91/18 91/19 91/20
HUD **[23]** 24/15 24/18 24/19 26/4 32/24 37/7 41/2 50/4 50/10 50/16 50/17 51/21 53/24 57/15 66/12 68/5 68/6 68/6 69/15 69/23 70/11 77/21 92/19
HUD-1 **[16]** 24/15 24/18 24/19 26/4 32/24 37/7 41/2 50/4 50/10 51/21 66/12 68/5 68/6 68/6 69/15 77/21
HUDs **[3]** 57/10 57/13 57/14
hurricane **[1]** 63/15
husband **[3]** 81/10 82/9 83/5
husband's **[2]** 81/12 81/13

I'll **[5]** 4/13 36/8 84/24 87/22 88/9
I'm **[59]** 9/8 9/20 10/12 13/4 13/16 14/20 18/11 18/20 21/20 22/18 23/10 23/11 24/15 27/1 27/13 28/25 29/22 30/14 32/12 33/9 36/7 37/10 37/11 39/1 39/2 40/2 41/5 42/5 42/11 45/16 47/3 47/6 49/9 49/22 51/1 51/5 51/19 52/17 54/3 56/11 56/13 63/22 64/14 67/24 69/8 70/20 71/16 72/2 73/1 75/16 78/2 79/21 79/22 88/6 88/8 88/9 89/16 93/5 95/8
I've **[2]** 4/7 77/7
ID **[1]** 82/19
idea **[2]** 73/9 91/19
ideas **[1]** 35/9
identical **[2]** 79/2 80/13
identification **[2]** 9/8 63/22
identified **[1]** 24/16
identity **[1]** 60/22
IL **[2]** 37/10 40/2
illegal **[1]** 43/2
impact **[1]** 63/15
improper **[1]** 43/3
improvements **[2]** 25/7 55/24
include **[3]** 57/21 57/23 79/7
included **[3]** 35/21 63/13 63/14
including **[2]** 20/14 66/4
income **[15]** 28/25 29/8 34/5 36/14 36/17 42/18 47/25 72/3 74/7 74/8 75/8 79/15 82/11 92/4 92/6
incoming **[1]** 30/4
incorrect **[2]** 32/4 32/5
increased **[1]** 70/3
incurred **[1]** 22/15
independent **[1]** 95/19
indicate **[2]** 12/10 30/8
indication **[3]** 28/22 46/17 46/20
indictment **[1]** 80/16
industry **[1]** 7/7
information **[16]** 19/5 19/8 27/10 29/11 36/22 38/12 39/19 44/1 48/3 62/2 62/4 73/7 89/11 89/12 90/3 93/25
ING **[1]** 8/15 8/16

I'll... continued above

inside **[5]** 55/9 83/11 85/12 85/23 85/23
inspect **[1]** 59/25
installing **[1]** 55/22
instruct **[1]** 19/5
instructed **[1]** 53/13
intended **[2]** 37/16 37/17
intent **[4]** 8/11 38/23 38/25 39/1
intention **[2]** 93/3 93/8
intentionally **[1]** 86/10
interest **[4]** 14/16 25/2 25/9 94/24
interested **[5]** 12/18 65/24 66/3 66/15 67/5
interior **[1]** 59/15
Internet **[1]** 77/8
interviewer **[2]** 46/17 74/25
interviewer's **[1]** 47/18
introduce **[1]** 21/3
introduced **[2]** 25/25 28/1
investment **[2]** 5/3 54/23
investors **[2]** 14/12 26/20
involved **[4]** 5/22 14/13 55/22 55/24
involvement **[3]** 24/7 28/16 34/24
IR **[1]** 36/8
Isle **[2]** 46/1 49/19
Isles **[1]** 4/4
issue **[6]** 28/7 39/4 69/12 82/22 92/20 93/21
issues **[1]** 11/11
it's **[31]** 3/18 7/8 13/17 15/18 18/6 24/18 24/19 29/1 41/7 41/12 45/19 49/14 50/15 51/18 60/10 60/13 65/16 65/18 67/15 71/15 72/11 73/10 73/14 84/16 90/6 90/6 92/19 94/7 94/8 95/4 95/6
italicize **[1]** 80/3
italicized **[2]** 80/1 80/7
items **[1]** 63/12

**J**

Jade **[1]** 14/13
JAMES **[1]** 1/13
Jennifer **[1]** 65/17
jennifer.owens **[1]** 65/18
job **[4]** 26/23 42/2 55/25 88/23
jobs **[1]** 41/25
John **[11]** 62/9 69/3 69/6 69/12 88/7 90/1

**John... [5]** 90/13 90/14 90/15 90/15 90/23
**joined [1]** 94/15
**Jorge [6]** 34/13 36/13 41/20 42/8 42/17 66/21
**journalists [1]** 95/18
**judge [2]** 1/14 85/17
**July [1]** 18/12
**July 27 [1]** 18/12
**June [9]** 26/6 26/24 29/22 31/5 31/21 74/22 75/4 75/5 79/11
**June 12th [1]** 79/11
**June 2007 [1]** 75/5
**June 25 [2]** 31/5 31/21
**June 25th [1]** 29/22
**junior [2]** 75/22 94/9
**jury [21]** 1/14 3/3 5/4 6/25 9/25 12/22 16/20 27/4 32/13 40/6 44/12 44/16 44/17 48/16 52/22 53/9 55/8 65/8 87/2 95/8 95/22

**K**

**KAREN [1]** 1/18
**KATZ [1]** 1/17
**keep [7]** 10/24 16/13 20/1 20/9 44/11 95/8 95/20
**key [1]** 79/25
**KH [4]** 75/17 78/1 79/23 80/9
**KI [3]** 79/22 79/24 80/6
**kind [6]** 6/8 6/18 8/4 42/2 74/3 92/15
**kitchens [1]** 55/13
**KJ [2]** 78/1 78/16
**knew [2]** 37/24 69/19
**know [45]** 5/13 16/18 17/2 18/22 19/14 24/2 24/4 24/12 25/11 26/3 26/6 26/7 29/15 31/11 32/9 35/7 42/2 43/5 45/2 47/22 47/24 50/24 51/2 58/11 58/12 59/2 59/5 61/7 68/23 72/24 73/2 75/15 76/16 77/4 79/25 81/12 81/13 82/4 82/8 82/19 83/1 88/8 89/21 92/20 95/12
**know -- strike [1]** 75/15
**knowing [1]** 77/1
**knowledge [9]** 21/5 29/7 32/3 32/17 32/24 39/23 59/19 82/22 90/19
**known [2]** 44/25 48/10

**L-U-A-R-E-T-I [1]** 3/20
**La [10]** 34/13 36/4 36/13 37/4 41/8 41/20 41/24 42/8 42/17 66/21
**lacking [1]** 55/11
**ladies [15]** 4/1 5/4 6/25 9/25 12/22 16/20 27/4 32/12 40/6 48/16 52/22 53/9 55/8 65/8 87/2
**laid [1]** 52/14
**Lane [2]** 21/17 22/20
**language [2]** 28/2 28/4
**large [1]** 78/23
**Las [1]** 36/1
**Lauderdale [4]** 1/8 1/19 1/25 36/1
**LAURETI [19]** 1/7 3/7 3/8 3/12 3/18 3/24 4/19 4/20 4/21 19/4 42/20 44/15 44/19 44/25 64/19 72/14 73/17 76/11 78/17
**Laureti's [1]** 95/5
**law [11]** 16/14 34/17 35/4 36/18 38/16 41/17 42/21 43/8 43/14 67/4 83/16
**lawsuit [5]** 94/8 94/11 94/21 94/24 95/1
**Lawyer [1]** 63/7
**LD [5]** 71/8 71/8 72/2 72/3 74/11
**Leading [2]** 89/15 89/17
**learn [2]** 58/20 86/2
**learned [1]** 77/7
**lease [25]** 86/25 87/8 87/21 88/7 88/9 88/14 89/6 90/10 90/11 90/13 90/14 90/15 90/23 91/17 91/17 91/21 91/25 92/4 92/9 92/21 92/25 93/4 93/4 93/6 93/13
**leased [1]** 88/11
**leases [1]** 88/2
**leasing [3]** 88/2 88/5 93/14
**left [6]** 3/9 53/12 54/17 54/20 59/2 78/23
**legible [1]** 29/2
**legitimate [1]** 76/7
**lender [12]** 19/22 20/5 91/14 91/15 91/16 91/16 93/3 93/10 93/12 94/7 94/9 94/9
**lenders [2]** 17/6 18/5
**lending [20]** 17/3 17/4 17/8 18/3 20/3 20/10 27/6 27/9 36/10 45/19 45/24 60/9 60/10 60/16 62/18 71/7

**Leon [1]** 83/8
**letter [7]** 7/8 7/9 8/11 8/18 40/18 51/9 52/4
**letterhead [1]** 51/6
**letters [1]** 67/9
**letting [1]** 33/5
**liabilities [3]** 23/19 24/3 47/8
**liability [4]** 15/25 23/11 47/3 47/13
**license [3]** 5/25 6/1 6/3
**licensed [4]** 5/17 18/4 19/20 19/21
**licenses [2]** 5/24 18/7
**lien [2]** 94/16 94/17
**lienholder [1]** 94/9
**life [1]** 35/8
**light [1]** 55/11
**limitation [5]** 66/19 67/4 67/12 67/14 67/16
**limited [2]** 15/24 79/6
**line [13]** 16/22 16/24 17/1 17/21 40/13 40/13 49/22 49/23 50/13 57/2 57/5 78/17 78/18
**Line 505 [3]** 40/13 49/22 49/23
**Line 506 [1]** 40/13
**lines [2]** 78/19 78/24
**liquidity [2]** 78/18 79/11
**list [6]** 36/17 47/11 91/25 92/4 92/6 94/22
**listed [12]** 15/14 23/13 23/17 32/20 47/9 49/15 56/24 62/8 66/12 72/3 75/23 82/21
**listen [1]** 95/17
**litigation [2]** 85/9 93/20
**little [5]** 27/14 31/13 35/25 47/6 90/2
**live [2]** 4/3 4/4
**lived [1]** 4/6
**LLC [1]** 87/14
**loan [83]** 5/13 5/18 6/15 7/2 7/10 7/11 8/11 8/13 8/14 8/19 8/20 17/20 17/22 18/8 18/9 18/10 18/14 18/16 19/8 19/10 20/7 22/7 22/8 22/24 23/12 23/23 24/2 24/7 24/12 27/6 27/20 34/6 36/2 36/2 36/3 36/11 38/13 41/8 42/12 42/14 42/21 43/6 45/19 45/24 49/24 50/7 50/10 51/13 51/25 60/11 60/14 71/8

**73/13 73/16 73/18 73/21 75/13 86/24 87/4 87/5 87/10 87/10 87/11 87/12 88/12 88/17 88/22 88/24 89/13 89/21 89/22 92/15 92/17 93/22 93/23
**loan-to-value [1]** 36/3
**loans [4]** 18/2 37/25 38/3 84/9
**located [1]** 31/12
**long [6]** 4/6 5/15 6/3 31/19 59/16 90/6
**longer [6]** 50/15 50/17 56/24 57/13 57/15 95/9
**look [14]** 16/25 32/20 43/20 43/22 63/23 65/15 75/2 79/23 82/18 88/3 88/6 91/17 91/18 92/9
**looked [2]** 30/2 55/9
**looking [3]** 6/21 17/21 60/14
**looks [2]** 47/12 47/12
**lot [4]** 18/8 83/22 83/24 83/25
**low [2]** 10/9 36/2
**low-rise [1]** 10/9
**Luis [1]** 7/23
**lump [1]** 69/21
**luxury [3]** 6/9 6/19 12/6

**M**

**M-A-R-C-O [1]** 3/19
**mail [3]** 42/25 46/22 46/23
**making [3]** 42/21 55/24 61/24
**man [1]** 21/24
**managing [1]** 34/25
**manipulate [1]** 47/6
**marble [2]** 55/20 55/21
**March [2]** 23/8 64/17
**March 23 [1]** 64/17
**MARCO [8]** 1/7 3/12 3/18 4/20 64/19 72/14 73/17 76/10
**Marino [3]** 63/2 72/11 91/11
**Mark [2]** 46/6 47/14
**marked [2]** 9/8 63/22
**market [5]** 11/25 48/17 62/7 62/18 64/25
**married [4]** 4/14 58/14 58/16 58/18 58/21
**matter [2]** 64/5 96/5
**mean [7]** 10/20 13/14 18/23 55/16 55/19 69/24 94/21
**meaning [2]** 30/4

**means [3]** 5/5 18/24 80/1
**media [1]** 95/17
**meet [4]** 12/4 17/10 17/12 83/13
**Melian [20]** 49/1 55/4 55/5 56/2 57/9 57/12 58/4 58/7 58/21 59/1 59/5 59/8 59/14 59/22 59/24 60/1 61/21 61/24 73/25 83/13
**Melian's [5]** 48/25 49/4 54/23 56/12 56/16
**member [6]** 66/4 66/15 66/18 66/22 67/13 67/15
**Mercedes [4]** 59/14 59/15 74/1 74/2
**Mercedes-Benz [1]** 59/15
**met [5]** 12/3 12/7 12/12 58/15 81/10
**Miami [11]** 1/22 4/24 4/25 5/1 12/5 22/1 22/20 24/22 30/1 31/13 61/18
**Miami-Dade [1]** 31/13
**Michelle [46]** 25/24 25/25 26/3 29/18 29/19 29/20 30/5 30/25 34/10 37/20 38/4 38/5 39/21 40/18 41/2 43/13 50/5 50/6 50/9 51/2 52/9 53/7 55/2 67/1 67/11 69/16 69/18 70/7 70/16 70/17 70/19 70/22 70/23 70/25 71/1 71/2 71/3 71/4 81/4 81/8 81/9 82/9 83/4 83/17 83/17 84/13
**microphone [2]** 3/14 3/15
**mid [2]** 10/9 87/4
**mid-rise [1]** 10/9
**middle [3]** 4/20 31/18 85/14
**million [11]** 6/22 13/7 13/11 13/11 13/12 13/19 13/21 49/21 70/12 78/19 79/12
**million-five [1]** 13/7
**million-six [1]** 13/11
**million-two [1]** 70/12
**mind [3]** 44/11 59/17 95/20
**mine [1]** 69/20
**minute [1]** 44/10
**minutes [1]** 31/17
**mislead [2]** 93/3 93/10
**missing [1]** 72/11
**mistake [1]** 92/24
**moment [1]** 8/4
**moments [4]** 10/18

## M

moments... [3] 64/5
67/21 74/10
money [38] 7/19 8/2
12/23 12/25 13/23
26/23 37/12 37/15
37/15 38/16 40/24
41/1 50/19 50/22 51/3
53/18 53/22 53/25
54/5 54/6 54/7 54/7
54/10 54/12 54/17
54/19 54/20 54/22
55/2 57/18 57/25
58/25 59/1 59/2 67/3
70/9 88/4 94/12
monies [5] 7/16 33/16
53/11 57/6 57/24
month [12] 23/5 23/7
23/24 29/2 61/25 72/8
72/16 73/8 74/9 74/11
74/17 75/8
monthly [7] 23/15
23/17 28/25 36/14
36/17 47/25 72/3
months [1] 84/1
morning [1] 95/21
mortgage [17] 6/1
17/9 18/18 18/19
19/20 19/21 23/22
40/14 40/16 40/19
49/24 50/7 50/10
56/25 61/3 61/6 61/8
Mostelac [45] 12/3
12/4 12/7 12/12 12/16
13/25 14/3 14/4 15/19
16/15 21/2 21/3 21/5
24/5 24/9 24/20 24/23
25/15 26/2 26/4 26/7
28/1 28/2 28/10 28/15
28/18 29/17 30/5
31/16 31/25 32/2
32/17 34/8 35/22
53/12 54/2 54/4 54/6
54/7 54/10 56/3 58/14
59/6 81/14 84/13
Mostelac's [18] 15/22
16/2 25/13 26/20
28/15 31/22 32/2
33/18 45/13 50/14
50/17 51/17 57/7
57/10 57/13 57/22
61/20 91/7
mother [2] 56/4 57/10
mother's [1] 60/3
move [8] 9/14 15/2
43/19 55/14 64/8 88/8
88/15 88/16
moved [2] 91/19
93/25
moving [3] 60/4 70/1
70/4
MR [3] 2/3 57/7 71/21
Mr. [117]
Mr. Andrew [2] 22/14
22/22
Mr. Corzo [10] 26/14

26/20 26/20 29/1
29/15 29/19 30/12
31/25 34/6 73/25
Mr. Corzo's [2] 29/7
32/24
Mr. Cruz [1] 34/24
Mr. D'Agostino [2]
7/24 8/22
Mr. De [3] 36/4 37/4
41/24
Mr. Estop [4] 21/12
22/3 23/23 24/3
Mr. Felix [1] 35/21
Mr. Frizzie [29] 18/14
19/5 19/7 19/10 19/11
19/17 22/5 22/24
23/12 24/1 27/8 28/4
28/6 28/14 28/20
29/10 34/5 37/19 38/1
44/1 47/16 62/5 71/18
72/4 72/15 72/22 73/7
75/6 77/9
Mr. Galen [3] 48/3
48/22 62/20
Mr. Garvin [4] 3/5
3/21 3/25 44/22
Mr. Jorge [2] 34/13
42/8
Mr. Laureti [8] 3/7 3/8
3/24 19/4 42/20 44/15
44/19 44/25
Mr. Laureti's [1] 95/5
Mr. Melian [2] 61/24
73/25
Mr. Melian's [1] 56/16
Mr. Mostelac [29]
12/12 12/16 14/3 14/4
21/2 21/3 21/5 24/5
24/9 24/23 25/15 26/4
26/7 28/1 28/2 28/10
28/15 28/18 29/17
31/25 32/17 34/8 54/2
54/4 54/6 54/7 54/10
58/14 84/13
Mr. Mostelac's [13]
15/22 16/2 25/13
26/20 28/15 45/13
50/14 50/17 51/17
57/10 57/13 61/20
91/7
Mrs. [1] 49/2
Mrs. Ramirez's [1]
49/2
Ms. [6] 45/7 45/10
45/13 45/21 49/17
57/12
Ms. Eneida [4] 45/7
45/10 45/13 49/17
Ms. Ramirez [2] 45/21
57/12
MSJ [5] 82/1 82/2 82/4
82/20 83/4
municipality [2] 66/5
66/16
Mutual [2] 18/18 65/5

## N

name [33] 3/16 3/16
3/18 3/19 4/19 6/16
16/18 21/9 21/20
26/12 26/12 26/19
27/23 30/17 30/19
32/1 34/14 34/16
34/21 41/18 42/8
47/18 50/20 52/23
56/16 56/21 58/12
58/17 72/13 73/16
81/12 81/13 85/10
named [4] 94/2 94/8
94/21 95/1
names [1] 4/18
Naples [1] 7/3
National [1] 85/10
Nautilus [1] 4/24
necessary [1] 32/14
need [2] 3/14 84/21
needed [4] 28/14
55/14 63/12 85/16
negotiated [1] 8/16
never [7] 58/9 76/12
81/11 86/23 88/11
91/18 91/19
new [9] 22/7 22/7
63/15 76/22 88/22
90/3 91/14 91/14
91/14
newspaper [3] 34/19
34/21 35/25
newspapers [1] 35/1
nice [1] 59/18
non [3] 66/3 66/15
67/5
non-interested [3]
66/3 66/15 67/5
nonprofit [2] 66/5
66/16
normal [2] 31/14
80/10
north [2] 4/23 31/13
Northview [9] 15/14
15/17 20/2 32/21 40/3
40/10 40/15 51/6 52/1
northwest [1] 31/13
Norvis [3] 58/19 58/24
59/3
notice [1] 40/13
noticed [1] 73/24
November [2] 1/8
96/6
number [23] 5/23 20/3
20/4 27/13 27/15
27/16 27/18 27/19
28/22 33/23 33/23
42/14 52/19 60/12
60/15 60/18 60/19
60/21 60/22 61/2
61/13 68/20 82/19
numbers [3] 13/4
51/19 76/22

## O

o'clock [5] 29/23

95/21
oath [1] 44/20
Object [1] 79/16
objection [10] 9/16
15/4 15/7 18/25 38/18
39/15 64/10 87/18
89/17 89/23
observe [1] 43/13
observed [1] 43/16
obtained [4] 7/2 7/10
8/14 17/20
occasion [5] 19/11
21/3 52/25 56/24
71/19
occasions [1] 59/22
occupation [4] 5/2
17/4 17/7 63/6
occurred [2] 14/2
29/15
occurring [1] 19/4
offer [1] 14/6
offered [3] 12/18 14/4
16/25
office [6] 30/1 85/19
85/21 85/25 86/1
90/24
Official [1] 1/24
Oh [1] 71/16
oil [1] 12/9
okay [24] 8/22 20/21
33/17 39/13 39/15
44/4 53/14 54/16
56/20 61/8 61/19
62/24 65/15 66/7
67/15 69/7 84/11
84/17 87/15 88/1
88/10 88/19 90/25
91/13
Olas [1] 36/1
old [2] 4/12 84/3
oldest [1] 84/2
Olsen [4] 69/2 69/3
69/6 69/12
once [6] 45/17 49/10
57/12 70/12 76/25
95/16
open [3] 39/16 44/11
95/20
opinion [1] 39/10
opportunity [2] 37/14
53/6
option [46] 9/1 9/20
9/21 9/23 10/1 10/2
10/19 11/17 11/23
12/15 12/17 12/21
12/24 12/25 13/2
13/16 14/4 14/5 14/6
15/11 15/20 16/4 16/6
16/15 33/2 33/5 33/12
33/16 33/24 40/7
47/23 50/12 50/14
50/17 51/17 51/17
51/23 53/19 54/13
54/14 54/16 54/16
57/6 57/19 57/22

30/6 63/20 85/18
95/21
options [1] 9/3
orally [1] 79/11
order [5] 10/18 38/24
44/13 55/14 85/16
organization [2] 66/5
66/16
original [6] 10/6 77/4
77/5 77/5 77/15 77/23
Orion [7] 7/3 7/9 7/10
7/12 8/6 8/12 8/14
OS [1] 67/25
Oscar [3] 84/15 84/19
84/23
outs [3] 55/12 57/24
59/12
outside [1] 83/13
overhead [1] 87/9
overrule [1] 87/22
overstating [1] 79/15
owed [3] 8/1 12/23
37/8
Owens [1] 65/17
owned [2] 52/9 71/2
87/14
owner [3] 30/24 60/22
68/23
ownership [2] 33/8
33/9

## P

p.m [6] 3/3 31/6 31/22
44/12 44/17 95/22
Pacific [1] 85/10
page [7] 2/2 47/3
66/12 68/2 70/1 72/2
77/11
Page 2 [1] 72/2
pages [1] 77/9
paid [5] 32/18 35/25
94/20 94/22 94/23
Palm [1] 80/18
papers [1] 43/18
paperwork [1] 86/6
part [5] 12/21 26/8
33/23 89/12 92/24
participant [1] 66/1
particular [7] 10/5
31/8 57/7 62/20 85/7
86/5 87/10
parties [3] 12/1 66/3
66/15
partner [1] 66/4
partners [2] 8/3 59/6
party [4] 33/5 65/24
67/5 88/10
pay [8] 8/4 15/19
35/13 57/25 70/5
80/21 80/24 81/23
payment [2] 37/24
40/23
payoff [6] 40/14 40/18
49/24 51/9 51/14
56/25
PE [3] 51/6 51/8 51/25
Pedro [19] 48/25 49/1

**Pedro... [17]** 49/4 55/4 55/5 56/2 56/11 58/4 58/7 58/21 59/1 59/5 59/8 59/14 59/22 59/24 60/1 61/21 83/13
**pending [1]** 93/20
**penthouse [8]** 46/1 49/19 50/7 52/1 55/7 55/9 55/10 56/4
**penthouses [2]** 10/23 13/13
**people [4]** 11/11 30/4 34/25 88/21
**percent [18]** 14/5 14/15 15/20 16/5 16/7 20/1 33/7 33/8 33/9 33/24 54/14 57/22 63/18 67/17 67/17 67/22 70/7 70/8
**percentage [2]** 16/3 16/6
**period [8]** 8/19 20/13 34/18 34/23 35/2 41/24 71/18 75/5
**periods [1]** 35/10
**person [10]** 16/18 24/12 35/24 44/25 56/12 58/12 58/17 76/25 81/3 93/19
**personal [4]** 20/7 87/9 87/10 92/6
**personally [1]** 5/19
**pertained [1]** 85/9
**PH [2]** 45/17 46/12
**phoney [1]** 79/14
**phrased [1]** 19/2
**physically [1]** 50/2
**Piccolo [3]** 84/15 84/19 84/23
**picked [1]** 90/24
**piece [6]** 20/17 32/8 45/25 46/3 49/18 80/18
**place [7]** 31/2 31/2 48/20 58/20 61/15 62/11 83/23
**placed [5]** 11/12 49/6 50/13 57/14 57/15
**plain [1]** 65/2
**Plaintiff [1]** 1/5
**please [23]** 3/4 3/9 3/13 3/13 3/16 4/3 6/12 6/25 16/20 18/20 21/23 31/1 40/13 44/16 44/18 48/16 52/22 53/9 55/8 65/7 65/22 87/2 90/9
**plus [2]** 13/11 13/12
**point [26]** 6/6 6/8 6/9 6/10 6/13 6/14 6/20 7/2 7/13 7/22 8/6 8/12 8/13 8/23 9/23 10/7 20/25 30/19 35/18 39/8 44/5 72/3 86/14

**pointed [1]** 83/6
**Ponce [1]** 83/8
**poorly [1]** 29/1
**Popular [2]** 34/22 34/24
**Porsche [2]** 74/4 74/5
**portion [1]** 78/12
**position [3]** 8/1 40/16 94/15
**possession [1]** 92/8
**pre [1]** 10/22
**pre-sold [1]** 10/22
**preconstruction [5]** 11/3 11/5 13/3 13/6 13/19
**preferential [1]** 18/6
**preferred [1]** 69/21
**pregnant [1]** 84/1
**preparation [1]** 48/21
**prepare [8]** 22/24 52/4 52/12 76/9 76/9 78/4 79/19 89/12
**prepared [12]** 23/12 24/3 36/15 48/22 50/4 51/9 62/18 74/10 74/23 75/6 76/12 89/21
**preparing [1]** 78/13
**present [4]** 30/9 43/11 44/15 49/3
**presented [2]** 7/13 7/16
**pretty [4]** 10/21 11/3 43/17 55/10
**previous [2]** 23/4 89/12
**price [4]** 13/6 13/19 24/25 49/20
**prices [1]** 13/3
**primarily [2]** 5/6 7/22
**principals [2]** 6/14 6/20
**printed [1]** 31/21
**prior [2]** 70/4 88/11
**Probably [2]** 20/16 31/20
**problem [3]** 81/1 85/3 85/6
**proceedings [5]** 3/2 38/22 39/16 95/24 96/4
**proceeds [1]** 25/2
**process [2]** 12/13 87/7
**processed [3]** 24/12 41/9 75/13
**processing [3]** 20/4 72/25 73/3
**produce [1]** 85/13
**produced [1]** 77/17
**Professional [1]** 96/2
**prohibition [1]** 19/23
**project [5]** 6/15 6/16 6/18 6/18 6/21
**projects [1]** 5/7 5/8

**property [24]** 21/8 22/15 22/19 22/21 23/23 32/9 33/2 45/25 46/2 46/3 49/4 49/18 62/10 62/12 63/1 63/4 68/7 73/14 80/18 87/14 91/23 91/24 93/1 93/15
**prosecution [1]** 83/6
**prove [2]** 39/9 39/10
**provide [2]** 71/24 90/3
**provided [2]** 67/18 68/5
**providing [1]** 93/4
**public [1]** 82/20
**pull [1]** 3/13
**purchase [21]** 9/1 9/21 9/21 10/2 10/5 11/20 12/20 13/16 14/4 15/12 24/25 25/16 33/5 35/18 36/5 47/17 49/20 59/9 63/8 63/13 91/10
**purchased [8]** 20/24 22/21 23/23 24/9 31/16 54/1 54/8 63/2
**purchaser [1]** 49/15
**purchasers [1]** 45/10
**purchases [1]** 22/2
**purchasing [2]** 12/18 91/7
**purported [1]** 52/19
**purportedly [1]** 52/23
**purports [1]** 75/19
**purpose [2]** 56/7 59/10
**purposes [2]** 9/9 63/23
**pursuant [1]** 53/19
**put [18]** 18/21 29/10 43/17 49/3 50/9 50/19 55/14 55/21 69/21 70/7 76/22 78/2 79/21 79/22 86/6 86/17 92/18 93/19
**putting [4]** 37/24 43/5 55/19 88/4
**PV [1]** 49/10

**Q**

**QP [1]** 60/8
**Quadrant [7]** 88/23 89/6 89/13 89/21 91/15 92/2 92/5
**Quadrant's [2]** 89/7 92/8
**quarter [1]** 18/16
**question [3]** 10/12 79/16 93/7
**questions [1]** 80/16
**quite [2]** 19/15 63/24
**quote [1]** 9/23
**quote/unquote [1]** 9/23

**R-N [1]** 56/14
**Raise [1]** 3/11
**raised [2]** 28/6 93/17
**ramification [2]** 92/11 92/13
**Ramirez [25]** 44/4 45/1 45/2 45/4 45/7 45/10 45/13 45/21 45/22 46/2 46/3 47/1 47/25 48/8 48/10 48/13 49/1 49/17 50/2 50/4 54/25 57/9 57/12 59/1 62/13
**Ramirez's [4]** 47/9 49/2 49/7 62/15
**RANDALL [1]** 1/17
**ranged [1]** 13/7
**read [13]** 18/20 21/21 21/25 27/4 27/15 41/6 48/1 48/16 49/23 52/22 65/17 65/22 95/17
**reading [2]** 18/20 18/23
**ready [1]** 55/12
**real [6]** 5/3 5/7 5/25 12/5 66/1 87/12 87/15 87/17
**really [3]** 53/15 59/18 94/15
**Realtime [1]** 96/3
**Realty [3]** 68/13 68/16 68/24
**reason [2]** 26/22 43/24
**recall [5]** 6/4 11/15 60/18 78/13 81/3
**recalled [1]** 32/1
**receive [3]** 28/18 41/8 68/15
**received [13]** 2/6 9/17 9/18 15/8 15/9 16/24 20/20 46/20 57/18 64/11 64/12 67/10 76/16
**receives [1]** 76/25
**receiving [2]** 69/19 82/16
**recess [1]** 95/5
**recognize [13]** 9/9 14/21 24/16 26/12 26/19 27/2 36/8 45/17 49/10 49/11 60/9 63/25 67/25
**recollection [1]** 30/10
**reconvene [1]** 95/10
**record [3]** 3/17 44/14 82/20 96/4
**records [4]** 17/24 30/2 42/12 61/16
**recover [1]** 94/10
**reduces [2]** 66/2 66/13
**refer [2]** 19/11 19/14
**referral [4]** 12/12

**referrals [1]** 20/10
**referred [4]** 18/14 19/15 19/15 64/4
**referring [5]** 9/12 9/22 14/25 15/12 33/1
**refi [1]** 18/18
**refinance [1]** 87/4
**reflect [2]** 44/14 49/25
**reflected [1]** 42/18
**reflecting [2]** 75/8 75/10
**regard [6]** 34/1 40/7 41/1 42/24 71/14 78/12
**regarding [8]** 14/8 25/15 38/12 46/24 47/1 53/16 85/13 95/15
**Registered [1]** 96/2
**relate [3]** 26/23 45/21 61/6
**related [1]** 61/7
**relates [2]** 45/24 64/1
**relating [1]** 77/20
**relation [1]** 49/1
**relationship [3]** 35/2 35/4 84/14
**relevance [2]** 87/18 87/19
**reliance [2]** 38/24 39/1
**relied [2]** 39/11 71/5
**rely [4]** 38/8 39/23 70/17 70/19
**remain [2]** 3/11 57/13
**remember [5]** 5/23 24/24 44/10 83/15 95/13
**remind [1]** 44/19
**remodeling [3]** 63/14 65/13 88/4
**remotely [1]** 58/10
**rendered [1]** 39/10
**renegotiate [1]** 8/15
**rent [2]** 91/21 91/21
**rented [1]** 91/18
**renting [1]** 91/23 91/24
**repayment [2]** 37/15 37/17
**repeat [2]** 10/12 93/7
**rephrase [1]** 32/7
**reply [6]** 38/6 38/8 38/8 38/15 39/18 39/21
**reported [2]** 28/25 74/7 95/16
**Reporter [4]** 1/23 1/24 96/2 96/3
**represent [6]** 33/15 40/11 40/15 42/20 46/3 79/10
**representation [1]** 14/11
**representations [1]**

**R**

representations... [1] 14/8
represented [3] 18/3 42/23 44/15
representing [1] 77/10
reputable [1] 12/5
request [3] 28/14 41/7 86/25
research [1] 95/19
resell [1] 13/2
residential [17] 5/10 5/13 5/18 17/6 20/3 23/12 24/2 27/6 34/6 36/10 37/25 38/3 45/19 60/10 64/25 70/24 71/7
resolved [3] 8/23 8/25 9/1
restriction [2] 41/3 70/13
result [3] 11/10 14/2 52/16
resulted [1] 20/10
return [1] 55/2
reviewing [1] 58/25
right [27] 3/4 3/8 3/11 4/13 10/18 10/25 33/12 33/20 35/13 39/12 40/8 41/18 44/14 44/18 66/9 72/9 74/1 75/10 76/14 76/17 78/15 78/20 79/24 87/22 88/24 90/9 95/4
right-hand [1] 78/20
rise [2] 10/9 10/9
RMR [2] 1/23 96/8
RN [1] 56/13
Road [4] 21/15 22/1 22/15 23/4
round [1] 13/4
running [1] 84/3
rush [1] 31/19
rush-hour [1] 31/19

**S**

S55 [1] 59/14
Sabor [3] 83/8 83/11 83/13
sale [2] 10/22 32/25
sales [1] 5/10
San [3] 63/2 72/11 91/11
saw [9] 32/1 37/7 59/8 59/9 59/22 59/24 62/12 69/15 89/7
saying [1] 82/25
says [17] 9/20 9/21 15/24 21/23 22/7 27/13 40/14 48/2 49/24 58/7 61/24 65/16 68/12 76/4 76/10 78/17 78/18
school [2] 4/22 4/23

86/16 86/16
screen [1] 74/13
seated [3] 3/4 3/13 44/18
second [9] 18/15 18/18 40/14 49/24 50/6 50/10 56/21 56/25 64/22
section [2] 23/11 48/13
secure [2] 6/14 8/20
securing [1] 8/19
security [1] 42/3
see [67] 15/5 18/12 22/7 23/13 23/15 23/19 23/22 25/6 26/14 27/11 27/13 27/14 27/16 27/23 29/3 29/5 30/15 30/17 30/22 32/21 33/17 37/1 40/3 40/10 40/10 42/6 42/8 42/12 42/14 42/16 46/12 46/17 47/4 48/5 48/14 48/21 52/17 52/19 56/14 56/16 56/21 57/7 59/8 59/10 59/13 60/12 60/15 61/4 61/25 64/14 68/2 68/13 71/8 72/4 72/20 73/14 75/12 75/17 75/23 76/2 76/4 76/14 78/16 78/19 79/23 86/18 95/21
seeking [4] 16/22 16/22 94/12 95/2
seen [3] 26/16 68/9 95/18
sell [3] 12/1 13/1 80/18
seller [13] 30/19 63/4 63/13 63/16 63/17 63/19 64/21 65/19 65/25 66/8 67/19 69/20 80/21
send [4] 17/24 56/2 61/12 82/23
sender [1] 76/23
sending [1] 65/3
Senior [2] 4/24 4/25
sent [4] 64/16 64/18 76/13 82/25
sentence [3] 18/21 90/5 90/7
sentences [1] 65/22
Service [1] 83/4
Services [4] 82/1 82/2 82/4 82/20
set [4] 20/3 35/7 35/8 83/11
settlement [7] 30/21 31/2 49/14 49/15 56/19 56/20 56/21
seven [1] 84/1
sharing [1] 81/15

shop [1] 83/8
shop [1] 83/8
shopped [1] 8/14
shopping [1] 18/15
show [15] 10/14 27/1 27/10 27/23 30/14 36/7 42/5 42/11 45/16 48/13 60/8 61/19 73/13 75/16 78/15
showed [3] 32/6 32/8 69/22
showing [25] 9/8 9/20 14/20 18/11 21/19 22/18 23/11 24/15 28/25 32/12 37/10 37/11 40/2 41/5 46/12 47/3 49/9 49/22 51/5 51/8 56/13 63/22 64/14 67/24 78/1
side [3] 78/2 78/2 78/20
sidebar [1] 38/20
sign [13] 43/8 43/18 43/18 43/18 43/19 48/7 52/6 71/11 72/18 72/22 84/4 90/13 90/13
signatory [1] 83/5
signature [7] 14/23 15/22 36/24 41/13 51/11 52/6 62/22
signed [13] 16/3 22/10 22/12 23/2 23/4 23/7 46/13 74/11 77/21 90/15 90/23 92/1 92/5
silver [1] 59/14
similar [2] 83/20 83/22
simply [2] 79/1 80/12
single [3] 21/24 58/14 78/21
sir [47] 4/3 4/6 4/12 4/22 5/12 9/10 9/20 10/16 21/20 23/11 24/17 25/6 26/11 27/11 27/24 29/13 31/21 32/22 34/18 35/6 36/22 39/18 41/6 44/6 44/23 48/14 48/21 49/9 50/12 56/11 57/9 58/12 59/5 60/14 62/24 71/9 72/5 73/7 76/7 79/1 79/21 82/2 84/7 90/5 90/6 92/23 95/7
sit [3] 29/17 84/5 84/7
sitting [1] 85/12
six [3] 13/11 47/12 60/18
slant [1] 80/3
slightly [1] 80/4
smaller [2] 4/20 13/10
socially [1] 26/16
sold [7] 10/10 10/22 10/25 11/2 11/3 11/5

somebody [1] 76/9
son [3] 49/2 57/10 57/12
sorry [11] 10/12 13/16 23/10 33/9 51/1 54/3 69/8 71/16 73/1 89/16 93/5
sort [1] 18/6
source [1] 29/10
South [6] 1/21 4/6 4/7 31/3 31/11 31/15
Southeast [2] 87/14 91/2
SOUTHERN [1] 1/1
space [5] 78/16 78/19 78/20 78/24 79/6
spaced [1] 78/21
Spain [1] 59/3
Spaniard [2] 12/11 28/10
Spanish [2] 28/3 28/10
speculation [4] 19/1 89/24 90/6 90/6
spell [1] 3/16
spelled [1] 3/19
spin [1] 86/17
split [2] 19/18 35/22
splitting [1] 19/23
spoke [4] 11/25 12/17 81/3 81/14
spoken [2] 45/4 80/25
spread [22] 13/2 13/14 13/15 13/16 13/20 40/8 40/12 40/21 40/23 41/1 47/23 50/12 50/14 50/17 51/17 51/17 51/23 53/19 54/16 54/16 57/19 81/19
stack [1] 43/18
stake [1] 94/5
stand [1] 3/9
standing [1] 3/11
start [2] 78/4 78/8
started [3] 4/23 26/17 45/2
state [2] 3/16 51/13
stated [1] 31/25
statement [9] 32/6 32/8 39/3 49/14 49/16 56/19 56/20 56/22 92/7
states [5] 1/1 1/4 1/18 18/4 23/19
stating [1] 40/19
step [1] 3/9
STEWART [1] 1/18
stickies [1] 43/19
straight [1] 80/10
straw [1] 30/12
streets [1] 26/16
strike [1] 75/15
structured [1] 5/6
stuck [1] 59/16
study [2] 84/5 84/7

subject [3] 64/20 65/19
sublease [2] 88/9 91/19
submit [1] 92/25
submitted [3] 72/24 73/2 91/18
submitting [1] 20/5
subsequent [1] 84/10
substance [2] 77/20 95/15
substantial [1] 20/17
successful [6] 6/23 16/23 19/10 60/24 91/23 91/24
sufficient [2] 11/19 11/24
suggest [1] 79/4
suggested [2] 87/7 88/1
Suite [2] 1/21 31/3
sum [1] 69/21
summer [1] 18/17
Sunbiz [1] 82/18
Sunny [1] 4/4
Sunset [6] 24/10 24/22 25/16 26/4 31/16 91/8
superior [1] 39/23
supervising [1] 17/9
supply [5] 25/22 36/22 48/3 62/2 62/4
supplying [1] 25/20
supporting [2] 46/21 46/23
supposed [3] 68/15 68/18 81/17
sure [1] 72/9
suspect [1] 43/24
sustained [4] 19/2 79/17 89/18 89/25
SWORN [1] 3/12

**T**

table [1] 58/7
take [6] 11/22 31/2 33/22 44/5 44/10 65/15
taken [1] 57/25
talk [12] 5/12 26/22 34/13 35/10 55/4 56/20 64/22 67/15 71/11 78/3 84/10 93/17
talked [1] 53/10
talking [5] 33/7 55/16 55/19 55/20 56/12
tampered [1] 79/5 79/9
tampering [2] 79/6 79/8
taxes [1] 82/11
telephone [2] 30/2 61/16
tell [33] 4/3 5/5 5/9 5/24 6/8 6/12 6/25

**tell... [26]** 16/20 18/1
19/7 21/23 31/1 35/24
36/14 41/2 50/6 53/9
53/16 56/2 60/1 63/24
65/2 69/6 69/18 72/7
72/15 81/6 82/13
84/19 84/23 90/9 92/8
93/12
**Temecula [3]** 87/6
88/12 88/21
**ten [1]** 32/1
**tenant [1]** 92/25
**tend [1]** 80/3
**terms [2]** 8/15 8/16
**testified [1]** 45/5
**testify [1]** 3/7
**testimony [1]** 95/6
**Thank [1]** 44/8
**thing [7]** 13/22 40/7
47/20 64/24 71/11
76/24 92/9
**things [8]** 35/9 64/25
65/1 79/7 83/23 83/24
83/25 93/17
**think [7]** 4/13 19/15
39/12 42/3 59/20 68/9
83/16
**thinking [1]** 60/4
**third [3]** 12/1 33/5
88/10
**thought [3]** 12/13
12/14 88/2
**three [13]** 4/17 13/11
13/12 16/9 16/11
16/15 49/21 81/18
82/6 82/7 82/8 82/13
82/16
**Three million-eight [1]**
49/21
**three-million [2]**
13/11 13/12
**throw [1]** 58/6
**thrown [2]** 85/22
85/24
**Thursday [1]** 18/12
**tie [1]** 87/20
**tile [1]** 55/19
**time [71]** 3/6 5/17 8/16
9/14 11/8 11/11 11/20
14/3 15/2 16/23 18/13
18/15 18/16 19/4
19/17 19/20 19/21
20/21 24/1 24/5 24/9
25/11 26/6 26/11 27/8
28/6 29/8 29/23 29/25
30/6 34/18 34/23 35/3
35/8 35/10 35/11
35/15 35/18 41/24
45/4 45/8 48/5 50/16
52/14 55/9 57/9 58/14
59/5 59/16 59/20 60/2
60/6 61/15 64/8 71/18
75/5 75/12 76/24 78/3
81/9 81/14 82/11 83/3
84/12 84/14 84/19

**title [10]** 27/5 30/21
30/24 52/8 52/11
52/24 52/25 65/19
65/23 71/2
**today [1]** 95/6
**told [16]** 8/3 12/23
30/12 38/24 40/6
53/23 55/6 55/21 56/3
60/3 69/19 70/17 88/3
88/6 88/7 91/17
**tomorrow [2]** 95/10
95/21
**top [6]** 9/21 27/10
28/22 60/12 60/15
76/13
**total [11]** 20/9 20/9
20/12 20/13 23/15
23/17 42/18 47/8 77/9
78/18 81/20
**track [3]** 20/9 60/21
61/1
**tracked [1]** 61/2
**traffic [2]** 31/15 31/19
**transaction [10]** 21/17
37/4 39/25 42/24 53/1
66/2 66/2 77/21 80/25
92/23
**transactions [9]** 5/21
5/21 20/22 21/6 21/9
21/12 21/15 80/15
84/13
**transcribed [3]** 3/2
93/22 95/24
**transcript [2]** 1/12
96/4
**translate [2]** 28/11
28/12
**Translating [1]** 28/17
**traveled [2]** 89/3 89/6
**treatment [1]** 18/7
**trial [5]** 1/12 39/4
68/10 89/7 95/18
**tried [2]** 11/25 29/24
**trigger [1]** 8/18
**trouble [1]** 8/3
**true [3]** 29/8 78/9
78/11
**trusted [1]** 84/9
**try [4]** 11/22 17/18
91/20 91/21
**trying [5]** 19/8 39/2
39/9 39/10 91/2
**TS [1]** 24/22
**TS-3 [1]** 24/22
**turn [3]** 26/11 28/19
44/4
**turned [2]** 77/9 86/7
**turning [2]** 62/7 72/2
**two [25]** 13/3 13/6
16/9 20/4 21/12 23/10
31/20 43/24 64/24
65/1 65/22 70/12
74/18 74/20 75/6 78/1
78/19 78/24 79/2 84/3

**type [13]** 13/12 17/4
17/5 17/7 41/2 45/18
49/11 49/13 55/16
56/18 75/25 80/10
87/11

**U**

**U.S [1]** 1/14
**Uhm [3]** 4/9 20/19
68/4
**ultimately [4]** 10/10
11/16 12/2 14/15
**understand [1]** 52/9
**understanding [8]**
12/7 15/25 16/8 16/10
57/4 65/1 67/7 67/9
**understated [1]** 24/3
**Uniform [12]** 5/12
5/18 23/12 24/2 27/6
34/6 36/10 43/5 45/19
60/10 71/7 73/13
**unit [25]** 10/5 10/9
10/19 12/19 12/20
13/1 13/1 13/2 13/4
13/8 13/12 13/17
13/18 32/25 35/18
35/21 35/25 46/5 46/7
49/19 59/9 59/25 60/4
61/22 81/21
**UNITED [3]** 1/1 1/4
1/18
**units [29]** 9/1 10/3
10/7 10/10 10/22
11/16 11/18 11/19
11/20 11/23 11/24
12/1 12/17 13/3 13/5
13/10 13/23 14/9
14/12 14/13 16/8 16/9
16/9 16/9 16/10 16/11
16/16 20/24 81/18
**University [3]** 4/25
31/3 31/9
**Unpaid [1]** 23/19
**unquote [1]** 9/23
**unrelated [2]** 84/12
84/13
**unsigned [1]** 68/6
**upgrades [2]** 55/14
65/13
**upgrading [1]** 63/14
**use [5]** 8/9 13/4 26/8
70/13 86/15
**usual [1]** 95/10
**utilize [1]** 40/23
**utilized [1]** 65/9

**V**

**Valley [3]** 87/6 88/12
88/21
**value [7]** 13/8 36/3
48/17 49/3 62/7 62/8
62/16
**vehicle [1]** 59/13
59/20

**verified [1]** 41/17
**verify [2]** 41/15 41/15
**view [1]** 94/5
**viewed [1]** 45/13
**visit [1]** 24/23
**volume [1]** 18/8

**W**

**Wachovia [1]** 78/17
**waiting [2]** 29/18
**wake [1]** 95/11
**WAMU [6]** 18/22 19/5
19/8 25/20 44/2 67/10
**wamu.net [1]** 65/18
**want [15]** 5/12 27/10
27/23 34/13 40/2
48/13 60/8 61/19 71/7
71/11 73/24 78/15
80/16 81/8 84/10
**wanted [7]** 10/24
12/21 16/13 56/4 56/5
59/12 65/4
**Washington [2]** 18/18
65/5
**watch [1]** 95/17
**watching [1]** 90/19
**water [1]** 36/1
**waterfront [1]** 12/6
**way [6]** 26/7 35/8
36/20 58/13 77/1 77/4
**ways [1]** 35/7
**we've [3]** 68/9 72/9
80/15
**welcome [1]** 44/9
**well [16]** 19/17 24/5
36/8 36/14 37/14
58/12 71/21 74/3 78/8
79/8 84/1 85/22 90/2
90/22 91/20 93/21
**went [13]** 4/23 4/24
4/24 4/25 11/25 55/4
59/2 59/3 60/16 87/20
88/12 88/18 89/4
**West [2]** 48/20 62/11
**wife [5]** 84/1 86/3 88/3
88/15 93/13
**windows [2]** 63/15
63/15
**wire [3]** 42/25 51/2
54/10
**wired [11]** 50/22
50/24 50/25 51/3 53/5
53/11 54/3 54/7 54/17
54/23 54/23
**wish [1]** 38/20
**withdraw [1]** 39/14
**withdrawn [1]** 39/15
**withhold [3]** 19/5
38/12 44/1
**withholding [1]** 19/7
**witness [4]** 2/2 3/5 3/9
86/8
**witnessed [1]** 83/17
**wood [1]** 55/21
**word [3]** 13/14 80/3

**words [1]** 65/3
**work [5]** 17/2 27/8
88/21 90/17 92/9
**worked [2]** 35/13
41/17
**world [1]** 36/20
**worry [1]** 84/23
**worth [2]** 13/17 13/18
**write [4]** 7/24 34/5
81/23 81/25
**writing [1]** 7/4 7/6 9/6
79/10
**written [5]** 7/14 7/17
7/19 14/18 70/12
**wrong [2]** 34/5 43/25
**wrote [1]** 82/4

**Y**

**yeah [2]** 23/10 47/12
**year [7]** 8/19 11/15
42/19 42/22 43/23
84/2 89/1
**years [9]** 4/8 4/10 4/11
13/3 13/6 32/1 35/15
43/24 84/3
**you if [1]** 18/12

**Z**

**zero [3]** 20/4 41/23
94/25
**zoom [3]** 45/17 47/6
49/10